**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Fred Stevens
Brendan M. Scott

*Proposed Attorneys for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re                                                          :
                                                               :    Chapter 11
ADVANCED CONTRACTING SOLUTIONS LLC,  :
                                                               :    Case No. 17-13147 (SHL)
                      Debtor.                           :
---------------------------------------------------------------x

**DECLARATION OF JEFFREY T. VARSALONE, CHIEF
RESTRUCTURING OFFICER OF ADVANCED CONTRACTING
SOLUTIONS LLC, CONTAINING INFORMATION REQUIRED
PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN
SUPPORT OF THE DEBTOR'S FIRST DAY MOTIONS**

Jeffrey T. Varsalone, make this declaration pursuant to 28 U.S.C. § 1746:

1. I am the Chief Restructuring Officer (the "CRO") of Advanced Contracting Solutions, LLC doing business as ACS-NY LLC, the above-captioned debtor and debtor in possession ("ACS" or the "Debtor"), which filed a voluntary Chapter 11 petition on November 2, 2017 (the "Petition Date"). On October 26, 2017, ACS determined to employ CBIZ Corporate Recovery Services ("CBIZ"), to provide a chief restructuring officer and related support to ACS to assist it in its financial and operations restructuring, and I was thereafter designated CRO.

2. I submit this affidavit (the "Affidavit") in accordance with Local Bankruptcy Rule ("LBR") 1007-2.

3. I confirmed with ACS's proposed counsel, Klestadt Winters Jureller Southard & Stevens, LLP ("KWJSS"), that it performed a PACER search which revealed that no other or prior bankruptcy case was filed by or against ACS. No committee of unsecured creditors was organized prior to the order for relief in ACS's Chapter 11 case.

4. Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis.

5. I have reviewed the voluntary petition and all documents filed in connection therewith and I am generally familiar with the facts alleged and relief requested therein. The information contained in this Affidavit is based upon (i) my review or the review of supporting personnel of certain books and records of ACS; (ii) discussions and information furnished by ACS's principals, officers and employees; and (iii) my opinion based upon my experience and knowledge with respect to the restructuring of entities like ACS.

**I.  ACS**

6. ACS was founded by Eoin Moriarty in July 2013 as an open-shop concrete foundation and concrete super-structure contractor. Since inception, ACS has completed over $250 million in work within the five boroughs of New York City. Its clients are some of the most prominent and reputable property developers in the area.

7. ACS was founded upon quality, experience, impeccable references, and best-of-class staffing and services. ACS's construction services are performed by a staff of team-oriented individuals who share the common goal of exceeding the expectations of ACS's clients. ACS uses leading-edge construction technology combined with hard work to realize its clients' goals and expectations. ACS delivers value through meticulous planning and strong plan execution and maintains a commitment of excellence, client satisfaction, and high value.

8.     The key to ACS's success is rooted in its project supervision, which has quickly earned an excellent reputation in the marketplace for quality and client satisfaction.

9.     ACS has grown from a nascent idea in 2013 to a significant construction company that currently employs approximately four hundred fifty (450) employees and as many as seven hundred people, during peak times.

10.     ACS is currently engaged on fifteen (15) construction jobs across New York City. Estimated future revenues from ACS's ongoing jobs is approximately $100,000,000.

   a.   Debtor's Ownership and Management.

11.     ACS was formed as a Delaware Limited Liability Company on July 16, 2013. Shortly after founding ACS, Moriarty recruited his close friend, William O'Donnell ("O'Donnell"), to join him.

12.     Moriarty and O'Donnell indirectly own 100% of the Debtor's membership interests. The Debtor's members are TMG Solutions, LLC ("TMG"), which is wholly owned by Moriarty, and WOD Solutions, LLC ("WOD"), which is wholly owned by O'Donnell. TMG and WOD each own 50% of the Debtor's membership interests.

