Hearing Date: November 8, 2017 at 2:00 p.m.

Kennedy, Jennik & Murray, P.C.
113 University Place
New York. New York 10003
Telephone: (212) 358-1500
Facsimile:  (212) 358-0207

Attorneys for Plaintiff  Benefit Fund Trustees in
*Moore v. Navillus Tile, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                :        Chapter 11
                                                      :
Advanced Contracting Solutions LLC,                   :        Case No. 17-13147 (SHL)
                                                      :
                              Debtor.                 :
-------------------------------------------------------------x

## LIMITED OBJECTION AND RESERVATION OF RIGHTS OF PLAINTIFF BENEFIT FUND TRUSTEES IN *MOORE V. NAVILLUS, TILE, INC.* REGARDING DEBTOR'S FIRST DAY CASH MANAGEMENT MOTION

### INTRODUCTION

1.      This chapter 11 bankruptcy case was filed because of a judgment obtained in

*Moore v. Navillus Tile, Inc.* No. 14-CV-8326 (S.D.N.Y.) by four groups of employee benefit

funds ("*Moore* Plaintiffs"). (Dkt. No. 2, ¶¶ 17-18.) The *Moore* Plaintiffs submit this limited

objection and reservation of rights with respect to the Debtor's to approve use of cash collateral

("Cash Motion"). (Dkt. No. 4.)

2.      The Cash Motion presents an approved budget that does not recognize its

obligation to make contributions to the *Moore* Plaintiffs' multiemployer benefit funds for all

hours of covered work performed by ACS.  The *Moore* Plaintiffs contend that this Court should

condition the use by ACS of its cash collateral pursuant to Bankruptcy Code § 363(e) on its

fulfillment of its continuing obligation to make benefit fund contributions to the *Moore*

Plaintiffs' benefit funds.

## **RELEVANT FACTS**

3.      The *Moore* Plaintiffs consist of labor and management trustees for four sets of multi-employer employee benefit funds in the New York City Concrete industry, which are sponsored, respectively, by Metallic Ironworkers Local 46, the NYC District Council of Carpenters, the Cement and Concrete Workers District Council and Cement Masons Local 780. ("the Sponsoring Unions").

4.      On October 12, 2014, the *Moore* Plaintiffs commenced an action in the Southern District of New York to recover damages from Advanced Contracting Solutions LLC ("ACS") on the grounds that it was started as, and continued at all relevant times, to be an alter ego of a concrete contractor named Navillus Tile, Inc. that had collective bargaining agreements with all of the Sponsoring Unions that covered the work being performed by ACS.  A trial was held in that action in August, 2017 and on September 20, 2017 Chief Judge Colleen McMahon issued her decision in which she squarely ruled that ACS was, in fact, an alter ego of Navillus ("Decision"). A copy of that decision is attached as Exhibit A to this motion.

5.      On September 22, 2017, Chief Judge McMahon entered a judgment finding ACS to be jointly and severally liable with ACS for unpaid contributions to the plaintiff multiemployer benefit funds in the amount of $74.3 million.  A copy of the judgment is attached as Exhibit B to this motion.

6.      The proposed Cash Motion assumes a budget that does not include any obligation to make payments to the *Moore* Plaintiff multiemployer benefit funds for the ACS hours of covered work.

7.      The *Moore* Plaintiffs therefore object to the Cash Motion.  Given the adjudication

2

of ACS as an alter ego of Navillus, and the joint and several liability imposed on ACS for failing to make benefit fund contributions for its hours worked, the projected operating statements of the Debtor for the first eight weeks after filing are incomplete since they do not include an obligation of ACS to make contributions to the *Moore* Plaintiffs' multiemployer benefit funds.

8.    The *Moore* Plaintiffs therefore object to the Cash Motion to the extent it rests on an analysis of ACS cash flow that does not include the obligation to make payments to the *Moore* Plaintiffs' benefit funds.

## RESERVATION OF RIGHTS

9.    The Moore Plaintiffs reserve their right to make or support motions to compel ACS to treat is obligation to make payments to the *Moore* Plaintiffs' multiemployer benefit funds as an administrative expense under the Bankruptcy Code.

## CONCLUSION

10.    For the foregoing reasons, the *Moore* Plaintiffs respectfully submit that the Cash Motion be approved upon the condition that it be amended as set forth herein.

Dated:  November 7, 2017
         New York, NY

KENNEDY, JENNIK & MURRAY, P.C.

By:_____/s/_____
         Thomas M. Kennedy
         113 University Place, 7th Floor
         New York, New York  10003
         (212) 358-1500 Telephone
         (212) 358-0207 Facsimile

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

TERRENCE MOORE, *et al.*,

     Plaintiffs,

    -against-                                    No. 14 Civ. 8326

NAVILLUS TILE, INC., *et al.*,

     Defendants.

——————————————————————x

THOMAS GESUALDI, *et al.*,

     Plaintiffs,

    -against-                                    No. 15 Civ. 8441

NAVILLUS TILE, INC., *et al.*,

     Defendants.

——————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/20/2017

McMahon, C.J.:

    Following a bench trial, the Court, for its findings of fact, conclusions of law, and

verdict:

### *Findings of Fact on Liability*

**I.**    **The Parties**

    1.    Plaintiffs in *Moore v. Navillus Tile, Inc.*, No. 14 Civ. 8326 ("the *Moore* Action"),

are Trustees of four different groups of multi-employer fringe benefit funds.

    2.    Plaintiffs Terrence Moore, Kevin Kelly, John Coffey, Ronald Richardson,

Michael Salgo, Michael Anderson, and Kevin O'Brien are Trustees of the Metal Lathers Local

46 Pension Fund, the Metal Lathers Local 46 Trust Fund, the Metal Lathers Local 46 Annuity

Fund, the Metal Lathers Local 46 Vacation Fund, the Metal Lathers Local 46 Apprenticeship

Fund, and the Metal Lathers Local 46 Scholarship Fund (collectively, the "Local 46 Funds").

(Joint Pretrial Order Stipulations ("JPTO Stip."), § III.B ¶ 1.)

3.    The Local 46 Funds are "employee benefit plans" and "multiemployer plans"

within the meaning of 29 U.S.C. § 1002(3) and (37), with their principal place of business at 61-

02 32nd Avenue, Woodside, NY 11377. The Local 46 Funds are jointly administered by a Board

of Trustees, comprised of an equal number of labor and management representatives in

accordance with Section 302(c)(5) of the Labor Management Relations Act of 1947 ("LMRA"),

29 U.S.C. § 186(c)(5). (JPTO Stip. § III.B ¶ 1.)

4.    Plaintiffs Angelo Angelone, Eric Lee, and Michael Salgo are Trustees of the

Cement & Concrete Workers Pension Trust Fund, the Cement & Concrete Workers Welfare

Trust Fund, the Cement & Concrete Workers Annuity Trust Fund, and the Cement & Concrete

Workers Scholarship Trust Fund. Plaintiff Kieran O'Sullivan is Trustee of the Cement &

Concrete Workers Training and Education Trust Fund (collectively, the "Cement Workers

Funds"). (JPTO Stip. § III.B ¶ 2.)

5.    The Cement Workers Funds are "employee benefit plans" and "multiemployer

plans" within the meaning of 29 U.S.C. § 1002(3) and (37), with their principal place of business

at 35-30 Francis Lewis Boulevard, 2nd Floor, Flushing, NY 11358. The Cement Workers Funds

are jointly administered by a Board of Trustees, comprised of an equal number of labor and

management representatives in accordance with LMRA § 302(c)(5), 29 U.S.C. § 186(c)(5).

(JPTO Stip. § III.B ¶ 2.)

6.    Plaintiffs Gino Castignoli, Michael Rendina, Robert Bertuzzi, Eddie Barbaria,

Frank Martorano, Jr., Joseph Mitrione, Michael Salgo, and Kevin O'Brien are Trustees of the

2

Cement Masons' Local 780 Trust Fund, the Cement Masons' Local 780 Pension Fund, the

Cement Masons' Local 780 Annuity Fund, the Cement Masons' Local 780 Vacation Fund, and

the Cement Masons' Local 780 Apprenticeship Fund (collectively, the "Local 780 Funds").

(JPTO Stip. § III.B ¶ 3.)

7.    The Local 780 Funds are "employee benefit plans" and "multiemployer plans"

within the meaning of 29 U.S.C. § 1002(3) and (37), with their principal place of business at

1983 Marcus Avenue, Suite C116, New Hyde Park, NY 11042. The Local 780 Funds are jointly

administered by a Board of Trustees, comprised of an equal number of labor and management

representatives in accordance with LMRA § 302(c)(5), 29 U.S.C. § 186(c)(5). (JPTO Stip.

§ III.B ¶ 3.)

8.    Plaintiffs Joseph Geiger, Stephen Mcinnis, Michael Cavanaugh, Paul Capurso,

John Sheehy, Paul Tyzner, David Meberg, Kevin O'Callaghan, John DeLollis, and Catherine

Condon are Trustees of the New York City District Council of Carpenters Pension Fund, the

New York City District Council of Carpenters Welfare Fund, the New York City District

Council of Carpenters Apprenticeship, Journeyman Retraining, Educational and Industry Fund,

and the New York City District Council of Carpenters Annuity Fund (collectively, the

"Carpenters Funds"). (JPTO Stip. § III.B ¶ 4.)

9.    The Carpenters Funds are "employee benefit plans" and "multiemployer plans"

within the meaning of 29 U.S.C. § 1002(3) and (37), with their principal place of business at 395

Hudson Street, New York, NY 10014. The Carpenters Funds are jointly administered by a Board

of Trustees, comprised of an equal number of labor and management representatives in

accordance with LMRA § 302(c)(5), 29 U.S.C. § 186(c)(5). (JPTO Stip. § III.B ¶ 4.)

3

10.     Plaintiffs in *Gesualdi v. Navillus Tile, Inc.*, 15 Civ. 8441 (the "*Gesualdi* Action"),

are Trustees of a fifth group of multi-employer benefit funds, set up to benefit the members of

the Teamsters Local 282 ("Local 282").

11.     Plaintiffs Thomas Gesualdi, Louis Bisignano, Darin Jeffers, Michael O'Toole,

Michael Bourgal, Frank H. Finkel, Joseph A. Ferrara, Sr., Marc Herbst, Denise Richardson, and

Thomas Corbett are Trustees and Fiduciaries of the Local 282 Welfare Trust Fund, the Local 282

Pension Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund,

and the Local 282 Vacation and Sick Leave Trust Fund (collectively, the "Local 282 Funds").

The Local 282 Funds are "employee benefit plans" and "multiemployer plans" within the

meaning of 29 U.S.C. § 1002(3) and (37), with their principal place of business at 2500 Marcus

Avenue, Lake Success, NY 11042. (JPTO Stip. § III.B ¶ 5.)

12.     Defendant Navillus Tile, Inc. d/b/a Navillus Contracting ("Navillus") is a New

York corporation with offices at 633 Third Avenue, New York, NY 10017. (JPTO Stip. § III.C

¶ 1.) Navillus is one of the largest unionized subcontractors in New York, serving primarily as a

masonry and concrete subcontractor on large union construction projects. (D. O'Sullivan Decl.

¶ 39, DX-171; Tr. at 198:24-199:02.)[1]

13.     Defendant Advanced Contracting Solutions, LLC, d/b/a ACS NY LLC ("ACS")

is a Delaware limited liability company, formed on July 16, 2013. (PX-25.) On September 30,

2013, ACS filed as a foreign corporation in New York under the name ACS NY LLC. (JPTO

Stip. § III.C ¶ 2.) ACS is an open-shop subcontractor that primarily performs concrete

foundation and superstructure work. (Moriarty Decl. ¶ 2, DX-172.)

---

[1] All references to "Tr." refer to the trial transcript.

14.     Defendant Time Square Construction, Inc. ("TSC") is a New York corporation with offices at 355 Lexington Avenue, New York, NY 10017. (JPTO Stip. § III.C ¶ 3.) TSC is principally a general contractor. (K. O'Sullivan Decl. ¶¶ 20-22, DX-176.)

15.     Defendant HDK Construction, LLC ("HDK") is a Delaware limited liability company, authorized to do business in New York, maintaining its principal offices for doing business at 355 Lexington Avenue, New York, NY 10017. (JPTO Stip. § III.C ¶ 4.)

16.     Defendant Donal O'Sullivan is currently the sole owner of Navillus.

17.     Defendant Kevin O'Sullivan is currently the sole owner of TSC.

18.     Helen O'Sullivan, sister of Donal and Kevin, was initially named as an individual Defendant to this action, but Plaintiffs withdrew all claims against her during trial. (*See* Tr. at 849:06-13.) Helen has worked at Navillus since 1989, and has never had an ownership interest in, or control over, Navillus, TSC, or HDK. (D. O'Sullivan Decl. ¶ 36, DX-171.)

## II.     Navillus

19.     Donal and Kevin O'Sullivan founded Navillus in 1987, with their brother Leonard, shortly after emigrating from Ireland. (*Id.* ¶ 1; K. O'Sullivan Decl. ¶ 7, DX-176.) Navillus has since grown from a small tile business to one of the largest union construction firms in New York. (D. O'Sullivan Decl. ¶ 2, DX-171.)

20.     In 1998, Leonard O'Sullivan left Navillus, leaving Donal and Kevin O'Sullivan each with 50% ownership of Navillus. (*Id.* ¶ 30; K. O'Sullivan Decl. ¶ 9, DX-176.)

21.     In 2006, Kevin O'Sullivan resigned as Navillus' Vice President. (D. O'Sullivan Decl. ¶ 31, DX-171.) On January 6, 2015 – after commencement of this lawsuit – Kevin O'Sullivan sold his 50% interest in Navillus to Donal O'Sullivan for $10,970,200. (*Id.* ¶ 33; DX-41; DX-150.)

22.     Donal O'Sullivan is currently the sole owner of Navillus and also serves as its

President and CEO. (D. O'Sullivan Decl. ¶ 1, DX-171.) In addition to Donal O'Sullivan,

Navillus' board members are Peter Downes (Chief Estimator), Colin Mathers (Director of

Operations), and Saleem Asmed (Vice President of Scaffolding Division). (*Id.* ¶¶ 34-35.)

Padraigh Naughton is Navillus' Chief Financial Officer. (*Id.* ¶ 35.) Helen O'Sullivan is in charge

of the payroll department. (*Id.* ¶ 36.)

23.     Today, Navillus primarily serves as a masonry and concrete subcontractor,

although it does other types of work as well, including stone, tile, steel, restoration, repointing,

roofing, carpentry, electrical, plastering, and fireproofing work. (*Id.* ¶ 3; Tr. at 198:24-199:02.)

Navillus also occasionally serves as a general contractor on projects where it self-performs the

majority of the work. (Tr. at 196:13-25.) From calendar year 2011 through calendar year 2016,

subcontracting work accounted for approximately 83% of Navillus' revenues, while general

contracting work accounted for approximately 17% of revenues. (D. O'Sullivan Decl. ¶ 39, DX-

171.)

24.     The majority of Navillus' current revenues come from concrete superstructure

work. In calendar year 2016, Navillus' revenues from concrete work amounted to $124 million.

(*Id.* ¶ 39.)

25.     Navillus' audited revenues increased from $145 million in fiscal year 2011 to

$240 million in fiscal year 2016, a roughly 65% increase. (*Id.* ¶ 10; *see* DX-30; DX-31; DX-32;

DX-33; DX-34.)

26.     Since 2015, Navillus has been headquartered at 633 Third Avenue, New York,

NY, where it leases 12,000 square feet of office space. (D. O'Sullivan Decl. ¶ 52, DX-171.)

From December 2011 until 2015, Navillus' was headquartered at 575 Fifth Avenue, New York,

NY. (*Id.* ¶ 52.) Prior to 2011, Navillus also had headquarters at 53-18 11th Street in Long Island

City, Queens and briefly at 460 Park Avenue in Manhattan. (*Id.*) Navillus also leases space on

First Street in Queens and previously had yards on Review Avenue in Queens and in Sayreville,

NJ. (K. O'Sullivan Decl. ¶¶ 29-30, DX-176.)

27.    Navillus maintains its own telephone and computer systems. (D. O'Sullivan Decl.

¶ 52, DX-171.) Navillus maintains its own books and records, files its own taxes, and does not

comingle funds with any other entity. (*Id.* ¶ 54.) Navillus does not share insurance policies, bank

accounts, human resources, payroll systems, or professional services with any other company,

nor does it pay for any other company's bank accounts, human resources, payroll systems, or

professional services. (*Id.*)

28.    Navillus owns millions of dollars' worth of construction equipment, including a

fleet of over twenty-three vehicles. Navillus also rents or leases a substantial amount of

equipment from various rental companies depending on the needs of the company. (*Id.* ¶ 55; DX-

39.) From 2011 through 2016, Navillus made payments totaling over $280 million to more than

1,000 different vendors for the purchase or lease of equipment, materials, and services. (D.

O'Sullivan Decl. ¶ 55, DX-171.)

29.    One of Navillus' vendors is Manhattan Tool, an entity that Donal O'Sullivan has

owned since 2014. Manhattan Tool leases equipment to over 300 different construction

companies in New York. (*Id.*)

30.    From 2011 through the end of 2016, Navillus received revenues from roughly 450

different jobs through contracts with over 100 different customers. (*Id.* ¶ 56.)

### A.    Navillus' Relationship with Unions

31.    Navillus has been a union employer since it hired its first employees in 1989, and

in 2016, Navillus employed over 1,600 union workers. (*Id.* ¶ 5.) However, in recent years

Navillus has bid on some non-union projects. (Tr. at 202:08-10.)

32.    Navillus is now one of the biggest contributors to union fringe benefit funds in

New York. (D. O'Sullivan Decl. ¶ 31, DX-171.) From calendar year 2011 through calendar year

2016, Navillus contributed more than $172 million to benefit funds, including $83 million to the

funds represented by Plaintiffs. (*Id.* ¶ 9.)

33.    Navillus is party to collective bargaining agreements ("CBAs") with the following

unions:

        a.    Bricklayers and Allied Craftworkers, Local 1;

        b.    Bricklayers and Allied Craftworkers, Local 7 (formerly Marble Carvers,

Cutters & Setters Union of NY & NJ, Local 4; Marble Finishers Union of NY, Local 20;

Tile Setters Union of NY & NJ, Local 52; and Tile Finishers of NY, Local 88).

        c.    NYC District Council of Carpenters, Locals 157 and 1556 ("Carpenters");

        d.    Laborers International Union of North America ("LIUNA") Cement &

Concrete Workers of New York City (Laborers' Locals 6A, 18A, and 20 Concrete

Workers) ("Cement Workers");

        e.    Cement Masons, Local 780 ("Local 780");

        f.    International Union of Operating Engineers, Locals 13, 15, 138;

        g.    LIUNA Local 731 (Excavators);

        h.    LIUNA (Laborers) Local 66;

        i.    LIUNA Construction and General Building Laborers' (Mason Tenders)

Local 79;

     j.      Metallic Lathers and Reinforcing Ironworkers, Local 46 ("Local 46");

     k.      Plasterers, Locals 1 and 262;

     l.      Pointers, Local 1;

     m.      Ironworkers Local 197 Stone Derrickmen & Riggers;

     n.      Stone Setter, Local 1;

     o.      Teamsters, Local 282 ("Local 282");

     p.      LIUNA Laborers Local 1010 (Pavers);

     q.      Ironworkers, Local 580; and

     r.      Locals 14, 15, 15A, and 15D (Operating Engineers and Surveyors).

(*Id.* ¶ 5.)

34.    Navillus is a member of a multi-employer collective bargaining association known as the Building Contractors Association, Inc. ("BCA") and has authorized the BCA to represent Navillus for purposes of entering into CBAs. (JPTO Stip. § III.D ¶ 1.) Navillus is also a member of a multi-employer collective bargaining association known as the Hoisting and Scaffolding Trade Association, Inc. ("HASTA"), which has also entered into certain CBAs on Navillus' behalf. (JPTO Stip. § III.D ¶ 2.)

**B.    The Collective Bargaining Agreements at Issue**

35.    As a result of its membership in the BCA and HASTA, Navillus is bound to a CBA with Local 46 (the "Local 46 CBA") and a CBA with the Carpenters (the "Carpenters CBA"). (Mem. Decision and Order Den. Defs.' Mots. for Summ. J. ("Summ. J. Decision"), Dkt. No. 165, at 20; JPTO Stip. § III.D ¶ 5; *see* PX-7 (Local 46 CBA); PX-4 (Carpenters CBA).)[2]

---

[2] Following the conventions used by the parties, the Court denotes exhibits introduced by Plaintiffs in the *Moore* Action with "PX," and exhibits introduced by Plaintiffs in the *Gesualdi* Action with the notation "GX."

36.    As part of the BCA, Navillus has been bound to a series of CBAs with Local 282. (JPTO Stip. § III.D ¶ 3.) The most recent CBAs between Navillus and Local 282 are for the periods July 1, 2008 to June 30, 2013 (the "2008 Local 282 CBA," GX-3) and July 1, 2013 to June 30, 2016 (the "2013 Local 282 CBA," GX-4) (collectively, the "Local 282 CBAs").

37.    At all times material to this litigation, Navillus was also bound by a CBA with Local 780 (the "Local 780 CBA"). (Summ. J. Decision at 22-23; *see* PX-5 (Local 780 CBA); *see also* JPTO Stip. § III.D ¶ 5.)

38.    Navillus had a CBA with the Cement Workers from July 1, 2008 to June 30, 2011, which was renewed on July 1, 2011 and again on July 1, 2014 (the "Cement Workers CBA"). (Summ. J. Decision at 21-22; *see* PX-1 (Cement Workers CBA); *see also* JPTO Stip. § III.D ¶ 5.) Donal O'Sullivan signed Independent Employer Interim Agreements with the Cement Workers for the period July 1, 2011 to June 30, 2014, and for the period July 1, 2014 to June 30, 2017. (Summ. J. Decision at 10, 21-22; PX-2; PX-3.)

