**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Fred Stevens
Brendan M. Scott
Andrew S. Richmond

*Proposed Attorneys for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re                                                            :
                                                                 :    Chapter 11
ADVANCED CONTRACTING SOLUTIONS, LLC :
                                                                 :    Case No. 17-13147 (SHL)
                       Debtor.                                   :
-----------------------------------------------------------------x

**DEBTOR'S OBJECTION TO METALLIC LATHERS AND
REINFORCING IRONWORKERS, LOCAL 46 AND CEMENT &
CONCRETE WORKERS DISTRICT COUNCIL, LIUNA FOR RELIEF
FROM THE AUTOMATIC STAY UNDER § 362(d) OF THE CODE**

**TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:**

Advanced Contracting Solutions, LLC ("ACS" or the "Debtor"), debtor and debtor in possession in the above-captioned case (the "Chapter 11 Case"), by and through its proposed attorneys, Klestadt Winters Jureller Southard & Stevens, LLP, hereby submits this objection (the "Objection") to the motion of Metallic Lathers and Reinforcing Ironworkers, Local 46 and Cement & Concrete Workers District Council (collectively, the "Unions"), for Relief from the

Automatic Stay Under 11 U.S.C. § 362(d) [Docket No. 66] (the "Motion").[1] In support of this Objection, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

The plaintiff fringe benefit funds (collectively, the "Funds," defined in the Motion as the "Moore Plaintiffs"), are the beneficiaries of a Judgment of $73.4 million against ACS that precipitated its bankruptcy filing. The Judgment is based upon a finding by the District Court that ACS was Navillus' alter-ego, and accordingly, that certain work performed by ACS should have resulted in benefit contributions to the Funds. ACS and its two co-defendants are actively pursuing an appeal of the Judgment to the Second Circuit Court of Appeals. By their Motion, the Unions (as sponsors of certain Funds) seek a modification of the automatic stay (or determination that the stay does not apply) in both the ACS and Navillus bankruptcy cases in order to pursue additional claims for alleged ongoing violations of certain CBAs as a result of ACS's continued use of non-union labor. The Unions further seek to impose the CBAs' grievance and arbitration process provisions on ACS. The Unions submit that the relief they seek is a simple matter of acknowledging what is written in the Decision and in the CBAs, and permitting them to proceed as mandated by Section 1113. This is false and the requisite inquiry is far more complex.

*First*, the Court has to determine threshold issues regarding the extent of the District Court's alter-ego finding, which is currently subject to an appeal. According to the Unions, the District Court's alter-ego finding covers all periods in time and makes ACS a party to the CBAs and subject to their terms going forward. ACS contends that the alter-ego finding was limited to a specific period in time (only up to June 21, 2016), and does not apply thereafter. ACS further believes the Judgment foreclosed the ongoing claims the Unions wish to assert now. These

---

[1] Capitalized terms not herein defined shall have the meanings ascribed to them in the Motion.

2

threshold questions regarding the reach of the District Court's Decision and Judgment must be answered before this matter can go further.  The first question for this Court is whether it or the District Court is the appropriate forum for answering those questions.

*Second*, even if the threshold questions were to be resolved against ACS, this Court should, nonetheless, decline to modify the stay to permit the Unions to assert their claims in arbitration for the following reasons:

(i) <u>Pursuit of the Sale Strategy</u>.  ACS has signaled its intention to sell its assets and wind-down its business on an expedited basis.[2]  If the sale is successful, the full universe of damages available to the Unions on its post-petition claims will be limited and identifiable.  Further, the amount of assets that will be available to satisfy any such claims will also be quantified.  It makes eminent sense to avoid immediately engaging in a costly, time consuming and distracting legal battle that may very likely prove to be economically unnecessary in the very near future.

(ii) <u>Any New Claims of the Unions Are Not Administrative</u>.  Even if ACS were accruing liability to the Unions by its post-petition use of non-union labor, those claims would not be administrative as they are not actual or necessary to preserve ACS's estate.  Neither ACS nor any of its employees receive any benefits from the Unions or Funds under the CBAs.  Liquidating general, unsecured claims is not a priority at this time for all the reasons stated above.

