Hearing Date: December 19, 2017 at 2:00 p.m.<br>
Objections Due: December 8, 2017<br>
Reply Due: December 15, 2017

Kennedy, Jennik & Murray, P.C.
113 University Place
New York, New York 10003
Telephone: (212) 358-1500
Facsimile: (212) 358-0207

Attorneys for Metallic Lathers & Reinforcing Ironworkers, Local 46
and Cement & Concrete Workers District Council, LIUNA

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re:                                    :    Chapter 11
                                          :
Advanced Contracting Solutions LLC,       :    Case No. 17-13147 (SHL)
                                          :
                Debtor.                   :
------------------------------------------------------------x
In re:                                    :    Chapter 11
                                          :
Navillus Tile, Inc. d/b/a Navillus Contracting  :  Case No. 17-13162 (SHL)
                                          :
                Debtor.                   :
------------------------------------------------------------x

**REPLY BY METALLIC LATHERS & REINFORCING IRONWORKERS,
LOCAL 46 AND CEMENT & CONCRETE WORKERS DISTRICT COUNCIL, LIUNA
TO THE DEBTORS' OBJECTION TO THEIR MOTION FOR RELIEF FROM THE
AUTOMATIC STAY UNDER § 362(d) OF THE CODE**

**INTRODUCTION**

1.      These related chapter 11 bankruptcy cases were filed because of a judgment ("Judgment") obtained in *Moore v. Navillus Tile, Inc.*, No. 14-CV-8326 (S.D.N.Y.), by four groups of employee benefit funds ("*Moore* Plaintiffs"). (ACS Dkt. No. 2, ¶¶ 17-18; Navillus Dkt. No. 7 at 3-6.)

2.      Two unions which sponsor some of the multiemployer benefit funds that brought the *Moore* action (collectively, "Unions"), submitted this motion for relief from the automatic

1

stay to allow the Unions to process a grievance alleging that Navillus has violated, and is continuing to violate, its collective bargaining agreements ("CBAs") with the Unions ("Motion") because of the continuing failure of Advanced Contracting Solutions LLC ("ACS") to make benefit fund contributions on the pre-Chapter 11 filing hours and post-Chapter 11 filing hours that ACS has worked but that were not included in the judgment issued on September 20, 2017.

3. In pertinent part, the decision in *Moore* found that ACS and Navillus Tile, Inc. ("Navillus") "are, and always have been, alter egos." (Motion, Ex. A, at 76) (emphasis added).) It is critical to note that the damages awarded by the District Court did not include any limitation of time on the ACS hours for which Navillus and ACS would jointly owe contributions to the Fund. Navillus erroneously states in its opposition that: "the District Court's finding as to alter ego liability was limited to the period ending on June 21, 2016 based on the evidence submitted at trial." (Navillus Dkt. No. 101, ¶ 17.) ACS similarly argues that "the alter-ego finding was limited to a specific period in time (only up to June 21, 2016), and does not apply thereafter." (ACS Dkt. No. 101 at 2.) The Plaintiffs' expert report on the calculation of damages in that litigation (which was adopted in its entirety in the damages awarded by the District Court), attached hereto as Exhibit A, sets forth at page 4 the covered work hours on various projects that were included in the damages calculation. The covered work hours for which damages were awarded in the Judgment include not only covered hours worked as of June 21, 2016 (the date of the damages report) but also hours that were projected to be worked beyond that. Thus, the job end date for the hours worked on the 122 East 23rd Street project was February 12, 2017; the job end date for hours worked on the 210 Livingston Project was January 22, 2017 and the job end date for hours worked on the 26 Ann Street Project was February 5, 2017. A number of other projects had covered work hours that were worked after June 21, 2016. It is simply fallacious to

2

contend that June 21, 2016 was the end date for damages in this proceeding – it was merely the last date on which ACS had reported actual and projected hours worked to the *Moore* Plaintiffs' Funds.

4.  Both Navillus and ACS argued throughout the District Court proceeding that even if the Court found overwhelming evidence of an alter ego relationship, it should limit any damages to the initial hours worked by ACS during a "start-up" period – a position that was soundly rejected by the Court. Instead, the District Court expressly found that "the record as a whole demonstrates that the alter ego relationship continued well beyond any "start-up" period. (Motion, Ex. A, at 68-69.)

5.  The objections by Navillus and ACS can be summarized as:

A. The looming sale of ACS will cure this problem and therefore there may be no need for an arbitration to address continuing hours worked in violation of the applicable CBAs.

