**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Fred Stevens
Brendan M. Scott

*Attorneys for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                                             :
                                                                  :          Chapter 11
ADVANCED CONTRACTING SOLUTIONS, LLC, :
                                                                  :          Case No. 17-13147 (SHL)
                          Debtor.                                 :
------------------------------------------------------------------x

**MOTION FOR ORDERS PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006: (A)(i)
ESTABLISHING BIDDING PROCEDURES AND BID PROTECTIONS IN
CONNECTION WITH THE SALE OF CERTAIN OF THE ASSETS OF THE DEBTOR,
(ii) APPROVING THE FORM AND MANNER OF NOTICES, (iii) APPROVING THE
ASSET PURCHASE AGREEMENT SUBJECT TO HIGHER AND BETTER OFFERS
AND (iv) SETTING A SALE HEARING DATE; AND (B)(i) APPROVING THE SALE OF
CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS AND
ENCUMBRANCES, (ii) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (iii)
GRANTING RELATED RELIEF**

**TO THE HONORABLE SEAN H. LANE,**
**UNITED STATES BANKRUPTCY JUDGE:**

Advanced Contracting Solutions, LLC, the above-captioned debtor and debtor in

possession ("ACS," or the "Debtor"), by its proposed attorneys, Klestadt Winters Jureller

Southard & Stevens, LLP, hereby moves (the "Motion") for entry of orders:

a.      Substantially in the form attached hereto as **Exhibit A** (the "Bidding
        Procedures Order") (a) establishing bidding procedures and bid

1

protections (the "<u>Bidding Procedures</u>"), (b) approving the form and manner of notices thereof (the "<u>Bidding Procedures Notice</u>"),

b.  Substantially in the form attached hereto as **Exhibit B** (the "<u>Sale Order</u>") (a) approving the Asset Purchase Agreement, dated December 19, 2017 (the "<u>Purchase Agreement</u>"), substantially in the form attached hereto as **Exhibit C**, among the Debtor and Trident General Contracting LLC (the "<u>Purchaser</u>"), pursuant to which the Debtor proposes to sell certain of its assets to Purchaser free and clear of any and all liens, claims and encumbrances, subject to higher and better offers (the "<u>Sale Transaction</u>"), (b) approving certain procedures with respect to the Debtor's assumption and assignment of certain executory contracts and unexpired leases, and approving the form and manner of notice of assumption and assignment of executory contracts substantially in the form attached hereto as **Exhibit D**, (c) approving the sale of the Assets (as defined in the Purchase Agreement) free and clear of liens, claims and encumbrances, (d) setting a hearing on January 24, 2018 (the "<u>Sale Hearing</u>") to consider approval of the Sale Transaction, (e) approving the form and manner of notice of sale (the "<u>Sale Notice</u>"), substantially in the form attached hereto as **Exhibit E**, and (f) granting related relief.

In support of the Motion, the Debtor incorporates the statements contained in the Declaration of Jeffrey T. Varsalone pursuant to Local Bankruptcy Rule 1007 [Docket No. 2] (the "<u>Varsalone Declaration</u>") and respectfully represents and alleges as follows:

## <u>PRELIMINARY STATEMENT</u>

ACS is a large open-shop concrete foundation and concrete super-structure contractor. On average, ACS employs approximately 450 persons and has annual revenues of in excess of $100 million. The Debtor was operating a successful and profitable business up until September 22, 2017, when the U.S. District Court for the Southern District of New York entered a judgment in the amount of $73.4 million (the "<u>Union Judgment</u>") against ACS, Navillus Tile, Inc. ("<u>Navillus</u>") and others in connection with a claim by various fringe benefit funds (collectively, the "<u>Union Funds</u>") that ACS was an alter-ego of Navillus, a union concrete contractor, and therefore liable to the Union Funds on account of its jobs staffed with non-union employees. ACS was forced to seek protection from this Court as a result of the Union Judgment in order to

maintain its operations and preserve the value of its assets and enterprise for the benefit of all stakeholders.

In the forty-five days since ACS filed for bankruptcy protection, it has faced numerous challenges.  One significant challenge has been the realization that a significant amount of the funds ACS was projected to receive on account of its ongoing work was attributable to creditors which have valid trust fund rights to those funds pursuant to Article 3-A of the New York Lien Law ("Article 3A").  Given those rights, the Debtor could not and cannot collect and utilize funds subject to Article 3A rights for general purposes, or even for the continuation of work on other ongoing jobs.  As a result, the Debtor was in a cash crisis from the case's inception.  ACS has since been able to stabilize through a Court-approved $2.5 million debtor in possession lending facility with Liberty Mutual Insurance Company (the "DIP Facility"), and has continued operations post-petition in order to preserve the value of its enterprise for creditors.

Another significant challenge to ACS is the Union Funds' (through sponsor unions, collectively, the "Unions") assertion of administrative claims as a result of ACS's continued employment and use of non-union employees.  Although ACS vehemently opposes the Unions' claims in this and nearly every other regard, ACS concedes that the costs and disruption caused by the continued litigation make ACS's continuation as a going concern untenable.  Accordingly, shortly after the Unions announced their intention to assert the administrative claims, ACS adopted a strategy to sell its business, assets and contracts, in order to preserve the value that exists in its business, avoid liability on any bonds issued with respect to its construction contracts, ensure payment to its lenders, avoid significant damages for breach of ongoing work contracts, and severely limit the costs of continuing to litigate with the Unions and Union Funds both within and outside of this bankruptcy proceeding.

ACS has identified the Purchaser which is willing to expeditiously consummate the transaction set forth in the Purchase Agreement providing for the sale of substantially all of ACS's assets free and clear of all liens, claims and encumbrances, to the Purchaser for a purchase price of approximately $4 million in cash (less any amount paid to the estate for the right to cancel existing contracts), plus assumed liabilities of approximately $17.9 million, for a total purchase price of approximately $21.9 million. The Sale Transaction is subject to higher and better offers pursuant to the Bidding Procedures. The $4 million cash component of the purchase price will be used primarily, if not entirely, to retire prepetition secured debt and the DIP Facility. The Sale Transaction could leave as much as $2 million in unencumbered cash in the estate in order to fund a wind-down and distribution to creditors, as well as litigation claims against insiders, if any.

ACS believes that the timely consummation of the Sale Transaction is in the best interests of the estate and its creditors. If the Sale Transaction is not consummated by the end of January 2018, ACS believes that it will run out of cash and will have to liquidate. Also, if the Unions are right (and ACS maintains that they are not), each day that ACS remains in operation it incurs approximately $100k in liability to the Union Funds that it could never afford to pay.

For all of these reasons and those set forth below, ACS respectfully requests approval of the Motion and authority to consummate the Sale Transaction or a better transaction.

## **JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105, 363 and 365 of Title 11, United States Code (the "Bankruptcy Code") and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A.  Organizational Structure of the Debtor

3.      ACS was formed as a Delaware Limited Liability Company on July 16, 2013. Eoin Moriarty and William O'Donnell indirectly own 100% of ACS's membership interests. ACS's members are TMG Solutions, LLC ("TMG"), which is wholly owned by Moriarty, and WOD Solutions, LLC ("WOD"), which is wholly owned by O'Donnell. TMG and WOD each own 50% of ACS's membership interests.

4.      Eoin Moriarty serves as ACS's co-President and Chief Executive Officer. William O'Donnell serves as co-President and General Superintendent.  Jeffrey T. Varsalone is ACS's Chief Restructuring Officer.  David McGrath serves as the Chief Estimator.  John Kuefner is the Director of Operations and Sharon King is the Debtor's Chief Financial Officer.

### B. Nature of the Debtor's Business

5.      ACS was founded by Eoin Moriarty in July 2013 as an open-shop concrete foundation and concrete super-structure contractor. Since inception, ACS has completed over $250 million in work within the five boroughs of New York City.  ACS's clients are some of the most prominent and reputable property developers in the area.

