**LOWENSTEIN SANDLER LLP**
Jeffrey Cohen, Esq.
Eric S. Chafetz, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402

– and –

Kenneth A. Rosen, Esq.
Michael Papandrea, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

*Proposed Counsel to the Official
Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ADVANCED CONTRACTING SOLUTIONS, LLC, | Case No.: 17-13147 (SHL) |
| | **Hearing Date: January 4, 2018 at 2:00 p.m.**<br>**Obj. Deadline: January 3, 2018 at 12:00 p.m. (noon)** |
| Debtor. | |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' LIMITED
OBJECTION AND RESERVATION OF RIGHTS TO THE DEBTOR'S
PROPOSED BIDDING PROCEDURES AND SALE MOTION**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case (the "Chapter 11 Case") of the above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its proposed undersigned counsel, hereby submits this limited objection and reservation of rights (the "Objection") to the Debtor's proposed bidding procedures (the "Bidding Procedures") contained in the *Motion for Orders Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006; (A)(i)*

*Establishing Bidding Procedures and Bid Protections in Connection With the Sale of Certain of the Assets of the Debtor, (ii) Approving the Form and Manner of Notices, (iii) Approving the Asset Purchase Agreement Subject to Higher and Better Offers and (iv) Setting a Sale Hearing Date; and (B)(i) Approving the Sale of Certain Assets of the Debtor Free and Clear of Liens, Claims and Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; and (iii) Granting Related Reliefy* (the "<u>Sale Motion</u>") [D.I. 122].[1]  In support of this Objection, the Committee respectfully states as follows:

### **PRELIMINARY STATEMENT**

1.      The Committee's goal since its recent appointment in the Chapter 11 Case has been to maximize the value of the Debtor's estate.  However, the Committee is just beginning to get up to speed on the sale process proposed by the Debtor and it is unclear to date whether that process is truly value-maximizing.  Particularly, the Purchaser appears to have connections with Navillus and at least one of its principals, necessitating an inquiry into whether the Purchaser may be an alter ego of the Debtor or Navillus.  Both the Committee and the Unions have served discovery requests/letters on various parties to determine the extent of the Debtor's, Navillus', and their respective principals' connections with the Purchaser, and involvement in the sale process.  The Committee reserves all rights to object to this Court's approval of the sale, whether in whole or in part (including any objection to the APA's waiver of successor liability claims), based on what is learned through this discovery.

2.      The Committee also believes that multiple aspects of the Bidding Procedures are seriously flawed. First and foremost, the proposed sale timeline is unreasonably short.  The Debtor admitted during the hearing to approve the DIP Facility on a final basis that a sale process was not contemplated until after the Petition Date.  Thus, there were no pre-petition marketing efforts undertaken and virtually all, if not all, post-petition marketing was undertaken

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the remainder of this Objection, as applicable.

during the Thanksgiving and Christmas holiday seasons. Notwithstanding this uncontroverted fact, the Debtor has agreed to an expedited January 31, 2018 deadline by which a sale must be closed. In fact, the Committee's financial advisor, Zolfo Cooper, provided the Debtor with a list of 21 potential purchasers on December 26, 2017 and the Debtor had only previously reached out to 3 of those potential purchasers. Accordingly, the sale process should be extended for at least two weeks to allow for a more robust marketing of the Debtor's assets and ensure that value is maximized for all creditors and not just the Debtor's secured lenders.