13.     Moriarty serves as ACS's co-President and Chief Executive Officer. O'Donnell serves as co-President and General Superintendent. David McGrath serves as the Chief Estimator. John Kuefner is the Director of Operations and Sharon King is ACS's Chief Financial Officer.

   b.   Prepetition Secured Debt

14.     ACS began its credit relationship with Signature Bank, N.A. ("Signature") in February 2015. At that time, Signature agreed to open a $1,500,000 line of credit for short term loans to allow ACS to finance its operations. On February 23, 2015, ACS issued a promissory

3

note in the amount of $1,500,000, which at the time was the maximum limit of the approved line of credit ("Prepetition LOC"). In consideration of the LOC, ACS and Signature entered into a Continuing Security Agreement on February 25, 2015, wherein ACS granted to Signature security interests in substantially all of its assets, including without limitation its cash ("Prepetition Collateral"). At the request of ACS, Signature agreed to increase the limit of the Prepetition LOC to $4,000,000 in April 2017. As a result, on or about April 7, 2017[1], ACS issued a promissory note to Signature in the amount of $4,000,000 ("LOC Note"). ACS's obligations under the LOC Note were guaranteed by Moriarty, O'Donnell, WOD Solutions, LLC and TMG Solutions, LLC.

15.    On September 28, 2017, Signature declared a default under the Prepetition LOC as a result of the entry of a Judgment (defined below) against ACS, and stated that it would not make and additional advances under the line. On October 6, 2017, Signature froze ACS's operating accounts at Signature.

16.    As of the Petition Date, ACS's liability to Signature under the LOC Note was approximately $1,800,000.

**II.    Events Leading to the Chapter 11 Filing**

17.    On October 17, 2014, trustees of four union funds ("Union Funds") commenced an action in the United States District Court for the Southern District of New York ("District Court") which was thereafter consolidated with a later-filed case brought by a separate fund. (*See* No. 1:14-cv-08326-CM-JLC, ECF Nos. 1, 204). The Union Funds claimed that three non-union construction companies - ACS, Time Square Construction, Inc. ("TSC"), and HDK Construction, LLC ("HDK")—were established by Navillus Tile, Inc. ("Navillus") for the purpose of evading

---

[1] Although the line of credit letter agreement is dated April 7, 2017, the signature page indicates that the agreement was executed on April 25, 2017

4

its obligations to contribute pension and welfare benefits under collective bargaining agreements. The Union Funds' theory was that, in establishing these entities, covered union work was performed by non-union labor. The Union Funds also alleged that Navillus breached its collective bargaining agreements and that Donal O'Sullivan, Navillus' CEO, should be individually liable. A seven-day bench trial was held in the District Court before the Honorable Colleen McMahon in August, 2017. About a month after closing arguments, the District Court issued its written decision and ruled that ACS and TSC were alter egos of Navillus, even though it acknowledged that neither company had been established or was operated to evade obligations.

18. On September 22, 2017, the District Court entered a judgment in the amount of $73.4 million ("Judgment") against ACS, Navillus and another co-defendants holding that ACS was an alter-ego of the unionized Navillus, and holding each jointly and severally liable for satisfaction of the Judgment. As a result of the Judgment, ACS is required to make fringe benefit contributions to the Union Funds in the amount of $73.4 million.

19. ACS has commenced an appeal from the Judgment, but has been unable to post a supersedeas bond in order to stay enforcement of the Judgment. On September 30, 2017, ACS moved before the United States Court of Appeals for the Second Circuit for a stay of enforcement of the Judgment. On October 5, 2017, the Second Circuit issued a temporary stay of the judgment pending determination of the motion by a three-judge panel. However, on October 31, 2017, the Second Circuit denied ACS's motion. On November 1, 2017, ACS and co-defendant Navillus Tile, Inc., made another motion to the Second Circuit for a stay on the condition that it post a $10 million bond, which was also denied by the Court. As a result, the Union Funds have the ability to execute upon the Judgment.