39.    Article III of the Local 46 CBA defines the work covered under the contract. (PX-7 at ML46_000100 to 000102.) Article I defines the geographic jurisdiction of the contract, which includes the five boroughs of New York City. (PX-7 at ML46_000100.)

40.    Article XII of the Local 46 CBA requires contributions to the Local 46 Funds "for every hour worked or paid for all employees covered by this Collective Bargaining Agreement." (PX-7 at ML46_000111 to 000112.)

41.    Article XIII of the Local 46 CBA provides:

> If the Employer merges or consolidates with another Employer or purchases, acquires, sells, leases or otherwise transfers its business operations to another Employer, the Employer agrees that it will guarantee that the Successor will be bound by all the terms and provisions of this Collective Bargaining Agreement and the Employer shall assume responsibility for the continuation of the Collective Bargaining Agreement between this Union and any Successor.

10

(PX-7 at ML46_000115.)

42.     Article XIX of the Local 46 CBA provides:

It is agreed that if any Employer contracts for or performs lathing work falling within the jurisdiction of the Union, as such jurisdiction is set forth in the Union's Collective Bargaining Agreement with the Employing Metallic Furring and Lathing Contractors Association of New York, the Employer agrees that it will assign such work to Employees represented by the union and further, the Employer agrees that all the terms of this Collective Bargaining Agreement shall be applicable to the performance of such work. The Employer must not subcontract bargaining unit work, unless the subcontractor receiving the subcontract is bound and obligated under this Agreement. In the event that the subcontractor . . . fails to make contributions to the Local 46 . . . Funds or working assessments, as required by this Agreement . . . the Employer shall be responsible for such non-compliance . . . .

(PX-7 at ML46_000117; *see also* PX-7 at ML46_000115 ("If[] a party to this Agreement employs a sub-contractor, the sub-contractor shall be bound by all provisions of this Agreement.").)

43.     Article VII of the Cement Workers CBA defines the work covered by the contract. (PX-1 at CCW_NAV000783 to CCW_NAV000789.) Article I provides the geographical jurisdiction of the contract, which includes the five boroughs of New York City. (PX-1 at CCW_NAV000768.)

44.     Article III of the Cement Workers CBA prevents an employer covered by the CBA from forming any new business entity – or from subcontracting any work covered by the CBA to another entity – unless that entity agrees to be bound by the CBA, and makes the original employer liable for any delinquent payments. (PX-1 at CCW_NAV000769 to CCW_NAV000772; *see also* PX-1 at CCW_NAV000831.)

45.     Article III Section 2 of the Cement Workers CBA provides: "If the Employer covered by the Agreement *or any such owner or principal* forms or acquires . . . an interest, whether by ownership, stock, equitable or managerial, in another . . . business entity, . . .

11

performing bargaining unit work within this jurisdiction, the Agreement shall cover such other

operation and such other bargaining unit Employee shall be considered an accretion to the

bargaining unit." (PX-1 at CCW_NAV000772 to CCW_NAV000773 (emphasis added).) Article

XIX Section 2 contains an identical provision. (PX-1 at CCW_NAV000831.)

    46.    Article III Section 3 of the Cement Workers CBA provides:

> If and when the Employer shall perform any work of the type covered by the
> Agreement, under its own name or under the name of another, as a corporation,
> company, partnership, or any other business entity, including joint venture or sole
> proprietorship, and the two (2) enterprises have substantially identical
> management, business purpose, operation, equipment, customers, supervision
> and/or ownership, wherein the employer exercises either directly or indirectly any
> significant degree of ownership management or control, the terms and conditions
> of the Agreement shall be applicable to all such work.

(PX-1 at CCW_NAV000773.)

    47.    Article III Section 5 of the Cement Workers CBA provides:

> If and when the Employer shall perform any on-site construction work of the type
> covered by the Agreement, under its own name or under the name of another, as a
> corporation, company, partnership, or any other business entity, including a joint
> venture, and where there exists between the Employer and such other business
> entity interrelation of operations, common management, centralized control of
> labor relations and/or common ownership, the terms and conditions of the
> Agreement shall be applicable to all such work. In determining the existence of
> the aforementioned criteria, the presence of the requisite control of commonality
> only at the top level of management shall be deemed to satisfy those criteria.

(PX-1 at CCW_NAV000774.)

    48.    Article IV of the Local 780 CBA defines the work covered by the contract. (*See*

PX-5 at 5-6.) Article III defines the geographical jurisdiction of the contract, which includes the

five boroughs of New York City. (*See* PX-5 at 4-5.)

    49.    Article VI of the Local 780 CBA defines the hourly rates and fringe benefit

contributions that must be made to the Local 780 Funds for journeypersons and apprentices

"working on all jobs in the jurisdictional area of the Union" as defined in Article III for every

hour worked. (PX-5 at 8-15.)

     50.    Article II Section 14 of the Local 780 CBA provides, in relevant part:

> . . . [N]o Employer which is a party to this collective bargaining agreement shall
> enter into a contract with any other person, partnership, firm, corporation, joint
> venture or other entity to perform bargaining unit work on a job site, unless such
> person, partnership, firm corporation, joint venture or other entity has signed a
> collective bargaining agreement with the Union or is a member of an Association
> which has signed a collective bargaining agreement with the Union.

(PX-5 at 4.) Article XV Section 7 contains a nearly identical provision. (PX-5 at 25.)

     51.    Article VI Section 3(c) of the Local 780 CBA requires Navillus to comply with

certain books and records requirements and provides, in part:

> In addition, the aforementioned books and records of any affiliate, subsidiary,
> alter ego, joint venture or other related company of the Employer shall also be
> made available at all reasonable times for inspection and audit by, but not limited
> to, the accountants, outside independent auditors or other representatives of the
> Trustees of the [Local 780 Funds].

(PX-5 at 12.)

     52.    Article XV Section 8 of the Local 780 CBA provides:

> If an Employer covered by this Agreement *or any such owner or principal* forms
> or acquires by purchase, merger or otherwise, an interest, whether by ownership,
> stock, equitable or managerial, in another company, corporation, partnership or
> joint venture, performing bargaining unit work within this jurisdiction, this
> Agreement shall cover such other operation and such other bargaining unit
> employees shall be considered an accretion to the bargaining unit.

(PX-5 at 25 (emphasis added).)

     53.    Article VI Section 3(g) imposes personal liability on officers, stockholders,

owners, and employees of Navillus responsible for the proper payment of contributions to the

Local 780 Funds. (*See* PX-5 at 13.)

13

54.    The Carpenters CBA defines the work covered by the CBA in Article III. (*See* PX-4 at 2-16.) Article IX defines the geographical jurisdiction of the CBA, which includes the five boroughs of New York City. (*See* PX-4 at 27-28.)

55.    Article XVI of the Carpenters CBA requires Navillus to make certain fringe benefit contributions to the Carpenters Funds "for each hour worked of all employees covered by this Agreement and employed by said Employer within the territory of this Agreement . . . ." (PX-4 at 46-47.)

56.    Article VIII, Section 2 of the Carpenters CBA prohibits Navillus from "subcontract[ing] any work covered under this Agreement to any one in order to circumvent the payment of wages, fringe benefits, and working conditions provided herein." (PX-4 at 27.)

57.    Article X of the Carpenters CBA provides that any Navillus subsidiary or joint venture is bound by the terms of the CBA "when such subsidiaries or joint ventures engage in building construction work." (PX-4 at 28.) It also provides that the CBA is binding on Navillus, "its successors and/or assigns, as well as any firm, be it corporation, partnership or joint venture [in] which the Employer, . . . its successors or assigns has or acquires a financial interest." (PX-4 at 8-9.)

58.    Article XVIII, Section 19(a) of the Carpenters CBA provides, in pertinent part:

> If and when the Employer shall perform any work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer exercises either directly or indirectly any significant degree of ownership management or control, the terms and conditions of this Agreement including Fringe Benefits shall be applicable to all such work.

(PX-4 at 64.)

59.    The 2008 Local 282 CBA defines the work covered by the contract in Section 5.

(GX-3 at 2-3.) Section 4 defines the geographical jurisdiction of the CBA, which includes the

five boroughs of New York City. (GX-3 at 2.)

60.    Section 3(D)(1) of the 2008 Local 282 CBA provides that the CBA "shall apply to

all present and future operations in the building construction and renovation industry in the area

of the Union's jurisdiction . . . by the Employer, or by *any person or persons who substantially*

*own or control the Employer*, whether such ownership or control is direct or indirect." (GX-3 at

1 (emphasis added).)

61.    Section 3(D)(3) of the 2008 Local 282 CBA provides that the CBA "shall be

binding upon the parties hereto, their successors, administrators, executors and assigns." (GX-3

at 2.) It further provides that:

> In the event the entire operation or any part thereof is sold, leased, transferred or
> taken over by sale, transfer, lease, assignment, receivership or bankruptcy
> proceedings . . . the Employees of the Employer affected shall be employed by the
> successor and such operation or part thereof shall continue to be subject to the
> terms and conditions of this Agreement for the life thereof. . . . No transaction
> described herein shall become effective unless and until the Union has been
> notified in writing by the Employer and the successor that the successor has
> agreed to assume the obligations of this Agreement.

(GX-3 at 2.) Section 3(D)(4) provides: "It is the intent of this provision to extend coverage of

this Agreement to the maximum extent permissible, and to prevent any escape or evasion of this

Agreement by any means, however sophisticated, and whether or not motivated by legitimate

business reasons." (GX-3 at 2.)

62.    Section 31 of the 2008 Local 282 CBA provides:

> The Employer hereby agrees that in order to protect and preserve the work
> opportunities of the Employees covered under this Agreement, it shall not
> establish or have an ownership interest in a DOUBLE BREASTED operation
> within the geographical jurisdiction of Local 282 . . . or outside Said area if the
> work is to be performed within said area.

(GX-3 at 20 (capitalization in original).)

63.     The 2013 Local 282 CBA adopts the same terms as the 2008 Local 282 CBA with amendments not relevant here. (*See* GX-4 at 1.)

## III.   TSC / HDK

64.     In 2004 or 2005, Kevin O'Sullivan decided to launch a new general contractor business, which ultimately became TSC. (*See* K. O'Sullivan Decl. ¶¶ 10-11, DX-176.)

65.     Kevin and Donal O'Sullivan formally incorporated TSC on February 15, 2006. (*Id.* ¶ 11; DX-12.)

66.     Kevin O'Sullivan became President of TSC, and has always been TSC's only corporate officer and only director, although both Donal and Kevin O'Sullivan were equal co-owners of the company until 2012. (K. O'Sullivan Decl. ¶¶ 2, 12, DX-176; DX-13; DX-14.)

67.     TSC's first project was the development of a property that Kevin and Donal O'Sullivan co-owned with two other individuals at 48th Street and Eighth Avenue in Manhattan (the "48th Street Project" or "785 Eighth Avenue"). Navillus served as the concrete subcontractor on that project, as well as on TSC's second project, 47 East 34th Street. (K. O'Sullivan Decl. ¶¶ 20-21, 79-80, DX-176; D. O'Sullivan Decl. ¶ 50, DX-171.)

68.     TSC was formed during a period of transition in the New York construction industry. While union work had previously dominated the market, non-union contractors were beginning to acquire a greater portion of the construction work in the city. (D. O'Sullivan Decl. ¶ 46, DX-171.) Now, approximately ten years later, virtually all privately-funded residential construction projects in the city are non-union. (*See* Tr. at 295:09-296:11.)

69.     TSC was, from its inception, an "open-shop" general contractor, meaning that it utilized both unionized and non-unionized subcontractors. (K. O'Sullivan Decl. ¶¶ 105-06, DX-176.)

70.     Once TSC was incorporated, Kevin O'Sullivan hired several Navillus employees

to help run the company: Thea Clarke, who had been Kevin O'Sullivan's assistant at Navillus;

Fergal Conefrey, an executive project manager for interior tile and stone at Navillus; and

Anthony DelGreco, a director of operations at Navillus. (*Id.* ¶ 24.)

71.     TSC uses the same accountants as Navillus: Grassi & Co., CPAs. (*Id.* ¶ 25.)

72.     TSC began setting up its own bank accounts, first with Commerce Bank, which

became TD Bank. (*Id.* ¶ 94.) On September 29, 2006, TSC began opening accounts with Chase

and then, in October 2013, with NorthEast Community Bank. (*See id.*; DX-09.)

73.     For the first six months of TSC's existence, it subleased office space from

Navillus at 53-18 11th St. in Long Island City, Queens, for $3,000 per month. (K. O'Sullivan

Decl. ¶ 26, DX-176; Clarke Decl. ¶ 13, DX-175.)

74.     Beginning on October 25, 2006, TSC began leasing office space at 355 Lexington

Avenue, where its offices remain today. (K. O'Sullivan Decl. ¶ 26, DX-176; DX-123; DX-126.)

75.     In order to obtain automobile insurance for TSC, Kevin O'Sullivan purchased a

2000 Mitsubishi Gallant from Navillus that had been used by Helen O'Sullivan. (K. O'Sullivan

Decl. ¶ 43, DX-176.) When TSC acquired more vehicles and no longer needed the Mitsubishi, it

sold the vehicle back to Navillus. (*Id.*)

76.     On May 1, 2012, TSC began leasing a portion of a storage yard at 52-11 29th

Avenue in Long Island City, Queens from Borden LIC Properties LLC. (*Id.* ¶ 29; DX-138.)

Borden LIC Properties LLC is an entity jointly owned by Donal and Kevin O'Sullivan. (K.

O'Sullivan Decl. ¶ 29, DX-176.) The storage yard in question was also used by Navillus;

however, when TSC began leasing a portion of the property, a fence was installed to divide

TSC's portion of the yard from Navillus'. (*Id.*)

77.     When Donal and Kevin O'Sullivan decided to develop the storage yard at 52-11

29th Avenue into a commercial self-storage facility, TSC had to find a new storage yard. (*Id.*

¶ 30.) At that time, Navillus was renting a storage yard at 40 Jernee Mill Road in Sayreville,

New Jersey. It assigned that lease to TSC in February 2014. (*Id.*; DX-125.) On March 18, 2015,

TSC renewed the lease for an additional year. (DX-124.)

78.     In August 2014, another construction company contacted Donal O'Sullivan via

email about temporarily leasing the property at 40 Jernee Mill Road, which the company

believed was being used by Navillus based on its observation of the property. (DX-101.) Donal

O'Sullivan forwarded the email to Padraig Naughton, asking when "our lease" was due to expire.

(DX-101.) Naughton informed him that the lease was currently with TSC and would inquire if

Kevin O'Sullivan planned to renew it. (DX-101.)

79.     In 2008, the Hon. Shira Scheindlin, ruling on a motion for a preliminary

injunction in a separate case, concluded that, as of the date of her opinion, Navillus and TSC

were not alter egos or joint employers, nor did they constitute a single employer. *See Time

Square Constr., Inc. v. Mason Tenders Dist. Council of Greater N.Y. & Long Island*, No. 07 Civ.

7250, 2008 WL 55116, at *6-*7 (S.D.N.Y. Jan. 2, 2008).

80.     Donal and Kevin O'Sullivan owned equal shares of TSC until 2012, when Donal

O'Sullivan sold his shares to Kevin O'Sullivan. Kevin O'Sullivan felt that the sale would relieve

pressure from the unions, which were accusing the brothers of running a double-breasted

operation. (D. O'Sullivan Decl. ¶ 62, DX-171; Tr. at 121:18-124:08.) Kevin O'Sullivan testified

that one of the reasons he wanted to purchase the shares was because another lawsuit had been

filed that accused Navillus and TSC of being alter egos. (Tr. at 882:21-883:03.)

18

81.    The brothers testified that they agreed to the terms of the sale on or about January 8, 2012, but decided to make the purchase effective on April 1, 2012, so that they could complete an independent valuation of TSC after the conclusion of its fiscal year on March 31, 2012. (PX-144; DX-40; DX-151; DX-164.) The brothers signed a Purchase Agreement dated January 8, 2012 (DX-40 at CONSNAV001209- CONSNAV001210), but Kevin O'Sullivan did not pay Donal O'Sullivan the purchase price of $301,467.50 until October 19, 2012. (K. O'Sullivan Decl. ¶ 39, DX-176; D. O'Sullivan Decl. ¶ 62, DX-171; PX-144; DX-151; DX-164.)

82.    I do not credit the brothers' testimony that they agreed to the sale in January 2012, because documents in the record contradict their timeline of events. The study that was used to determine the fair market value of Donal O'Sullivan's shares was dated October 19, 2012 – the very day that Kevin O'Sullivan transferred the funds to Donal O'Sullivan's account. (DX-164.) It was purportedly this study that set the purchase price of $301,467.50. However, the Purchase Agreement specifies that the purchase price was to be $301,467.50. (*See* DX-40 at CONSNAV001209.) Since the brothers could not have known on January 8, 2012, what the company's valuation would be as of March 31, 2012 – and since the valuation study was not completed until much later in the year – it is obvious that the January 8 date is a fiction, and that the brothers reached their agreement (and signed the Purchase Agreement) much later in the year. Kevin O'Sullivan effectively admitted as much. (Tr. at 887:10-13.)

83.    I conclude, as a matter of fact, that Donal and Kevin O'Sullivan executed the Purchase Agreement and Assignment of Shares on October 19, 2012, and backdated both documents due to concerns about allegations from the unions that TSC and Navillus were alter egos.

A.      **Two Fifth Avenue and the Formation of HDK**

84.     In February 2012, TSC obtained the contract for restoration and renovation work at Two Fifth Avenue. (K. O'Sullivan Decl. ¶ 41, DX-176.) Two Fifth Avenue was first job that TSC had secured in approximately eighteen months. (*Id.* ¶ 47; Tr. at 878:11-16.) Although TSC was to be the general contractor at Two Fifth Avenue, Kevin O'Sullivan decided that TSC would self-perform some of the work in order to generate additional revenue. (K. O'Sullivan Decl. ¶ 41, DX-176; Dooley Decl. ¶ 13.)

85.     In order to create an extra layer of liability insurance for the Two Fifth Avenue job, Kevin O'Sullivan decided to pay TSC's laborers through a separate legal entity, called a "paymaster" or "payroll master." (K. O'Sullivan Decl. ¶ 41, DX-176.) HDK was originally created to be that paymaster. (*Id.* ¶¶ 41-42.)

86.     On January 27, 2012, HDK was formed by the filing of its Certificate of Formation with the Delaware Secretary of State. (PX-143.) The initials "HDK" stood for three of the O'Sullivan siblings: Helen, Donal, and Kevin. (Tr. at 851:25-852:06.)

87.     The Certificate lists Donal and Kevin O'Sullivan as HDK's only two members. (PX-143.) However, HDK's LLC Agreement, dated January 30, 2012, lists Kevin O'Sullivan as the only member of HDK. (*See* DX 136.)

88.     Kevin O'Sullivan hired Martin Dooley to be the superintendent/project manager for Two Fifth Avenue. (K. O'Sullivan Decl. ¶ 45, DX-176.) Dooley, who had been employed by Navillus from 1998 or 1999 until June 2010 (Dooley Decl. ¶¶ 3-4), was responsible for overseeing the project's other subcontractors; he also oversaw the HDK employees who were performing the demolition, masonry, and cleanup work. (Dooley Decl. ¶¶ 13-14.)

89.     As Two Fifth Avenue was the first project on which TSC actually performed some of the construction work, TSC needed a vehicle to move equipment to and from the

project. (K. O'Sullivan Decl. ¶ 44, DX-176.) Thus, on March 28, 2012, TSC purchased a GMC

van from Navillus for $7,000. (Dooley Decl. ¶ 31; *see* DX-168.)

90.    TSC also needed heavy-duty scaffolding and a sidewalk bridge for the Two Fifth

Avenue project. (K. O'Sullivan Decl. ¶ 45, DX-176.) Unable to find the needed scaffolding

quickly from local suppliers, TSC purchased the necessary materials from Navillus. (*Id.* ¶ 45;

Dooley Decl. ¶¶ 25-26; Tr. at 879:03-09.) Navillus charged TSC approximately $40,000 for the

scaffolding. (DX-169.) TSC borrowed Navillus' truck to transport this scaffolding material from

the divided storage yard in Long Island City to the Two Fifth Avenue job site. (Dooley Decl.

¶ 26.)

91.    When a technical masonry issue arose on Two Fifth Avenue, Dooley and Fergal

Conefrey asked Colin Mathers, Navillus' Director of Operations, to assist. (Dooley Decl. ¶ 17.)

Mathers agreed to meet with the project's engineers and representatives of the project's owners

and coop board, along with Dooley and Conefrey, to explain his advice on the masonry problem.

(Dooley Decl. ¶ 17.)

92.    TSC also used Navillus as a visa sponsor for one of its workers on Two Fifth

Avenue, Donald Dunnion. Dunnion was originally employed by Navillus; his employer sponsor

information was not corrected when he switched to working for TSC on Two Fifth Avenue. (Tr.

at 895:11-896:04.)

**B.    The Sugar Hill Project**

93.    In early 2012, Navillus submitted a bid to general contractor Mountco

Construction ("Mountco") for a concrete superstructure and foundation subcontract on a project

at 400 West 155th Street in the Sugar Hill district of West Harlem (the "Sugar Hill" project). (D.

O'Sullivan Decl. ¶ 68, DX-171; Downes Decl. ¶ 16, DX-178; PX-118A.)