(iii) <u>The CBAs Would be Subject to Rejection by ACS</u>.  Even if ACS was found to presently be a party to the CBAs, ACS could reject the CBAs under Section 1113

---

[2] Pursuant to the debtor in possession lending agreement between ACS, as borrower, and Liberty Mutual Insurance Company, as lender, approved on an interim basis by this Court's order, dated November 29, 2017 [Docket No. 86], ACS has until December 15, 2017 to obtain a letter of intent on the purchase of its assets, until December 22, 2017 to file a sale motion, and until January 31, 2017 to close on a sale.

following fulfillment of the statute's technical requirements. All of ACS's current contracts were bid and intended to be staffed with non-union labor, and are not economically viable if ACS is liable for ongoing contributions under the CBAs. Accordingly, even if ACS was subject to the CBAs, the CBAs could and should be rejected.

Based upon the foregoing and as set forth in further detail below, relief from the stay should be denied. The District Court's finding that ACS was an alter-ego of Navillus was past-tense and fixed to a specific period of time and there is no indication it was intended to bind ACS to the CBAs in future. Accordingly, ACS is not a party to the CBAs and is not subject to any of their terms, including the terms mandating compliance with the grievance and arbitration process. Further, granting relief from the automatic stay to essentially liquidate general, unsecured claims does not make any sense at this time, and is not in the best interests of the Debtor, its estate or its creditors.

## ARGUMENT

### A. Threshold Questions Regarding The Implications Of The Decision - The Alter-Ego Finding Is Not Forward-Looking And ACS Is Not A Party To The CBAs

The Unions argue that the District Court's alter-ego finding is forward looking in nature and renders ACS a party to the CBAs, and thus, subject to its grievance and arbitration dispute resolution provisions and Section 1113 of the Bankruptcy Code. There are two major problems with the Unions' argument: (i) the alter-ego finding was based upon evidence submitted through June 21, 2016, and was not forward looking; and (ii) that forward-looking claim was expressly rejected by the District Court.

As a preliminary matter, this Court must decide the most appropriate forum to answer these preliminary questions regarding the impact of the Decision. ACS leaves that to the sound

discretion of this Court but submits that: (a) this Court can and should interpret the Decision; and (b) the District Court's ability to interpret the Decision may be limited given that the Judgment is currently subject to appeal which arguably deprives the District Court of jurisdiction.

### *(i)    The Alter-Ego Finding Did Not Go Past June 21, 2016*

In support of their argument that the alter-ego finding is forward-looking and thus obligates ACS to the CBAs, the Unions rely upon the following statement by the District Court: "[b]ased upon these factors, I conclude ACS and Navillus are, and always have been, alter egos." Decision, p.76. However, the evidence considered by the District Court in reaching that finding was fixed in time and did not go past June 21, 2016.

Moreover, the District Court's language with respect to its alter-ego finding was not consistent in the Decision. In another section of the Decision, the District Court's finding was appropriately limited (unlike the portion quoted above), finding that "ACS was set up as, and *at all relevant times was*, Navillus' alter ego." Decision, p. 55, ¶ 205 (emphasis added). The "relevant times" referred to in the Decision were only until June 21, 2016, the end date for the evidence submitted at trial, and the District Court's use of the past-tense "was" as opposed to the present-tense "is" appropriately limited the finding to the evidence considered. At the very least, the clear contradiction between different parts of the Decision should be acknowledged, (rather than ignored as it is by the Unions), and interpreted or clarified by the appropriate forum.

ACS submits that its view that the alter-ego finding was limited to the relevant portion in time is the right view. Even if the quotation selected by the Unions was deemed to be the one that captured the District Court's actual intention, it is unlikely that it would survive appeal given that an alter-ego finding for periods after June 21, 2016 was not supported by any evidence in the record as such evidence was largely excluded.