B. The resolution of additional claims by the Funds or the Unions should await the Second Circuit decision on the various appeals, the conclusion of mediation by all parties or the successful sale of ACS assets.

C. The prospect of multiple decisions addressing substantive liability could cause a "procedural train wreck".

D. The Court should ignore the Second Circuit law enforcing Section 1113 of the Code because ACS can always reject the CBAs under Section 1113.

**THE IMPACT OF THE POTENTIAL SALE OF ACS**

6.  The Unions concede that if ACS is sold in an arms-length transaction for fair value to an unrelated party that can demonstrate that it is not yet another attempt to evade the

3

reach of the Navillus CBAs, such a sale may terminate the obligation to make Fund contributions for hours worked on ACS Projects after the sale. But those factors each remain to be proven. While it would be pointless to again address the issues which have caused the Unions to be highly skeptical of the conduct of ACS, the Court should be aware that Navillus was also found to have utilized other corporations as alter egos to avoid its CBAs including Time Square Corporation and HDK Construction, LLC. (Motion, Ex. A., at 68.) Even assuming the best intentions by ACS, the reality is that it will be difficult to complete a sale of ACS given the difficulties of operating a debt laden construction firm in Chapter 11. Further, if an appropriate buyer materializes and permission is sought for a sale, it will be necessary to establish that it is not yet another attempt to evade the CBA obligations. All of that will take time, and there is no reason to prevent the Unions from proceeding with their grievances while this process takes place. Even if a sale occurs, it will be necessary to liquidate the additional claims by the Funds and potential claims by the Unions based on the res judicata impact of the District Court decision. Any CBA based claim must first go to a trade board grievance process and then, if unresolved, an arbitration, and the mere possibility of a sale of assets by ACS should not stop either from occurring.

### THE REQUEST TO DELAY ANY GRIEVANCE OR ARBITRATION UNTIL THE SECOND CIRCUIT RULES ON THE APPEAL

7.      This request to suspend the grievance process during the pendency of the appeals comes against a backdrop (unmentioned by Navillus or ACS) in which **these Defendants were denied a stay of enforcement of the September 20, 2017 Judgment three separate times.** On September 28, 2017, the District Court issued a lengthy decision denying a request for a stay of execution, attached hereto as Exhibit B. On October 31, 2017, the Second Circuit after argument before a three judge panel denied the emergency appeal from the denial of a stay and on

4

November 3, 2017, yet another emergency motion by Navillus and ACS for a stay was denied. These Second Circuit decisions are attached as Exhibits C and D.

8. The clear rule in the Second Circuit is that the pendency of an appeal does not diminish the res judicata impact of the decision below. *In re MF Glob. Holdings, Ltd.*, No. 11-15059 (MG), 2014 Bankr. LEXIS 3067, 2014 WL 3536977, at *4 (Bankr. S.D.N.Y. July 17, 2014) (the pendency of an appeal does not affect a decision's finality for res judicata purposes); *see Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 189, 61 S. Ct. 513, 85 L. Ed. 725 (1941) ("In the federal courts the general rule has long been recognized that while appeal with proper supersedeas stays execution of the judgment, it does not – until and unless reversed – detract from its decisiveness and finality.").

9. This most recent attempt to obtain a stay of the finality of this judgment should be denied. The Unions have already made clear that they would not seek execution or other enforcement of any arbitration or grievance award outside of this Court, especially on the issue of whether ACS hours worked give rise to an administrative claim by the Funds. But the District Court's decision is no less final just because it has been appealed. The Unions are entitled to utilize it in the grievance and arbitration process to address the continuing CBA violations by ACS.

### ALLEGED FEARS OF A "TRAIN WRECK" DO NOT WARRANT DENIAL OF THE UNIONS' RIGHTS TO COMPEL ARBITRATION

10. Along with "fishing expedition", one of the most overused clichés in the legal lexicon is "train wreck". While easy to hurl as a colorful metaphor, what does it mean in this situation? While Navillus and ACS are not clear about why these proposed grievances or arbitrations would result in a "train wreck", they presumably mean that multiple proceedings would be expensive and could result in different outcomes. But all of the CBAs in this case are

5

between the various unions and a single multiemployer bargaining association, the Building Contractors Association, Inc., which represents Navillus for purposes of collective bargaining. All of the unions would undoubtedly agree on a single grievance to be heard by a single trade board and then, if unresolved, by a single arbitrator, just as they consolidated their District Court proceedings before a single judge. There would be a single proceeding, not a multitude of proceedings. There would be one decision, and there would be no possibility of conflicting decisions. After that one arbitration decision, this Court would then consider whether the Funds would be entitled to an administrative claim. The train wreck metaphor, whatever its use elsewhere, simply has no bearing here.