6.      ACS was founded upon quality, experience, impeccable references, and best-of-class staffing and services.  ACS's construction services are performed by a staff of team-oriented individuals who share the common goal of exceeding the expectations of ACS's clients. ACS uses leading-edge construction technology combined with hard work to realize its clients'

goals and expectations. ACS delivers value through meticulous planning and strong plan execution and maintains a commitment of excellence, client satisfaction, and high value.

7.    The key to ACS's success is rooted in its project supervision, which has quickly earned an excellent reputation in the marketplace for quality and client satisfaction.

8.    ACS has grown from a nascent idea in 2013 to a significant construction company that currently employs approximately four hundred fifty (450) employees and as many as seven hundred (700) people, during peak times.

9.    ACS is currently engaged on fourteen (14) construction jobs across New York City. Estimated future revenue from the Debtor's ongoing jobs is approximately $75,000,000.[1]

### C.  Events Leading up to the Debtor's Bankruptcy Filing

10.    On October 17, 2014, trustees of the Union Funds commenced an action in the United States District Court for the Southern District of New York (the "District Court") which was thereafter consolidated with a later-filed case brought by a separate fund. (*See* No. 1:14-cv-08326-CM-JLC, ECF Nos. 1, 204). The Union Funds claimed that three non-union construction companies - ACS, Time Square Construction, Inc. ("TSC"), and HDK Construction, LLC ("HDK") — were established by Navillus for the purpose of evading its obligations to contribute pension and welfare benefits under collective bargaining agreements. The Union Funds' theory was that, in establishing these entities, covered union work was performed by non-union labor. The Union Funds also alleged that Navillus breached its collective bargaining agreements and that Donal O'Sullivan, Navillus' CEO, should be individually liable. A seven-day bench trial was held in the District Court before the Honorable Colleen McMahon in August, 2017. About a month after closing arguments, the District Court issued its written decision and ruled that ACS

---

[1] Since the Petition Date, ACS lost a valuable contract with Gilbane Residential Construction, LLC ("Gilbane") for the project known as 42 Trinity Place with anticipated revenues of $25.95 million. Gilbane paid $275,000 for the cancellation right which will apply as a credit against the cash purchase price.

and TSC were alter egos of Navillus for purposes of calculating damages through June 2016, even though it acknowledged that neither company had been established or was operated to evade obligations.

11.     On September 22, 2017, the District Court entered the Union Judgment in the amount of $73.4 million against ACS, Navillus and other co-defendants, holding ACS and Navillus jointly and severally liable for satisfaction of the $73.4 million (the Union Judgement also included other amounts for which ACS was not liable).  ACS timely commenced an appeal from the Union Judgment, but was unable to post a supersedeas bond in order to stay enforcement of the Union Judgment.

12.     On September 30, 2017, ACS moved before the United States Court of Appeals for the Second Circuit for a stay of enforcement of the Union Judgment.  On October 5, 2017, the Second Circuit issued a temporary stay of the judgment pending determination of the motion by a three-judge panel.  On October 31, 2017, the Second Circuit denied ACS's motion.  A subsequent request for a stay on November 2, 2017 was also denied.  As a result, the Union Funds had the ability to execute upon the Union Judgment prior to the Petition Date, and in fact restrained ACS's bank accounts the moment they were able.

13.     The Union Funds' restraint of ACS's cash and receivables would have destroyed ACS's business if permitted to continue, and accordingly, ACS had no option but to commence this chapter 11 case (the "Chapter 11 Case") in order to afford itself the breathing spell necessary to properly wind-down its business and financial affairs.  ACS's appellate brief with respect to the Union Judgment is due to be filed with the Second Circuit on or around January 5, 2018.

14.     The entry of the Union Judgement, together with the ACS's bankruptcy filing, made it impossible for ACS to obtain new jobs.  Accordingly, ACS has no choice but to liquidate in the manner that will best serve ACS, its creditors and its estate.

**D.  The Bankruptcy Case to Date**

15.     On November 6, 2017 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

16.     The Debtor continues in possession of its property and continues to operate and manage its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

17.     On the Petition Date, ACS had an existing secured credit facility with Signature Bank (the "Prepetition Lender").   ACS filed a motion for authority to use the Prepetition Lender's cash collateral (the "Cash Collateral Motion") [Docket No. 3].  Leading up to and following an emergency hearing on the Cash Collateral Motion on November 8, 2017, ACS and the Prepetition Lender negotiated the terms of a consensual emergency Cash Collateral use order, which was entered by the Court on November 9, 2017 (the "Emergency Cash Collateral Order") [Docket No. 33].

18.     Pursuant to the Emergency Cash Collateral Order, ACS was permitted to use Cash Collateral through November 22, 2017, on certain terms and conditions pursuant to an approved budget (the "Interim Budget") submitted by ACS in connection with the Cash Collateral Motion.

19.     Shortly after the Emergency Hearing on the Cash Collateral Motion, owners of ACS' various projects held back a significant amount of the cash ACS expected to receive on the basis that vendors of ACS had a superior claim to those funds pursuant to Article 3A.  Owners,

project managers and general contractors are concerned that ACS may not abide by the strictures of Article 3A which would leave the owners with liability to ACS's vendors if ACS's restructuring efforts fail leaving vendors' claims unsatisfied after the use of Article 3A trust funds.

20.    On November 21, 2017, a second hearing was held before the Court on the Debtor's Cash Collateral Motion.  At that time, ACS had received an oral commitment from Liberty Mutual Insurance Company ("Liberty") to make the DIP Facility available, subject to final approvals and documentation, and ACS was seeking authority to use $248,000 of the Prepetition Lender's Cash Collateral to pay payroll and related expenses on November 24, 2017 so that it could present the motion for approval of the DIP Facility to the Court the following week.  The Prepetition Lender opposed the Debtor's continued use of Cash Collateral without receiving assurances from some third party that it could recover its $248,000 in Cash Collateral if it was used and the DIP Facility was never approved.  Ultimately, Liberty agreed to backstop the $248,000, which agreement was set forth in a second order authorizing the limited continued use of cash collateral entered by the Court on November 22, 2017 [Docket No. 61].

21.    Immediately thereafter, ACS entered into an agreement, dated November 29, 2017, providing for the $2.5 million DIP Facility from Liberty.  Approval of the DIP Facility was opposed by the various Unions and Union Funds.  The Court approved the DIP Facility and continued use of the Prepetition Lender's cash collateral on an interim basis over the objections by order dated November 30, 2017 [Docket No. 86], and scheduled a hearing to consider final approval of the DIP Facility on December 12, 2017.  Upon interim approval, Liberty funded the first $1 million advance under the DIP Facility, which stabilized ACS's operations in the short term.

22.     Prior to the final hearing on approval of the DIP Facility, on December 8, 2017, the United States Trustee appointed a three member Official Committee of Unsecured Creditors (the "Committee").  The Committee members are as follows: Cement Masons Local 780 Trust Funds; Metallic Lathers & Reinforcing Ironworkers, Local 46; and Construction Risk Partners, LLC.  Two of the three members of the Committee consist of Unions or Union Funds, and ACS understands that other Unions or Union Funds have been granted *ex officio* membership on the Committee.  The Committee is currently represented by Lowenstein Sandler LLP as legal counsel, and Zolfo Cooper as financial advisors.

23.     On December 11, 2017, the newly-formed Committee requested an adjournment of the December 12th hearings so that it could come up to speed, which ACS agreed to.  Upon the Committee's request, the hearing to consider final approval of the DIP Facility was adjourned to December 20, 2017.  On December 19, 2017, the Committee filed a limited objection to approval of the DIP Facility.  On December 20, 2017, the Court approved the DIP Facility on a final basis and all objections were either resolved or overruled by the Court.  The Court entered an order approving the DIP Facility on a final basis on December 21, 2017 [Docket No. 121].