3. Additionally, the Committee respectfully requests that the following issues, among others, with the Bidding Procedures be addressed and/or resolved in any order approving the Bidding Procedures:

(a) The proposed 3% break-up fee is based not only on the cash purchase price for the Debtor's assets ($4 million less $275,00 paid by Gilbane Residential Construction, LLC), but also the amount of assumed liabilities (up to $17.9 million). This results in an unreasonably high break-up fee (of up to approximately $650,000) and will unnecessarily chill bidding. At most, the break-up fee should be 3% of solely the cash portion of the purchase price, not the up to 17% currently contemplated;

(b) The Committee should be granted significantly more consultation rights vis a vis the sale process than currently contemplated and the bid procedures should be clarified to make clear that the Committee members and its professionals can attend the auction;

(c) The APA currently includes various termination provisions which appear to give the Purchaser the right to opt out of the APA without cause and also includes an overly broad "material adverse effect" clause. Thus, any order approving the Bidding Procedures should make clear that the Purchaser may not unilaterally terminate the APA without cause, and clarify the intent of the material adverse effect clause; and

(d) Finally, a significant number of the schedules and the exhibits to the APA have not been filed with the Court. The Debtor should be required to publicly disclose these documents at least three days in advance of the Bid Deadline so potential bidders can fully assess the terms of the bid against which they are bidding.

## BACKGROUND

**A.    General Background**

4.    On November 6, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

5.    On December 8, 2017, the Office of the United States Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. *See Notice of Appointment of Official Committee of Unsecured Creditors* [D.I. 99]. On the same day, the Committee selected Lowenstein Sandler LLP to serve as its counsel.

**B.    The Debtor's Business & Relevent Pre-petition Events**

6.    The Debtor is a concrete foundation and super-structure contractor employing approximately 450 people. Since its inception in July 2013, the Debtor has completed over $250 million in contracting work throughout New York City. Currently, the Debtor is engaged in 15 construction jobs across New York City. The Debtor estimates that its future revenues from its ongoing jobs are approximately $100 million.

7.    On October 17, 2016, the trustees of various union funds (the "Unions") commenced a lawsuit in the United States District Court for the Southern District of New York. The Unions asserted that the Debtor and two other construction companies—none of which are unionized—were created by Navillus Tile, Inc. ("Navillus") in order to evade its obligations to the Unions under their collective bargaining agreements ("CBAs"), such as making contributions to pension and welfare benefits. The Unions' position was that Navillus, by and through the Debtor, used non-union labor on construction jobs that should have been staffed by unionized labor under the CBAs. The Unions assert that such evasive tactics are ongoing post-petition, resulting in significant administrative expense claims.

8.    On September 22, 2017, the District Court entered a $73.4 million judgment (the "Judgment") against the Debtor, Navillus, and the other co-defendants, for which the Debtor and

Navillus are jointly and severally liable. The Judgment was entered following the District Court's issuance of a written decision in which the District Court held that the Debtor was an alter-ego entity of Navillus.

**C.    The Debtor's Capital Structure & DIP Facility**

9.    Prior to the Petition Date, in February 2015, the Debtor opened a $1.5 million line of credit (the "Prepetition LOC") with Signature Bank (the "Prepetition Lender") to finance its operations. In conjunction with the Prepetition LOC, the Debtor and Prepetition Lender entered into a security agreement under which the Debtor purported to grant the Prepetition Lender liens on and security interests in substantially all of its assets, including its cash. In April 2017, the Prepetition LOC was increased to $4 million.

10.    The Debtor estimates that, as of the Petition Date, its liability to the Prepetition Lender is approximately $1.4 million.

11.    Additionally, on December 21, 2017, the Court entered a final order authorizing the Debtor to obtain up to $2.5 million in post-petition financing (the "DIP Facility") from Liberty Mutual Insurance Company ("Liberty"). Pursuant to the terms of the DIP Facility, Liberty possesses a perfected security interest in all of the existing and after-acquired tangible and intangle assets of the Debtor aside from actions arising under Article 5 of the Bankruptcy Code (both trade and insider claims).[2] The Committee views the DIP Facility as a defensive maneuver to protect Liberty's interests in connection with its exposure on certain prepetition performance bonds.[3]

---

[2] Nothing contained in or omitted from this Objection constitutes an admission or stipulation by the Committee, any member of the Committee, or any other party with respect to any alleged claims against the Debtor, Liberty, or the Prepetition Lender, including but not limited to: (a) the amount, validity, or enforceability of any alleged claims against the Debtor; (b) the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtor's assets; or (c) any money damage causes of action against the Prepetition Lender or Liberty.