20. The Union Funds' ability to restrain ACS's cash and receivables threatens to

destroy ACS's business, and accordingly, ACS had no option but to commence this case in order to afford itself with the breathing spell necessary to reorganize its business and financial affairs.

### III. The Balance Sheet – Other Assets and Liabilities

21. ACS has potential liabilities in addition to those to the Union Funds, including (a) secured bank debt, and (b) liability to numerous trade vendors.

22. ACS's assets, liabilities and equity, as of September 30, 2017, is approximately as follows, noting that without the Judgment, ACS is a solvent company:

**Assets:**

| | |
|---|---|
| **Current Assets** | $30,303,091 |
| **Long Term Assets** | $1,970,493 |
| **Total Assets** | $32,273,584 |

**Liabilities:**

| | |
|---|---|
| **Current Liabilities (including Judgment)** | $99,025,780 |
| **Long Term Liabilities** | $564,321 |
| **Total Liabilities** | $99,590,101 |
| **Total Equity** | ($67,316,517) |
| **Total Liabilities and Equity** | $32,273,584 |

### IV. Case Strategy

23. ACS desires an opportunity to complete it ongoing construction jobs, collect receivables, and work to win new jobs and reorganize for the benefit of its Estate. ACS anticipates proposing a plan of reorganization in this case as soon as it is able to stabilize its construction operations.

### V. Summary of First Day Motions[2]

24. Concurrent with the filing of the Petition, the Debtor filed the First Day Motions

---

[2] All capitalized terms not defined in the following summary shall have the meanings ascribed to them in the motions discussed herein.

6

listed below, which I believe are necessary to enable the Debtor's business to operate with a minimum of disruption and loss of productivity. The Debtor intends to seek entry of orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules.

### a. Cash Collateral Motion

25. As set forth above, as part of its Prepetition Collateral package, Signature has an interest in ACS's cash (the "Cash Collateral"). ACS has filed a motion (the "Cash Collateral Motion") pursuant to which it requests entry of interim and final orders: (a) authorizing ACS's use of Cash Collateral on an interim basis, (b) granting certain adequate protection to Signature in connection with the use of cash collateral and any diminution in the value of the Signature's interest in the Cash Collateral, and (c) prescribing the form and manner of notice and setting the time for the Final Hearing.

26. The Debtor has determined, in the exercise of its business judgment, with the assistance of its advisors, that it requires the use of Cash Collateral. The Debtor has an immediate and critical need to use Cash Collateral to pay, in accordance with the proposed budget annexed to the Cash Collateral Motion (the "Budget"), various parties in the ordinary course of business and/or as authorized by the Court. Among other things, the continued use of Cash Collateral will enable the Debtor to continue to operate its concrete construction business, maintain relationships with its vendors and creditors, pay its employees, and satisfy other ordinary operational costs that are essential to preserve estate value by continuing to operate its business in the ordinary course. In the absence of the continued authorization to use Cash Collateral, the Debtor's ability to operate its business will be jeopardized, causing immediate and

7

irreparable harm to the Debtor's estate, creditors, employees, and all other stakeholders by virtue of the loss of significant revenue. Thus, the Debtor's continued use of Cash Collateral is essential in order to enable the Debtor to pay their ordinary operating costs and expenses during the pendency of the Chapter 11 Case.

27. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of Signature in the Cash Collateral to the extent of any diminution in value, the Debtor proposes to grant Signature, in all cases subject to the Carve-Out (as defined below), continuing, valid, binding, enforceable and automatically perfected postpetition additional and replacement security interests in and liens and mortgages on (collectively, the "Adequate Protection Liens") as follows:

   i. a first priority perfected security interest in, and lien and mortgage on, all prepetition and postpetition property of the Debtor, whether tangible or intangible, not subject to a valid, perfected, enforceable and unavoidable lien or security interest on the Petition Date; and

   ii. a junior perfected security interest in and lien and mortgage on all prepetition and postpetition property of the Debtor, whether tangible or intangible, that is subject to (i) a valid, perfected, enforceable and unavoidable consensual lien or security interest in existence on the Petition Date or (ii) a valid and unavoidable consensual lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code;

provided, however, that the Adequate Protection Liens shall be senior to any other liens, including, without limitation, any other adequate protection replacement liens. The Adequate Protection Liens shall not be secured by any Avoidance Actions; provided, however, that, subject to entry of the Final Order, the Adequate Protection Liens shall be secured by the proceeds of any Avoidance Actions.