94.    Navillus' bid was prepared by Peter Downes, Navillus' Chief Estimator and Vice President. (Downes Decl. ¶ 17, DX-178.) Navillus typically bids on approximately 350 to 400 projects per year, and is generally awarded 10%-15% of the projects on which it bids. (*Id.* ¶ 13.) Downes personally prepares approximately 25% of all of Navillus' bids (generally for the larger and more complex projects); his team prepares the rest, subject to his approval. (*Id.*)

95.    Before submitting the bid, Downes and Donal O'Sullivan went to Mountco's offices to discuss the project. (*Id.* ¶ 17; *see* Tr. at 131:03-10.) Rich Caruso, Mountco's Vice President of Construction, was present at that meeting, as was Kieran Power, who was hired by Mountco as a consultant to review the concrete subcontractor bids on the project. (Tr. at 405:15-19; 406:21-407:07.) Joel Mounty, the principal of Mountco, met Donal O'Sullivan after that meeting. (*See* Tr. at 407:25-408:06.)

96.    Mountco considered factors like the contractor's level of experience and ability to obtain a performance bond to be important when evaluating bids and considered those factors in addition to price. (*See* Tr. at 416:10-15; 463:10-17.)

97.    Navillus' initial bid for the Sugar Hill project was for $13,113,900. (PX-118A.) Several witnesses testified that Navillus' bid was rejected, and that the reason for its rejection was that its bid was too high. (*See* Tr. at 126:11-18 (D. O'Sullivan testimony); 438:05-09 (Mounty testimony); Downes Decl. ¶ 18, DX-178.)

98.    However, Navillus was the only union contractor that submitted a bid to Mountco. (Tr. at 438:20-22.) Mounty testified that, all things being equal, he would choose a non-union subcontractor over one that used union labor, because having a union subcontractor could create a conflict on the job site. (*See* Tr. at 441:08-442:04.)

22

99.    As is customary, Mountco sought a "best and final" bid for the Sugar Hill project.
(*See* Tr. at 473:20-474:01; PX-118A.) According to the "leveling sheet" used by Mountco to
compare the bids, Navillus (not TSC) submitted a "best and final" bid for the Sugar Hill project,
in the amount of $11,950,000. (PX-118A.) There is no indication on the leveling sheet that any
other company that had submitted an initial bid also submitted a "best and final" bid.

100.    But Navillus was not ultimately awarded the contract for the Sugar Hill project.
(*See* PX-118A.) Instead, the contract was awarded to TSC, at the exact price of Navillus' best
and final bid, $11,950,000.

101.    Kevin O'Sullivan testified that he learned about the Sugar Hill project from his
brother Donal O'Sullivan in March or April 2012, *after* Navillus' initial bid had been rejected.
(K. O'Sullivan Decl. ¶ 48, DX-176; Tr. at 862:07-09.) According to Kevin, Donal told him that
Navillus' bid had been rejected because it was too high and because Mountco would not use
union contractors. (K. O'Sullivan Decl. ¶ 48, DX-176.)

102.    As noted above, TSC had very little work lined up and needed the business. (*Id.*
¶¶ 48-49.) The only other job that TSC had in early 2012 was the project at Two Fifth Avenue.
(*Id.* ¶ 47; Tr. at 878:11-16.) Indeed, in an email dated July 26, 2012, Navillus' Chief Financial
Officer, Padraig Naughton, told Donal O'Sullivan that he had to "write off" an undisclosed sum
that TSC owed to Navillus in order to keep TSC afloat, which resulted in a reduction in Navillus'
2012 profits. (PX-100.)

103.    TSC had never previously performed concrete foundation or concrete
superstructure work as a subcontractor. (Tr. at 862:15-18.) TSC's previous experience was
exclusively as a general contractor. (Tr. at 862:22-25.) At the time, TSC did not have any
employees who were experienced in concrete construction, nor did it have a superintendent or

23

project manager on staff. (Tr. at 863:01-08.) TSC did not own any of the equipment necessary to

perform the job, such as foundation excavators, concrete forms, or compressors. (Tr. at 879:08-

20.) TSC had also never performed work on a public-sector project and had no experience

dealing with the obligations of a prevailing wage job. (K. O'Sullivan Decl. ¶ 49, DX-176.) In

other words, TSC had no objective way to perform the Sugar Hill job and lacked the experience

that Mounty testified that he valued in selecting subcontractors to work on his projects.

104.    Navillus, of course, had plenty of experience doing concrete construction on

public-sector jobs as a subcontractor.

105.    Donal O'Sullivan offered to help Kevin "find the right people to hire" in order to

get TSC the Sugar Hill contract. (*Id.*) Per Donal O'Sullivan's advice, Kevin O'Sullivan

contacted one of Navillus' project managers, John Kuefner, who recommended he ask Rory

McSwiney for assistance in preparing TSC's bid. (*Id.* ¶ 50.)

106.    Kevin O'Sullivan hired McSwiney, then a Navillus project manager, as a

consultant to prepare TSC's bid for Sugar Hill. (*Id.* ¶ 51; Tr. at 864:18-20.) At the time,

McSwiney was twenty-five years old, had never previously been employed by TSC, and had

never previously prepared a bid for a concrete construction subcontract during his work at

Navillus. (*See* Tr. at 864:21-865:03, 992:23-993:05.)

107.    Kevin O'Sullivan testified that he contacted Kieran Power, Mountco's consultant

who was evaluating the concrete bids on Sugar Hill, about submitting a bid from TSC for the

project in April 2012. (Tr. at 863:22-864:10.) Power had previously worked for Kevin

O'Sullivan for three years and served as Senior Project Executive on TSC's largest project, 785

Eighth Avenue. (Tr. at 863:09-13, 864:01-10.) Power told Kevin O'Sullivan that TSC's bid was

"very late" but would be considered. (Tr. at 864:05-10.)

24

108.    TSC submitted its initial bid for the Sugar Hill project on April 16, 2012, in the amount of $12,000,000. (PX-116.) Unlike the bids from other companies, which separated the estimated cost into foundation work and superstructure work and contained detailed estimates for various types of work, the TSC bid contained no such breakdown. (*Compare* PX-118A *with* PX-116.) Indeed, TSC's entire bid was less than two pages long. (PX-116.) As Peter Downes, Navillus' Chief Estimator, testified, bids for these types of complex jobs are usually much longer and more detailed, with line items for things like the cost of materials and equipment. (*See* Tr. at 998:10-13.) TSC's non-conforming bid document was of a piece with its inexperience in this type of work.

109.    Nonetheless, and despite Moriarty's preference for an experienced contractor (*see* Tr. at 441:13-15), TSC's bid was accepted by Mountco two days later, on April 18, 2012. (PX-116; PX-118A.) In the end, the amount of the accepted bid was $11,950,000 – the exact amount listed on Mountco's leveling sheet as being the "best and final" bid submitted by *Navillus*. (PX-116; PX-118A.)

110.    Kevin O'Sullivan testified that he gave McSwiney full authority to determine the final bid amount, including the power to change the overall bid amount from the original $12,000,000. (Tr. at 866:11-19.)

111.    Mounty testified that one of the important things that led Mountco to select TSC as the concrete subcontractor was its ability to handle the project's prevailing wage obligations. (Tr. at 416:10-24.) TSC, as discussed, had absolutely no experience with prevailing wage projects. (K. O'Sullivan Decl. ¶ 49, DX-176.) Mountco's acceptance of TSC's bid based on this criterion makes clear that Mountco was relying on Navillus' experience in this area in order to complete the job.

112.    After TSC was awarded the Sugar Hill project, Kevin O'Sullivan hired Hazel

Corcoran as a consultant (through her company LJB Contracting, Inc.) to assist with contract

negotiations. (*Id.* ¶ 53.) Hazel Corcoran had been employed by Navillus as an engineer until

approximately 2008. (*Id.*) Her husband, Patrick Corocran, was also a Navillus employee. (D.

O'Sullivan Decl. ¶ 79, DX-171.)

113.    The negotiations over the Sugar Hill contract were conducted by TSC's outside

counsel, Corcoran, McSwiney, Donal O'Sullivan, and Donal O'Sullivan's assistant, Krystle

Venechanos. Kevin O'Sullivan was not copied on most of the email correspondence about the

contract negotiations.

a.    On April 25, 2012, Power sent a draft scope of work to McSwiney for

TSC's review, copying Corcoran, Caruso, and Donal O'Sullivan. (PX-176.) Later that

same day, Power sent a sample insurance certificate to the same group of individuals.

(PX-177.) Kevin O'Sullivan was not copied on either email.

b.    On April 27, 2012, Power sent two emails, one attaching TSC's bid with

his notes and one attaching a proposed bond format, again copying only Corcoran,

McSwiney, and Donal O'Sullivan from the TSC side. (PX-178; PX-179.)

c.    On April 30, 2012, Power sent an email directly to Donal O'Sullivan,

copying Corcoran and McSwiney, with questions about TSC's proposal and requesting a

conference call to discuss. (PX-179.)

d.    On May 4, 2012, Power sent an email to McSwiney, copying Corcoran

and Donal O'Sullivan, with questions about TSC's proposed use of a crane on the

project. (PX-180.)

26

e.    On May 22, 2012, Corcoran sent emails to TSC's counsel, copying Donal O'Sullivan and McSwiney, attaching the proposed Sugar Hill subcontract and exhibits for review. (PX-181; PX-182.)

f.    On May 29, 2012, TSC's counsel replied to Corcoran with proposed changes to the Sugar Hill contract. (PX-183.) Corcoran replied to this email on May 30, copying McSwiney, Kevin O'Sullivan, and Donal O'Sullivan, requesting a conference call "with Donal and Kevin" to discuss. (PX-183; *see also* PX-185 (emails arranging conference call).)

g.    Later on May 30, 2012, Corcoran emailed Power asking for a conference call with Mountco representatives to discuss the contract, copying McSwiney, Donal O'Sullivan, and Venechanos. (PX-184.) Kevin O'Sullivan was not copied on this email.

h.    On June 1, 2012, counsel for Mountco emailed Corcoran to arrange a conference call to "go over the Sugar Hill agreement." Donal O'Sullivan was copied on this email, but Kevin O'Sullivan was not. (PX-186.)

i.    After a series of back-and-forth negotiations between counsel for Mountco and TSC over the contract terms, Corcoran again emailed Donal O'Sullivan on June 5 to arrange a conference call to discuss the contract with TSC's lawyer, Jason Samuels. (PX-187.) Kevin O'Sullivan was not copied on this email either. Later that day, McSwiney responded to the email chain, stating, "Jason – Just spoke to Donal now, he is gone into a meeting but he said he will call you after to discuss the issues himself." (PX-188 at NAV0004618.)

j.    On June 7, 2012, Venechanos sent two emails to TSC's counsel listing the outstanding issues to be negotiated on the Sugar Hill contract, including "The issue of our

right to stop work due to non-payment," the amount of "Our markup," that "We must request and see Mountco's bond," and that "We must review the MBE requirements in the prime contract." (PX-188.) Finally, she commented about the issue of indemnity against breach of contract: "Donal, I know you don't want to push too hard on this issue, but its [sic] worth pushing back again." (PX-188.)

      k.     On June 11, 2012, TSC's counsel Jason Samuels emailed Donal O'Sullivan directly, stating, "Donal . . . With regard to the 'second' modification to Paragraph 5.3.2, I don't like that provision at all. It basically allows Mountco to withhold money that they've been paid by the Owner for *your* work . . . . It's up to you, how do you want me to handle this?" (PX-189 (emphasis added).) Kevin O'Sullivan was not included on this email.

      l.     On June 14, 2012, Samuels sent Venechanos a package of the final subcontract documents for signature, copying Donal (but not Kevin) O'Sullivan. Samuels stated, "Please sign two originals and keep a copy for comparison when Mountco returns their set of fully executed documents to you." (PX-190.)

      m.     On June 28, 2012, Mountco sent a document to McSwiney regarding site audits for a signature, which McSwiney immediately forwarded to Venechanos asking her to "Please advise." (PX-193.) Venechanos responded, instructing McSwiney not to sign the document and copying Samuels and Donal O'Sullivan. Samuels responded, saying he would contact Mountco's counsel "and let her know that we are still discussing the labor certification." (PX-193.) Again, Kevin O'Sullivan was not copied on any of these emails.

114.    Donal O'Sullivan was the driving force in the negotiation of TSC's Sugar Hill contract; he was not simply a consultant about prevailing wage issues. Aside from participating in one conference call on May 31, there is no evidence that Kevin O'Sullivan played any role in the contract negotiations, while Donal O'Sullivan is copied on nearly every email in the record concerning the contract's terms. The emails indicate that TSC's counsel took instructions directly from Donal O'Sullivan and his assistant about what negotiating positions to take.

115.    I do not credit the testimony of Donal O'Sullivan that Samuels' June 11 email stating "It's up to you," (PX-189) was anything but an indication that TSC's counsel was taking direction straight from Donal O'Sullivan. (*See* Tr. at .142:05-08.) Indeed, when Donal O'Sullivan was asked whether Venechanos' June 7 email about the indemnity clause meant that it was "up to you to decide whether to push back on that indemnity clause," he responded, "It would seem that way." (Tr. at 142:04-06.)

116.    The fact that Venechanos was involved in these negotiations at all is itself illuminating. Venechanos worked at Navillus as Donal O'Sullivan's assistant and was never employed by TSC. Yet she communicated directly with TSC's counsel about outstanding issues about what she characterized as "our" rights under the contract. (*See* PX-188.) Furthermore, when it came time to have the contract signed, TSC's counsel sent the final copies to Venechanos with instructions for signature – not to Kevin O'Sullivan or anyone at TSC. (*See* PX-190.)

117.    On these facts, I cannot reasonably conclude that TSC won the bid for the Sugar Hill project on its own merits, independent of Navillus' involvement. Instead, I conclude that, when Donal O'Sullivan learned that Navillus' bid would be rejected because it was a union-affiliated contractor, he arranged for the contract to be awarded to his brother's firm at exactly

29

the same price that Navillus had proposed in its best and final offer. I further conclude that Donal

O'Sullivan remained in charge of negotiating the contract with Mountco, and assured both

Mountco and Kevin O'Sullivan that Navillus would supply key employees with sufficient

experience to handle the project – which, as discussed below, it did.

118.   Sugar Hill broke ground on July 19, 2012. (*See* PX-194.)

119.   In August 2012, John Kuefner resigned his position at Navillus and formed his

own consulting company, CCB Experts, LLC ("CCB"). (Tr. at 691:18-20; PX-80.) According to

Kuefner's testimony, he did not begin consulting on Sugar Hill until shortly after the formation

of CCB on August 24, 2012. (Kuefner Decl. ¶¶ 20-21, DX-174; *see* Tr. at 692:19-694:09.) The

first invoice from CCB to TSC for work on the project was dated September 29, 2012. (PX-81 at

TS-0000949.) Kuefner testified that when he began working on the Sugar Hill project, he took

over as project manager for Rory McSwiney, who returned to Ireland. (Tr. at 749:21-24.)

According to Kuefner, he began working on the project after it was already underway and the

foundation work was about three-quarters complete. (Tr. at 749:9-12.) He testified that he was

not present on the Sugar Hill site while the excavation and foundation work was beginning; that

work was supervised by McSwiney. (Tr. at 749:13-20.)

120.   For several reasons, I do not credit Kuefner's testimony that he did not begin

working on the Sugar Hill project until after he resigned from his position at Navillus – which,

according to him, was on August 21, 2012. (Kuefner Decl. ¶ 16, DX-174.) That timeline is

irreconcilable with the testimony of other witnesses and the documentary evidence in the record.

121.   First, William O'Donnell, another Navillus employee who specialized in the

pouring of concrete foundations (*see* Tr. at 634:10-15), testified that he was asked to provide

advice on the Sugar Hill project. O'Donnell, who was never employed by TSC or HDK, took

30

time off from his work at the World Trade Center project to visit the Sugar Hill site in Harlem. (Tr. at 618:01-619:04.) O'Donnell testified that he visited the project five or six times. (Tr. at 617:17-25, 619:05-11.)

122.    O'Donnell testified that he met both Kuefner and McSwiney the first time he visited Sugar Hill, and that Kuefner may have been supervising McSwiney, who was "running the job" on a day-to-day basis. (Tr. at 620:10-21.) O'Donnell also testified that he visited the site to provide advice on "what way they would attack the foundation," meaning that the foundation work was still in its early stages at the time of his first visit. (Tr. at 619:05-11.)

123.    In the context in which O'Donnell's testimony was given, it is reasonable to infer that his advice was sought early in the process of pouring the foundation for Sugar Hill, and that Kuefner was on site at the same time as McSwiney during this phase of construction. This is inconsistent with Kuefner's testimony that he was not involved in the Sugar Hill project until after the foundation was three-quarters complete and that he replaced, rather than supervised, McSwiney.

124.    Second, Eoin Moriarty, another Navillus employee, testified that he was contacted by Kuefner in "the spring of 2012" to help consult on the Sugar Hill project. (Moriarty Decl. ¶ 20, DX-172.) Kuefner contacted Moriarty to ask him to oversee the wage compliance and certified payroll issues for TSC on Sugar Hill. (*Id.*) Moriarty performed this work for TSC through Moriarty's consulting company, Xcel Advisors. (*Id.* ¶¶ 20-21.)

125.    Again, this evidence supports the conclusion that Kuefner was already performing work for TSC at the time he retained Moriarty's consulting company, Xcel Advisors, which had to have been sometime by the spring of 2012. That conclusion is consistent with Kuefner's own testimony that he had discussions with Kevin O'Sullivan about the project around July 2012

31

(Kuefner Decl. ¶ 19, DX-174), that he filed the paperwork to establish CCB approximately two months before it was formally created on August 24, 2012 (Tr. at 691:21-23; *see* Kuefner Decl. ¶ 18, DX-174), and that, before he left Navillus, he "had already lined up CCB's work" for TSC on Sugar Hill. (Kuefner Decl. ¶ 20, DX-174.)

126.    Therefore, I conclude that Kuefner was performing services for TSC related to the Sugar Hill project for several months while still employed by Navillus. Moriarty, who remained employed by Navillus until August of 2013, was also simultaneously working for both companies. (Moriarty Decl. ¶ 26, DX-172; *see also* PX-107 (showing payments from Navillus to Xcel Advisors during this period).)

127.    On October 1, 2012, Patrick Corcoran, husband of Hazel Corcoran, was hired by TSC as general superintendent on the Sugar Hill job. (PX-82; D. O'Sullivan Decl. ¶ 79, DX-171; Tr. at 695:20-25.) Patrick Corcoran was also a longtime Navillus employee who had worked on the Rapid Repair project with Moriarty and the 1717 Broadway project with Kuefner. (D. O'Sullivan Decl. ¶ 79, DX-171; Tr. at 498:22-23, 501:08.) He was continuously employed by Navillus up until his transfer to TSC on October 1, 2012. (PX-83.) As general superintendent, Corcoran reported to Kuefner and was responsible for hiring employees for the job. (Tr. at 695:20-696:04.)

128.    Donal O'Sullivan also visited the Sugar Hill site at least once. (D. O'Sullivan Decl. ¶ 82, DX-171.)

129.    Although the Sugar Hill contract was awarded to TSC, Kevin O'Sullivan arranged to have most or all of the employees, including Patrick Corcoran and Moriarty (through his Xcel Advisors consultancy), paid through HDK. (*See* Tr. at 348:15-19; PX-56; PX-82.)

130.    In addition to management, several timbermen, lathers, and laborers were moved from the Navillus payroll to the HDK payroll to work on the Sugar Hill project. Although complete payroll data is not available, those individuals included, at minimum: Dennis Harvey (*see* PX-262 (employed by Navillus in June 2012); PX-265 (employed by HDK in November 2012)); James Gidursky (*see* PX-107 at MLCCW005400 (employed by Navillus in June 2012); PX-265 (employed by HDK in November 2012)); Niall Gillespie (*see* PX-107 at MLCCW005406 (employed by Navillus in July 2012); PX-266 (employed by HDK in November 2012)); Vincent Cienfuegos (*see* PX-255 (employed by Navillus continuously from October 2011 through August 2012, then from July 2013 through November 2013); PX-266 (employed by HDK in November 2012)); and Damian Calders (*see* PX-257 (employed by Navillus in December 2011); PX-266 (employed by HDK November 2012)).

131.    At least four individuals, after working for HDK on Sugar Hill, moved to Navillus' payroll for future projects, including: Daniel Morales (*see* PX-265 (employed by HDK in November 2012); PX-258 (employed by Navillus in June 2013)); Carlos Carattina (*see* PX-265 (employed by HDK in November 2012); PX-253 (employed by Navillus in August 2014)); Vincent Cienfuegos (*see* PX-255 (employed by Navillus continuously from October 2011 through August 2012, then from July 2013 through November 2013); PX-266 (employed by HDK in November 2012)); and Hugh McCallion (*see* PX-266 (employed by HDK in November 2012); PX-259 (employed by Navillus in April 2014)).

132.    When Mountco's principal, Joel Mounty, encountered difficulties on the Sugar Hill project, he reached out to Donal O'Sullivan for assistance.

a.    In February 2013, when Mountco received inquiries from the New York City Department of Housing Preservation and Development ("HPD") – the government

33

agency involved in financing the Sugar Hill project (Tr. at 876:23-877:02) – about

paperwork it needed from TSC, Joel Mounty personally forwarded the request to Donal

O'Sullivan. In that email, Mounty stated: "Donal, you [have] got to step-in [sic] and

straighten out TSC on the Sugar Hill project. HPD is all over my ass about TSC not being

responsive and submitting required paperwork in any sort of timely fashion. . . . I shook

your hand on this deal, nobody else's. I'm only dealing with obstinate staff people, biting

at my [heels]." (PX-155.)

     b.     On September 26, 2013, Mounty again reached out to Donal O'Sullivan

when HPD sent a letter to Mountco seeking additional information. In that email he said,

"Donal, I sent this letter to Kevin last night. I've previously sent you emails asking that

you, Kevin, address HPD's request for info. I've received no reply from any of my emails

from you or Kevin." (PX-158.)

     c.     On September 30, 2013, Mounty forwarded another request from HPD

directly to Donal O'Sullivan. (PX-159.) Donal O'Sullivan sent the request to Eoin

Moriarty, asking, "Again, what's going on with this?" (PX-160.) After Moriarty

responded, saying that, "we have provided them everything that has been requested to

date," Donal O'Sullivan forwarded this information to Mounty. (PX-160.) Mounty

replied, saying, "I forwarded you what HPD sent me. The burden is on you." (PX-160.)