5

### *(ii)    The District Court Already Rejected The Ongoing Alter-Ego Theory*

The ongoing alter-ego and continued liability theory was already asserted by Thomas Gesauldi and certain other plaintiffs in the underlying District Court case. See Complaint of Thomas Gesauldi, et al., dated October 27, 2015, p.25 (seeking an order requiring Navillus, ACS and the other defendants to continue to make contributions to the union funds going forward, and a specific finding requiring ACS and other defendants to "remain current in contributions to the Funds"). Significanty, the District Court had previously consolidated the *Gesualdi* and *Moore* cases for all purposes. See Moore, et al. v. Navillus Tile, Inc., et al., Case Nos. 14-cv-8326 and 15-cv-8441, Docket No. 204 (S.D.N.Y. Jan. 3, 2017) (memorandum decision consolidating cases for all purposes). The District Court did not enter judgment on that claim and in fact dismissed that claim with prejudice, along with all other asserted claims and counterclaims that were not specifically granted by the Decision. Decision, p.95. No timely appeal was taken of the dismissal of the ongoing liability claim with prejudice.

The rejection of that ongoing alter-ego and contribution claim, if not dispositive of the current motion, has significant implications. It demonstrates that the District Court considered and rejected the exact same claim that the Unions seek to assert now, and it supports ACS's contention that the District Court's alter-ego finding was in fact fixed in the past. The Unions' claims are indistinguishable from the claim that was rejected by the District Court, and are subject to *res judicata* as the Funds had a full and fair opportunity to raise and litigate this issue in the underlying action. See  Burgos v. Hopkins, 14 F.3d 787, 789 (2d Cir. 1994) (quoting Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 414 (1980)) ("Traditionally, the doctrine of res judicata, or claim preclusion, provides that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that *were or could have been* raised in that action'") (emphasis added)). The fact that these Unions or the Funds they sponsor

specifically did not raise this issue in the underlying action is irrelevant as they had a full opportunity to do so and *res judicata* therefore applies.

### B. The Automatic Stay Should Not Be Modified

Even if all the foregoing threshold questions were resolved in the Unions' favor, the automatic stay should not be modified to permit the Unions to pursue the claims in any forum at this time.

The purpose of the automatic stay is "to protect creditors as well as the debtor." Ostano Commerzanstalt v. Telewide Sys., Inc., 790 F.2d 206, 207 (2d Cir. 1986). This is done "by avoiding wasteful, duplicative, individual actions by creditors seeking individual recoveries from the debtor's estate, and by ensuring an equitable distribution of the debtor's estate." Note Holders v. Large Private Beneficial Owners (In re Tribune Co. Fraudulent Conveyance Litig.), 818 F.3d 98, 108 (2d Cir. 2016); see McMullen v. Sevigny (In re McMullen), 386 F.3d 320, 324 (1st Cir. 2004) (noting that the stay "safeguard[s] the debtor estate from piecemeal dissipation . . . . ensur[ing] that the assets remain within the exclusive jurisdiction of the bankruptcy court pending their orderly and equitable distribution among the creditors."). Moreover, "[t]he automatic stay is critical to a debtor because it allows a debtor to focus on its reorganization instead of litigation." In re Residential Capital, LLC, No. 12-12020 (MG), 2012 WL 3249641, at *4 (Bankr. S.D.N.Y. Aug. 7, 2012). Similarly, the automatic stay "provides stability and certainty to both the debtor and creditors." Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 995 (9th Cir. 2001).

#### (i) *The Debtor Should Be Permitted To Pursue And Complete A Sale Process*

First, the stay should not be modified given ACS's pursuit of an expeditious sale of its assets and wind-down of its business. A sale and wind-down of ACS will resolve a number of the Unions' pressing issues. It will limit any potential accumulation of damages, all of which

7

would be tied to ACS's continued use of non-union labor. When ACS stops doing work, any potential continuing liability to the Unions and Funds ends. Also, following the sale, constituents will know exactly what assets are available to satisfy any claim of the Unions and Funds. It is highly likely that ACS's estate will not have sufficient resources to satisfy such claims, rendering their pursuit unnecessary.