11.     The authority relied upon by Navillus in support of its All Writs Act argument, *Allstate Insurance Co. v. Hisham Elzanaty*, 929 F. Supp. 2d 199 (E.D.N.Y. 2013), has no bearing on this case. First, the Court there construed the Federal Arbitration Act ("FAA"). The FAA, 9 U.S.C. § 1 *et seq.*, does not apply to labor disputes covered by the Labor Management Relations Act, which are governed by federal common law under Section 301, 29 U.S.C. § 185. *See Coca-Cola Bottling Co. of N.Y., Inc. v. Soft Drink & Brewery Workers Union Local 812 Int'l Bhd. of Teamsters*, 242 F.3d 52, 54 (2d Cir. 2001); *N.Y. Med. Ctr. of Queens v. 1199 SEIU United Healthcare Workers East*, No. 11-CV-04421 (ENV)(RLM), 2012 U.S. Dist. LEXIS 81973, at *5 n.2 (E.D.N.Y. 2012) (citations omitted). In addition, the "train wreck" feared by the *Elzanaty* Court consisted of a large number of No Fault arbitrations by multiple unrelated parties that would inevitably result in inconsistent determinations of matters also before the Court:

> It would severely threaten any judgment of this Court to have pending arbitrations or future arbitrations result in inconsistent rulings with regard to Uptown's eligibility for reimbursement of No-Fault insurance payments. The Court is fully aware that piecemeal litigation and inefficiency are at times unavoidable, especially in light of the FAA's strong mandate that contractual arbitration rights be respected. However, if these rights are delayed, rather than effectively terminated, the Court believes that a

>stay is the most appropriate solution here in order to avoid the large volume of arbitrations and inconsistent judgments that are gradually culminating in a procedural and substantive train wreck…. Nevertheless, under the complicated procedural facts of this case, it cannot be said that the drafters of § 5106(b) intended or that the notions underlying the FAA permit the haphazard and contradictory concurrent flow of litigation and arbitration that appears here."

*Elzanaty*, 929 F. Supp. 2d at 220. There are simply no parallel facts in this motion to lift the stay since the Unions are proposing a single grievance and arbitration process under a set of labor agreements all with the same employer on a matter where the underlying alter ego liability has already been established by Chief Judge McMahon. The other authority relied upon by Navillus to defeat this Motion to permit arbitration is also an FAA case. *LGC Holdings, Inc. v. Julius Klein Diamonds, LLC*, 238 F. Supp. 3d 452, 464-65 (S.D.N.Y. 2017). *LGC Holdings* simply confirms that the grounds for overturning an arbitration award are limited, which is precisely why arbitration is a critical vehicle to protect union rights under collective bargaining agreements.

12. Navillus does not dispute Second Circuit case law that issues of collateral estoppel based on a prior federal District Court judgment can be for the arbitrator to decide because it is not a gateway question of arbitrability. ACS, as an adjudicated alter ego, has a similar contractual duty to arbitrate its obligations under the Navillus CBAs. *See Local 348-S, UFCW, AFL-CIO v. Meridian Mgmt. Corp.*, 583 F.3d 65 (2d Cir. 2009) (holding that "[i]t is not necessary exhaustively to catalog the situations in which a 'successor employer' might be bound by the pre-existing collective bargaining agreement [to engage in arbitration with a union], but previous cases generally have required a company to abide by a collective bargaining agreement where there has been a merger, where the company expressly or impliedly assumed the CBA, or where the 'successor employer' is in fact simply an alter ego of the predecessor employer");

7

*Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 259 n.5 (1974) (discussing alter ego doctrine).

### ACS ERRONEOUSLY ASSERTS THAT THE LIFT STAY MOTION SHOULD BE DENIED BECAUSE ACS CAN REJECT THE CBAS UNDER SECTION 1113

13.     Neither Navillus nor ACS mount an effective challenge to the Second Circuit holding in *Ionosphere I* that the automatic stay provision does not apply to the grievance and arbitration process under a CBA. The Second Circuit has held that "an arbitration brought pursuant to a provision in a collective bargaining agreement is not subject to the automatic stay since its application would allow a debtor unilaterally to avoid its obligation to arbitrate." *In re Ionosphere Clubs*, 922 F.2d 984, 993 (2d Cir. 1990). CBAs are treated differently by Bankruptcy Courts than other contracts because CBAs cannot be modified in Chapter 11 unless the requirements of Section 1113 of the Bankruptcy Code are met. Section 1113(f) provides: "No provision of this title [11 U.S.C. §§ 101 *et seq*.] shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." 11 U.S.C. § 1113(f).