**E.  The Unions' Asserted Administrative Claim and Origin of the Sale Strategy**

24.     Shortly after the Petition Date, the Unions and Union Funds made clear that they believed that by virtue of the language contained in the District Court's decision supporting the Union Judgment, ACS is and always has been an alter ego of Navillus and therefore a party to Navillus' collective bargaining agreements with the Unions (the "Navillus CBAs"). Accordingly, the Unions assert that ACS has an ongoing administrative obligation to pay benefits to the Union Funds on account of ACS's continued use of non-union labor.  On November 24, 2017, certain Unions filed a motion to modify the automatic stay (or determine that the stay does not apply) in order to assert those claims in arbitration pursuant to the terms of

10

the Navillus CBAs (the "<u>Union Stay Motion</u>") [Docket No. 66].  At the hearings on December 20, 2017, the Court granted the Union Stay Motion in part to permit the Unions to start the arbitration process but go no further.

25.     In response to the Unions' asserted administrative claim, ACS determined upon consultation with its legal counsel and Chief Restructuring Officer, that a sale strategy, if possible, would be the best possible alternative for ACS and its stakeholders.  A sale and cessation of ACS's business would stop any alleged accrual of a significant administrative obligation to the Unions (which ACS vehemently opposes).  A sale would permit the orderly completion of ACS existing jobs and eliminate the massive liabilities that would be incurred if ACS were to liquidate precipitously.  If ACS could locate an ideal buyer, it could further ensure a transition of employment for a majority of its employees as well.

26.     Any sale presents significant challenges for ACS.  The DIP Facility has stabilized ACS's operations, but is only expected to carry ACS until the end of January, 2018, at which time it will need to either complete a sale, stop most operations, or receive an additional injection of funds.  Accordingly, any sale must be done on a short time line.  The sale must also produce sufficient cash to repay the Prepetition Lender (estimated to be owed approximately $1 million by the end of January), Wells Fargo, which holds liens on various equipment of approximately $400k, and Liberty on the $2.5 million DIP Facility.  Further, any buyer must have the necessary expertise and be able to acquire the proper permits and insurance to step into ACS's shoes.  The universe of potential buyers is extraordinarily limited.  Further, the buyer must be acceptable to ACS's numerous contract parties and to Liberty, who has issued performance and payment bonds on seven of ACS's open contracts.

### F. The Purchase – Sale and Marketing Process

27.     ACS, through its management and Chief Restructuring Officer, immediately made inquiries within the industry to locate a buyer for ACS's assets.  ACS made it immediately known to its business partners that it was looking for a potential acquirer.  ACS is constrained by the fact that the community of parties that could step in ACS's shoes is finite.  The Chief Restructuring Officer reached out to each and every person that expressed any interest in potentially acquiring ACS's assets and has had contact with a total of fifteen (15) potential interested parties, including eight (8) known competitors of ACS.  Only the Purchaser has responded thus far with a definitive proposal, and given ACS's time constraints, ACS determined that it was in the best interests of ACS and its stakeholders to move ahead with the Purchase Agreement.

28.     The Purchaser was introduced to ACS by Liberty.  ACS understands that the Purchaser was introduced to Liberty by Donal O'Sullivan, Navillus' owner and chief executive. ACS has determined that Donal O'Sullivan has no interest in the Purchaser whatsoever and the Purchaser is entirely independent of Navillus, ACS or any of their respective owners and management. ACS has absolutely no doubt that parties in this case will make a significant issue of the introduction and the extremely limited business relationship between Donal O'Sullivan and William Murphy, a principal of the Purchaser.[2]  To that end, ACS strongly encourages such

---

[2]     William Murphy is the manager of Blackfin Properties & Investments, LLLP ("Blackfin"), a Florida Limited liability partnership, which is a fifty (50%) percent owner of the Purchaser, the other half owned by Patrick Murphy, William's son.  Blackfin has numerous real estate holdings including an 18.18% ownership interest in SBM Associates, LLC ("SBM"), a Florida limited liability company, formed in 2013 to purchase and develop property in Florida.  SBM is also owned 20.455% by Donal O'Sullivan, 20.455% by South East Planation, LLC, an entity owned by Kevin O'Sullivan, Donal O'Sullivan's brother, 39.91% by Michael Brewster, and 1% by Padraig Naughton, a Navillus executive.  In addition, Blackfin has an eighty (80%) percent interest in Blackwood Partners, LLC ("Blackwood"), a Florida limited liability company.  Padraig Naughton, a Navillus executive, owns a five (5%) percent interest in Blackwood.  Neither any member of the Murphy family nor Blackfin has any other connection or business relationship with Navillus, ACS, ACS's management, Donal O'Sullivan, Kevin O'Sullivan or Padraig Naughton.

parties to better focus their efforts on assisting ACS and its Chief Restructuring Officer in finding a higher or better alternative transaction. Liberty, the Committee and other parties have been requested and invited to introduce ACS to any and all parties that may have an interest in entering into a sale transaction with ACS. Liberty and the Committee, through their duly retained professionals, have been invited to participate in any diligence calls or meetings between ACS and prospective buyers.

29.    The Purchaser is owed fifty (50%) percent by Blackfin, an entity owned by Murphy family members, and fifty (50%) percent by Patrick Murphy, William Murphy's son. William Murphy is an experienced Florida-based real estate developer, and former construction lending and real estate workouts officer for JPMorgan Chase Bank. Patrick Murphy is the President and Chief Executive of the Purchaser. Patrick Murphy is a 2006 graduate of the United States Naval Academy and former search and rescue sea combat helicopter pilot for the United States Navy. Patrick currently works for the Canadian Imperial Bank of Commerce in real estate finance and capital markets.

30.    At present, ACS strongly believes that the proposed Sale Transaction presents the best possible outcome for ACS and its estate and creditors. The Sale Transaction will result in the satisfaction of the secured claims of the Prepetition Lender, Wells Fargo and Liberty on the DIP Facility. In addition, it will leave sufficient unencumbered cash in the estate to fund a liquidating plan and optimistically make some distribution to general unsecured creditors.

## RELIEF REQUESTED

### A.  The Proposed Sale

31.    The Purchase Agreement sets forth the terms of the sale of certain of the Debtor's assets and business and related transactions, subject to higher and better offers, free and clear of liens, claims, interests and encumbrances. The following is a summary of certain salient

provisions of the Purchase Agreement and is qualified entirely by reference to the Purchase

Agreement itself.[3]

> (a)   Purchase Price.   The Purchaser must deliver an earnest money deposit in the amount of $400,000.00 (the "Deposit") to the Debtor's attorneys to be held in escrow pending the Closing by December 28, 2017. The cash purchase price of the Acquired Assets shall be $4,000,000.00 less the Deposit (the "Closing Payment"), less the $275,000 paid by Gilbane for the termination of the 42 Trinity project contract.   The Closing Payment shall be payable at the Closing by wire transfer or other immediately available funds.   As additional consideration, Purchaser shall assume the Assumed Liabilities in accordance with the terms of Section 1.5 of the Purchase Agreement in an amount estimated to be, but not to exceed, $17,900,000.00.

> (b)   Acquired Assets.   Under the Purchase Agreement, the Seller  will transfer all right, title and interest in certain of its assets (described with more particularity in the Purchase Agreement as Acquired Assets), including Acquired Assets:  (i) all furniture, fixtures, and other personalty; (ii) the Acquired Contracts (as identified in Schedule 1.6 of the Purchase Agreement); (iii) all equipment maintained and used by the Seller in the conduct of its business; (iv) all inventory of goods and materials used by the Seller in the conduct of its business; (v) all intangible assets, goodwill, customer lists, manuals, sales and marketing materials, phone numbers, internet websites and domain names; (vi) all books and records relating to the foregoing in both hard copy and electronic form; (vii) all security deposits provided under real estate or equipment leases that are being assigned to and assumed by Purchaser; (viii) all Accounts Receivable; (ix) all Causes of Action, including without limitation, Avoidance Actions against any Person who is not an Insider and/or any Affiliate of an Insider; and (x) all claims for refunds with respect to taxes for all periods ended after the Closing Date.