[3] The Debtor and Liberty are parties to various performance bonds aggregating approximately $136.4 million (the "Liberty Bonds") issued by Liberty that are related to construction projects currently being worked on by the Debtor.

**D.     The Sale Motion**

12.     On December 26, 2017, the Debtor filed the Sale Motion, seeking approval of the sale of substantially all of the Debtor's assets to a stalking horse purchaser, Trident General Contracting LLC (the "Purchaser") pursuant to an asset purchase agreement (the "APA"). Assets that would be excluded from the sale are (i) the Debtor's cash, (ii) certain outstanding contracts, and (iii) all causes of action against insiders, including avoidance actions. The purchase price is $4 million (less $275,000 previously paid by Gilbane Residential Construction, LLC), and the Purchaser will assume liabilities up to $17.9 million.

13.     The APA will be subject to higher and better offers via an auction (the "Auction"). The Debtor is proposing that the Purchaser be provided certain bid protections in the event the Auction results in a successful bidder that is not the Purchaser, including a break-up fee equal to 3% of the "Purchase Price"—which is defined under the APA to include the cash component of the purchase price as well as the ultimate amount of assumed liabilities.

14.     Moreover, the Debtor proposes to conduct the sale according to the following expedited timeline:

- **January 5, 2018** – Deadline for entry of order approving Bidding Procedures.

- **January 22, 2018** – Deadline to submit bids (the "Bid Deadline").

- **January 23, 2018** – Auction.

- **January 26, 2018** – Deadline for entry of order approving the sale (the "Sale Order").

- If the sale has not closed within 15 days from the date the Sale Order is entered, the Purchaser may terminate the APA.

15.     Finally, Donal O'Sullivan, the owner and chief executive of Navillus, introduced the Purchaser to Liberty, who in turn introduced the Purchaser to the Debtor. While the Debtor alleges that the Purchaser is not affiliated with Navillus or the Debtor, the Debtor indicates that

Mr. O'Sullivan has a business relationship with the Purchaser's principal, William Murphy. Significantly, despite this admitted connection between the Purchaser and Navillus, the Debtor is proposing that the sale be consummated free and clear of any successor liability claims—including alter ego claims—against the Purchaser.

**OBJECTION**

16. The overriding goal of any proposed asset sale under section 363 of the Bankruptcy Code is to maximize the proceeds received by a debtor's estate. *See Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003). The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate. *See*, *e.g.*, *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998). To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting a sale. *See id.; see also In re Wintz Co.*, 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring a sale of assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets").

17. While the Committee does not fundamentally oppose the Debtor's proposed sale process, the Committee has concerns regarding the circumstances surrounding the proposed sale and whether the Bidding Procedures are truly designed to be value-maximizing. Accordingly, the Committee respectfully requests that the rights of itself and other parties in interest be protected and the Bidding Procedures be modified as set forth below.

**I.    The Right to Object to the Sale Must Be Explicitly Preserved**

18. Based on the circumstances leading to the Judgment, the Committee has concerns regarding the manner in which the Purchaser was introduced to the Debtor. The Debtor admits that it conducted no prepetition marketing (and, given the short lifespan of this Chapter 11 Case, the Debtor has conducted little post-petition marketing) and ultimately selected the Purchaser to serve as the stalking horse bidder under the APA upon being introduced to the Purchaser by

Navillus' principal. It is critical to ensure that the proposed sale transaction maximizes value for the Debtor's estate (and not just the secured lenders) and is also not merely an attempt by the Debtor and/or Navillus to evade payment of their prepetition liabilities, including the Judgment obtained by the Unions. *See, e.g., In re Boston Generating, LLC*, 440 B.R. 302, 330 (Bankr. S.D.N.Y. 2010) (noting that in order to approve a section 363 sale, "the [c]ourt must be satisfied that (i) proper notice has been given . . . (ii) the proposed sale price is fair and reasonable; and (iii) the purchaser is proceeding in good faith") (emphasis added).