28. As additional adequate protection, the Debtor proposes to pay to the Prepetition Lender a weekly principal payment in the amount of Fifty Thousand ($50,000.00) Dollars and a

8

monthly interest payment in the amount of approximately Nine Thousand ($9,000.00) Dollars.

29. The Debtor respectfully requests that the Court implement a "Carve-Out" from the Adequate Protection. The Debtor proposes that the "Carve-Out" include (i) the quarterly fees and interest thereon required to be paid pursuant to 28 U.S.C. §1930(a)(6); (ii) any fees payable to the Clerk of the Court; (iii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $10,000; (iv) the accrued and unpaid fees and expenses incurred by the professionals retained by the Debtor or any Creditors' Committee, up to the amounts provided for in the Budget; provided, however, that with respect to the foregoing clause (iv), such fees and expenses (A) shall be net of any unused retainers held by the respective professionals; (B) will only be paid to the extent allowed by the Court; and (C) will be subject to the rights of Signature and any other party in interest to object to the allowance thereof.

30. I have reviewed the Cash Collateral Motion and believe the facts stated therein are accurate to the best of my knowledge, information and belief. I further believe that the relief requested in the Cash Collateral Motion is in the best interests of ACS's estate, its creditors, and all other parties in interest, and will enable ACS to continue to operate its business in chapter 11 without disruption. Accordingly, on behalf of ACS, I respectfully submit that the Cash Collateral Motion should be granted.

    b. **Cash Management Motion**

31. The guidelines established by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") require debtors in possession to take certain actions regarding prepetition bank accounts, including, among others, closing all existing bank accounts, opening of new accounts and the immediate printing of new checks with a "Debtor in

9

Possession" designation on them.

32. ACS has filed a motion (the "Cash Management Motion"), seeking entry of interim and final orders (i) approving the use of its existing bank accounts (the "Existing Bank Accounts"), which are identified in the Cash Management Motion and (ii) authorizing the continued use of existing business forms.

33. ACS manages its cash receipts, transfers, and disbursements and records such collections, transfers and disbursements through the Existing Bank Accounts. ACS utilizes a number of methods for disbursing and receiving funds, including: (a) debit; (b) wire transfer; and (c) written check. ACS has collected receivables and maintained payroll accounts and operating accounts through the Existing Bank Accounts for an extended period of time. ACS believes that any confusion or disruption in the continuity of these pre-existing procedures would severely hamper ACS's ability to operate its business and marshal its assets in the most efficient manner available. This type of disruption would create adverse economic and operational consequences which would negatively affect ACS's ability to maximize value for its creditors.

34. The Existing Bank Accounts are maintained at Signature Bank, N.A. (the "Signature Accounts"), which is insured by the Federal Deposit Insurance Corporation. In addition, the Debtor had an account at JP Morgan Chase Bank, N.A, (the "Chase Account"), also insured by the Federal Deposit Insurance Corporation. As of the Petition Date a transfer was initiated to close the Chase Account and the funds were transferred to the Signature Accounts.