Donal responded to that email, stating: "With all due respect Joel, if they require

something, they should ask for it. That burden is not on me!! We are not mind readers.

From what I have been told, we have talked to Carlos and he is unware of what paper

work, if any[,] is outstanding. We will submit or resubmit paperwork once we know what

it is." (PX-160.)

133.    It is clear from these emails that Mounty understood Donal O'Sullivan to be supervising TSC's work on the Sugar Hill project and to have enough control over TSC's operations to be able to arrange for TSC to submit official paperwork to HPD. Mounty himself testified that he understood Donal O'Sullivan to be speaking for TSC in these emails. (*See* Tr. at 418:04-08.) As late as February 20, 2013 – almost a year after the contract was awarded to TSC and with work nearly complete on the project – Mounty had not yet met Kevin O'Sullivan. (Tr. at 413:20-414:02.)

134.    TSC's work on Sugar Hill was substantially completed by the spring of 2013. (Moriarty Decl. ¶ 21, DX-172 (testifying that work was completed in May 2013); Clarke Decl. ¶ 19, DX-175 (same); Tr. at 695:12-16 (Kuefner testimony that work was completed in May or June 2013); Tr. at 902:20-23 (Kevin O'Sullivan testimony that work was completed in March 2013).) However, as is standard in the industry, TSC remained responsible for any outstanding "punch-list work" that was covered by its subcontract. (*See* K. O'Sullivan Decl. ¶ 61, DX-176; Clarke Decl. ¶ 20, DX-175.)

135.    The concrete punch-list work for Sugar Hill was not ready to be performed until 2014, by which time the managers and workers on the job had moved on to other projects. On March 5, 2014, Kevin O'Sullivan emailed John Kuefner (who, by then, was working full-time at ACS, as discussed below) asking him to meet with Mountco's representative and determine the scope of the punch-list work. (DX-142.) Kuefner promptly visited the Sugar Hill site and responded that, "We are arranging a small crew and a bit of material for Tuesday next week," in order to complete the remaining concrete-related tasks. (DX-142.) Kuefner testified that the work remaining was minor and only required a crew of four to five for approximately two days. (Kuefner Decl. ¶ 23, DX-174.) However, because TSC "did not perform any concrete or

35

foundation superstructure work," it had "no employees capable of doing such work" at the time. (*Id.*) Therefore, Kuefner arranged to have employees of ACS perform the work. (*Id.*) On March 31, 2014, ACS sent TSC an invoice for the punch-list work performed on the Sugar Hill project. (*See* DX-122.)

136.    Mountco still refused to pay TSC the remaining money owed, which was almost a million dollars. (*See* PX-89; Kuefner Decl. ¶ 24, DX-174.) Accordingly, in August 2014, Kevin O'Sullivan emailed Mounty to arrange a close-out meeting to discuss any punch-list items, and specifically asked for Moriarty and Kuefner (by then, both employed at ACS) to be present. (*See* PX-90.) That meeting took place on August 19, 2014, at which time TSC and Mountco agreed on the remaining tasks needed to close out the project. (PX-91.) The remaining work, which required a crew of four for approximately five weeks, was performed by HDK employees and supervised by Patrick Corcoran. (Kuefner Decl. ¶ 25, DX-174.)

137.    On September 29, 2014, Mounty emailed Kevin O'Sullivan about outstanding work to be completed on the sidewalk and driveway at Sugar Hill. (PX-165; PX-166.) After some back-and-forth, TSC agreed to complete this work, which took approximately two days. Kuefner testified that he believed this work was performed by ACS employees as well. (*See* Tr. at 701:10-702:08.)

138.    Sometime in 2014, Kevin O'Sullivan transformed HDK into an operating non-union subcontractor, primarily performing masonry work and installing curtain walls on large high-rise buildings. (K. O'Sullivan Decl. ¶ 42, DX-176.) Since Sugar Hill, neither TSC nor HDK has performed any work as a concrete subcontractor. (*See id.* ¶ 49; Kuefner Decl. ¶ 23, DX-174.) TSC also eventually acquired several large trucks, which drivers employed by HDK would use

36

on both TSC and HDK projects, pursuant to a written agreement between the companies. (DX-140.)

139.    After the Sugar Hill project was completed, some of the project's managers stayed with TSC or HDK, while others either returned to Navillus or moved on to ACS. Martin Dooley, the project manager for the Two Fifth Avenue project, remains the Director of Operations at HDK. (K. O'Sullivan Decl. ¶ 99, DX-176.) Fergal Conefrey is TSC's Head of Construction. (*Id.*) Thea Clarke is TSC's Office Manager. (Clarke Decl. ¶ 1, DX-175.)

140.    Neither Navillus, TSC, nor HDK made any fringe benefit contributions for hours of work performed by employees on the Sugar Hill project. (*See* Tr. at 266:02-09.)

## IV.    ACS

### A.    TMG Contracting

141.    On May 16, 2012 – around the same time he began consulting on Sugar Hill for TSC – Eoin Moriarty formed The Moriarty Group, LLC d/b/a "TMG Contracting" ("TMG Contracting"), a New York limited liability company. (Moriarty Decl. ¶ 13, DX-172; *see* PX-12.)

142.    According to Moriarty, he intended TMG Contracting to be a concrete and drywall company in the event opportunities to do that type of work outside of Navillus arose. (Moriarty Decl. ¶ 13, DX-172.) In other words, he intended to be in the same line of business as Navillus.

143.    After Hurricane Sandy caused widespread damage to parts of the New York metropolitan area at the end of October 2012, Moriarty and other Navillus employees performed volunteer work in the Breezy Point neighborhood of Queens. (*Id.* ¶¶ 14-16.) Soon thereafter, Navillus sought and won a contract for the NYC Rapid Repair Program, a contract valued at $70 million, to repair homes in the Breezy Point neighborhood. (*Id.* ¶ 17.) Moriarty served as

Navillus' project manager on that contract from the time of its award to June 2013, when it was substantially completed. (*Id.* ¶¶ 17-19.)

144.    At the same time he was overseeing the Rapid Repair program as an employee of Navillus and consulting for TSC on Sugar Hill, Moriarty began preparing non-union construction bids for TMG Contracting. Moriarty and Kuefner submitted TMG Contracting's first bid in April 2013 to Triton Construction for the concrete superstructure work on a project at 551 West 21st Street (the "21st Street" project). (*Id.* ¶¶ 23-25; Kuefner Decl. ¶¶ 27, 32, 33, DX-174.) Kuefner prepared that bid, and Navillus' Chief Estimator, Peter Downes, reviewed two versions of the bid before it was submitted. (Moriarty Decl. ¶ 25, DX-172; Downes Decl. ¶ 28, DX-178.) Moriarty also sought advice on the bid from Patrick Corcoran. (Moriarty Decl. ¶ 25, DX-172.)

145.    In May 2013, TMG Contracting secured a rebar installation contract on Coney Island from a foundation company named Eagle, and later secured another Eagle contract doing rebar installation work at the Brooklyn Pierhouse. (*Id.* ¶ 22.)

146.    From May 2013 to January 2014, Kuefner was hired by Donal O'Sullivan to consult on the Navillus project at 150 Charles Street, which he did while preparing additional bids for TMG Contracting. (D. O'Sullivan Decl. ¶ 80, DX-171; Kuefner Decl. ¶ 33, DX-174.) Donal O'Sullivan also hired Patrick Corcoran, TSC's general superintendent on the Sugar Hill job, to work on 150 Charles Street for Navillus. (D. O'Sullivan Decl. ¶ 80, DX-171.)

147.    In mid-July 2013, TMG Contracting was awarded the bid for the 21st Street project. (Moriarty Decl. ¶ 26, DX-172.)

148.    Sometime in August 2013, Moriarty told Donal O'Sullivan that he would be leaving Navillus to work full time for TMG Contracting. (*Id.*) Despite this, Donal O'Sullivan agreed to continue having Navillus pay Moriarty's health insurance premiums, which it did until

late 2014. (*Id.* ¶ 27; *see* Tr. at 351:06-352:14.) Moriarty's health insurance was provided through Cement Workers Local 18A; Donal O'Sullivan had written a letter to the union in April 2013 stating that Moriarty would be employed as a journeyman on the project at 150 Charles Street so that Moriarty could access union benefits including health insurance. (*See* PX-57; PX-58.) Those statements were not true: Donal O'Sullivan characterized Moriarty's role at Navillus as a "bookkeeper," and Moriarty testified that he last poured concrete for Navillus back in 2002 and there was never an intention that he would work as a journeyman for Navillus. (Tr. at 221:01-16; 321:04-04.)

149.    Because Navillus represented to the Cement Workers that Moriarty remained a Navillus employee until late 2014, it cannot now argue that he ceased being affiliated with the company after August 2013. I conclude that, his "departure" notwithstanding, Moriarty remained an employee of Navillus through the period when his union health insurance premiums were being paid by Navillus. The fact that Moriarty was owed significant bonus money from the completion of several projects, including his work on the Rapid Repair program, would not justify Navillus' continued representation to the union that Moriarty was an employee.

150.    In May 2013, Kuefner and Downes also prepared a bid for a concrete foundation and superstructure contract at 1191 Boston Road in the Bronx (the "Boston Road" project). (Downes Decl. ¶ 31, DX-178; Kuefner Decl. ¶ 36, DX-174.) That bid was submitted on behalf of TMG Contracting on May 29, 2013 (PX-86), and a revised version was submitted on June 21, 2013 (PX-87). Moriarty testified that he had asked Donal O'Sullivan to "put in a good word" with Mountco for his bid, but did not know if O'Sullivan ever did so. (Moriarty Decl. ¶ 62, DX-172.)

151.    Moriarty testified that the bid for Boston Road was not awarded until October

2013. (*Id.* ¶ 60.) This was not a true statement. William O'Donnell testified that he visited the

site multiple times starting in June 2013 "after the project had been awarded to Eoin," to inspect

the progress on the job. (O'Donnell Decl. ¶ 10, DX-173.) At that time, both Moriarty and

O'Donnell were Navillus employees.

### B.    The Formation of ACS

152.    Boston Road's general contractor, Mountco, required its subcontractors to have a

liability insurance policy with a $10 million limit. (Moriarty Decl. ¶ 28, DX-172.) As it had no

history in the construction business, TMG Contracting could not obtain such insurance. (*Id.*)

According to Moriarty's testimony, he decided to form a new entity that could obtain such

insurance. (*Id.*) Of course, that new entity had no construction experience, either, but that was

not a problem, because the new entity – ACS – was simply a front for Navillus.

153.    On July 16, 2013, Moriarty formed ACS as a Delaware LLC, listing Peter

Downes as the sole member. (*Id.* ¶ 32; *see* PX-25.) At the time, Downes was the Vice President

of Navillus and Navillus' only corporate officer other than Donal O'Sullivan. (PX-108; Tr. at

59:10-20.) Moriarty testified that Downes was a "figurehead" who agreed to serve as ACS's only

member solely for purposes of obtaining favorable insurance rates. (*See* Tr. at 355:01-356:20.) If

that is true, his participation would amount to a fraud. I conclude that Downes was used to signal

to those in the industry that ACS was a Navillus entity.

154.    The filing fees for ACS's formation were paid with a Navillus corporate credit

card belonging to Helen O'Sullivan. (PX-26.) The receipt for the filing fees was sent to Padraig

Naughton's Navillus email account. Moriarty testified that he "assume[d]" that he reimbursed

Navillus for these expenses, but he does not specifically recall doing so (Moriarty Decl. ¶ 34,

DX-172), and there is no independent evidence that he did so. I conclude that he did not.

40

155.    The original mailing address listed for ACS was 314 East 41st Street, Apartment

103C, New York, NY 10017, an apartment owned by Donal O'Sullivan's wife Kathleen. (Tr. at

60:06-10, 525:14-526:09; PX-26.) According to Moriarty's testimony, he was unaware at the

time that the apartment was owned by Kathleen O'Sullivan, nor did Donal O'Sullivan give him

permission to use the apartment for business purposes. (Moriarty Decl. ¶ 32, DX-172.)

156.    I do not credit this testimony for several reasons, not the least of which is that

Donal O'Sullivan also used this address for one of his companies, CKK Solutions LLC – which,

as discussed below, later acquired options to purchase a majority of ACS's shares. (PX-279.)

Donal O'Sullivan testified that he used that address, rather than Navillus' corporate office

address, in order to avoid inquiries from the unions. (Tr. at 174:11-15.)

157.    On September 5, 2013, Moriarty registered ACS to do business in New York,

again listing Downes as the sole member of the LLC. (Moriarty Decl. ¶ 33, DX-172; PX-29.)

Moriarty testified that he paid the fees associated with this registration with his personal credit

card rather than with Navillus funds (Moriarty Decl. ¶ 34, DX-172), but there is no

documentation corroborating that testimony. In fact, the registration documentation indicates

payment was made by "drawdown" of a line of credit, not a credit card. (*See* PX-29.) ACS

immediately sought and obtained an insurance policy from the State Insurance Fund, again

listing Downes as ACS's sole member. (PX-32.) Downes was also listed as ACS's "President"

on bank signature cards for accounts opened at Navillus' preferred lender, Signature Bank. (PX-

30.) In view of the fact that Downes was a senior officer of Navillus, the use of his name

indicates either an intent to deceive various regulators and insurers or as a signal that Navillus

was the backer of ACS. I find the latter to be the case.

41

158.    ACS's March 31, 2014 financial statement describes ACS's "business activity" as follows: "The Company serves as a masonry and tile contractor, concrete superstructure contractor, and a subcontractor. The majority of the Company's work is performed in New York City under fixed-price contracts with general contractors. The length of the contracts varies [sic] but typically ranges from one to three years." (PX-42 at ACS00000663.) This business description is virtually identical to that used in Navillus' March 31, 2014 financial statement. (*See* PX-105 at NAV0002060.)

159.    On January 13, 2014, TMG Contracting's contract on the 21st Street project was assigned to ACS. (*See* PX-20.) Patrick Corcoran was the project's concrete superintendent. (*See* Moriarty Decl. ¶ 76, DX-172.) On January 22, 2014, Kuefner sent a letter on TSC letterhead (notarized by Hazel Corcoran) to the New York City Department of Buildings stating that Patrick Corcoran was "presently employed with HDK" (PX-82), but Kuefner testified that this statement was false when made. (Tr. at 690:14-17.) Kuefner prepared a similar letter, also dated January 22, 2014, on Navillus letterhead stating that "Patrick Corcoran is presently employed with Navillus" (PX-83), which he testified was also false. (Tr. at 688:02-689:17.) On February 11, 2014, he prepared a third letter, this time on ACS letterhead, stating that Patrick Corcoran "is presently employed with ACS." (PX-84.) Kuefner testified that this statement was correct. (Tr. at 689:18-690:02.)

160.    At some point, Patrick Corcoran borrowed an unknown number of concrete DOKA forms from the Navillus yard for ACS's use on the 21st Street project, apparently without compensating Navillus or even alerting the company that the forms were being used. (Moriarty Decl. ¶ 76, DX-172.) Those forms, which were spray-painted with a large "N" for Navillus, were seen on the 21st Street project site. (PX-219; PX-220.) An ACS employee on the site witnessed

42

another worker painting the forms in order to erase the "N" identifiers. (Bravo Decl. ¶ 3, PX-273.)

### C.    ACS's Ownership

161.    On August 30, 2013, Donal O'Sullivan issued what would be the first of three personal loans to Moriarty in order to finance ACS's expenses. (*See* PX-34.) That loan was for $200,000, had an annual interest rate of 3.8%, and had a maturity date of January 31, 2014. (PX-34.) On September 30, 2013, Donal O'Sullivan loaned Moriarty another $300,000, again due January 31, 2014, to finance ACS's expenses. (PX-35.)

162.    Sometime after ACS obtained the Boston Road contract, Moriarty bought out Downes' interest in the company for a token payment of $1,000. (Moriarty Decl. ¶ 36, DX-172; Downes Decl. ¶¶ 37-38, DX-178.)

163.    Starting in August 2013, ACS was also preparing to bid on a contract for concrete superstructure work at City Point in Brooklyn (the "City Point" project). That project was overseen by construction manager ZDG. (Tr. at 484:08-10.) Moriarty was confident that ACS would secure the award, even though no formal bid was submitted until months later. (*See* Moriarty Decl. ¶ 50, DX-172.) He had William O'Donnell visit the site to conduct a preliminary analysis with John Kuefner and purportedly convinced O'Donnell to leave his job with Navillus (along with all of his union pension and benefits) by representing that ACS was "likely" to secure the contract. (*See* O'Donnell Decl. ¶ 18, DX-173; Tr. at 628:19-630:18.) And indeed it did: ACS's bid was submitted on November 22, 2013 (PX-52) and the bid was awarded on December 9, 2013 (PX-45).

164.    On November 6, 2013, Moriarty restructured ACS's ownership, such that the company had three owners: (1) Moriarty, who owned one third of the company through a holding company called TMG Solutions, LLC (not to be confused with TMG Contracting, his

43

operating company); (2) William O'Donnell, who owned one third of ACS through his holding company WOD Solutions, LLC; and (3) Hazel Corcoran, who owned one third through her holding company LJB Solutions, LLC. (*See* PX-40 (ACS's Amended Operating Agreement).)

165.    O'Donnell was a longtime Navillus employee who had consulted with Kuefner on the preparation of TMG Contracting's original bid on the Boston Road project back in April or May 2013. (O'Donnell Decl. ¶ 10, DX-173.) He had also visited the Boston Road site "five or six times" prior to work commencing to provide advice, all while still employed at Navillus. (*Id.*) Corcoran was employed at Navillus until 2008, before becoming an independent contractor who, *inter alia*, advised TSC on the Sugar Hill project. (*See* K. O'Sullivan Decl. ¶ 53, DX-176.)

166.    On November 1, 2013, Donal O'Sullivan loaned Moriarty an additional $1,300,000, again due on January 31, 2014 – this time at an interest rate of 4.0% annually. (PX-36.) Unlike the prior two loans, which were made from Donal O'Sullivan's personal funds, this loan came from an entity owned by Donal O'Sullivan, called KCK Solutions LLC. (*See* PX-36.)

167.    According to Moriarty's testimony, he immediately injected all of the money he borrowed from Donal O'Sullivan into ACS. (Moriarty Decl. ¶¶ 50-51, DX-172.) However, ACS's November 30, 2013 financial statement reflects only a $200,000 loan "From Eoin" and a $300,000 loan "From TMG." (PX-19.) These were the exact amounts of the first two personal loans that Donal O'Sullivan had made to Moriarty. The $1,300,000 loan from Donal O'Sullivan does not appear on the balance sheet.

168.    Moriarty testified that all three loans were repaid before the end of January 2014, but no documentary evidence in the record corroborates this statement and I do not credit it. (Moriarty Decl. ¶ 53, DX-172.)

44

169.    According to testimony from Moriarty and Donal O'Sullivan, as consideration for the third and final loan of $1,300,000, Donal O'Sullivan received options from the three owners to purchase their ACS shares at fair market value any time within the next three years. (*See id.* ¶ 41; Tr. at 62:10-22 (Donal O'Sullivan testimony).) Two of the three owners, O'Donnell and Corcoran, signed agreements granting O'Sullivan an option to purchase their shares even though neither of them had ever borrowed any money from Donal O'Sullivan. (*See* PX-279.) There is no evidence, other than Donal O'Sullivan's testimony, that Moriarty ever signed such an agreement.

170.    At his deposition, Donal O'Sullivan testified that he never acquired options to purchase shares of ACS and that he never discussed the possibility of such options with any of ACS's three owners. (*See* Tr. at 277:07-09.) Moriarty similarly testified that he never "had any discussions with Donal O'Sullivan about the purchase of options to acquire ACS." (*See* Tr. at 372:17-373:04.) This testimony was, obviously, false.

171.    Shortly before trial, Donal O'Sullivan revealed to his lawyers, for the first time, that he actually had an option to purchase the majority of ACS's shares. He produced portions of three option agreements, including cover pages indicating the making of deals by and between Donal O'Sullivan and (1) O'Donnell[3] and (2) Moriarty. (*See* PX-279.) He also produced signature pages signed by O'Donnell and Hazel Corcran, but not Moriarty. (*See id.*) I credit the statements from counsel that they were unaware of any of this until July 3, 2017. I do not credit any of Donal O'Sullivan's trial testimony on this subject.

172.    In particular, I do not credit Donal O'Sullivan's testimony that he forgot about holding an option to purchase the interests of Corcoran and O'Donnell in ACS. (D. O'Sullivan

---

[3] O'Donnell testified that he had no recollection of ever signing the option agreement, but that he "signed lots of documents for [Moriarty]." (Tr. at 665:22-24.) The document presented in evidence was clearly signed by O'Donnell on behalf of his LLC, WOD Solutions. (*See* PX-279.)

45

Decl. ¶ 106, DX-171.) That is an obvious falsehood; as I remarked during the trial, Donal
O'Sullivan is not a man who forgets a business deal.

173.    I conclude that Donal O'Sullivan perjured himself in giving both his deposition
testimony (in which he disclaimed the existence of any options) and his trial testimony (in which
he claimed to have forgotten about the options until he discovered copies in his office in July of
2017 – conveniently three months after the options expired). (*See* Tr. at 79:22-80:03.)

174.    I also do not credit any of Moriarty's testimony about the options. He claimed that
the options were merely security for the loans from Donal O'Sullivan, and the he, too, forgot
about them because he considered them "null and void" once the loans were repaid. (Tr. at
373:24.)