### (ii) The Unions Would Not Be Entitled To An Administrative Claim

Even if the Unions successfully convinced the proper forum that ACS was an ongoing alter-ego of Navillus, was a deemed party to the CBAs, and had ongoing post-petition liability to the Unions and Funds as a result, the Unions' post-petition claims would not be entitled to administrative priority. Section 507 provides for administrative expense priority for expenses incurred which are "the actual, necessary cost and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). The requesting party bears the burden of proving entitlement to an administrative expense priority. Supplee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), 479 F.3d 167, 172 (2d Cir. 2007) (quoting Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 5 (1st Cir. 1992)); In re Drexel Burnham Lambert Grp. Inc., 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991). Moreover, there is a presumption "that creditors act primarily in their own interests and not for the benefit of the estate." In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882, 890 (Bankr. S.D.N.Y. 1993).

The purpose of providing a priority for administrative expenses is "to facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all of the estate's creditors." Trustee of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 101 (2d Cir. 1986); Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950, 953 (1st Cir. 1976). "Accordingly, an expense is administrative only if it arises out of a transaction

between the creditor and the bankrupt's trustee or debtor in possession, and 'only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.'" McFarlin's, 789 F.2d at 101 (quoting In re Mammoth Mart, 536 F.2d at 954; citing In re Jartran, Inc., 732 F.2d 584, 587 (7th Cir. 1984; Straus-Duparquet, Inc. v. Local Union No. 3 Int'l Bhd. of Elec. Workers, A F of L, CIO, 386 F.2d 649, 651 (2d Cir. 1967)); In re Drexel Burnham Lambert Grp. Inc., 134 B.R. 482, 488 (Bankr. S.D.N.Y. 1991) ("[T]he estate must accrue a real benefit from the transaction, because administrative expense priority will be granted on claims against the estate. The estate must have actually benefitted, as opposed to potentially benefitted."); see In re Bethlehem Steel Corp., 479 F.3d at 172–73 ("Regardless of when the debtor-in-possession becomes obliged to make the payment, it can only be an administrative expense if the debtor received the consideration for the obligation after the commencement of the bankruptcy proceedings."). A debt is not entitled to priority status simply because the right to payment arose post-petition. McFarlin's, 789 F.2d at 101.

In McFarlin's, the Second Circuit held that the withdrawal liability associated with the debtor ending its participation in a multiemployer pension plan covering its laid-off employees was not entitled to administrative priority. The court reasoned that because the lump sum contribution was for benefits already earned by the employees, there was no benefit conferred on the debtor in possession or for the continuation of the business post-petition. McFarlin's, 789 F.2d at 103–04; see Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 24–25 (2d Cir. 1996); Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 10 F.3d 944, 956 (2d Cir. 1993). There is an even more compelling reason here to deny administrative priority to any post-petition claim the Unions and Funds may have.

9

Here, there is no benefit whatsoever for any recoveries by the Unions or Funds. The Unions and the related Funds do not supply health, education, pension, representation or other benefits to ACS or its non-union workers. Moreover, ACS's current work at the negotiated contract prices could never be staffed with union employees, because even if permitted it would not be economically viable. There is absolutely no benefit to the estate of paying anything to the Unions or Funds.

Accordingly, any post-petition claim asserted by the Unions or Funds would not be afforded administrative priority. The Unions' present efforts are only to liquidate an unsecured claim and there is absolutely no need to do that at this time. ACS's proposed sale and other case exigencies should be dealt with first, after which ACS and other case constituents can determine if it is even necessary to liquidate general, unsecured claims.

### (iii)    *If ACS Were A Party To The CBAs, It Could Reject Them*

Finally, to the extent ACS lost every preceding argument, and was consequently deemed an ongoing alter-ego of Navillus and a party to the CBAs, it could reject the CBAs under Section 1113 of the Bankruptcy Code.

*[Continued on next page]*

## CONCLUSION

Based upon the foregoing, ACS respectfully submits that the Motion should be denied in its entirety, the automatic stay should remain in full force and effect, and any claim asserted by the Unions should be liquidated at the appropriate time in the future.

Dated:  New York, New York
        December 8, 2017

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By: */s/ Fred Stevens*
Tracy L. Klestadt
Fred Stevens
Brendan M. Scott
Andrew S. Richmond
200 West 41st Street, 17th Floor
New York, New York 10036-7203
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: tklestadt@klestadt.com
       fstevens@klestadt.com
       bscott@klestadt.com
       arichmond@klestadt.com

*Proposed Attorneys for Debtor and Debtor in possession*