14.     Navillus argues that the All Writs Act as contained in Section 105 of the Code provides authority for this Court to ignore Section 1113 and *Ionosphere I.* But Navillus cites no authority for this novel interpretation and that interpretation of *Ionosphere I* is inconsistent with the view of the Second Circuit in *Air Line Pilots Association v. Shugrue (In re Ionosphere Clubs)*, 22 F.3d 403 (2d Cir. 1990). *See id.* at 407 ("We ultimately decided that application of the automatic stay would effectively nullify the arbitration clause in the CBA at issue in *Ionosphere I* by altering the method of dispute resolution. Accordingly, there was an irreconcilable conflict with section 1113, and the automatic stay could not be applied to stay the arbitration.") (citing *Ionosphere I*, 922 F.2d at 993-94).

8

15.     Section 105 was part of the Code at the time *Ionosphere* was decided, and reported authority does not support the claim that Section 105 overrules the requirements of Section 1113. In *Citigroup, Inc. v. Abu Dhabi Investment Authority*, 776 F.3d 126, 130 (2d Cir. 2015), the Second Circuit observed that Section 105 is a residual source of authority to issue writs on "matters not otherwise covered by the Code". In this case, the Code has already spoken on the relationship between the automatic stay rule and Section 1113: Section 1113 trumps the automatic stay rule with respect to the grievance and arbitration process under CBAs – there is no gap in Code coverage for Section 105 to address.

16.     The easiest response to ACS' claims that it could reject the CBAs under Section 1113 is to observe that in fact it has not done so and, more importantly, has fulfilled none of the procedural requirements of doing so under Section 1113. Until it has completed the notice, information sharing and bargaining required under Section 1113, it cannot make any claims hinging upon rejecting the CBAs under Section 1113.

17.     But any attempt by ACS to reject the CBAs under Section 1113 would fail because the relevant terms of Section 1113 do not permit an adjudicated alter ego employer (ACS) to reject the CBAs of the signatory employer (Navillus) while the signatory continues to adhere to those CBAs. ACS is not a signatory employer to the CBAs; it is bound to their terms by virtue of its being a disguised continuance (or alter ego) of Navillus. Navillus could concededly seek rejection of its CBAs under Section 1113 but it has not done so and, in fact, Navillus has confirmed that it intends to continue as a union employer.

18.     Since an alter ego employer is viewed as subject to the contract as though it were a disguised continuation of the signatory employer (Navillus), there can be no rejection of a contract by only one half of an alter ego arrangement. The continuing desire of Navillus to

9

access the union construction market precludes ACS from seeking an independent rescission of the Navillus CBAs.

19.    The other objections by ACS warrant little discussion. The Unions making this motion and the Moore Plaintiff benefit funds did not adopt or otherwise participate in the *Gesualdi* complaint that ACS characterizes as some sort of waiver. A sale of assets by ACS, even if it occurs, will not settle issues related to the hours ACS has worked that were not included within the damages calculation. This motion is not the forum for a determination of whether the post Chapter 11 filing hours represent an administrative claim. The issue of the damages arising from those hours remains whether or not they are characterized as an administrative claim, a priority unsecured claim or a general unsecured claim.

## **CONCLUSION**

Navillus and ACS have not presented compelling arguments or authority to support their opposition to the Union's motion to lift stay to allow them to proceed to a trial board and, if necessary, an arbitration, to determine the liability of Navillus and ACS for covered hours worked by ACS that were not included in the damages calculation by the District Court below. The Second Circuit has balanced Section 1113 and the automatic stay rule and determined that the automatic stay does not apply proceedings under collective bargaining contracts. In addition, since there was no stay granted to Navillus and ACS (despite their multiple applications for a stay) the determination that they are alter egos is final.[1]

---

[1] It is useful to note that neither ACS nor Navillus has ever articulated a creditable basis for an appeal of the September 20, 2017 decision by Chief Judge McMahon finding them to be alter egos. A place holder appeal intended to give the Defendants deniability during any mediation of this dispute is not entitled to any respect by this Court given the case law making any judgment final if no stay is granted.

10

Dated: December 15, 2017
    New York, NY

                                      KENNEDY, JENNIK & MURRAY, P.C.

                                      By:_____/s/_____
                                          Thomas M. Kennedy
                                          Susan M. Jennik
                                          113 University Place, 7th Floor
                                          New York, New York 10003
                                          (212) 358-1500 Telephone
                                          (212) 358-0207 Facsimile