> Notwithstanding the above, the Acquired Assets shall not include the following (the "Excluded Assets"): (v) cash of

---

[3] The following summary of the Purchase Agreement is provided for the convenience of the Court and the parties in interest.  A copy of the Purchase Agreement is attached hereto as **Exhibit C**.  To the extent that there are any discrepancies between this summary and the Purchase Agreement, the terms and language of the Purchase Agreement shall govern.  Unless defined herein, capitalized terms defined in the Purchase Agreement shall have the meanings ascribed to them therein.

Seller; (x) any contracts or agreements other than the Acquired Contracts; (y) the Excluded Contracts; and (z) any and all Causes of Action, inclusive of Avoidance Actions, against Insiders and/or any Affiliate of an Insider.

(c)     Assumed Liabilities.   Purchaser shall assume as of the Closing Date and shall subsequently observe, honor and pay in an amount estimated to be, but not to exceed $17,900,000.00, (i) certain post-petition accrued expenses and certain pre-petition accounts payable of Seller (excluding professional fees and other expenses not incurred in the Ordinary Course of Business) and cure costs under the Acquired Contracts or any leases expressly assumed by or assigned to Purchaser pursuant to Section 365, all as of the Closing Date, and (ii) any ongoing post-Closing performance obligations under the Acquired Contracts or any leases expressly assumed by or assigned to Purchaser pursuant to Section 365 (collectively, the "Assumed Liabilities").   The Assumed Liabilities are listed in Disclosure Schedule 1.5 of the Purchase Agreement.

(d)     Representations and Warranties.   The Debtor has represented and warranted that it is the title owner to the Acquired Assets, and, subject to approval by the Court, it has the requisite legal authority to sell and assign such assets and the Acquired Contracts, together with certain of its assets and business to Purchaser, and that all of the other representations and warranties provided under the Purchase Agreement are true and correct as detailed more fully in Article 2.1 of the Purchase Agreement.   Purchaser has represented and warranted that it is a limited liability company duly formed under the laws of the State of New York and subject to satisfaction of the conditions and requirements under the Purchase Agreement, has the requisite power, authority, and financial capability to consummate the transactions contemplated hereunder, and that all of the other representations and warranties provided under the Purchase Agreement are true and correct as detailed more fully in Article 2.2 of the Purchase Agreement.

(e)     Termination.   The parties may terminate this Agreement as provided below (whether before or after the entry of the Bidding Procedures Order and/or the Sale Order): (i) Purchaser and Seller may terminate the Purchase Agreement by mutual written consent at any time prior to the Closing; (ii) Purchaser may terminate the Purchase Agreement by giving written notice to Seller at any time prior

to the Closing (a) in the event Seller has breached any representation, warranty, or covenant contained in the Purchase Agreement and such breach has caused or is reasonably likely to cause a Material Adverse Effect, or (b) if the Closing shall not have occurred on or before the Closing Date because any of the conditions precedent set forth in Section 5.1 hereof have not been satisfied in full; (iii) Seller may terminate the Purchase Agreement by giving written notice to Purchaser at any time prior to the Closing (a) in the event Purchaser has breached any representation, warranty, or covenant contained in the Purchase Agreement and such breach has caused or is reasonably likely to cause a Material Adverse Effect, or (b) if the Closing shall not have occurred on or before the Closing Date because any of the conditions precedent set forth in Section 5.2 hereof have not been satisfied in full; (iv) Purchaser may terminate the Purchase Agreement by giving written notice to Seller if the Closing shall not have occurred on or before 5:00 p.m. on the fifteenth day after the Sale Order has been entered; (v) Purchaser may terminate the Purchase Agreement by giving written notice to Seller if Seller has not filed a motion with the (a) the Bankruptcy Court has not entered the Bidding Procedures Order on or before January 5, 2018 or (b) the Bidding Procedures Order has been entered but is stayed, withdrawn, or rescinded as of such date; (vi) Purchaser may terminate the Purchase Agreement by giving written notice to Seller if the Bankruptcy Court has not entered the Sale Order on or before January 26, 2018; (vii) Purchaser may terminate the Purchase Agreement by giving written notice to Seller if an order has been entered dismissing the Bankruptcy Case, converting the Bankruptcy Case to a Chapter 7 case or if Seller files a motion or other pleading seeking the dismissal or conversion of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; (viii) Purchaser or Seller may terminate the Purchase Agreement in the event that any Law or order becomes effective restraining, enjoining, or otherwise prohibiting or making illegal the consummation of the transactions contemplated by the Purchase Agreement; (ix) Seller may terminate the Purchase Agreement at any time after the Bankruptcy Court approves an Alternate Transaction, or Purchaser may terminate the Purchase Agreement upon the closing of an Alternate Transaction; (x) Purchaser may terminate the Purchase Agreement at any time after the appointment of a Chapter 7 trustee or an examiner with expanded powers in the Bankruptcy Case; (xi) Purchaser may terminate the Purchase Agreement at any time in the event the

Bankruptcy Court does not approve the Breakup Fee and Expense Reimbursement; (xii) Purchaser may terminate the Purchase Agreement in the event the Bankruptcy Court grants relief from the automatic stay to any party to permit foreclosure or the exercise of other remedies on any material Acquired Assets of Seller; (xiii) Purchaser may terminate the Purchase Agreement in the event that Seller modifies, alters or amends the Purchase Agreement without the consent of Purchaser, or in the event that Seller consents to any such modification, alteration or amendment; or (xiv) Purchaser may terminate the Purchase Agreement if an event of default under the DIP Financing Facility has occurred and has not been cured or waived in accordance with the terms of the DIP Financing Facility documents.

32.     The Sale Transaction provides for the continuation of business operations, preservation of attendant jobs to the extent employees of ACS become employees of Purchaser, most of which are expected to be offered employment by the Purchaser, and maximization of value for the benefit of ACS, its creditors and the estate.

### B.  Extraordinary Provisions

33.     In accordance with General Order M-383, In the Matter of: Adoption of Amended Guidelines for the Conduct of Asset Sales, dated November 18, 2009 ("General Order M-383"), ACS discloses the following Extraordinary Provisions provided for in the Purchase Agreement:

(a)     Deadlines that Effectively Limit Notice: The Purchase Agreement includes provisions requiring entry of the Bidding Procedures Order on or before January 5, 2018 and entry of the Sale order on or before January 26, 2018. The Purchase Agreement allows Purchaser to terminate the Purchase Agreement if either of the benchmarks are not met.

(b)     Record Retention: After the Closing Date, Purchaser shall provide Seller and its representatives reasonable access to the books and records of Seller included in the Acquired Assets during normal business hours and on reasonable prior notice, to enable Seller to prepare tax returns, deal with tax audits and administer claims in the Case. The Debtor believes these provisions are sufficient to allow the Debtor to administer its estate.

(c)    <u>Use of Proceeds</u>: At the Closing, Seller shall be required to use the proceeds of the Closing Payment to satisfy in full (i) Seller's obligations under the DIP Facility, (ii) Seller's secured indebtedness owing to Signature Bank, and (iii) Seller's secured indebtedness to Wells Fargo Equipment Finance related to any Acquired Assets. All remaining portions of the Closing Payment must be retained by Seller pending production of the Final Statement and payment by the appropriate Party of the Reconciliation Amount

(d)    <u>Successor Liability</u>: The proposed form of Sale Order contains findings and provisions limiting Purchaser's successor liability. The parties intend that the transfer of the Assets will not subject Purchaser to any liability other than any Assumed Liabilities. The proposed finding in the Sale Order authorizing the Sale to be made free and clear of successor liability claims complies with applicable principles of sales conducted pursuant to Section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law.