19. The Committee and other parties in interest have not yet had a sufficient opportunity to fully vet the Purchaser. However, the Committee, as well as the Unions, has begun the process of investigating the relationship between the Purchaser and Navillus. To that end, they have served various discovery requests with a response deadline of January 5, 2018. Although the Committee is not in a position at this time to object to the sale on the basis that the Purchaser is an alter ego entity or that the proposed sale transaction is otherwise suspect, it is imperative that the Committee's and other parties' right to object to the sale are preserved pending the resolution of the Committee's and other parties investigation into the relationship between the Purchaser and the Debtor and/or Navillus or any of their principals. Any order approving the Bidding Procedures should explicitly reserve this right.

## II.     The Sale Timeline is Prohibitively Short

20. Despite the Debtor having admitted that it did not conduct a prepetition marketing process, it is proposing that the entire post-petition sale process take place within approximately one month after the hearing to approve the Bidding Procedures. This expedited timeline is simply too short to maximize value, especially given the Committee's very recent appointment and the Debtor's post-petition marketing process has entirely taken place during the holiday season. Thus, the Committee and its professionals have only just begun the process of identifying and reviewing potential alternative purchasers/transactions. In fact, although the Committee's financial advisor provided the Debtor with a list of 21 possible alternative purchasers, the Debtor had only previously contacted 3 of those potential purchasers.

21. The Committee recognizes the Debtor's liquidity constraints in light of an upcoming insurance payment that comes due in early February. However, a short extension of the sale process and related deadlines will not harm the Debtor's estate, and instead will ensure that the value of the Debtor's assets is maximized. The Committee must be given sufficient time to investigate possible alternative transactions, and potential bidders must be given sufficient time post-petition to conduct due diligence, obtain financing if necessary, and submit a competing bid. *See*, *e.g.*, *In re Energy Future Holdings Corp.*, (Bankr. D. Del. Nov. 3, 2014) (Case No. 14-10979) (CSS) Tr. at 20:16-20 (holding that "the proposed timelines must be stretched . . . to allow for sufficient time for any interested party to develop an alternative transaction . . . and the . . . committee to . . . get up to speed");[4] *see also In re Flour City Bagels, LLC*, 557 B.R. 53, 80 (Bankr. W.D.N.Y. 2016) (generally noting that there are "inherent advantages and disadvantages that an expedited sale under § 363 can pose"). Accordingly, the Committee submits that the sale process and associated deadlines should be extended by two weeks.

22. In the alternative, if the timeline for the sale proposed by the Debtor is approved, the Committee respectfully requests that the order approving the Bidding Procedures includes a reservation of rights for the Committee to seek an extension from the Court of any sale-related deadline including, but not limited to, the Bid Deadline, the Auction date, the date by which an order approving the sale must be entered, and the date by which a sale must close, upon motion for "cause shown" on three days' notice to the Debtor and Liberty, in the event that the Debtor and Liberty (to the extent required) do not consent to the requested extension.

### III.    The Proposed Break-Up Fee is Excessive and May Chill Bidding

23. It is well established that a court will grant bid protections, such as a break-up fee, when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer. *See In re Integrated Resources, Inc.*,

---

[4] Copies of this transcript is attached as Exhibit A to the Objection.

147 B.R. 650, 659 (S.D.N.Y. 1992). When assessing break-up fees, courts generally consider (1) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (2) whether the break-up fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is unreasonable relative to the proposed purchase price. *Id.* at 657. Putting aside any potential questions regarding the Purchaser's possible affiliation with the Debtor and/or Navillus and their respective principals (with respect to which the Committee reserves all rights), the proposed break-up fee is excessive and should not be approved.