35. I have reviewed the Cash Management Motion and believe that the facts stated therein are accurate to the best of my knowledge, information and belief. I further believe that the relief requested in the Cash Management Motion is in the best interests of ACS's estates, its creditors, and all other parties in interest, and will enable ACS to continue to operate its business

10

in chapter 11 without disruption. Accordingly, on behalf of ACS, I respectfully submit that the Cash Management Motion should be granted.

      c.     **Employee Wage Motion**

36.     ACS has also filed a motion (the "Employee Wage Motion"), wherein it seeks entry of an order (a) authorizing, but not requiring, it to pay or cause to be paid, in its sole discretion, all or a portion of the amounts owing (and associated costs) under or related to Wages, the Withholding Obligations, the Reimbursement Expenses, the Health Plan Obligations (all capitalized terms as defined in the Employee Wage Motion) in accordance with the terms of the Budget, and (b) authorizing applicable banks and other financial institutions to receive, process, and pay any and all checks drawn on ACS's payroll and general disbursement accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing.

37.     ACS currently has 450 employees. 20 employees are salaried and 430 are paid an hourly wage. ACS's uses a weekly pay period, which runs from Wednesday to Tuesday. ACS pays its employees on Friday for the preceding Tuesday to Wednesday pay period. The average weekly total of ACS's payroll is approximately $700,000. By way of the Employee Wage Motion, ACS seeks to pay its employees for the partial prepetition payroll period from Wednesday November 1 through Tuesday November 7. In addition the Debtor is seeking approval to pay to its Employees, $25,000 on account of Reimbursable Expenses incurred by its Employees in the ordinary course of business prior to the Petition Date. The aggregate amount to be paid in accordance with the Motion is $735,000 and no single employee will be paid more than $12,850.

38.     If the requested relief is not granted, ACS's relationship with its employees would

11

be adversely impacted and there could well be irreparable harm to the employees' morale, dedication, confidence, and cooperation at a time when ACS's ability to rely on its employees to assist in achieving its goal to complete jobs it of the utmost importance. The vast majority of ACS's employees are hourly wage earners who rely upon their paycheck each week to pay their living expenses. If employees do not have confidence that they will be paid in the ordinary course of business, they will seek employment elsewhere. At this early stage, ACS simply cannot risk the substantial damage to its business that would result from the loss of its highly trained employees.

39. I believe that the relief requested in the Employee Wage Motion is in the best interests of ACS's estate, its creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of ACS, I respectfully submit that the Employee Wage Motion should be Approved.

    **d.**    **Insurance Motion**

40. In connection with the day-to-day operations of its business, the Debtor maintains various business insurance programs (the "Insurance Programs") and related insurance policies, including, as listed in Exhibit A to the motion with respect to such programs (the "Insurance Motion"), through several different insurance providers.

41. As is reflected in Exhibit A to the Insurance Motion, the Debtor has various insurance policies covering a variety of matters, such as commercial general liability, excess liability, pollution liability, property/inland marine liability, workers' compensation and automobile insurance.

42. Pursuant to its insurance policies, the Debtor is required to pay insurance premiums. The Debtor pays approximately $8.8 million in insurance premiums each year. The

Debtor finances most of its insurance premiums pursuant to a premium finance agreement (a "Premium Finance Agreement") with Triumph Premium Finance ("Triumph"), dated August 3, 2017.

43. With the exception of the Insurance Premiums arising under the workers' compensation and automobile insurance policies, all of the Debtor's financed insurance premiums are financed pursuant to the Premium Financing Agreement. Pursuant to the Premium Financing Agreement, Triumph agreed to finance applicable insurance premiums in an amount of approximately $6.5 million. In exchange, the Debtor agreed to pay Triumph a down payment of approximately $655,304.01, followed by nine monthly installments of approximately $655,304.01 each. The amount financed under the Premium Financing Agreement accrues interest at a rate of 2.95% per annum. Pursuant to the Premium Financing Agreement, the Debtor grants Triumph a security interest in all sums payable under the Premium Financing Agreement, all unearned Insurance Premiums and dividends which may be payable under the Insurance Policies and all loss payments which reduce the unearned Insurance Premiums, subject to any mortgagee or loss payee interests.

44. As of the Petition date, the Debtor has made the down payment and three monthly installment payments. The insurance policies financed under the Premium Financing Agreement will expire pursuant to their terms on July 31, 2018.