175.    Moriarty was obviously lying. The options are dated April 1, 2014, which is
several months *after* the loans were, according to Moriarty, allegedly repaid. (PX-279; Moriarty
Decl. ¶ 53, DX-172.) Although Donal O'Sullivan testified that he likely "papered the deal" a few
months after the agreement to grant him the options was made (Tr. at 68:03-05), there is no
logical reason to reduce an options agreement to writing if, as Moriarty claimed, the options
were simply security for loans that had already been repaid. Moriarty's contention that the
options were merely collateral is further undermined by the fact that the entity holding the right
to purchase the shares of ACS was not Donal O'Sullivan himself, but CKK Solutions. CKK
Solutions (not to be confused with KCK Solutions, the entity that loaned $1.3 million to
Moriarty) was an entity owned by Donal O'Sullivan that had never loaned money to anybody,
but that did use the same address at 314 East 41st Street originally used by ACS.

176.    There is no reason why O'Donnell and Corcoran would have signed options
giving Donal O'Sullivan, or an entity controlled by him, the right to purchase their shares – and

also to prevent them from otherwise disposing of or encumbering their shares – as collateral for

loans that had been made to Moriarty personally and that had already been repaid. (*See* PX-279

at 2.) What makes much more sense is that Corcoran and O'Donnell were at all times beholden

to and in the employ of Donal O'Sullivan (either personally or through one or more intermediary

personal corporations), and were installed as "owners" of ACS at Donal O'Sullivan's behest and

to hide his participation.

177.    Finally, it is impossible that all four of the people involved (Donal O'Sullivan,

Moriarty, O'Donnell, and Corcoran) forgot about the options, or any conversations concerning

options, and lost all of their copies.

178.    I conclude that Moriarty and Donal O'Sullivan agreed, in exchange for Donal

O'Sullivan's generous financial support of ACS in the fall of 2013, that Donal O'Sullivan would

have the right to purchase at least a majority of the shares of ACS if the company became

profitable within its first few years of operation. The options were never intended to be security

for the loans, because they were to remain in full force and effect during their stated term – even

if Moriarty repaid the loans prior to the expiration date. Corcoran and O'Donnell signed the

options agreements because that was part of the deal when they became part "owners" of the

company.

179.    I further conclude that it was always the intention of all parties that Donal

O'Sullivan would exercise the options. Obviously, they never were exercised, and Hazel

Corcoran actually sold her interest in ACS to O'Donnell and Moriarty in late 2015. (*See*

Moriarty Decl. ¶ 93, DX-172.) I believe the pendency of this lawsuit prevented Donal O'Sullivan

from exercising the options and the parties from completing the deal to which they had originally

agreed.

180.    Through Navillus, Donal O'Sullivan gave ACS more than financial support. In October 2013, ACS signed a lease for office space and a yard at 26-02 First Street in Astoria, Queens. (*Id.* ¶ 39.) It remained at that location until the end of September 2015. (*Id.*) That office and yard is directly adjacent to Navillus' yard at 26-40 First Street. (*See* DX-23 at ACS00000186.)

181.    ACS hired many former Navillus, TSC, or HDK employees to manage the company, as demonstrated by an organizational chart from the spring of 2014. (PX-46; *see* Tr. at 496:01-14.) Each of the four top-level employees (Patrick Corcoran, General Superintendent of Superstructures; William O'Donnell, Vice President and General Superintendent; Eoin Moriarty, President and CEO; and Hazel Corcoran, Vice President of Procurement) were all former Navillus employees. Both of the employees in the next level (John Kuefner, Director of Operations, and David McGrath, Chief Estimator/Purchasing) were former Navillus employees. (*See* Tr. at 229:09-12; Tr. at 497:16-18.) At least twelve individuals on the bottom levels of the chart were recently at Navillus, TSC, or HDK (Cormac Breen, Jason Roy, Henrique Almeida, Niall Gillespie, David Ashe, Sharon King, James Gidursky, Michele Miller, Moizes Trandade, Stephen O'Sullivan, David Hanevy, and John Brennan). (*See* Tr. at 497:10-499:10; PX-250 at TS-0000751 (confirming Breen worked for TSC until at least September 2013); PX-250 at TS-0000841 (confirming Miller worked for TSC until at least March 2014).)

**D.    ACS's Performance on Boston Road**

182.    After being awarded the Boston Road contract, Moriarty realized that the job had been underbid and that ACS would likely lose money. (Moriarty Decl. ¶ 63, DX-172.) Moriarty attempted to manufacture a labor dispute with Mountco over sign-in procedures in order to get out of the contract. (*Id.*; Tr. at 480:18-481:05.)

183.   Naturally, Moriarty turned to Donal O'Sullivan for assistance in resolving the dispute. On November 14, 2013, Donal O'Sullivan sent an email to Joel Mounty at Mountco from the account officeiphone@acsnyllc.com. (*See* PX-170.) In that email, he stated "Joel, I am not sure what you want ACS to do!! . . . *We* will not electronically sign in, however *we* will do the normal sign ins as *we* did in Sugar [H]ill. If this does not work for you or if you prefer to have another contractor complete the work, that [is] OK with ACS." (*Id.* (emphases added).) Mounty refused to lift the swipe-card requirement, which he indicated was required in order to ensure there was no prevailing wage fraud on the project; he also noted that ACS still had not submitted the bond required under the contract. (*See id.*)

184.   The dispute was ultimately resolved after a conversation between Mounty and Donal O'Sullivan, and ACS continued to perform work on the Boston Road project for Mountco. (*See* PX-169; PX-171; PX-172; PX-173.) Indeed, Mounty testified, credibly, that O'Sullivan assured him that ACS would complete the project as promised. (Tr. at 423:13-22.) ACS had, however, dramatically underbid the project and ultimately lost $1.5 million on the job. (Tr. at 480:18-481:05.)

185.   After the contretemps over the swipe-card issue, efforts were made to distance ACS from Donal O'Sullivan. In January 2014, when a Mountco representative emailed, *inter alia*, Donal O'Sullivan about outstanding construction issues, Hazel Corcoran replied, "Please do not email or call Donal as he is not involved with this project. . . ." (PX-175.) In response, Mountco's representative sent an email that clearly outlines Donal O'Sullivan's extensive and ongoing involvement in the project:

> I do understand that Donal has larger jobs to be more concerned with. Let's review a few items. It was Donal who looked the owner of Mountco in the eye while shaking his hand and gave his word to have a quality successful job at Boston Road. When the card swipe was an issue Donal was involved in the

49

outcome. When speaking with Mike yesterday he continually said Donal was
calling him asking if plumbing was installed. So to say he is not involved is
simply a fallacy. . . .

(PX-175.) There is no email in the record from anyone at ACS disputing any of these

contentions. If these contentions were untrue, I would expect either Hazel Corcoran, Donal

O'Sullivan, or someone else from ACS to protest in response. Accordingly, these statements are

admissible against ACS as an admission by silence. *See* Fed. R. Evid. 801(d)(2)(B); *United*

*States v. Abouhalima*, 201 F.3d 432 (2d Cir. 1999). They are also admissible as a business record

of Mountco. Fed. R. Evid. 803(6).

186.    I credit Mounty's testimony that he met no fewer than three times with Donal

O'Sullivan to discuss issues relating to the project. (Tr. at 420:19-421:01.) He recalled that, at

one of the meetings, he and Donal O'Sullivan discussed issues with the excavation of rock from

the site, which was part of ACS's contract. (Tr. at 421:02-12.) He understood Donal O'Sullivan

to be speaking on behalf of ACS in these conversations; he thought that perhaps Donal

O'Sullivan had been hired by ACS as a consultant. (Tr. at 449:11-13.)

187.    Donal O'Sullivan continued to be personally involved in the project for several

more months. For example, in May 2014, emails exchanged between Donal O'Sullivan (using

his ACS email account) and Hazel Corcoran show him reviewing details about the prices of

various crane rentals for the project. (*See* PX-246.)

E.    **The 92nd Street Project**

188.    In late 2013, prominent developer Related Companies solicited bids for masonry

and concrete superstructure work on a project at 205 East 92nd Street (the "92nd Street" project).

Navillus submitted a union bid for the superstructure work on September 16, 2013 (*see* PX-134)

and the masonry work on October 2, 2013 (*see* PX-131). Navillus' superstructure bid was

quickly withdrawn or rejected, as indicated by its strikeout on the leveling sheet dated November

12, 2013, and distributed internally at Related. (*See* PX-134; PX-136.) Shortly thereafter, ACS submitted a non-union bid for superstructure work on the project on November 19, 2013. (*See* PX-132.) TSC also submitted bids for the masonry and roofing work on 92nd Street. (*See* PX-138.)

189.    Related evaluated those bids over the following months, as evidenced by emails in the record and the testimony of Jim Harris, a Senior Vice President at Related. On January 29, 2014, Harris sent an email to his colleagues stating: "Attached please find the proposed agenda for this Friday's meeting at 8:00 with ACS. . . . I think the owner of Navillus is going to be there to introduce himself and outline the various services they can perform if anyone wants to meet him." (PX-129.) Donal O'Sullivan had no reason to attend a meeting about ACS's bid on 92nd Street (Navillus' bid had already been rejected or withdrawn), or to discuss "the various services" that Navillus could perform, unless it was to make clear Navillus' ongoing relationship with ACS. In another email, dated March 6, 2014, Harris described ACS as "Affiliated with Navillus." (PX-130.) ACS was ultimately awarded the 92nd Street contract.

190.    I conclude that Navillus and ACS held themselves out to Related, a prospective customer, as affiliated entities, and that this connection was part of the reason why ACS was awarded the 92nd Street project.

191.    The contract with Related required ACS to provide a tower crane. (Tr. at 486:13-15.) ACS did not own such a crane at the time it made the bid. (Tr. at 486:16-19.)

192.    Moriarty testified that, for a period of "weeks, maybe two months" following its November 2013 bid, ACS considered purchasing a crane for the project, but could not afford one and had abandoned the idea of purchasing a crane by January of 2014. (Tr. at 487:11-21.) However, in emails dated April 18, May 28, and June 2, 2014, ACS representatives indicated to

Related that ACS was planning to purchase – not rent – a crane for the project. (*See* PX-76; PX-77.)

193.    ACS ultimately rented the crane it needed from Manhattan Tool – conveniently, yet another company owned by Donal O'Sullivan. Manhattan Tool did not own the crane prior to June 2014; rather, it purchased that crane for approximately $1.8 million on June 18, 2014, so that ACS could use it on 92nd Street. (*See* Tr. at 212:24-213:15.) In an email dated June 18, 2014, a representative of Morrow Equipment Company, LLC (the seller of the crane) asked Donal O'Sullivan whether the crane would be purchased directly in the name of ACS; Donal O'Sullivan replied, "Will let you know next week." (PX-104; *see* Tr. at 213:23-214:24.)

194.    After Manhattan Tool purchased the crane ACS needed, Donal O'Sullivan executed a Recourse Agreement with Signature Financial LLC on behalf of Navillus to guarantee the financing used to purchase the tower crane. (*See* PX-214.) Navillus was thus on the hook in the event Manhattan Tool defaulted on its loan used to purchase the crane.

195.    Donal O'Sullivan also worked to acquire a crane for ACS's use on the Kent Avenue project, as well as to get local approval for use of the crane for ACS. (Tr. at 219:01-22.)

196.    ACS has worked on numerous projects since 2014, including on East 86th Street, where it worked for Gilbane, on City Point, where it worked for Lendlease, and on Hudson Park, where it worked for Plaza Construction. (Tr. at 570:20-571:08.) Navillus has also bid on or performed projects for these same companies: it bid on projects for Gilbane, it performed work for Lendlease on the World Trade Center project, and it performed work for Plaza Construction on 125 Greenwich Street and 45 East 22nd Street. (Tr. at 202:18-204:08.)

197.    Neither ACS nor Navillus made any fringe benefit contributions to the Plaintiff funds for work performed on any ACS project. (*See* PX-126A.)

52

**F.    Additional Relevant Conduct**

198.    As already discussed, ACS relied upon Navillus' personnel, equipment, and reputation – as well as Donal O'Sullivan's goodwill, generous financial assistance, and personal connections – to survive its first year in business. However, it also used Navillus' corporate resources and reputation to secure financing for its projects, as well as visas and insurance for its workers. Unless this behavior was intended to fraudulently induce third parties to do business with ACS, it must be viewed as additional evidence of the close affiliation between Navillus and ACS.

199.    In January of 2014, Dave McGrath, an ACS estimator, emailed Construction Risk Partners (Navillus' preferred insurer) in an effort to obtain a letter of surety for ACS for a bid that it was preparing. (*See* PX-49.) The letter that was prepared and sent to CNY Group LLC stated that "Liberty Mutual Insurance Company has supported [ACS] on single contracts in excess of $150,000,000 and an aggregate work program of $400,000,000." (PX-51.) Of course, these numbers were not remotely accurate. At the time, ACS had been awarded perhaps $35 million in contracts and had actually performed only $15 to $20 million in projects. (Tr. at 519:05-520:20.) These false numbers were submitted to CNY Group, a company from which ACS was seeking work at the time. (Tr. at 518:13-18.) Navillus had performed work for CNY on a project at 1717 Broadway, for which Kuefner had served as project manager. (Tr. at 179:12-14; Tr. at 203:14-16.) It appears that ACS was taking credit for Navillus' work – something only an alter ego could do.

200.    ACS also obtained visas for its employees using Navillus as the corporate sponsor. Moriarty obtained an H-1B visa while employed at Navillus. (Tr. at 232:01-06.) After he "left" Navillus in 2013, he maintained that visa for more than a year by claiming to be an employee of Navillus. (Tr. at 232:07-10; Tr. at 502:15-503:07.) It was not until the

53

commencement of this litigation that Moriarty had the visa documentation corrected to show

ACS as his employer. (Tr. at 502:24-25.) Unless Moriarty was committing visa fraud, I can only

infer that he was in fact an employee of Navillus for more than a year after he claimed to have

left that company's employ and started running ACS, a purportedly independent company.

201.    Moriarty also obtained a J-1 visa for Andrew Corcoran (an ACS employee) using

Navillus as the corporate sponsor. (Tr. at 508:04-08.) Corcoran never worked for Navillus, but

ACS desperately needed him as a surveyor, so Moriarty arranged to have him processed as a

Navillus employee instead of taking the time to have ACS certified as an eligible employer. (Tr.

at 237:22-24; Tr. at 508:09-509:13.)

202.    Conversely, Navillus continued to list Moriarty as the point of contact on its H-1B

inspection files long after he had "left" Navillus' employment. Moriarty's email address (first his

Navillus account and then his personal email address once he no longer worked there) is listed as

the contact on Navillus' H-1B inspection files until well into 2015. (*See, e.g.*, PX-223

(application dated February 24, 2015 listing "emoriarty82@gmail.com" as employer point of

contact).) Moriarty admitted that Navillus employees would still come to him for help with

obtaining visas even after he "left" the company. (Tr. at 503:08-14.)

203.    Finally, several ACS employees continued to receive health insurance from

Navillus at no cost well after they purportedly left Navillus' employ. In addition to Moriarty,

discussed above, they included Mike Duffy, David McGrath, John Brennan, and Patrick

Corcoran, who continued to receive insurance from Navillus until at least August of 2014. (*See*

Tr. at 186:02-15; PX-53.) O'Donnell also arranged with Donal O'Sullivan to have Navillus pay

his union health insurance premiums until March of 2015. (Tr. at 656:15-658:10.) The union

health and welfare plan policies do not permit employers to insure individuals who are no longer

employees of the company performing covered work – and certainly not individuals who have launched a competing non-union construction company.

## V.   Summary Findings of Fact on Liability

204.   I conclude, based on the foregoing, that Donal O'Sullivan obtained a commitment for Navillus to do the Sugar Hill project via his brother's company, TSC, and that Navillus provided TSC with the skilled employees and managers from Navillus that TSC needed to get the project completed. For purposes of the Sugar Hill project, TSC operated as Navillus' alter ego.

205.   I also conclude that Donal O'Sullivan and Navillus were intimately involved in the creation and operation of ACS, not only during its first few months, but continuing at least through 2014. The idea that Moriarty, who had no experience running a construction company, could have formed an independent non-union shop and quickly acquired contracts for four major projects (21st Street, Boston Road, City Point, and 92nd Street) without Navillus' assistance simply beggars belief. It is also implausible that the company could have survived a $1.5 million loss on its first contract without significant financial assistance from Donal O'Sullivan. Unless it were a part of the O'Sullivan construction empire, a start-up like ACS would have gone under after such a fiasco. ACS was set up as, and at all relevant times was, Navillus' alter ego.

### *Conclusions of Law on Liability*

## I.   Jurisdiction and Venue

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), (f), because Plaintiffs bring this action to obtain equitable relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(3). (JPTO Stip. § III.A ¶ 1.) This Court also has jurisdiction under the LMRA, 29 U.S.C. § 185, because

Plaintiffs allege that certain of Defendants' actions violated collective bargaining agreements between an employer and labor organizations. (JPTO Stip. § III.A ¶ 1.)

Venue lies in this District under 29 U.S.C. § 1132(e)(l) and 29 U.S.C. § 185(a), as a substantial number of the alleged violations of ERISA and the collective bargaining agreements are alleged to have occurred in this district. (JPTO Stip. § III.A ¶ 1.)

## II.    Alter-Ego Liability

Plaintiffs assert that TSC, HDK, and ACS are "alter egos" of Navillus, such that each is bound to the CBAs entered into by Navillus and is obligated, *inter alia*, to make fringe benefit contributions to the Plaintiffs for the hours worked by employees governed by those contracts.

"The alter ego doctrine provides an analytical hook to bind a non-signatory to a collective bargaining agreement." *Truck Drivers Local Union No. 807, I.B.T. v. Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991). Although developed in the context of the National Labor Relations Act ("NLRA"), the doctrine applies equally to claims brought under ERISA. *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010). "The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'" *Id.* (quoting *Newspaper Guild of N.Y., Local No. 3 of the Newspaper Guild, AFL-CIO v. NLRB*, 261 F.3d 291, 298 (2d Cir. 2001)). "To protect employee benefits, courts observe 'a general federal policy of piercing the corporate veil when necessary.'" *Id.* (quoting *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 (2d Cir. 2005)).

The test of alter ego status is "flexible" and dependent upon the "circumstances of the individual case." *Kombassan*, 629 F.3d at 288 (internal quotation marks omitted) (quoting *Goodman Piping Prod., Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir. 1984)). Nonetheless, the

"hallmarks of the alter ego doctrine include whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 748 (2d Cir. 1996) (internal quotation marks omitted) (quoting *Truck Drivers*, 944 F.2d at 1046), *as amended* (May 9, 1996). Not all of these factors need to be present in order to establish that two entities are alter egos, and no single factor is dispositive. *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A & M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.*, 314 F. Supp. 2d 332, 347 (S.D.N.Y. 2004); *see Goodman Piping Prod., Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir. 1984). Although the presence of anti-union animus or an intent to evade union obligations is relevant to the inquiry – and may, in some instances be sufficient, standing alone, to impose alter ego status – it is not a necessary factor. *Kombassan*, 629 F.3d at 288.

"Although the alter ego doctrine is primarily applied in situations involving successor companies, where the successor is merely a disguised continuance of the old employer, it also applies to situations where the companies are parallel companies." *Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307 (1st Cir. 1998) (internal quotation marks and citations omitted). Accordingly, two companies can be found to be alter egos where both companies "exist simultaneously." *Kombassan*, 629 F.3d at 288.

The alter ego doctrine is related but "conceptually distinct" from the single employer doctrine, where two nominally separate entities are actually part of a single integrated enterprise. *Bourgal v. Robco Contracting Enters., Ltd.*, 969 F. Supp. 854, 863 (E.D.N.Y. 1997), *aff'd*, 182 F.3d 898 (2d Cir. 1999).

Given the fact-dependent nature of the alter ego inquiry, the Court addresses the allegations against TSC and HDK separately from the allegations against ACS.

57

## A.    TSC and HDK

The only TSC or HDK project for which the Plaintiffs in the *Moore* Action seek damages

is the Sugar Hill project. (*See* PX-128A.) The *Gesualdi* Plaintiffs seek damages for work

performed by TSC and HDK drivers on Sugar Hill as well as other projects. (*See* GX-14; GX-15;

GX-27; Tr. at 1117:13-1118:04.) However, the Court does not find that TSC and HDK were alter

egos of Navillus for any project except Sugar Hill.

During the Sugar Hill project, TSC and HDK shared substantially identical ownership,

management, supervision, business purpose, and customers with Navillus. I, therefore, conclude

that both entities were alter egos of Navillus for purposes of that project, and are bound by the

relevant CBAs for all work covered by those contracts related to Sugar Hill, from approximately

March 2012 through the end of 2014.

### 1.  Ownership

Donal O'Sullivan and Kevin O'Sullivan jointly owned TSC from its incorporation on

February 15, 2006, until the sale of Donal O'Sullivan's shares on October 19, 2012. Both Kevin

O'Sullivan and Donal O'Sullivan admitted that the transaction was designed to circumvent

allegations from various unions that TSC and Navillus were alter egos. There is nothing

intrinsically wrong with that; however, the brothers backdated the sales documents in order to

give the impression that Donal O'Sullivan's ownership of TSC ended as early as possible. This is

evidence of a "sham transaction or technical change in operations" designed to evade obligations

imposed by the CBAs. *Kombassan*, 629 F.3d at 288.

Even if Donal O'Sullivan's ownership interest in TSC ended on April 1, 2012 (or January

8, 2012), as the brothers claim, Kevin O'Sullivan remained a 50% owner of Navillus until

January 6, 2015 – well after this litigation began. And several of the CBAs at issue specifically

prevent any "owner or principal" of Navillus from acquiring an interest in a non-union company.