(e)    <u>Relief from Bankruptcy Rule 6004(h)</u>: The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtor submits such relief is appropriate under the circumstances.

(f)    <u>Sale of Avoidance Actions</u>: Included in the Acquired Assets are avoidance actions against Persons that do not qualify as Insiders or Affiliates of Insiders..

## PROPOSED BIDDING PROCEDURES, AUCTION AND AUCTION PROCEDURES

34.    Consistent with the Purchase Agreement, ACS is proposing the Bidding Procedures, which are designed to maximize the value of the Acquired Assets for ACS's estate, creditors and other interested parties. Specifically, as discussed in more detail below, the Sale Transaction is subject to higher and better offers. In that regard, Purchaser has expended considerable time, effort and resources conducting due diligence, negotiating the Purchase Agreement, and taking steps necessary to acquire necessary license, permits and insurance if it

becomes the successful purchaser of the Acquired Assets.  Accordingly, the Purchaser required

certain break-up fees and expenses reimbursements to the extent it is outbid.

35.    The Debtor proposes that competing offers ("Competing Offers") for the

Acquired Assets be governed by the following Bidding Procedures:[4]

> (a)    Any entity that wishes to make a bid for
> Acquired Assets must provide the Debtor with sufficient and
> adequate information to demonstrate, to the absolute
> satisfaction of the Debtor, that such entity (i) has the financial
> wherewithal and ability to consummate the Sale Transaction
> including evidence of adequate financing, and including a
> financial guaranty, if appropriate, (ii) can provide all non-
> debtor contracting parties to the Acquired  Contracts with
> adequate assurance of future performance as contemplated by
> section 365 of the Bankruptcy Code; (iii) will be on
> substantially the same terms and conditions as the Purchase
> Agreement except for price; (iv) will require the payment of a
> closing cash payment of not less than $4,100,000.00, less the
> $275,000.00 paid by Gilbane to terminate its contract, plus the
> Bidding Protections and the assumption of the Assumed
> Liabilities (the "Minimum Bid"); (v) will be accompanied by
> an earnest money deposit of 10% of the initial purchase price
> set forth in any Modified Purchase Agreement, plus the
> amount of the Bidding Protections.  Any bid satisfying such
> criteria shall be designated as a "Qualified Bid."  Except as
> provided for in the Purchase Agreement, the bid must not
> contain any contingencies of any kind, including, but not
> limited to (a) obtaining financing or shareholder, board of
> directors or other approval, or (b) the outcome or completion
> of due diligence.    Each Potential Bidder must also
> affirmatively acknowledge that the Potential Bidder (x) had an
> opportunity to conduct due diligence regarding the Assets
> prior to making its offer and does not require further due
> diligence, (y) has relied solely upon its own independent
> review, investigation and/or inspection of any documents
> and/or the Acquired Assets in making its bid, and (z) did not
> rely upon any written or oral statements, representations,
> promises, warranties or guaranties whatsoever, whether

---

[4] The summary description of the Bidding Procedures provided herein is provided for the convenience of the Court
and parties in interest.  To the extent that there are any discrepancies between this summary and the Bidding
Procedures Order, the terms and language of the Bidding Procedures Order shall govern.  Unless otherwise defined
herein, capitalized terms defined in the Bidding Procedures shall have the meaning ascribed to them in the Bidding
Procedures Order or the Purchase Agreement.

express or implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures.

(b)    Competing Offers must (a) be in writing and (b) be received by Fred Stevens of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036 so that such bid is received no later than January  22, 2018 at 5:00 p.m. (the "Competing Offer Deadline"). Parties who do not submit Competing Offers by the Competing Offer Deadline shall not be permitted to participate at the Auction.

(c)    Competing Offers must be accompanied by a good faith deposit in the amount of 10% of the initial purchase price set forth in any Modified Purchase Agreement, plus the amount of the Bidding Protections, in the form of in the form of wire transfer or a certified check payable to Klestadt Winters Jureller Southard & Stevens, LLP, as attorneys.  All such deposits shall be retained by the Debtor pending the hearing to consider the Sale Motion and shall be returned to a Potential Bidder (x) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder or (y) no later than five (5) business days after entry of the Sale Order if the Potential Bidder is deemed to be a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder; provided, however, that in the event Purchaser is not the Successful Bidder, its Deposit shall be returned to it promptly upon termination of the Purchase Agreement, but in no event later than five (5) business days from the date of that termination.  The Debtor will maintain any Deposit in a non-interest bearing account.

(d)    Any Competing Offer by a Qualified Party conforming to the within requirements shall be considered at the auction to be held at the Offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036 on commencing on **January 23, 2018, at 12:00 p.m. (EST)**, or in such manner and at such alternative location as the Debtor may determine or the Court may direct (the "Auction").

(e)    The Debtor shall, after the Competing Offer Deadline and prior to the Auction, evaluate all bids received, and determine which bid reflects the highest or best

offer for the Assets.   The Debtor shall announce such determination at the commencement of the Auction and then the Debtor shall conduct the Auction among the parties submitting Competing Offers to determine if any higher or better offer might be obtained.  Any further bids made at the Auction shall be in increments of at least $100,000 greater than the preceding bid.

(f)    If there is a successful Competing Offer for the Assets, such successful bidder shall have such rights and responsibilities of Purchaser, as set forth in the Modified Purchase Agreement, or the Purchase Agreement, as applicable with appropriate modifications for (i) the identity of the successful bidder and (ii) the purchase price as the same shall have been increased at the Auction.

(g)    In the event that the Court enters a Final Order approving an Alternative Transaction, then Purchaser shall be entitled to and Debtor shall pay to Purchaser at the consummation of an Alternate Transaction (or in the case of a plan of reorganization or liquidation that is an Alternate Transaction, upon confirmation of such plan or reorganization or liquidation), 3.0% of the Purchase Price (the "Breakup Fee").  The Breakup Fee is intended to cover opportunity costs incurred by Purchaser in pursuing and negotiating this Agreement and the transactions contemplated hereby, and is considered by the Parties to be reasonable for such purposes.  The Breakup Fee shall be paid from the first sale proceeds of an Alternate Transaction.   The claims of Purchaser to the Breakup Fee shall constitute an administrative expense against Seller's bankruptcy estate under the applicable provisions of the Bankruptcy Code.

(h)    In addition to any Breakup Fee that may be payable pursuant to the Purchase Agreement, upon (i) any event in which the Breakup Fee is payable, or (ii) the Purchase Agreement is terminated by Purchaser pursuant to Section 6.1.1(b) or Section 6.1.1(i), the Debtor   shall reimburse Purchaser the actual and necessary expenses, including reasonable attorney's fees, incurred in connection with negotiation and entry into the Transaction Documents, due diligence with respect to the transactions contemplated by the Transaction Documents, and obtaining Bankruptcy Court approval of the Transaction Documents, in an amount not to exceed $150,000 (the "Expense Reimbursement").   The claims of Purchaser to the Expense Reimbursement shall constitute an administrative expense against Seller's

bankruptcy estate under the applicable provisions of the Bankruptcy Code.

(i)      In the event that a Competing Offer is the Successful Bidder and such Successful Bidder fails to consummate the proposed transaction by the Closing Date, such bidder's deposit shall be forfeited to the Debtor (but not as liquidated damages, the Debtor reserving the right to pursue all remedies that may be available to it) and the Debtor shall be free to consummate the proposed transaction with the next highest bidder at the final price bid by such bidder at the Auction (or, if that bidder is unable to consummate the transaction at that price, the Debtor may consummate the transaction with the next higher bidder, and so forth) without the need for an additional hearing or order of the Bankruptcy Court.

(j)      All bids for the purchase of the Debtor's assets shall be subject to approval of the Bankruptcy Court.