24. As currently contemplated in the APA, the Debtor is proposing a break-up fee that, depending on the total amount of assumed liabilities, may be as high as approximately $650,000 (more than 17% of the cash purchase price). Given the relatively small cash component of the proposed transaction, such a break-up fee is highly excessive and should not be approved. Most significantly, due to the broad termination rights granted to the Purchaser and the broad material adverse effect clause in favor of the Purchaser, the Purchaser's bid is arguably illusory and does not create a floor. In any event, any break-up fee permitted in any order approving the Bidding Procedures should be, at most, limited to 3% of the cash component of the purchase price under the APA.

## IV.    Additional Proposed Revisions to Order Approving Bidding Procedures

25. In addition to the foregoing, the Committee respectfully requests that to ensure a fair and value maximizing sale process, any order approving the Bidding Procedures include provisions ensuring that:

   i. The Committee is given full consultation rights regarding the sale process—including with respect to the determination of whether any bid constitutes a qualified bid and the selection of the prevailing bid;

   ii. The Committee, its professionals, and its members are expressly granted the right to attend the Auction;

   iii. Third parties' rights to pursue claims for successor liability are preserved solely to the extent that it is later determined by the National

       Labor Relations Board ("NLRB") or other relevant authority that the Purchaser is an alter ego of the Debtor and/or Navillus;[5]

    iv.    The Debtor is required to file all schedules and exhibits to the APA no later than three days in advance of the Bid Deadline; and

    v.    The Purchaser is not permitted to unilaterally terminate the APA without providing sufficient cause for so doing and the material adverse effect clause is sufficiently clarified.[6]

## **RESERVATION OF RIGHTS**

26.    The Committee reserves all rights with respect to the Sale Motion, including the right to supplement this Objection or raise further arguments at the hearing to consider approval of the Bidding Procedures and any other hearing(s) on the Sale Motion.[7]

*[Remainder of page intentionally left blank]*

---

[5] Similar provisions have been included in other bankruptcy courts' orders approving section 363 sales under similar circumstances. *See, e.g., In re Wrangell Seafoods, Inc.*, 2009 WL 8478297, *2 (Bankr. D. Alaska Mar. 9, 2009) (providing in sale order that "Nothing in this Order is intended to, nor shall it be deemed to, preclude the National Labor Relations Board or any court from finding that Trident Seafoods, Inc., or any other purchaser of the Debtor's assets, is subject to a successor collective bargaining obligation under the National Labor Relations Act.").

[6] The APA includes various circumstances upon which Trident and/or the Debtor can terminate the APA. Some of these termination provisions are unclear or overly broad. For example, the Debtor asserts in the Sale Motion that, under the APA, the Purchaser "may terminate the [APA] by giving written notice to [the Debtor] at any time prior to the Closing." Similarly, the APA allows the Purchaser to opt out of the transaction upon the occurrence of a "material adverse effect"—which is broadly defined as "any material adverse change in the condition (financial or other) of the [Debtor's b]usiness, assets, liabilities, business, operations or prospects, other than changes of a general economic or political nature . . . ." The Debtor, Committee, and other parties in interest will be expending significant amounts of time and resources evaluating and partaking in the sale process contemplated by the APA and should not be subjected to the risk that the Purchaser may opt to walk away from the transaction without cause, for any reason and at any time. If that is allowed, the Purchaser's bid is not actually setting a floor for the Auction and, instead, is illusory.

[7] For example, the Committee reserves the right to, among other things, object to the Purchaser's purchase of non-insider avoidance actions.

## CONCLUSION

For the foregoing reasons, unless the Bidding Procedures are modified as set forth in this Objection, the Committee respectfully requests that the Court enter an order sustaining the Objection and denying approval of the Sale Motion as it relates to the Bidding Procedures and granting such further relief as may be just and proper.

Dated: January 3, 2018         **LOWENSTEIN SANDLER LLP**

/s/ *Jeffrey Cohen*
Jeffrey Cohen, Esq.
Eric S. Chafetz, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402

– and –

Kenneth A. Rosen, Esq.
Michael Papandrea, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400

*Proposed Counsel to the Official
Committee of Unsecured Creditors*