45. In addition to insurance premiums paid pursuant to the Premium Financing Agreements, the Debtor maintains two additional insurance policies: a workers' compensation policy with the New York State Insurance Fund ("NYSIF") and an automobile policy with Nationwide Insurance ("Nationwide"). The Debtor pays approximately $2 million in premiums for the NYSIF policy with 12 monthly installments of approximately $180,000. The NYSIF

13

policy will expire pursuant to its terms on September 3, 2018. With regard to the Nationwide policy, the Debtor pays approximately $140,000 in premiums with 10 monthly installments of approximately $14,000. The policy is set to expire pursuant to its terms on June 4, 2018.

46. While the Debtor believes that it is current on all of its insurance obligations as of the Petition Date, the Debtor has filed this Motion in order to obtain authority to continue its pre-petition insurance policies and programs, and pay and perform, as may be necessary, all pre-petition obligations in respect thereof.

47. In view of the importance of maintaining uninterrupted insurance coverage with respect to its business activities and assets, the Debtor respectfully submits that it is in the best interests of its estate and creditors for the Court to authorize the Debtor to honor any outstanding prepetition insurance obligations. Any other alternative could result in the termination of necessary insurance coverage, could require a considerably higher cash expenditure by the Debtor to obtain similar insurance coverage, or could result in the Debtor obtaining insurance coverage on less desirable terms than its current coverage, any of which would be detrimental to the Debtor's estate and creditors. In addition, the Debtor's efforts to maximize the value of its assets for the benefit of its estate and creditors could be thwarted by the occurrence of a loss event that the Debtor is not insured against due to a potential lapse of coverage.

48. The relief requested by this Insurance Motion represents a sound exercise of the Debtor's business judgment, is necessary to avoid immediate and irreparable harm to the Debtor's estate and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtor has compelling business reasons for seeking to maintain its Insurance Policies and to ensure payment of necessary premiums thereunder.

### e. Utilities Motion

49. In connection with the operation of its business, ACS obtains electricity, internet and telephone services at ACS's principal offices and cellular telephone services for certain employees. Uninterrupted utility services are essential to ACS's ongoing operations, and to its Chapter 11 efforts. Should any utility company refuse or discontinue service, even for a brief period, ACS's business operations could be severely disrupted. It is therefore critical that utility services continue uninterrupted.

50. The Debtor has filed a motion (the "Utilities Motion") pursuant to which it requests entry of an order, which (i) prohibits the Debtor's utility providers from altering, refusing or discontinuing utility services on account of any prepetition amounts owed and outstanding for any utility services rendered, on account of the Debtor's bankruptcy filing or because of any perceived inadequacy of the Debtor's proposed adequate assurance; (ii) determining that the utility providers have received adequate assurance of payment for future utility services; (iii) approving procedures whereby the utility providers may request additional or different assurances beyond that proposed in the Utilities Motion; and (iv) determining that the Debtor is not required to provide any additional assurance beyond the assurance set forth in the Utilities Motion.

51. ACS typically pays approximately $8,430 per month on account of utility services, and it intends to pay all post-petition obligations owed to their utility companies in a timely manner in accordance with the terms of the Budget.

52. In addition, ACS proposes to provide to any utility provider not currently holding

a deposit a cash deposit in an amount equal to the average cost of one (1) month of utility service from that utility provider, calculated as an historical average over the past twelve (12) months.

53. In the event that any utility provider who is holding a deposit as of the Petition Date, but that believes it is not adequately assured of future payment based on such existing deposit, such utility provider may make a deposit request, provided that (a) such request is made in writing no later than the request deadline; (b) such requesting utility provider does not already hold a deposit that is equal to or greater than the proposed adequate assurance deposit; and (c) such requesting Utility Provider is not currently paid in advance for its utility services. The Debtor will issue a check for the balance between any then current deposit and the adequate assurance deposit if a timely deposit request is made.