(*See* PX-1 at CCW_NAV000772 to CCW_NAV000773; PX-5 at 25.) There was, therefore, a substantial identity of ownership between Navillus and TSC up until January 2015, which is well after the Sugar Hill project was fully completed.

HDK and Navillus also shared substantially identical ownership during the Sugar Hill project, although Donal O'Sullivan was never formally an owner of HDK.

The Certificate of Formation for HDK, filed with the Delaware Secretary of State on January 27, 2012, lists Donal O'Sullivan and Kevin O'Sullivan as the two members of HDK. (*See* PX-143.) However, HDK's LLC Agreement, dated January 30, 2012, identifies Kevin O'Sullivan as the sole member of the LLC. (*See* DX-136.)

Under Delaware law, an LLC's Certificate of Formation is "a relatively brief and formal document" that "does not contain a comprehensive agreement among the parties." *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 288 (Del. 1999). There is no requirement that the Certificate of Formation name the LLC's members, although the members may choose to include in the Certificate any information that they wish. *See* Del. Code tit. 6, § 18-201(a). Where a conflict exists regarding the membership listed on the Certificate and the membership listed in the LLC Agreement, the LLC Agreement controls. *See In re Grupo Dos Chiles, LLC*, No. CIV.A. 1447-N, 2006 WL 668443, at *2-*3 (Del. Ch. Mar. 10, 2006). Accordingly, I do not place reliance on the Certificate of Formation, and conclude that Kevin O'Sullivan was the only member of HDK upon execution of the LLC Agreement on January 30, 2012, and has remained HDK's only member since that date. Nonetheless, Kevin O'Sullivan's 50% ownership interest in Navillus until January 2015 satisfies the common ownership criterion for HDK as well.

Even if Kevin O'Sullivan had never owned half of Navillus, substantially identical ownership can be inferred where, as here, businesses are held by close family members. *See, e.g.,*

59

*Goodman Piping*, 741 F.2d at 11 (finding substantially identical ownership between two companies where non-signatory company was owned by the spouse of the owner of the signatory company); *accord Bourgal*, 969 F. Supp. at 863. In this particular instance, strong family considerations motivated Navillus to use TSC to obtain and perform the work on the Sugar Hill project. Therefore, regardless of when formal ownership changes occurred, Navillus, TSC, and HDK have always had – and continue to have – substantially identical owners due to the fraternal relationship between Kevin O'Sullivan and Donal O'Sullivan. The manner in which the three ostensibly separate businesses operated during the Sugar Hill job only reinforces this conclusion.

The cases cited by Defendants do not undermine this analysis. In arguing that TSC, HDK, and Navillus do not share substantially identical ownership, Defendants point to cases where the *only* alter ego factor present was a family connection between the two entities. *See, e.g.*, *Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Co-op., Pension & Welfare Funds v. JJJ Concrete Corp.*, No. 13-CV-4363, 2015 WL 790085, at *9 (E.D.N.Y. Feb. 24, 2015); *United Union of Roofers, Waterproofers, Allied Workers, Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.*, No. 07-CV-224-HKS, 2012 WL 4092598, at *15 (W.D.N.Y. Sept. 10, 2012), *aff'd sub nom. United Union of Roofers, Waterproofers, & Allied Workers Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.*, 547 F. App'x 17 (2d Cir. 2013); *In Matter of Staying Arbitration & Vacating Notice of Intention to Arbitrate Between Armen Dig. Graphics, Ltd., Amalgamated Lithographers of Am., Local One*, No. 96 Civ. 5844, 1997 WL 458738, at *7 n.9 (S.D.N.Y. Aug. 12, 1997). That is not the case here. Donal and Kevin O'Sullivan formally owned both TSC and Navillus through the first few months of the Sugar Hill project, and Kevin O'Sullivan continued to own half of Navillus until after this lawsuit was

60

filed. The brothers only disaggregated their ownership to undercut the alter ego claims being made against them, and did so by backdating contracts to make it appear that Donal O'Sullivan's separation from TSC had occurred months earlier. To top it off, they provided what I conclude to be false testimony about the date that the relevant documents were signed, which indicates they were trying to obscure the true details of the transaction.

### 2. Management

Consistent with Donal O'Sullivan's promise to help Kevin "find the right people to hire" for Sugar Hill, the management team for the project was comprised almost entirely of people who had worked for Navillus or were doing so immediately prior to moving to the Sugar Hill job – and a few who simply never stopped working for Navillus. TSC's bid was prepared by Rory McSwiney, a Navillus project manager hired as a consultant to TSC. Hazel Corcoran, a former Navillus engineer also hired by TSC through a consultancy, led contract negotiations for TSC. Donal O'Sullivan and his assistant, Krystle Venechanos, also actively participated in the contract negotiations and Donal O'Sullivan served as the final decision-maker on important issues.

John Kuefner and Eoin Moriarty worked on the Sugar Hill project while still employed by Navillus; each was paid through his own consulting company as well. Willie O'Donnell, a Navillus foundation specialist, visited the project five or six times to provide advice. Hazel Corcoran's husband Patrick was transferred over from the Navillus payroll on October 1, 2012 to serve as the project's superintendent. As project superintendent, Patrick Corcoran was responsible for hiring and firing employees on the Sugar Hill job. After the Sugar Hill project, Patrick Corcoran returned to Navillus to work on the 150 Charles Street project.

These facts compel the conclusion that TSC and HDK had substantially identical management to Navillus. *See Puccio v. L.M.G. Air Corp.*, No. 94 CV 4013, 1998 WL 887008, at *7 (E.D.N.Y. Dec. 8, 1998). Indeed, the record appears to be barren of any evidence that anyone

served as a manager on the Sugar Hill project who was *not* a current or former Navillus employee. Furthermore, the unrebutted testimony established that, although some individuals were paid through HDK, there was only one HDK/TSC management team for the Sugar Hill project.

Again, these facts contrast with those in the cases cited by Defendants where no common management was found. In *A.W. Farrell & Son, Inc.*, 2012 WL 4092598, at *14, for example, the court found that the manager of the union company provided "limited business advice and operational support" during the non-union company's "early stages" and that this was insufficient to establish substantially identical management. *Accord Blue & White Cabs*, 291 NLRB 1047, 1047-48 (1988) (finding common ownership and management was limited to first eight months of new company's existence). These cases would perhaps be relevant if Donal O'Sullivan had simply provided "limited advice" at the outset of the Sugar Hill project, but he did not; he personally directed TSC's negotiations over the Sugar Hill contract and continued to be involved in the operation of the project. The cases also might be relevant if TSC had actually been in the "early stages" of its business, but it was not; it had been operating for six years. Although TSC was certainly a novice concerning concrete foundation and superstructure work, Defendants point to no case where a court has considered an established company to be in a "startup period" merely because it was branching into a new line of business. And, even if it were possible to deem the Sugar Hill project equivalent to a "startup period," Donal O'Sullivan and Navillus did not limit their involvement to the "early stages" of that project.

Defendants' citation to the statement in *Local 812 GIPA v. Canada Dry Bottling Co. of N.Y.*, No. 98 Civ. 3791, 2000 WL 1886616, at *4 (S.D.N.Y. Dec. 29, 2000) that "the mere transfer of low and middle managers does not establish" common management is equally

62

unpersuasive. Here, the relevant "low and middle managers" included *all* of the individuals

responsible for negotiating the Sugar Hill contract and overseeing the day-to-day operations at

the project. Several of these individuals remained on the Navillus payroll while completing this

work, making this case an example of "significant managerial overlap" indicative of an alter ego

relationship. *Puccio*, 1998 WL 887008, at *7.

### 3. Supervision

The evidence in the record clearly establishes that Donal O'Sullivan supervised the

progress on the Sugar Hill project, just as he would for any Navillus project. He and his assistant

(a Navillus employee) communicated directly with TSC's counsel in negotiating the contract

with Mountco. He was the ultimate decision-maker for numerous important questions in those

negotiations, including issues as diverse as bond requirements, indemnity issues, and whether

TSC would provide a crane for the project. Once the project was underway, email

correspondence shows that Donal O'Sullivan remained the point-person on TSC's prevailing

wage obligations, and that he made decisions regarding TSC's communications with the

government agency financing the project. Donal O'Sullivan's central role in the Sugar Hill

project was epitomized by Mounty's February 2013 email in which he stated: "Donal, . . . I

shook your hand on this deal, nobody else's." (PX-155.)

Defendants cite only one case in rebuttal that specifically addresses common supervision

(as opposed to management). In *Amalgamated Lithographers*, 1997 WL 458738, at *9, the court

concluded that three "isolated facts" were insufficient to establish alter ego status against a

backdrop of other contrary evidence: (1) that the owner of one company had once signed a letter

identifying her as "President" of the other; (2) that said owner had check-signing authority at the

other company for two years; and (3) that she had once declared (inside the two companies'

shared office) that she was "in charge here." These facts are easily distinguishable from the

present case, where Donal O'Sullivan *was* a co-owner of TSC during the period of contract

negotiations over Sugar Hill and was the point-person who communicated with Mountco on

behalf of TSC when issues arose on the project. It is highly significant, as discussed above, that

Kevin O'Sullivan, President of TSC, was rarely copied on emails in which problems were

discussed and resolved. Furthermore, the evidence demonstrates that the only reason TSC

obtained the Sugar Hill contract in the first place was through Donal O'Sullivan's efforts.

TSC and HDK had substantially identical supervision as Navillus for purposes of the

Sugar Hill project.

### 4. Business Purpose

"In the ordinary case, two entities have the same 'business purpose' if they deal in the

same product or service." *Newspaper Guild of N.Y., Local No. 3 of Newspaper Guild, AFL-CIO

v. NLRB*, 261 F.3d 291, 299 (2d Cir. 2001). As such, companies have been found to share

substantially identical business purposes where both companies, for example, "manufacture paint

brushes," *A&P Brush Mfg. Corp. & Its Alter Ego A&P Diversified Techs., Inc.*, 323 NLRB 303,

308 (1997), are "involved in the heating, air conditioning and ventilation industry," *A & M

Heating*, 314 F. Supp. 2d at 338, or perform "masonry construction," *Mason Tenders Dist.

Council Welfare Fund v. ITRI Brick & Concrete Corp.*, No. 96 Civ. 6754, 1997 WL 678164, at

*15 (S.D.N.Y. Oct. 31, 1997). On the other hand, companies have been found to have

"completely different" business purposes where, for example, one company manufactures

clothing and another markets and sells clothing, *Lihli Fashions Corp.*, 80 F.3d at 749, or where

the companies "were engaged in different, though related, lines of business within the freight

transportation industry," *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express

Servs., Inc.*, 426 F.3d 640, 650 (2d Cir. 2005). Likewise, "financial and strategic goals may be

considered among the attributes of a company's business purpose." *Id.* at 300.

Here, for the duration of the Sugar Hill project, TSC and HDK shared identical business purposes with Navillus: serving as a concrete foundation and superstructure subcontractor. While TSC ordinarily operated as a general contractor, rather than a subcontractor, and HDK transformed into a masonry and curtain wall subcontractor after Sugar Hill, their business purposes as related to this particular project were identical to those of Navillus.

Defendants argue that two construction companies cannot share a common business purpose where one primarily utilizes unionized labor and the other a non-unionized workforce, because the construction market in New York is bifurcated. Even if that were true in some cases, it is not true here where Navillus also submitted a bid for the same Sugar Hill contract that TSC was eventually awarded. Once it became clear that Mountco preferred a non-union contractor, Navillus used TSC as a front to acquire the business. Furthermore, most (if not all) of the managerial employees used by TSC and HDK were former or current Navillus employees, and at least five workers were moved from Navillus' (unionized) payroll directly to TSC's (non-unionized) payroll for purposes of the Sugar Hill project and at least four moved to the Navillus payroll after the project was finished. This fluid movement in the workforce belies any argument that Navillus was operating in an entirely different "unionized" market from TSC and HDK insofar as it relates to this project.

However, aside from the Sugar Hill project, Navillus, TSC, and HDK operated in different lines of business: TSC as a general contractor and Navillus and HDK as subcontractors specializing in masonry and concrete work. After the completion of the Sugar Hill project, TSC and HDK sufficiently disentangled their businesses from Navillus such that they ceased being its alter egos. *See Bd. of Trs. of Plumbers, Pipefitters & Mech. Equip. Serv., Local Union No. 392 Pension Fund v. Humbert*, No. 1:13CV004, 2017 WL 1177505, at *6 (S.D. Ohio Mar. 30, 2017).

However, this does not undermine the fact that, on the Sugar Hill project, Navillus, TSC, and

HDK were operating in the same line of business, with the non-union companies acting as alter

egos for Navillus.

### 5. Customers

For purposes of Sugar Hill, the relevant customers were Mountco and its principal, Joel

Mounty. Donal O'Sullivan and Navillus certainly *treated* Mountco and Mounty as customers,

even after TSC was mysteriously awarded the contract: Donal O'Sullivan was Mounty's primary

contact when problems arose on the contract, and Donal O'Sullivan dispatched several of

Navillus' top managers to ensure that the project would be completed.

The evidence in the record suggests that contractors on major construction projects in

New York City all deal with a common set of customers – with some projects (including all

publicly funded projects) being unionized and an increasing number of projects (including most

private residential high rise construction projects) being non-unionized. The same developers

appear to operate in both spheres and developers are the ultimate source of business for both

general and subcontractors. I do not find this particular factor to be terribly relevant to the alter

ego analysis.

### 6. Operations

Navillus and TSC/HDK are operated substantially independently. They maintain separate

offices, telephones, computer systems, books and records, insurance policies, bank accounts,

human resources, payroll systems, and professional services. The companies file their own taxes

and do not comingle funds.

The few examples of overlapping operations in the record do not outweigh these facts.

The Court gives little weight, for example, to the fact that, back in 2006, TSC leased office space

from Navillus during the first six months of its existence. Nor is the fact that TSC and Navillus

used the same accountants, attorneys, and insurance brokers strongly indicative of alter ego status; those service providers are available to all members of the public.

More relevant is the fact that Mounty contacted Donal O'Sullivan when he needed to resolve issues with TSC and HDK on the Sugar Hill project. *See LaBarbera v. C. Volante Corp.*, 164 F. Supp. 2d 321, 327 (E.D.N.Y. 2001) ("That the three companies operated from the same location and that customers spoke to any family member to arrange business with any company also indicate substantial identity of operations.").

Also relevant is that, from May 2012 to February 2014, TSC and Navillus used adjoining storage yards in Long Island City, Queens. Those yards were actually part of a single piece of property jointly owned by Donal and Kevin O'Sullivan through another company, and a fence was erected to divide TSC's portion of the property from Navillus' portion. TSC began leasing its portion of that yard on May 1, 2012 – that is, less than two weeks after it was awarded the Sugar Hill contract. During Sugar Hill, HDK was simply a paymaster for TSC, so its operations are inseparable from TSC for purposes of this contract.

Notwithstanding these facts, the evidence in the record shows that TSC and HDK had largely independent operations from Navillus. This factor weighs against a finding of alter ego status.

### 7. Equipment

There is no evidence that TSC or HDK utilized Navillus' equipment on the Sugar Hill project. While TSC purchased some equipment from Navillus for the Two Fifth Avenue project, including a $7,000 GMC van and $40,000 in scaffolding, those items were paid for at fair market value and were not purchased for purposes of the Sugar Hill project. This factor weighs against a finding of alter ego status.

67

### 8.  Anti-Union Animus

Finally, there is no evidence in the record that Donal O'Sullivan or Navillus harbored

anti-union animus. Donal O'Sullivan is a "career-long union" employer, and Navillus has, and

remains, a primarily union subcontractor. *A.W. Farrell & Son, Inc.*, 2012 WL 4092598, at *15.

There is some limited evidence of anti-union animus on the part of Kevin O'Sullivan, who

wanted to buy out Donal O'Sullivan's portion of TSC specifically to undermine claims by

various unions that TSC and Navillus were operating as alter egos. There is also substantial

evidence in the record that the Sugar Hill contract was awarded to TSC (rather than to Navillus)

principally due to TSC's status as a non-union employer, but that indicates anti-union animus by

Mountco, not Navillus.

Overall, these factors weigh in favor of concluding that TSC and HDK were alter egos of

Navillus during the Sugar Hill project and were obligated to make fringe benefit contributions to

the Plaintiffs for the work performed on that project. For that project, the companies had

substantially identical ownership, management, supervision, business purpose and customers.

Furthermore, the evidence indicates that the O'Sullivan brothers took several steps to get the

Sugar Hill contract awarded to TSC, rather than Navillus, while simultaneously working to

disguise the alter ego relationship between the two companies. Although the companies'

operations and equipment were not substantially identical, these two factors are not sufficient

indicia of separateness to support a conclusion that the companies were not alter egos.

### B.  ACS

Evaluating the same factors, I conclude that ACS is also an alter ego of Navillus. ACS

has substantially identical ownership, management, supervision, business purpose, customers,

operations, and equipment as Navillus. Furthermore, the record as a whole demonstrates that the

alter ego relationship continued well beyond any "startup period." *See A.W. Farrell & Son, Inc.*,
2012 WL 4092598, at *14; *Blue & White Cabs*, 291 NLRB at 1048.

### 1. Ownership

Unlike TSC, Donal O'Sullivan never formally owned any portion of ACS outright.
However, based on the evidence adduced at trial, I conclude that he operated as a de facto owner
throughout much of ACS's history, and that he and the nominal principals of ACS had every
intention of formalizing that relationship, and would have done so but for the pendency of this
lawsuit.

First, ACS's initial owner, Downes, was a corporate officer of Navillus. Moriarty
testified that Downes merely served as a "figurehead" so that ACS could acquire favorable
insurance rates using his Navillus connection and experience. Once he had served that purpose,
Downes was paid $1,000 in cash for his 100% share of the company. I credit that testimony only
insofar as it indicates that Downes was used for a limited time and limited purposes. He was a
stand-in for his boss, Donal O'Sullivan, and the $1,000 "separation" payment – a nominal sum,
unrelated to any meaningful participation in ACS's business (and certainly unrelated to the full
value of the company) – was designed to disguise the true nature of his participation in the
venture.

As revealed shortly before trial, Donal O'Sullivan had options that would have allowed
him to purchase at least a controlling share of ACS's stock at all times relevant to this litigation.
The option agreements gave him the right to purchase the shares at any time between April 1,
2014 and April 1, 2017. Those contracts also gave Donal O'Sullivan the power to prevent any of
ACS's three owners from transferring their shares to anyone else during this same three-year
period or doing anything else to negatively affect his investment.

Plaintiffs argue that, under the principles discussed in *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 123 (3d Cir. 1986), Donal O'Sullivan's ownership of options to purchase a majority of shares of ACS means he should be "deemed" the legal owner of ACS for ERISA purposes. However, *Barker & Williamson* was addressing the statutory stock constructive ownership rule contained in 26 U.S.C. § 1563(e)(1), a provision of the Internal Revenue Code. ERISA incorporates those standards for purposes of determining "whether two related corporations are within a controlled group and therefore deemed to be a single employer" for purposes of determining withdrawal liability. *Barker & Williamson, Inc.*, 788 F.2d at 123. As discussed above, the "single employer" doctrine is distinct from the alter ego doctrine at issue here, although the two are related.

However, despite Defendants' arguments to the contrary, that does not make Donal O'Sullivan's ownership of options to acquire a majority of ACS "irrelevant" to the analysis. Defendants argue that the Second Circuit rejected reliance on 26 U.S.C. § 1563(e)(1) in alter ego cases, citing *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005). But the Circuit did no such thing. *Express Services* involved the ownership of a right of first refusal, which the Second Circuit said could not be equated to a stock option because it could not be exercised at will. It, therefore, declined to hold that the two companies at issue were under common control based on § 1563(e)(1) for purposes of a single employer claim. It then went on to separately analyze the alter ego claim, which it rejected because the entities did not engage in the same line of business, shared no customers, and shared no equipment. *See id.* at 650. The Circuit did not address whether ownership of a stock option was relevant to the common ownership criterion of the alter ego analysis.

Here, I conclude that it is. On the facts established at trial, Donal O'Sullivan was the

source of the original funding for ACS (in the amount of $1.8 million), and the options were

issued to him as consideration for his funding of the company through its earliest days. Since I

do not find Moriarty or Donal O'Sullivan to be particularly credible witnesses, and since only

their testimony establishes that the loans were repaid out of ACS's initial line of credit, there is

no credible evidence that he was in fact repaid the loans prior to being granted the options – and

I do not believe that he was. The record is barren of evidence that Moriarty could have created

from scratch a company that was, within months of being formed, hired to do significant work on

a major New York City construction project. Thus, I conclude that Donal O'Sullivan's money

was the money behind ACS, and that O'Sullivan was the true owner of the company all along.

The fact that O'Donnell and Hazel Corcoran were prepared to grant O'Sullivan options for their

interests in the company for no apparent reason other than the fact that they were part of the

O'Sullivan/Navillus "team" merely reinforces this conclusion.

Considering that the alter ego analysis is an equitable inquiry, intended to prevent the use

of sham transactions designed to subvert an employer's union obligations, I have no qualms

about finding that Donal O'Sullivan's options agreements made him the constructive owner of

ACS – particularly since he would be considered the legal owner of ACS under ERISA's

statutory test for common control used for withdrawal liability cases.

Furthermore, on other occasions, the Second Circuit has made clear that, for purposes of

assessing an alter ego claim, de facto control of an entity can satisfy the ownership criterion. In

*Kombassan*, 629 F.3d at 286-87, for example, the district court concluded that two entities were

under common control for purposes of ERISA's statutory single employer approach to

withdrawal liability laid out in 29 U.S.C. § 1301(b)(1). It further concluded that "because [the

71

two entities] were under the common control" of a single individual, they could be considered to have identical ownership for alter ego purposes, particularly because "the Second Circuit applies the alter ego approach broadly in the ERISA context." *Id.* at 287. The Second Circuit affirmed, noting in its alter ego analysis that one corporation appeared to be in "actual, if not legal, control" of the other. *Id.* at 298.