(k)      No bids shall be considered by the Debtor or the Bankruptcy Court unless a party submitted a Competing Offer in accordance with the Bidding Procedures and participated in the Auction.  The Debtor, in its absolute discretion, may reject any Competing Offers not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules of the Court, or contrary to the best interests of the Debtor and parties of interest.

(l)      All bids (other than those of the Successful Bidder and Backup Bidder) are irrevocable until the earlier of (A) ninety (90) days following entry of the Sale Order (defined below) and (B) closing with the Successful Bidder .

(m)      All bids are subject to such other terms and conditions as are announced by the Debtor at the outset of the Auction.

## **BIDDING PROTECTIONS**

36.      The proposed Purchase Agreement contemplates the payment of certain protections, including a Breakup Fee and Expense Reimbursement (collectively, the "Bidding

Protections"), in certain circumstances.   The Debtor requests the Court grant the proposed

Bidding Protections administrative expense priority pursuant to Bankruptcy Code 503(b) and

507(b), which shall be payable solely from the first proceeds of an Alternate Transaction.   The

Purchase Agreement provides that if the proposed Bidding Protections are not approved by the

Court, Purchaser shall have the right, but not the obligation, to not enter into the Purchase

Agreement and none of the parties shall have any further obligations to the other.

        37.     The Debtor submits that (a) approval of the proposed Bidding Protections is an

integral part of the Purchase Agreement, (b) in the absence of the Debtor's obligation to pay the

Bidding Protections, Purchaser will not enter into the Purchase Agreement, (c) the entry into the

Purchase Agreement is necessary for the preservation of the Debtor's estate and is beneficial to

the Debtor, its estate, creditors and other parties in interest, and (d) the Bidding Protections are

reasonable in relation to Purchaser's efforts and the amount of consideration contemplated by the

Purchase Agreement.

        38.     The efforts of Purchaser have increased the chances that the Debtor will receive

the highest or otherwise best offer for the Acquired Assets by establishing a minimum bid for

other bidders, subjecting the Acquired Assets to an open auction and serving as a catalyst for

other potential or actual bidders.   Thus, the Bidding Protections benefit the Debtor, its estate, its

creditors and all other parties in interest.

        39.     As stated above, Purchaser is unwilling to commit to hold open its offer to

purchase the Acquired Assets under the terms of the Purchase Agreement unless the Bidding

Protections are approved.   Accordingly, the Debtor requests that the Court approve the Bidding

Protections and authorize payment of the Breakup Fee and Expense Reimbursement pursuant to

the terms and conditions of the Purchase Agreement.

### ASSUMPTION AND ASSIGNMENT AND REJECTION OF EXECUTORY CONTRACTS AND LEASES

**A.  Acquired Contracts**

40.     In connection with the Sale Transaction, the Debtor seeks authority under section 365 of the Bankruptcy Code to (a) assume and assign the Acquired Contracts, and (b) execute and deliver to Purchaser (or the Successful Bidder, as the case may be) such documents or other instruments as may be necessary to assign and transfer the Acquired Contracts as of the date of the Closing on the Purchase Agreement (and expressly subject to Closing).

41.     By and through this Motion, the Debtor is seeking authority to assume any and all Acquired Contracts (as defined in the Purchase Agreement) following and subject to the Closing, and to assign all such contracts to Purchaser.  The Debtor seeks the authority to assume and assign to Purchaser any and all of the Acquired Contracts which Purchaser in its sole discretion elects to assume and gives notice of the same to the Debtor.

42.     To effectuate the assumption/assignment process, the Debtor proposes to serve a notice on the non-debtor parties to the Acquired Contracts of the potential assumption and assignment of the Acquired Contracts (the "Assignment Notice"), substantially in the form annexed hereto as **Exhibit D**, advising each such party of the Debtor's interest to assume and assign such executory contract. The Assignment Notice shall be served no later than five (5) business days following the entry of the Bidding Procedures Order. The list of Acquired Contracts attached to the Assignment Notice, which comprises all of the Debtor's executory contracts, except for those specifically excluded from the Acquired Assets, and sets forth (a) the name and address of the counterparties to the executory contracts proposed to be assumed and assigned to Purchaser or its designee; (b) the nature of the executory contract; and (c) the amount

of any cure costs that the Debtor believes to be due and owing as reflected on its books and records.

43.    Under the terms of the Purchase Agreement, Purchaser is responsible for paying cure costs, if any, under any Acquired Contracts that are ultimately assumed and assigned to Purchaser, provided those cure costs together with other Assumed Liabilities do not exceed the aggregate $17.9 million cap.

44.    Any non-debtor party who objects to its Cure Amount set forth in its Cure Notices must file an objection to the Cure Amount with respect to such Acquired Contract, state with specificity the nature of the objection and the amount of the alleged Cure Amount and include appropriate supporting documentation demonstrating the calculation of the cure amounts as claimed not later than the Cure Objection Deadline as provided for below.  Any such objections must be (a) filed with the Court and (b) served upon (i) the proposed attorneys for the Debtor, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036 (Attn: Fred Stevens), (ii) the attorneys  for the Purchaser, Berger Singerman LLP, 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301 (Attn: Robert W. Barron and Isaac M. Marcushamer), (iii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: Richard Morrissey) and (iv) the attorneys for the Committee, Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020 (Attn: Jeffrey Cohen and Eric S. Chafetz), so as to be actually received no later than 12:00 Noon (EST), five (5) days prior to the Sale Hearing (the "Cure Objection Deadline").

45.    If no objection to the Cure Amounts is timely received in accordance with the preceding paragraph, or if a timely objection is received but is not in compliance with the

foregoing requirements, any non-debtor party to a Acquired Contract shall be barred and permanently enjoined from asserting any amounts in excess of the Cure Amount set forth in its Cure Notices.  Any timely filed and serve objection to any Cure Amount shall be heard at the Sale Hearing.

46.    In an effort to provide the most up-to-date information to non-debtor parties to the Acquired Contracts, in the event Purchaser is not the Successful Bidder at the Auction, the Debtor will use its reasonable best efforts to provide non-debtor parties to the Acquired Contracts with the identity of the Successful Bidder prior to the Sale Hearing. Otherwise, the non-debtor parties to the Acquired Contracts may wish to plan to attend the Sale Hearing.

47.    Any non-debtor party to an Acquired Contract shall have the right to request adequate assurance of performance by Purchaser of such Acquired Contract either by contacting Purchaser through its attorneys, or filing, prior to the deadline for objecting to the proposed Sale Order, such request with the Court and serving (a) the attorneys for the Debtor, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036 (Attn: Fred Stevens), (b) the attorneys  for the Purchaser, Berger Singerman LLP, 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301 (Attn: Robert W. Barron and Isaac M. Marcushamer), (c) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: Richard Morrissey) and (d) the attorneys for the Committee, Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020 (Attn: Jeffrey Cohen and Eric S. Chafetz), so as to be actually received no later than 12:00 Noon (EST), five (5) days prior to the Sale Hearing, indicating what adequate assurance it requires from Purchaser.

48.    If no such requests for adequate assurance are timely made or filed, Purchaser shall be deemed to have provided adequate assurance as required by section 365(f)(2)(B) of the Bankruptcy Code.  If any such requests are filed, the Court, at the Sale Hearing, shall determine whether Purchaser has provided adequate assurance as required by section 365(f)(2)(B) of the Bankruptcy Code.

49.    The Debtor believes that those procedures and deadlines are fair and reasonable, and will provide sufficient notice to the non-debtor parties to the Acquired Contracts.  These procedures are designed to provide certainty to the Debtor and the non-debtor parties to the Acquired Contracts regarding their obligations and rights in respect of the Cure Amounts. Accordingly, the Debtor requests that the Court approve the foregoing procedures and deadlines.