54. ACS submits that the adequate insurance deposit, together with ACS's ability to pay for future utility services in the ordinary course of business, constitutes sufficient adequate assurance to the utility providers.

55. As further detailed in the Utilities Motion, the relief requested pursuant to the motion is necessary, fair to the utility providers, and in the best interests of ACS, its estate and its creditors.

**VI.    Other Information**

56. ACS's case was originally commenced under chapter 11 of the Bankruptcy Code. Accordingly, no prior trustee was appointed in ACS's case.

57. No official or unofficial committee of creditors was formed prior to the Petition Date.

16

    **(a)**    **Twenty Largest Unsecured Creditors**

58.    A list setting forth ACSs twenty (20) largest unsecured creditors, excluding those persons who constitute "insiders" under Bankruptcy Code section 101(31), is attached hereto as **Exhibit A**.

59.    As required by Local Rule 1007-2(a)(4), **Exhibit A** includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, and an indication of whether the claims are contingent, unliquidated, disputed, or partially secured.

    **(b)**    **Five Largest Secured Creditors**

60.    A list setting forth ACS's secured creditors is attached hereto as **Exhibit B**.

    **(c)**    **Assets and Liabilities**

61.    As required by Local Rule 1007-2(a)(6), a summary of ACS's assets and liabilities is included above.

    **(d)**    **Publicly Held Stock**

62.    As required by Local Rule 1007-2(a)(7), no classes of shares of stock, debentures, or other securities of ACS are publicly held.

    **(e)**    **Debtor Property Held By Others**

63.    ACS has no property in possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity other than as follows:

- ACS has accounts with an aggregate value in the amount of $124,841, which are currently held by Signature Bank, as discussed above. In addition, the Chase Account has an aggregate value in the amount of $0.00. As discussed above, as of the Petition Date, a transfer

has been completed to close the Chase Account and transfer the funds to the Signature Accounts, however the Chase Account has not been officially closed.

- Three Boroughs L.L.C., ACS's landlord with regard to its Office Space, is currently holding a security deposit in the amount of $61,666.66.

**(f)    Debtor's Office Space**

64.    As required by Local Rule 1007-2(a)(9), ACS leases office space located at 1160 Commerce Avenue, Bronx New York (the "Office Space").

**(g)    Location of Debtor's Assets and Books and Records**

65.    Pursuant to Local Rule 1007-2(a)(10), the majority of ACS's books and records are maintained within the Office Space.

**(h)    Threatened or Pending Actions Against ACS**

66.    Pursuant to Local Rule 1007-2(a)(11), a list of pending or threatened actions is annexed hereto as **Exhibit C**.

**(i)    ACS's Senior Management**

67.    Pursuant to Local Rule 1007-2(a)(12), the Debtor's senior management is identified in paragraphs 12 and 13 above.

**(j)    Additional Information Required by Local Rule 1007-2(b)**

68.    In accordance with Local Rule 1007-2(b), ACS intends to continue the operation of its business and the management of its properties as Debtor and Debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

69.    In accordance with Local Rule 1007-2(b)(1), the estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the Petition Date is approximately $2,450,000.

70. In accordance with Local Rule 1007-2(b)(2), the amounts paid and proposed to be paid for the thirty (30) day period following the Petition Date for services rendered by ACS's officers and directors is $25,000.

71. ACS has not engaged a financial or business consultant, therefore Local Rule 1007-2(b)(2)(C) is not applicable.

72. In accordance with Local Rule 1007-2(b)(3), a schedule, for the thirty (30) day period following the filing of the chapter 11 petition, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing is annexed hereto as **Exhibit D**.

### VII. Conclusion

73. ACS reserves the right to amend or supplement any of the attached schedules in the event additional information is obtained by ACS.

74. ACS believes that the protection of the Bankruptcy Court will enable it to maximize the value of its assets for the benefit of the estate and its creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on the 6th day of November, 2017.

_____
Jeffrey T. Varsalone, Chief Restructuring Officer