Regardless of whether Donal O'Sullivan was the legal owner of ACS for ERISA purposes, he certainly operated as the de facto owner, which is sufficient to satisfy the ownership criterion under *Kombassan*. When issues arose on the Boston Road job, Donal O'Sullivan stepped in to assure Mounty that ACS would complete the job, even if it meant the company would suffer a $1.5 million loss. That conversation took place sometime in November 2013, less than a month after O'Sullivan had issued his third, $1.3 million loan to Moriarty to finance ACS. To protect his investment in ACS, Donal O'Sullivan remained actively involved in the project – so much so that a Mountco representative scoffed when Hazel Corcoran suggested that Donal was not involved. When ACS bid on the 92nd Street project for Related, ACS held itself out as affiliated with Navillus in order to help secure the contract. The ownership of Navillus and ACS is, therefore, substantially identical.

### 2. Management

ACS had substantially identical management as Navillus, both in the form of Donal O'Sullivan, the ultimate manager, and in the form of numerous intermediate supervisors. Moriarty, who managed ACS on a day-to-day business, brought on Kuefner, Hazel and Patrick Corcoran, and O'Donnell – all former Navillus managers who had gained experience in the non-unionized world on the Sugar Hill project – to help manage the new company. More than a dozen members of ACS's leadership team in the spring of 2014 were formerly employees of Navillus, TSC, or HDK. Where "two companies share[] a large number of employees,"

72

particularly managers, as was the case here, this can be evidence of alter ego status. *Belmont Concrete*, 139 F.3d at 309.

### 3. Supervision

As with the Sugar Hill project, Donal O'Sullivan took an active role in supervising ACS's work. He personally communicated with Mounty (using an ACS email account) regarding the labor dispute that Moriarty had manufactured in an attempt to get out of the Boston Road contract, and ultimately settled the disagreement by guaranteeing that ACS would complete the job. In his emails, Donal O'Sullivan consistently used the terms "we," "us," or "my" when referring to ACS.

Moreover, Donal O'Sullivan personally met with representatives of Related in connection with securing ACS's bid on 92nd Street. Emails show he negotiated crane prices for ACS on the Boston Road job, that he obtained a $1.8 million crane for ACS's use on the 92nd Street job (a crane for which Navillus guaranteed the financing), and that he worked to arrange a crane for ACS on the Kent Avenue project as well. ACS and Navillus had substantially identical supervision in the form of Donal O'Sullivan.

### 4. Business Purpose

ACS and Navillus have substantially identical business purposes, as reflected in their virtually identical business descriptions in their March 31, 2014 financial statements. Where companies "described their business purpose in nearly identical terms in letters sent to potential customers," this is evidence of common business purpose. *Castaldi v. River Ave. Contracting Corp.*, No. 14 Civ. 5435, 2015 WL 3929691, at *4 (S.D.N.Y. June 22, 2015). Both ACS and Navillus serve as concrete foundation and superstructure subcontractors, although Navillus also performs other types of subcontracting work as well. Two entities may be considered to have substantially identical business purposes even if one entity performs only a subset of the business

73

activities of the other. *See Jacobson v. Metro. Switchboard Co.*, No. 05-CV-2224, 2007 WL
1774911, at *6 (E.D.N.Y. June 18, 2007); *Metro. Teletronics Corp.*, 303 NLRB 793, 797-98
(1991) ("In resolving questions concerning an alleged alter ego status, the Board consistently
considers . . . whether the two employers . . . shared substantially the same business purpose in
whole *or in part* . . . ." (emphasis added)).

### 5. Customers

ACS and Navillus shared at least six major customers. Both companies submitted bids to
Mountco for the Boston Road project. Both companies bid on the work for Related on 92nd
Street. Both companies bid on or performed projects for CNY, Plaza Construction, Lendlease,
and Gilbane. No evidence was presented at trial that ACS had any major customers that Navillus
did not share. Even if a few customers were unique to ACS, the substantial overlap between the
two companies' customers weighs in favor of finding them to be alter egos. *See Metro.
Switchboard*, 2007 WL 1774911, at *6.

### 6. Operations

ACS and Navillus had substantial operational overlaps. In addition to the large number of
employees who moved from Navillus to ACS, ACS relied on many of Navillus' corporate
resources. A Navillus credit card was used to pay ACS's filing fees – and there is no evidence
that Navillus was ever reimbursed. An apartment owned by Donal O'Sullivan's wife was used as
ACS's first mailing address. Downes' name, reputation, and connections to Navillus were used
to obtain insurance and financing for ACS. Donal O'Sullivan provided ACS with $1.8 million in
initial funds. ACS used Navillus' preferred insurer to get a false letter of surety that overstated
ACS's prior work experience in order to obtain a contract with CNY. Moriarty fraudulently used
Navillus' status as a corporate immigration sponsor to maintain his own visa and to secure a visa

74

for another ACS employee. Navillus continued to provide health insurance to several employees for months after they formally left the company and moved to ACS.

ACS does maintain separate offices from Navillus with its own telephone and computer systems – granted, those offices were, from October 2013 through September 2015, directly adjacent to Navillus' offices on First Street in Astoria. ACS also maintains separate bank accounts from Navillus (at Navillus' longtime lender, Signature Bank), keeps separate financial statements (that are prepared by the same accountants and use virtually identical language as Navillus' statements), and files its own taxes. However, these facts do not change the reality that there is a substantial overlap in operations between the two companies.

### 7. Equipment

There is also evidence that Navillus and ACS shared equipment. Patrick Corcoran "borrowed" a number of DOKA concrete forms from Navillus for ACS's use on the 21st Street project, where workers were photographed painting over the Navillus "N" on the forms. As discussed, Donal O'Sullivan worked to acquire cranes for ACS's use on at least two projects, and Navillus guaranteed the loan used to purchase the crane for the 92nd Street project. Even though some of this equipment was rented to ACS from other entities owned by Donal O'Sullivan, it is clear from the emails in the record that Donal O'Sullivan was acting on behalf of ACS. For example, ACS told the 92nd Street developer that it was in the process of purchasing a crane at the exact time that Donal O'Sullivan was arranging to purchase a crane – perhaps even in the name of ACS – which he would eventually "lease" to ACS through Manhattan Tool. Even though not all equipment was shared between ACS and Navillus, they shared important, expensive pieces of equipment like cranes and DOKA forms, and did so under circumstances that indicate that the companies were operating as one business, but working to disguise that connection by using intermediary companies owned by Donal O'Sullivan.

This is more than enough to conclude that the two companies had at least some common equipment. In *Barbera v. R. Rio Trucking*, No. 03-CV-1508, 2010 WL 3928553, at \*14 (E.D.N.Y. Sept. 30, 2010), for example, the court considered the rental of a single truck from one entity to another to be evidence of common equipment. In *Belmont Concrete*, the First Circuit concluded that two entities were alter egos in part because some equipment was shared using "informal leasing arrangements." 139 F.3d at 309.

### 8. Anti-Union Animus

As with TSC and HDK, there is no evidence in the record of overt anti-union animus on the part of ACS or Navillus. The evidence is to the contrary – Navillus is a strongly pro-union company, but it and Donal O'Sullivan did not want to be shut out of the increasingly non-unionized market for residential real estate construction in New York City. That is the reason why TSC and HDK were used as a front for Navillus on the Sugar Hill project, and why ACS was formed at all. Nonetheless, anti-union animus is not required to conclude that two companies are alter egos, and certainly not when *every* other factor weighs in favor of an alter ego relationship.

Based on these factors, I conclude that ACS and Navillus are, and always have been, alter egos.

## III.    Individual Liability

In addition to corporate liability against ACS, TSC, HDK, and Navillus, Plaintiffs also seek individual liability against Donal and Kevin O'Sullivan for the unpaid fringe benefit contributions.

"[A]n individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager." *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993). Personal liability for corporate officers arises only where "special circumstances" are present, including

where the individual defendant acted in concert with fiduciaries to breach fiduciary obligations, intermixed corporate and personal assets, used corporate funds for personal purposes, or engaged in a criminal conspiracy to defraud beneficiaries of fringe benefit contributions. *Id.* at 50-51. However, "a corporate officer's role in a company's failure to make [required] contributions is not automatically participation in a breach of fiduciary duties." *Id.* at 51.

Plaintiffs assert that the efforts made by Donal and Kevin O'Sullivan to cloak the alter ego relationships between Navillus, TSC, HDK, and ACS are sufficient to hold each personally liable for the unpaid contributions. These efforts include ACS's use of an apartment owned by Donal O'Sullivan's wife, Downes' service as the "figurehead" to obtain insurance and financing for ACS, Donal O'Sullivan's acquisition of purchase options to own ACS combined with false testimony about those options, and the backdating of sales documents related to Donal O'Sullivan's shares of TSC. Although each of these troubling facts is relevant to concluding that the various corporations breached their *contractual* obligations to the Plaintiff funds, they do not rise to the level of the acts identified by the Second Circuit as sufficiently egregious "special circumstances" to justify the imposition of personal liability.

As to Kevin O'Sullivan, there is no evidence that he conspired with fiduciaries to defraud the Plaintiff funds of owed contributions, used corporate funds inappropriately, or engaged in a criminal conspiracy. The evidence shows that, at a time when he had little or no business and TSC was in danger of going under, he allowed his brother to use his non-union company as a front to get a contract, which kept his company afloat through its hard times. Indeed, Kevin O'Sullivan is almost an afterthought defendant in this case; and there is insufficient evidence of his personal participation in the "troubling facts" cited above to impose personal liability on him for TSC's failure to make fringe benefit contributions related to the Sugar Hill project.

As to Donal O'Sullivan, the evidence is again insufficient to establish personal liability under ERISA. There is no evidence that he ever comingled personal and corporate funds or ever used corporate assets for personal purposes. There is no evidence that would allow me to pierce the corporate veil to conclude that Navillus is merely an alter ego for Donal O'Sullivan. He has not been convicted of engaging in a criminal conspiracy. There is also no evidence that he acted in concert with any fiduciary of any of the Plaintiffs to deprive them of owed contributions.

Instead, the evidence shows that Donal O'Sullivan worked to establish a double-breasted operation under his ownership, which violated the CBAs entered into by Navillus (*see, e.g.*, GX-3 at 20), and that he was personally involved in the affairs of Navillus' alter egos. He also took steps to disguise his involvement from the unions. However, a corporate officer cannot be held personally liable under ERISA for causing a corporate employer to breach its contractual obligation to make fringe benefit contributions, even where the officer played a "dominant role in the affairs" of the employer. *Sasso*, 985 F.2d at 51.

I am deeply troubled by Donal O'Sullivan's behavior in connection with the matters in suit, in particular his false testimony to the Court, but these actions are not sufficient to impose on him personal liability for the unpaid fringe benefit contributions owed by Navillus and its alter egos.

### *Findings of Fact on Damages*

I.    **Unpaid Contributions to the *Moore* Plaintiffs**

206.    Defendants and the *Moore* Plaintiffs agreed that carpenters, laborers, lathers, and cement masons worked a total of 1,561,695 hours on ACS projects between July 1, 2013 and June 21, 2016 (the "Total ACS Hours"). (PX-126A at 6, 86.) They also agreed that those four trades worked 47,995 hours on the Sugar Hill project (the "Total Sugar Hill Hours"). (PX-126A

at 6, 91.)[4] However, neither TSC, HDK, nor ACS maintained detailed records allocating those hours among the four trades on those projects.

207.    Sean Donohue, expert for the *Moore* Plaintiffs, credibly testified about his estimate of how many hours should be allocated among the four trades. Donohue has a master's degree in civil engineering and has extensive experience analyzing and auditing large construction projects. (*See* PX-126A; Donohue Decl. ¶¶ 1-3, PX-271.)

208.    Donohue based his estimate off of two projects for which some records were available: the Sugar Hill project performed by TSC/HDK and the 92nd Street project performed by ACS.

209.    In preparing his estimate of the percentage of total hours expended by each trade on the 92nd Street project, Donohue relied on the pre-construction labor estimate provided by ACS, which estimated the labor hours for carpenters, laborers, and cement finishers (masons). (PX-126A at 3.) Missing from this estimate was the total number of hours required by lathers to install rebar; instead, the estimate accounted for this labor cost by simply applying a unit price to the total weight of the rebar used on the project. Donohue, therefore, estimated the labor hours needed to install the rebar quantity – 4,904,000 pounds – used on the project, using a construction cost data service known as RSMeans. (PX-126A at 3-4.)

210.    Donohue estimated the hours for each trade as follows on the 92nd Street project:

| Trade | Total Hours | Percentage |
|-------|-------------|------------|
| Laborers | 58,080 | 43.9% |
| Carpenters | 41,220 | 31.2% |

---

[4] The parties initially concluded that these four trades worked 52,650 on Sugar Hill, but later determined that 4,655 of those hours were worked by trades not related to the Plaintiff funds participating in this litigation. (*See* PX-128B at 3-4.)

| | | |
|---|---|---|
| Cement Masons | 7,590 | 5.7% |
| Lathers | 25,311 | 19.1% |
| *Subtotal:* | 132,201 | |

(PX-126A at 3-5.)

211.    For the Sugar Hill project, Donohue used an available sample of weekly payroll reports and daily sign-in sheets, which (once duplicates were removed) included 3,298 hours over 21 workdays out of the total 47,995 hours worked by the four trades, allocated as follows:

| Trade | Total Hours | Percentage |
|---|---|---|
| Laborers | 1,449 | 43.9% |
| Carpenters | 1,021 | 30.9% |
| Cement Masons | 88 | 2.7% |
| Lathers | 741 | 22.5% |
| *Subtotal:* | 3,298 | |

(PX-126A at 5.)

212.    Donohue then averaged the allocations from the two projects as follows:

| Trade | 92nd Street Percentage | Sugar Hill Percentage | Average Percentage |
|---|---|---|---|
| Laborers | 43.9% | 43.9% | 43.9% |
| Carpenters | 31.2% | 30.9% | 31.1% |
| Cement Masons | 5.7% | 2.7% | 4.2% |
| Lathers | 19.1% | 22.5% | 20.8% |

(PX-126A at 6.)

213.    Based on these estimates, Donohue allocated the 1,614,345 hours (which represented the combined Total ACS Hours and Total Sugar Hill Hours) as follows:

| Trade | Average Allocation | Allocated Hours |
|-------|--------------------|-----------------|
| Laborers | 43.9% | 709,253 |
| Carpenters | 31.1% | 501,438 |
| Cement Masons | 4.2% | 67,757 |
| Lathers | 20.8% | 335,897 |
| *Total:* | | 1,614,345 |

(PX-126A at 6-7.)

214.    Defendants' expert, Wajdi Atallah, found these estimates to be reasonable, including Donohue's estimate of the number of lather hours required to install rebar on 92nd Street. (Tr. at 1142:03-15.) I likewise find them to be a reasonable estimate of the number of hours performed by each of these four trades on the relevant projects.

215.    *Moore* Plaintiffs' expert Stephen Bowen calculated the estimated unpaid fund contributions for each of the projects based on the allocation of hours estimated by Donohue. (*See* Bowen Decl., PX-270.)

216.    To calculate the fringe benefits owed to the Local 46 Funds, Bowen first calculated the base number of hours worked by lathers on each project. To do so, he multiplied the 20.8% average allocation for lathers against the hours estimated for Sugar Hill and each of the twenty-seven ACS projects identified by Defendants. (*See* PX-128A at 2.) He also estimated the number of hours that would be paid for overtime (for which benefits must be paid at a rate of time-and-a-half) and incorporated those additional hours into the base number of hours used to calculate the fringe benefits owed to the Local 46 Funds. (*See* Bowen Decl. ¶ 4, PX-270.)

Although Defendants' expert Atallah objected to the use of an estimate to determine the amount

of overtime hours, he could not provide an alternative estimate (*see* Tr. at 1156:04-1157:24), and

the Court finds Bowen's estimate (approximately 6.1% for lathers) to be reasonable based upon

the evidence in the record from the Sugar Hill project, where lathers worked 45 overtime hours

out of 741 total hours, or approximately 6.1%. (*See* PX-126A at 5.) Bowen multiplied that 6.1%

figure by 50% (approximately 3.05% - referred to as the "Overtime Premium" rate), multiplied it

by the total hours reported for the job, and added that number to the total hours in order to

estimate the total base number of hours for each project. (*See* PX-128A at 2.)

217.    Using the midpoint of the project as the applicable date, Bowen then calculated

the fringe benefit contributions owed for each project based on the fringe benefit rate applicable

at that date for each of the Local 46 Funds. (*See* PX-128A at 3; Bowen Decl. ¶ 3, PX-270.) He

then calculated the interest owed on those contributions at a rate of 12% up through June 30,

2017, as well as the amount of liquidated damages, which were the greater of the interest owed

or 20% of the unpaid contributions. (*See* PX-128A at 5.)

218.    Bowen calculated the total amounts owed to each of the Local 46 Funds for the

ACS projects, including interest and liquidated damages, as follows:

| Local 46 Funds | Total |
| --- | --- |
| **Trust Fund** | $4,402,575.50 |
| **Pension Fund** | $4,434,904.83 |
| **Annuity Fund** | $5,718774.17 |
| **Vacation Fund** | $4,807,655.12 |
| **Scholarship Fund** | $180,756.34 |
| **Apprenticeship Fund** | $242,720.86 |

| Total Fringe Benefits Due for ACS Projects: | $19,677,386.83 |
|---|---|

(PX-128B at 1.)

219.    Bowen undertook the same process for each of the other *Moore* Plaintiff Funds
for the ACS projects.

220.    For the Carpenters Funds, he did not include an Overtime Premium. (PX-128A at
6.) He calculated the unpaid fringe benefit contributions for the ACS projects as follows:

| Carpenters Funds | Total |
|---|---|
| Welfare Fund | $9,167,9198.14 |
| Pension Fund | $7,867,394.33 |
| Annuity Fund | $5,401,376.06 |
| Vacation Fund | $4,284,612.80 |
| A.J.R.E.I. Fund | $438,356.74 |
| Total Fringe Benefits Due for ACS Projects: | $27,159,658.10 |

(PX-128B at 1.)

221.    For the Cement Workers Funds, he estimated an Overtime Premium rate of
approximately 3.4% for the ACS projects. (PX-128A at 10.) I conclude that estimate to be
reasonable considering that the overtime rate from the Sugar Hill project was 3.8% (*see* PX-
126A at 5), and the fact that the Cement Workers CBA requires overtime rates to be paid at time-
and-a-half after the seventh hour and for all weekend work to be paid at double-time (*see* PX-1 at
23-26). The estimated unpaid contributions for the ACS projects are as follows:

| Cement Workers Funds | Total |
|---|---|
| Welfare Fund | $8,454.307.22 |

| Pension Fund | $6,417,416.07 |
| Annuity Fund | $4,660,826.46 |
| Training & Education Fund | $1,478,712.03 |
| Scholarship Fund | $137,009.34 |
| *Total Fringe Benefits Due for ACS Projects:* | $21,148,271.12 |

(PX-128B at 1.)

222.    For the Local 780 Funds, Bowen added an additional premium of 12.9%, but only for purposes of calculating contributions to the Vacation Fund. (PX-128A at 14.) This premium does not appear to be an estimate of the overtime hours, as the Local 780 CBA requires all overtime hours to be counted as double-time for purposes of calculating Trust and Pension benefit contributions and all contributions to be calculated at double-time on Sundays and holidays. (*See* PX-5 at 8-9.) Furthermore, if this was an overtime estimate, it would be unreasonably high because, on the Sugar Hill project, cement masons worked only two hours of overtime out of eighty-eight total hours, or approximately 2.3%. (*See* PX-126A at 5.) There appears to be no justification in the record for this 12.9% premium, and I accordingly discount Bowen's calculations to exclude this premium.

223.    Accordingly, the estimated unpaid contributions for the ACS projects for the Local 780 Funds are as follows:

| Local 780 Funds | Total |
| --- | --- |
| Welfare Fund | $1,127,838.11 |
| Pension Fund | $868,997.70 |
| Annuity Fund | $1,131,637.04 |

| | |
|---|---|
| **Vacation Fund** | $640,326.64 |
| **Apprenticeship Fund** | $35,181.90 |
| ***Total Fringe Benefits Due for ACS Projects:*** | $3,803,981.39 |

(PX-128B at 2.)

224.    Using the same methodology, Bowen also calculated the unpaid contributions

owed on the Sugar Hill project, which are as follows for the Local 46 Funds:

| **Local 46 Funds** | **Total** |
|---|---|
| **Trust Fund** | $198,069.19 |
| **Pension Fund** | $194,609.46 |
| **Annuity Fund** | $216,232.74 |
| **Vacation Fund** | $183,797.82 |
| **Scholarship Fund** | $2,162.32 |
| **Apprenticeship Fund** | $10,811.64 |
| ***Total Fringe Benefits Due for Sugar Hill:*** | $805,683.18 |

(PX-128B at 3.)

225.    And as follows for the Carpenters Funds:

| **Carpenters Funds** | **Total** |
|---|---|
| **Welfare Fund** | $167,917.50 |
| **Pension Fund** | $261,263.16 |
| **Annuity Fund** | $146,006.50 |
| **Vacation Fund** | $143,794.28 |
| **A.J.R.E.I. Fund** | $15,485.54 |

| Total Fringe Benefits Due for Sugar Hill: | $815,424.20 |
|---|---|

(PX-128B at 3.)

226.   And as follows for the Cement Workers Funds:

| Cement Workers Funds | Total |
|---|---|
| Welfare Fund | $294,963.78 |
| Pension Fund | $231,454.04 |
| Annuity Fund | $161,812.98 |
| Training & Education Fund | $81,643.90 |
| Scholarship Fund | $8,264.04 |
| Total Fringe Benefits Due for Sugar Hill: | $778,138.74 |

(PX-128B at 4.)