## NOTICE OF SALE, AUCTION AND BIDDING PROCEDURES

50.    The Debtor, no later than one (1) business day after entry of the Bidding Procedures Order, will serve a copy of this Motion, the Bidding Procedures Order, the proposed Sale Order and all exhibits to such orders upon the following persons by first-class mail, postage prepaid: (i) the Office of the United States Trustee; (ii) the attorneys for the Committee; (iii) the attorneys for Purchaser; (iv) all counterparties to the Acquired Contracts; (v) all parties who have made an expression of interest in acquiring the Assets or the Business within twelve (12) months prior to the date of the Motion; (v) all known persons holding a lien on any of the Acquired Assets and/or their attorneys; (vi) all taxing authorities that have jurisdiction over the Acquired Assets; and (vii) all parties who have requested notice in the Case (collectively, the "Bidding Procedures Parties").

51.    In addition, no later than five (5) business days after entry of the Bidding Procedures Order, the Debtor shall cause the form of auction notice, a copy of which is annexed

hereto as **Exhibit E**, to be (i) served upon the Bidding Procedures Parties, and (ii) served upon all known creditors and all known parties in interest in this Chapter 11 Case (collectively, the "Auction Notice Parties").

52.     The Debtor believes that the foregoing notice to the Auction Notice Parties is sufficient to provide effective notice of the Bidding Procedures, the Auction and the proposed Sale to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Auction while minimizing the costs to the estate. Accordingly, the Debtor requests that the Court find that notice in this manner is sufficient and that no further notice of the Auction, the Bidding Procedures or the proposed Sale is required.

## BASIS FOR RELIEF REQUESTED

### A.  The Proposed Sale is Within the Debtor's Sound Business Judgment and Should Therefore Be Approved

53.     The Debtor submits that ample authority exists for the approval of the Sale Transaction to Purchaser pursuant to the Purchase Agreement, or to such other purchaser submitting a higher and better offer for the Acquired Assets.  Section 363(b) of the Bankruptcy Code permits a debtor to sell assets outside the ordinary course of its business.  That section provides in pertinent part, "[t]he trustee,[5] after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  While Section 363(b) does not provide any standards to be applied to a debtor's request to sell assets, a wide body of case law has evolved containing the judicial standards governing sales of assets.

54.     In In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), one of the seminal and most widely followed cases dealing with asset sales, the Second Circuit determined that a sale of assets could be approved if the debtor could demonstrate an "articulated business justification"

---

[5] Pursuant to Section 1107(a) of the Bankruptcy Code, the debtor in possession has all of the powers of a trustee (except the power to investigate the debtor's own financial affairs).

for the sale.  722 F.2d at 1070.  The Court further held that the factors to be considered in

determining whether a sound business reason exists include the following:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed
> time since the filing, the likelihood that a plan of reorganization will be proposed
> and confirmed in the near future, the effect of the proposed disposition on future
> plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis
> any appraisals of the property, which of the alternatives of use, sale or lease the
> proposal envisions and, *most importantly perhaps, whether the asset is increasing
> or decreasing in value*.

Id. at 1071 (emphasis supplied).

55.     The Lionel decision has been widely accepted and applied by numerous other

courts facing a debtor's request to sell assets, including requests to approve a sale of certain of

the assets of a debtor's estate.  See, e.g., In re the Delaware & Hudson Ry. Co., 124 B.R. 169 (D.

Del. 1991); In re Eng'g Prod. Co., 121 B.R. 246 (Bankr. E.D. Wis. 1990); In re Thomson

McKinnon Sec., Inc., 120 B.R. 301 (Bankr. S.D.N.Y. 1990); In re Channel One

Communications, Inc., 117 B.R. 493 (Bankr. E.D. Mo. 1990); In re Brethren Care, 98 B.R. 927

(Bankr. N.D. Ind. 1989).  As will be demonstrated below, application of the above-listed factors

demonstrates that approval of the Purchase Agreement is warranted at this time.

56.     In addition to requiring sound business reasons to approve a sale pursuant to

section 363(b) of the Bankruptcy Code, many courts have required a showing that the price to be

obtained for assets be fair and reasonable; that the sale to the proposed purchaser was negotiated

in good faith; and that it does not unfairly benefit insiders, the purchaser, or a certain creditor or

class of creditors.  See, e.g., In re Channel One Communications, 117 B.R. at 494-97; In re

Indus. Valley Refrig. & Air Cond. Supplies, Inc., 77 B.R. 15 (Bankr. E.D. Pa. 1987).

57.     The Debtor and Purchaser negotiated in good faith, at arms' length, and with a

view towards maximizing the value of the Debtor's estate for all creditors, rather than to benefit

insiders or a particular creditor.

58.     The Debtor is confident that the Purchase Price is the best achievable under the present circumstances.   Nonetheless, the Purchase Agreement is subject to higher and better offers, thereby ensuring that the best possible offer has been or will be received.

59.     Many courts require that "fair and accurate notice" be given of the proposed sale under section 363(b) of the Bankruptcy Code.  See, e.g., In re Delaware & Hudson Ry., 124 B.R. 169, 176 (D. Del. 1991); Channel One 117 B.R. at 496 (Bankr. E.D. Mo. 1990); Naron & Wagner, Chartered, 88 B.R. 85, 88 (Bankr. D.Md. 1988).  Fair and accurate notice should inform all interested parties of the liquidation of the debtor's business; disclose accurately the terms of the sale; explain the effect of the sale upon the debtor's business; and explain why the sale is in the best interests of the debtor's estate.  Delaware & Hudson, 124 B.R. at 180; see also, Naron & Wagner, 88 B.R. at 88.

60.     The Debtor submits that the notice given here alerted parties in interest to the sale contemplated by the Purchase Agreement, described and explained all material terms thereof, and explained the effect of the sale on the Debtor's business.

**B.  The Purchaser is a Good Faith Purchaser and is Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

61.     Section 363(m) of the Bankruptcy Code provides:  "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."  11 U.S.C. § 363(m).

62.     Although the Bankruptcy Code does not define "good faith," in In re Colony Hill Assocs., 111 F.3d 269 (2d Cir. 1997) the Second Circuit held that:

The "good faith" component of the test under § 363(m) speaks to the equity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

111 F.3d at 276 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)) (internal quotations omitted).

63.    As set forth above, Purchaser was selected by the Debtor after engaging numerous parties and determining that the terms of Purchaser's bid were the only viable option.  The Purchase Agreement is a product of extensive arms-length negotiations and was not in any way tainted by fraud, collusion or bad faith.  Accordingly, the Debtor requests that the Court make a finding that Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

### C.    The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code fora Sale Free and Clear of Liens, Claims, Encumbrances and Interests

64.    The Debtor seeks authorization to sell the Acquired Assets to Purchaser free and clear of all liens, claims and encumbrances, except as expressly permitted by the Purchase Agreement.  Nonetheless, the Acquired Assets may be sold free and clear of liens in accordance with section 363(f) of the Bankruptcy Code, which provides, in pertinent part:

(f)    The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if

(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

65.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will be sufficient to permit the Sale Transaction free and clear of liens, claims, encumbrances, pledges, mortgages, security interests, charges, options, and other interests. See In re Grubb & Ellis Co., Case No. 12-10685 (MG), 2012 Bankr. LEXIS 1279, at *31 (Bankr. S.D.N.Y. Mar. 27, 2012) (discussing Bankruptcy Code § 363(f)); In re Borders Group, Inc., 453 B.R. 477, 483–84 (Bankr. S.D.N.Y. 2011) (discussing Bankruptcy Code § 363(f)). The Debtor submits that, the Purchase Agreement provides that the proposed Purchase Price is greater than the aggregate value of all such liens.  As such, the rights of secured creditors are preserved and in fact, will be satisfied at or around the time of Closing.  Thus, the Acquired Assets may be sold free and clear of such liens pursuant to section 363(f)(3) of the Bankruptcy Code.  In re General Bearing Corp., 136 B.R. 361 (Bankr. S.D.N.Y. 1992); In re Oneida Lake Development, Inc., 114 B.R. 352 (Bankr.  N.D.N.Y. 1990).