227.   And as follows for the Local 780 Funds, again discounting the 12.9% premium applied to the Vacation fund:

| Local 780 Funds | Total |
|---|---|
| Welfare Fund | $45,390.24 |
| Pension Fund | $32,558.40 |
| Annuity Fund | $44,049.60 |
| Vacation Fund | $26,796.32 |
| Apprenticeship Fund | $383.04 |
| Total Fringe Benefits Due for Sugar Hill: | $149,177.60 |

(PX-128B at 4.)

86

228.     Consistent with the above, I find all of these estimates and calculations to be reasonable.

229.     Defendant's expert Atallah noted that these estimates do not account for the blend of skill levels that would ordinarily work on a major unionized construction project. For example, most union construction projects will have apprentices work alongside more experienced workers, and some of the CBAs provide for lower fringe benefit contribution rates for apprentices. However, no records were maintained of how many – if any – apprentices worked on any of the ACS projects or on Sugar Hill, making it impossible to accurately estimate how many hours should be discounted to apprentice rates.

230.     Atallah also argued that these estimates do not incorporate a "union efficiency factor" – that is, they do not take into account the fact that union workers are more productive than non-union workers, and thus can accomplish a project in fewer hours than a crew of non-union workers.

231.     Finally, Atallah noted that several of the ACS projects used to estimate these damages, as well as Sugar Hill, were prevailing wage projects, meaning that employees were paid a wage that approximates the value of a union wage and benefits. As such, he argued that those projects should be excluded from the analysis.

232.     However, paying workers directly the amount of money that would have been contributed to the Plaintiff funds is not the same as paying the funds themselves. The unions maintain funds for the protection of workers in times of need, of medical necessity and old age. Giving money directly to the worker who should be covered by fund contributions deprives the fund and the sponsoring union of the benefit of their bargain with Navillus.

87

## II.    Unpaid Contributions to the *Gesualdi* Plaintiffs

233.    The *Gesualdi* Plaintiffs assert that they are owed two types of damages:
(1) contributions for hours of truck driving performed by third parties hired by ACS for the
delivery of concrete; and (2) contributions for hours of truck driving performed directly by
employees of ACS, HDK, and TSC.

234.    The *Gesualdi* Plaintiffs' expert Edward Federico estimated the number of hours
spent by third-party truck drivers delivering concrete on eight ACS projects. Those estimates
were calculated using either: (1) when available, daily pour reports that showed the total number
of cubic yards of concrete poured on the project, or (2) when pour reports were unavailable,
estimates of the number of cubic yards of concrete poured on the project. (Federico Decl. ¶ 17,
GX-28.)[5] Federico then added 5% to these totals to account for waste and spillage, which he
credibly testified was a reasonable average estimate given his experience in the industry. (Tr. at
1115:24-1116:21.) Using this data and the standard concrete truck capacity of ten cubic yards,
Federico estimated the number of concrete deliveries for each of the eight projects. (Federico
Decl. ¶ 18, GX-28.)

235.    Using the pour report data from the projects in which ACS maintained such data,
Federico estimated the average number of hours spent delivering, waiting, and pouring concrete
on each project, and used that average to estimate the number of hours required to pour all of the
concrete used on the eight ACS projects. (*Id.* ¶¶ 19-24.)

236.    Federico estimated that 11,579 hours were spent delivering concrete on these
eight ACS projects. (*See* GX-27 at 1.) Federico then estimated the amount of unpaid

---

[5] The Court inadvertently admitted Federico's declaration as GX-26, which is the exhibit number
used for Ho's declaration. The Court accordingly refers to Federico's declaration as "GX-28"
throughout.

contributions using the average fringe benefit contribution rate applicable between July 1, 2013 and June 30, 2016 for each Local 282 Fund. (*See* GX-27 at 2; Federico Decl. ¶ 31, GX-28.)

237.   Those estimates are as follows:

| Local 282 Fund | Average Rate | Hours | Total |
|---|---|---|---|
| **Annuity Fund** | $13.34/hour | 11,579 | $154,464 |
| **Welfare Fund** | $14.55/hour | 11,579 | $168,476 |
| **Pension Fund** | $11.50/hour | 11,579 | $133,161 |
| **Job Training Fund** | $0.15/hour | 11,579 | $1,737 |
| *Total:* | | | $457,838 |

(GX-27 at 1.)

238.   Federico then calculated the total amount of interest accrued on these unpaid contributions through June 9, 2017, as well as liquidated damages in the same amount, to come up with the following total amounts of unpaid contributions:

| Local 282 Fund | Fringe Benefit | Interest | Liquidated Damages | Total |
|---|---|---|---|---|
| **Annuity Fund** | $154,464 | $65,023 | $65,023 | $284,510 |
| **Welfare Fund** | $168,476 | $70,920 | $70,920 | $310,316 |
| **Pension Fund** | $133,161 | $56,056 | $56,056 | $245,273 |
| **Job Training Fund** | $1,737 | $730 | $730 | $3,197 |
| *Total:* | $457,838 | $192,729 | $192,729 | $843,296 |

(GX-27 at 1.)

239.    Based on the evidence presented at trial, I find all of these estimates and calculations to be reasonable, including the inclusion of the 5% spillage factor and the estimated amount of time spent on each truck delivery run.

240.    The second form of damages sought by the *Gesualdi* Plaintiffs are those based on the hours worked by employees of HDK, TSC, and ACS on various projects. *Gesualdi* expert Tony Ho used payroll records from each of the three companies to calculate these damages. (Ho Decl. ¶¶ 7-11, GX-26.)

241.    As to ACS, Ho examined the records of six individuals reported by ACS as being employed as drivers (James Girdusky, Wayne Hylton, Darren Kanhai, Rasheed Rajkumar, Mohamed Wazeer Shaw, and Eashwardial Sooknanan). (*See* Tr. at 721:03-06 (Kuefner testimony that all six individuals worked as drivers at least some of the time).)

242.    He calculated unpaid fringe benefit contributions as follows:

| Local 282 Fund | Fringe Benefit | Interest | Total |
|---|---|---|---|
| **Annuity Fund** | $292,113.19 | $45,484.54 | $337,597.73 |
| **Welfare Fund** | $204,289.26 | $32,397.98 | $236,687.24 |
| **Pension Fund** | $157,817.38 | $25,987.80 | $183,805.18 |
| **Job Training Fund** | $2,058.49 | $338.97 | $2,397.46 |
| *Total:* | | | $760,487.61 |

(GX-13 at 1-2.)

243.    Defendants made no objection as to any of these calculations, and I find them to be reasonable.

244.    As to TSC and HDK, Ho was not provided with sufficient data to separate the hours reported into particular projects, only by month. The payroll data provided for TSC all

covers a period of August 2014 to May of 2016, while the data for HDK covers February 2012 through September 2014. (GX-14; GX-15.)

245.    Sugar Hill was substantially complete no later than June of 2013, and, therefore, none of the damages sought based on hours worked by employees of TSC is covered by this period.

246.    As to HDK, the unpaid contributions between February 2012 and June 2013 are as follows:

| Local 282 Fund | Fringe Benefit | Interest | Total |
|---|---|---|---|
| Annuity Fund | $72,785.35 | $45,075.70 | $117,861.05 |
| Welfare Fund | $51,987.75 | $32,697.38 | $84,685.13 |
| Pension Fund | $47,667.00 | $30,002.27 | $77,669.27 |
| Job Training Fund | $621.78 | $391.32 | $1,013.10 |
| Total: | | | $281,228.55 |

(PX-15.)

247.    Again, Defendants do not object to any of these calculations, and I find them to be reasonable.

### *Conclusions of Law on Damages*

Under ERISA, an employer must maintain records of hours worked by employees and report those records to fringe benefit plan administrators such that benefits may be calculated as each employee. *See* 29 U.S.C. § 1059(a)(1). "Since the employer is in the best position to know the number of hours worked, courts have determined that the policies of ERISA are advanced by the imposition of a burden that reflects the employer's duties under ERISA." *Demolition*

*Workers Union v. Mackroyce Contracting Corp.*, No. 97 Civ. 4094, 2000 WL 297244, at *7

(S.D.N.Y. Mar. 17, 2000) (quoting *Local 282 Welfare Trust Fund v. A. Morrison Trucking, Inc.*,

No. 92 Civ. 2079, 1993 WL 120081, at *1 (E.D.N.Y. Mar. 30, 1993)). While the Second Circuit

has not specifically addressed the applicable standard where a benefit fund contests the amount

of contributions owed by an employer, other circuits to consider the issue have held that where a

benefit fund produces evidence "raising genuine questions concerning an employer's failure to

maintain adequate records," the burden shifts to the employer to come forward with "evidence

either of the precise number of hours worked or to negate the reasonableness of the inferences to

be drawn from the plaintiff fund's evidence." *Gesualdi v. RRZ Trucking Co., LLC*, No. Civ. 03-

3449, 2011 WL 1988374, at *4 (E.D.N.Y. May 20, 2011) (quoting *Hanley v. Orient Beach Club*,

No. 96 Civ. 4478, 1998 WL 65990, at *5 (S.D.N.Y. Feb. 17, 1998)).

In this case, Defendants have not produced any evidence of the precise number of hours

worked by trade on any of the projects on which Plaintiffs are entitled to damages. Nor have they

negated the reasonableness of the inferences made by Plaintiffs' experts.

As to the damages sought by the *Moore* Plaintiffs, there is no reason to exclude hours

worked on prevailing wage projects from the damages calculation, as Defendants have pointed to

nothing in any of the CBAs that would exempt an employer from making the required fringe

benefit contributions on such projects. I also see no reason to discount the required contributions

by a "union efficiency factor" – each CBA requires contributions per hour actually worked by

members of a particular trade; they do not calculate contributions based on the number of hours

an "efficient" employee *would* have worked on the project.

As to the *Gesualdi* Plaintiffs, I conclude they are entitled to the full amount of the

damages sought from ACS both for third parties and for the six individuals on ACS's payroll.

Although Defendants attempted to create an issue by arguing that some of these individuals only worked as drivers some of the time, Kuefner admitted on cross that there are no records of when any of these individuals performed non-driving duties (Tr. at 723:24-724:09), and therefore it was not unreasonable for Ho to include all of the hours reported by ACS for these six individuals in his damages calculation.

For the damages against TSC and HDK, I conclude that they are entitled only to damages during the time period of the Sugar Hill project, which was substantially complete no later than June 2013. That eliminates all damages arising from employees working directly for TSC and part of the damages sought for employees working directly for HDK. Although the payroll records do not specifically identify all of these drivers as working for HDK on Sugar Hill during this period, I conclude this is a reasonable assumption considering that the burden is on the employer to maintain accurate payroll records.

### *Verdict*

The Local 46 Funds shall have judgment against Navillus and ACS in the amount of $19,677,386.83, representing the total amount of unpaid fringe benefit contributions owed for work performed on ACS projects, along with unpaid interest and liquidated damages.

The Local 46 Funds shall have judgment against Navillus, TSC, and HDK in the amount of $805,683.18, representing the total amount of unpaid fringe benefit contributions owed for work performed on the Sugar Hill project, along with unpaid interest and liquidated damages.

The Carpenters Funds shall have judgment against Navillus and ACS in the amount of $27,159,658.10, representing the total amount of unpaid fringe benefit contributions owed for work performed on ACS projects, along with unpaid interest and liquidated damages.

The Carpenters Funds shall have judgment against Navillus, TSC, and HDK in the amount of $815,424.20, representing the total amount of unpaid fringe benefit contributions owed for work performed on the Sugar Hill project, along with unpaid interest and liquidated damages.

The Cement Workers Funds shall have judgment against Navillus and ACS in the amount of $21,148,271.12, representing the total amount of unpaid fringe benefit contributions owed for work performed on ACS projects, along with unpaid interest and liquidated damages.

The Cement Workers Funds shall have judgment against Navillus, TSC, and HDK in the amount of $778,138.74, representing the total amount of unpaid fringe benefit contributions owed for work performed on the Sugar Hill project, along with unpaid interest and liquidated damages.

The Local 780 Funds shall have judgment against Navillus and ACS in the amount of $3,803,981.39, representing the total amount of unpaid fringe benefit contributions owed for work performed on ACS projects, along with unpaid interest and liquidated damages.

The Local 780 Funds shall have judgment against Navillus, TSC, and HDK in the amount of $149,177.60, representing the total amount of unpaid fringe benefit contributions owed for work performed on the Sugar Hill project, along with unpaid interest and liquidated damages.

The Local 282 Funds shall have judgment against Navillus and ACS in the amount of $1,603,783.61, representing the total amount of unpaid fringe benefit contributions owed for work performed by third parties on eight ACS projects, and by ACS employees, along with unpaid interest and liquidated damages.

The Local 282 Funds shall have judgment against Navillus, TSC, and HDK in the amount of $281,228.55, representing the total amount of unpaid fringe benefit contributions owed for work performed by HDK employees on the Sugar Hill project, along with unpaid interest.

The judgment shall bear interest at the Fed Funds Rate from the date of entry until the date the judgment is satisfied.

All other claims and counterclaims asserted by any party against any other party are hereby dismissed with prejudice.

The Clerk of the Court shall enter judgment accordingly and close the file.

Dated: September 20, 2017

_____
Chief Judge

BY ECF TO ALL COUNSEL

# Exhibit B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

TERRENCE MOORE, *et al.*,

                        Plaintiffs,

     -against-

NAVILLUS TILE, INC., *et al.*,

                        Defendants.
-------------------------------------------------------------X
THOMAS GESUALDI, *et al.*,

                        Plaintiffs,

     -against-

NAVILLUS TILE, INC., *et al.*,

                        Defendants.
-------------------------------------------------------------X

14 **CIVIL** 8326 (CM)

## JUDGMENT

15 **CIVIL** 8441 (CM)

Whereas this Court having held a bench trial, and the matter having come before the Honorable Colleen McMahon, United States District Court Judge, and the Court, on September 20, 2017, having issued its Findings of Fact, Conclusions of Law, and Verdict that:

Plaintiffs Terrence Moore, Kevin Kelly, John Coffey, Ronald Richardson, Michael Salgo, Michael Anderson, and Kevin O'Brien, as Trustees of the Metal Lathers Local 46 Pension Fund, the Metal Lathers Local 46 Trust Fund, the Metal Lathers Local 46 Annuity Fund, the Metal Lathers Local 46 Vacation Fund, the Metal Lathers Local 46 Apprenticeship Fund, and the Metal Lathers Local 46 Scholarship Fund (collectively, the "Local 46 Funds"), shall have judgment against Defendant Navillus Tile, Inc. ("Navillus") and Defendant Advanced Contracting Solutions, LLC, d/b/a ACS NY LLC ("ACS") in the amount of $19,677,386.83, representing the

total amount of unpaid fringe benefit contributions owed for work performed on ACS projects, along with unpaid interest and liquidated damages; that,

the Local 46 Funds shall have judgment against Navillus, Defendant Time Square Construction, Inc. ("TSC"), and Defendant HDK Construction, LLC ("HDK") in the amount of $805,683.18, representing the total amount of unpaid fringe benefit contributions owed for work performed on the Sugar Hill project, along with unpaid interest and liquidated damages; that,

Plaintiffs Joseph Geiger, Stephen Mcinnis, Michael Cavanaugh, Paul Capurso, John Sheehy, Paul Tyzner, David Meberg, Kevin O'Callaghan, John DeLollis, and Catherine Condon, as Trustees of the New York City District Council of Carpenters Pension Fund, the New York City District Council of Carpenters Welfare Fund, the New York City District Council of Carpenters Apprenticeship, Journeyman Retraining, Educational and Industry Fund, and the New York City District Council of Carpenters Annuity Fund (collectively, the "Carpenters Funds"), shall have judgment against Navillus and ACS in the amount of $27,159,658.10, representing the total amount of unpaid fringe benefit contributions owed for work performed on ACS projects, along with unpaid interest and liquidated damages; that,

the Carpenters Funds shall have judgment against Navillus, TSC, and HDK in the amount of $815,424.20, representing the total amount of unpaid fringe benefit contributions owed for work performed on the Sugar Hill project, along with unpaid interest and liquidated damages; that,

Plaintiffs Angelo Angelone, Eric Lee, and Michael Salgo, as Trustees of the Cement & Concrete Workers Pension Trust Fund, the Cement & Concrete Workers Welfare Trust Fund, the Cement & Concrete Workers Annuity Trust Fund, and the Cement & Concrete Workers Scholarship Trust Fund, and Plaintiff Kieran O'Sullivan, as Trustee of the Cement & Concrete Workers Training and Education Trust Fund (collectively, the "Cement Workers Funds"), shall

have judgment against Navillus and ACS in the amount of $21,148,271.12, representing the total amount of unpaid fringe benefit contributions owed for work performed on ACS projects, along with unpaid interest and liquidated damages; that,

the Cement Workers Funds shall have judgment against Navillus, TSC, and HDK in the amount of $778,138.74, representing the total amount of unpaid fringe benefit contributions owed for work performed on the Sugar Hill project, along with unpaid interest and liquidated damages; that,

Plaintiffs Gino Castignoli, Michael Rendina, Robert Bertuzzi, Eddie Barbaria, Frank Martorano, Jr., Joseph Mitrione, Michael Salgo, and Kevin O'Brien, as Trustees of the Cement Masons' Local 780 Trust Fund, the Cement Masons' Local 780 Pension Fund, the Cement Masons' Local 780 Annuity Fund, the Cement Masons' Local 780 Vacation Fund, and the Cement Masons' Local 780 Apprenticeship Fund (collectively, the "Local 780 Funds"), shall have judgment against Navillus and ACS in the amount of $3,803,981.39, representing the total amount of unpaid fringe benefit contributions owed for work performed on ACS projects, along with unpaid interest and liquidated damages; that,

the Local 780 Funds shall have judgment against Navillus, TSC, and HDK in the amount of $149,177.60, representing the total amount of unpaid fringe benefit contributions owed for work performed on the Sugar Hill project, along with unpaid interest and liquidated damages; that,

Plaintiffs Thomas Gesualdi, Louis Bisignano, Darin Jeffers, Michael O'Toole, Michael Bourgal, Frank H. Finkel, Joseph A. Ferrara, Sr., Marc Herbst, Denise Richardson, and Thomas Corbett, as Trustees and Fiduciaries of the Local 282 Welfare Trust Fund, the Local 282 Pension Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund (collectively, the "Local 282 Funds"), shall have

judgment against Navillus and ACS in the amount of $1,603,783.61, representing the total amount

of unpaid fringe benefit contributions owed for work performed by third parties on eight ACS

projects, and by ACS employees, along with unpaid interest and liquidated damages; that,

the Local 282 Funds shall have judgment against Navillus, TSC, and HDK in the amount

of $281,228.55, representing the total amount of unpaid fringe benefit contributions owed for work

performed by HDK employees on the Sugar Hill project, along with unpaid interest; that,

the judgment shall bear interest at the Fed Funds Rate from the date of entry until the date

the judgment is satisfied; that,

all other claims and counterclaims asserted by any party against any other party are hereby

dismissed with prejudice; and that,

the Clerk of the Court shall enter judgment accordingly and close the file, it is,

**ORDERED, ADJUDGED AND DECREED:** That, for the reasons stated in the

Court's Findings of Fact, Conclusions of Law, and Verdict dated September 20, 2017, judgment

is entered as follows:

The Local 46 Funds have judgment against Navillus and ACS in the amount of

$19,677,386.83.

The Local 46 Funds have judgment against Navillus, TSC, and HDK in the amount of

$805,683.18.

The Carpenters Funds have judgment against Navillus and ACS in the amount of

$27,159,658.10.

The Carpenters Funds have judgment against Navillus, TSC, and HDK in the amount of

$815,424.20.

The Cement Workers Funds have judgment against Navillus and ACS in the amount of $21,148,271.12.

The Cement Workers Funds have judgment against Navillus, TSC, and HDK in the amount of $778,138.74.

The Local 780 Funds have judgment against Navillus and ACS in the amount of $3,803,981.39.

The Local 780 Funds have judgment against Navillus, TSC, and HDK in the amount of $149,177.60.

The Local 282 Funds have judgment against Navillus and ACS in the amount of $1,603,783.61.

The Local 282 Funds have judgment against Navillus, TSC, and HDK in the amount of $281,228.55.

This judgment shall bear interest at the Fed Funds Rate from the date of entry until the date the judgment is satisfied. All other claims and counterclaims asserted by any party against any other party are hereby dismissed with prejudice; accordingly, the case is closed.

**DATED:** New York, New York
September 22, 2017

**RUBY J. KRAJICK**

Clerk of Court

BY: _____

Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON 9/22/2017

Fig 107 of 109

# Exhibit C

H895moo4                          Moriarty - redirect

1    Q.  How about in 2014?

2    A.  No.

3    Q.  How come?

4    A.  It was about keeping the guys working, payroll was more

5    important than anything else.  It was about building our

6    company, building a brand.

7    Q.  Did you -- have you drawn a salary since then?

8    A.  Yeah.  Well, we have guaranteed payment structures, myself

9    and Willie are organized.

10   Q.  Have you split profits since then?

11   A.  Yes.

12   Q.  What was your taxable income in 2015?

13            MR. BARDAVID:  Objection.  Relevance.

14            THE COURT:  I understand it, you don't.

15   Q.  I think that means you can answer.

16            THE COURT:  Answer the question.

17   A.  Taxable income '15, somewhere around $2 million, maybe $1.7

18   million.

19   Q.  How about 2016?

20   A.  '16 was $2 million and change.

21   Q.  How about this year?

22   A.  It is projected to be around $2 million, $2.1 million, $2

23   million.

24   Q.  Are there any reserved earnings at this point that you and

25   Mr. O'Donnell share in the company?