### D.  The Court Should Waive or Reduce the Fourteen-Day Stay Periods Required by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure

66.     Pursuant to Bankruptcy Rule 6004(g), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order.  Fed. R. Bankr. P. 6004(g).  The purpose of Bankruptcy Rule 6004(g) is to provide sufficient time for an objecting party to appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(g).

67.     Although Bankruptcy Rule 6004(g) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier suggested that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."   10

Collier on Bankruptcy 15th Ed. Rev., 6004.09 (L. King, 15th rev. ed. 2005).  Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

68.    Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 14 days, unless the court orders otherwise.

69.    To preserve the value of the Acquired Assets and limit the costs of administering and preserving the Acquired Assets, it is critical that the Debtor close the Sale Transaction as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtor hereby requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(g) and 6006(d), or in the alternative, if an objection to the sale or to the assignment of a contract or lease is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal to allow the sale to close as provided under the Purchase Agreement.

**E.  The Assumption and Assignment of Acquired Contracts Should be Authorized**

70.    Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(f) of the Bankruptcy Code provides that a debtor in possession may assign an executory contract or unexpired lease of the debtor only if (a) the debtor in possession assumes such contract or lease in accordance with the provisions of section 365, and (b) adequate assurance of future performance by the assignee of such contract or lease is provided. 11 U.S.C. § 365(f)(2).

71.    Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for

assuming an unexpired lease or executory lease or executory contract of a debtor.    This

subsection provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the
> debtor, the trustee may not assume such contract or lease unless, at the time of
> assumption of such contract or lease, the trustee
>
> (A) cures or provides adequate assurance that the trustee will promptly cure, such
> default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly
> compensate, a party other than the debtor to such contract or lease, for any actual
> pecuniary loss to such party resulting from such default; and
>
> (C) provide adequate assurance of future performance under such contract or
> lease.

11 U.S.C. § 365(b)(1).

72.    The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction."  EBG

Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.),

139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir.1993).

73.    When an executory contract or lease is to be assumed and assigned, adequate

assurance may be provided by, among other things, demonstrating the financial health of the

assignee and its experience and ability in managing the type of enterprise or property assigned.

See e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate

assurance of future performance is present when a prospective assignee of a lease from debtor

has financial resources and has expressed a willingness to devote sufficient funding to the

business in order to give it a strong likelihood of success).

74.    To the extent that any defaults exist under any Acquired Contracts, the Debtor

will cure, or provide adequate assurance of cure of, such defaults within the meaning of section

365(b)(1)(A) and in accordance with the Purchase Agreement.  Moreover, the Debtor will demonstrate facts at the Sale Hearing that show Purchaser's (or the Successful Bidder's, as the case may be) financial credibility, experience in the industry, and willingness and ability to perform under the Acquired Contracts.  Therefore, the Sale Hearing will provide the Court and other interested parties with an opportunity to evaluate and, if necessary, challenge the ability of Purchaser (or the Successful Bidder, as the case may be) to provide adequate assurance of future performance under the Acquired Contracts. Accordingly, the Debtor submits that the assumption and assignment of the Acquired Contracts as set forth herein should be approved.

### F.  Conducting an Auction Pursuant to the Bidding Procedures is in the Best Interests of the Debtor's Estate and Its Creditors

75.    In order to maximize the value of the Acquired Assets for the benefit of the Debtor, its creditors and its chapter 11 estate, the Debtor seeks to implement a competitive bidding process typical for transactions of this size and nature and designed to generate a maximum recovery.  The Debtor believes that the Auction and proposed Bidding Procedures will encourage participation by financially capable bidders that demonstrate the ability to close a transaction.    Furthermore, the Bidding Procedures are consistent with other procedures previously approved by this Court, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  See e.g., In re Kmart, Case No. 02-B02474 (SPS) (Bankr. N.D. Ill. May 10, 2002); In re Global Crossing, Case No. 02-40188 (S.D.N.Y. March 25, 2002) (REG); In re Randall's Island Family Golf Ctrs., Inc., 261 B.R. 96 (S.D.N.Y. 2001); In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992).

### G.  Bidding Protections Are Warranted

76.    The Debtor proposes that if overbidding occurs at the Auction, Purchaser shall have the right, but not the obligation, to participate in the overbidding subject only to the

limitations provided by the Bidding Procedures.  However, to compensate Purchaser for serving as a "stalking horse," thereby subjecting its bid to better or higher offers, the Debtor and Purchaser seek authority for the Debtor to pay Purchaser the Breakup Fee and Expense Reimbursement if an Alternative Transaction is approved or consummated or there is a material breach by the Debtor preventing a Closing as provided in the Purchase Agreement.  The Debtor and Purchaser believe that the Bidding Protections are (a) fair and reasonable, given the benefits to the estate of having a definitive Purchase Agreement and the risk to Purchaser that a third-party offer may ultimately be accepted and (b) are necessary to preserve the value of the Debtor's estate.

77.     Bidding incentives such as the Breakup Fee encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  See e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "[a]greements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

78.     The Debtor submits that the Bidding Protections are a normal and necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  See e.g., In re Kmart, Case No. 02 B02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and bid protections for potential bidders); In re Comdisco, Inc.,

Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the Asset Purchase Agreement); In re Integrated Resources, Inc., 147 B.R. at 660 (noting that break-up fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs, and the risks such bidder faces by having its offer held open, subject to higher and better offers); In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break up fee); In re Kupp Acquisition Corp., Case No. 96 1223 (PJW) (Bankr. D. Del. March 3, 1997).

79.    Here, the proposed Breakup Fee is 3.0 percent of the Purchase Price. Thus, the Breakup Fee and Expense Reimbursement are within the range of fees typically paid in other significant sales transactions that have been consummated in a bankruptcy setting. See e.g., Consumer News & Bus. Channel P'ship v. Financial News Network, Inc. (In re Financial News Network, Inc.), 980 F.2d 165, 167 (2d Cir. 1992) (noting that transaction at issue provided for a $8.2 million breakup fee on a $149.3 million transaction (5.5%)); Doehring v. Crown Corp. (In re Crown Corp.), 679 F.2d 774 (9th Cir. 1982) (bid protection of 4.9% approved).  Further, the amount of the Breakup Fee and Expense Reimbursement is reasonably calculated to compensate Purchaser (a) for committing the time to perform due diligence, (b) for lost opportunity in being bound to a transaction that could be topped in a competitive auction process and (c) for serving as a "stalking horse" to encourage the submission of other bids. Accordingly, the Debtor believes that the Bidding Protections should be approved.

## NOTICE

80.     Notice of this Motion will be given to (i) the Office of the United States Trustee; (ii) all known creditors, (iii) the Official Committee of Unsecured Creditors, and (iv) those parties that have requested notice in the Case.  Additional notices will be provided in accordance with the notice provisions contained herein. The Debtor submits that such notice is sufficient and requests that this Court find that no other or further notice is necessary.

## NO PRIOR REQUEST

81.     No previous application for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that this Court enter orders, substantially in the form annexed hereto, granting the Motion and such other relief as may be just and proper.

Dated:   New York, New York
           December 26, 2017

                              **KLESTADT WINTERS JURELLER
                              SOUTHARD & STEVENS, LLP**

                      By:   */s/ Fred Stevens*
                              Fred Stevens
                              Brendan M. Scott
                              200 West 41st Street, 17th Floor
                              New York, New York 10036-7203
                              Tel: (212) 972-3000
                              Fax: (212) 972-2245
                              Email: fstevens@klestadt.com
                                        bscott@klestadt.com

                              *Attorneys for Debtor and Debtor in possession*