Return Date: January 4, 2018, 2:00 p.m.
Objection deadline: January 3, 2018,  12:00 p.m.

**COHEN, WEISS & SIMON, L,LP**
Thomas M. Kennedy
Susan M. Jennik
900 Third Avenue
New York, NY  10022
Tel. (212) 563-4100
Fax (212) 563-6527

Attorneys for Trustees of Cement Workers Funds

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
In re:                                                              :
                                                                         :      Chapter 11
ADVANCED CONTRACTING                         :
SOLUTIONS, LLC                                          :      Case No. 17-13147 (SHL)
                                                                         :
                                   Debtor.                    :
-------------------------------------------------------X

**OBJECTION AND RESERVATION OF RIGHTS OF TRUSTEES OF THE
CEMENT WORKERS FUNDS AND LOCAL 282 TO THE MOTION FOR
APPROVAL OF PROPOSED SALE PROCEDURES**

This chapter 11 bankruptcy case was filed because of a judgment obtained in *Moore v. Navillus Tile, Inc.* No. 14-CV-8326 (S.D.N.Y.) in part by the Trustees of the Cement Workers Funds.[1] (Dkt. No. 2, ¶¶ 17-18.) The Cement Workers Funds and  Building Material Teamsters Local 282, IBT ("Local 282"), by and through their counsel, file this objection and reservation of

---

[1] Angelo Angelone, Eric Lee and Michael Salgo as Trustees of the Cement & Concrete Workers Pension Trust Fund, Cement & Concrete Workers Welfare Trust Fund, Cement & Concrete Workers Annuity Trust Fund, Cement & Concrete Workers Scholarship Trust Fund, and Kieran O'Sullivan as Trustee of the Cement & Concrete Workers Training and Education Trust Fund (collectively, "Cement Workers Funds") were plaintiffs in *Moore v. Navillus Tile, Inc.* The Cement Workers Funds were awarded a judgment of $21,148,271.12 jointly and severally against Debtor ACS and Navillus Tile, Inc. (Dkt. No. 17 at 106.). The Trustees of the Local 282 Funds were plaintiffs in *Gesualdi v Navillus Tile Inc* and were awarded a judgment of $1,885,012.10 jointly and severally against Debtor ACS and Navillus Tile, Inc. (Id.)

rights (the "Objection") to the Debtor's proposed bidding procedures (the "Bidding Procedures") contained in the Motion for Orders Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006; (A)(i) Establishing Bidding Procedures and Bid Protections in Connection With the Sale of Certain of the Assets of the Debtor, (ii) Approving the Form and Manner of Notices, (iii) Approving the Asset Purchase Agreement Subject to Higher and Better Offers and (iv) Setting a Sale Hearing Date; and (B)(i) Approving the Sale of Certain Assets of the Debtor Free and Clear of Liens, Claims and Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; and (iii) Granting Related Relief (the "Sale Motion") (Dkt. No. 122). In support of this Objection, the Cement Workers Funds and Local 282 respectfully state as follows:

1. It is clear even at this time that the Bidding Procedures are deficient (i) because they do not provide sufficient time for interested parties to prepare for the Sales Order approval hearing, (ii) because they do not require that ACS comply with the successor clause under the Local 282 CBA with Navillus[2] and (iii) because the proposed Sale Order does not include the following provision if a proposed Section 363 sale is approved:

> Nothing in this Sale Order is intended to, nor shall it be deemed to, preclude the Funds or any similarly situated union sponsored multiemployer benefit fund, sponsored in part by a labor union with a collective bargaining agreement with Navillus Tile Inc., d/b/a Navillus, from arguing or requesting a finding from any court or the National Labor Relations Board that such purchaser is subject to a collective bargaining obligation under the National Labor Relations Act or the Employee Retirement Income Security Act; and provided, further, that such Funds' rights to seek such a finding or any request for relief therefor are expressly reserved and preserved.

---

[2] Although not parties to this objection, all of the unions which sponsor the Plaintiff Funds in the *Moore v Navillus Tile Inc* litigation have similar contractual clauses in their agreements with Navillus which require purchasers to assume the relevant CBAs and would expect ACS to require any purchaser of its assets to comply with them pursuant to ACS' obligations as an alter ego of Navillus.

2

**BACKGROUND - RELEVANT FACTS**

I. **THERE IS A SUBSTANTIAL QUESTION FOR LITIGATION AS TO WHETHER THERE HAS BEEN COLLUSION AMONG NAVILLUS, DONAL O'SULLIVAN AND TRIDENT, THE PROSPECTIVE PURCHASER OF ACS' ASSETS.**

2.  Navillus has an adjudicated past record of utilizing alter ego entities to perform work covered under the collective bargaining agreements with the various unions with which it is party ("CBAs"). In her decision imposing $73 million dollars in liability jointly and severally against ACS and Navillus, Judge McMahon found that:

> Para 152: "Of course [ACS] had no construction experience … but that was not a problem because the new entity – ACS – was simply a front for Navillus."
>
> Para 193: "ACS ultimately rented the crane it needed from Manhattan Tool – conveniently yet another company owned by Donal O'Sullivan."
>
> Para 204: "The idea that Moriarty, who had no experience in running a construction company, could have formed an independent non-union shop and quickly acquired contracts for four major projects … without Navillus' assistance simply beggars belief."

3.  Moreover, the decision by Judge McMahon made clear that Donal O'Sullivan and Eoin Moriarty were prepared to and did commit repeated acts of perjury to cloak their scheme to form and operate ACS as an alter ego of Navillus:

> Para 182: I do not credit the [Donal and Kevin O'Sullivan] testimony that they agreed to the sale in January 2012, because documents in the record contradict their timeline of events.
>
> Para 183  I conclude, as a matter of fact, that Donal and Kevin O'Sullivan executed the Purchase Agreement and Assignment of Shares on October 19, 2012 and backdated both documents due to concerns about allegations from the unions that TSC and Navillus were alter egos.
>
> Para 115: I do not credit the testimony of Donal O'Sullivan that Samuels' June 11 email stating "its up to you" was anything but an indication that TSC's counsel was taking direction straight from Donal O'Sullivan.

3

Para 156: I do not credit this testimony [by Moriarty denying knowledge that the apartment they pretended was the headquarters of ACS was actually owned by the wife of Donal O'Sullivan] not the least because Donal O'Sullivan also used this address for one of his companies, CKK Solutions LLC which … later acquired options to purchase a majority of ACS's shares.

Para 170 and 172: Deeming the testimony by O'Sullivan and Moriarty denying that they entered into or discussed options to purchase ACS "obviously false" and "an obvious falsehood".

Para 173: " I conclude that Donal O'Sullivan perjured himself in giving both his deposition testimony (in which he disclaimed the existence of any options) and his trial testimony (in which he claimed to have forgotten about the options . . ."

Para 175: "Moriarty was obviously lying".

Para 199: [Liberty Mutual Insurance Company submitted a bonding letter for ACS that purported to set forth the single program and aggregate work program amounts with ACS] "Of course, these numbers were not even remotely accurate" … These false numbers were submitted to CNY Group…" It appears that ACS was taking credit for Navillus" work.

4.      ACS now files this Motion and assures the court that Trident General Contracting, LLC ("Trident"), another corporate entity (which was formed on December 12, 2017 shortly before the filing of the Sale Motion) is a good faith, arms-length purchaser of the assets of ACS. But even ACS has admitted that Trident was "introduced to ACS by Liberty" and that Trident "was introduced to Liberty by Donal O'Sullivan". (Dkt. No. 122, ¶ 28).  ACS also admits that Blackfin Properties, a 50% owner of Trident, also owns other companies in which Donal O'Sullivan, Kevin O'Sullivan and another Navillus executive named Padraigh Naughton, own collectively 41% of the equity. Naughton owns 5% of yet another Blackfin entity.  The active involvement of Donal O'Sullivan in the sale of the assets of ACS to Trident raises compelling questions whether the newly formed Trident is anything more than the latest version of an alter ego entity of Navillus and whether Trident could be a good-faith purchaser.

4

5. The research conducted thus far on the individuals who allegedly own Trident, William Murphy and Patrick Murphy, based on publicly filed documents and prior to responses to discovery, reveals a startling lack of concrete construction industry experience by either individual. The Florida-based William Murphy is a real estate developer who owns a number of real estate development companies, but has apparently never served as a construction industry executive. Patrick Murphy is a Naval Academy graduate who flew a helicopter for the Navy and, after a series of air-based military assignments, left the armed services in August, 2016 and has been serving since January, 2017 as a commercial mortgage initiator for CBIA Capital markets in Florida. The parallel to Donal O'Sullivan's selection of Corcoran and O'Donnell to hide his participation as the actual owner of ACS is obvious. See McMahon Opinion, Exhibit A to this motion:

> para: 176: "What makes much more sense is that Corcoran and O'Donnell were at all times beholden to and in the employ of Donal O'Sullivan (either personally or through one or more intermediary personal corporations) and were installed as "owners" of ACS at Donal O'Sullivan's behest and to hide his participation."
>
> P. 72: Regardless of whether Donal O'Sullivan was the legal owner of ACS for ERISA purposes, he certainly operated as the de facto owner …

6. At a minimum, this active involvement of Donal O'Sullivan in the arrangements between ACS and Trident require substantial review and analysis by the other constituents in this case, including expedited discovery, to evaluate the good faith of the parties and potential collusion among Navillus, ACS and Trident: "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Kabro Assocs., LLC v. Colony Hill Assocs.,* 111 F.3d 269, 276 (2d Cir. 1997) (quoting *In re Rock Industries Mach. Corp.,* 572 F.2d 1195, 1198 (2d Cir. 1978). The "good faith" inquiry focuses on

5

"the integrity of [the purchaser's] conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made." *In re Lehman Bros. Holdings, Inc.*, 415 B.R. 77, 84 (S.D.N.Y. 2009).

7. In addition, the proposed Asset Purchase Agreement does not have attached the consultancy or employment agreements under which Trident will employ the existing management of ACS. (Dkt. No. 122-3 at 5-6). In *In re Abbotts Dairies*, 788 F.2d 143, 148 (3d Cir.1986), the court noted that if allegations were substantiated that an asset sales agreement was accompanied by a lucrative employment agreement for the debtor's CEO, and the process was manipulated to favor one bidder, those allegations "would, as a matter of law, constitute 'collusion between the purchaser and [ the debtor], or an attempt to take grossly unfair advantage of other bidders,' sufficient to destroy [the purchaser's] 'good faith status.' Quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1198.

II. **THE SALES PROCEDURES DO NOT PROVIDE ENOUGH TIME FOR THE DISCOVERY NECESSARY TO EVALUATE THE GOOD FAITH STATUS OF TRIDENT**

8. The Sale Motion was filed on December 26, 2017. On December 27, 2017, the Cement Workers Funds sent a demand for the production of documents relevant to the proposed Section 363 sale to ACS and served subpoenas for the production of documents on Navillus, Trident, Liberty Mutual Insurance Co. ("Liberty").

9. Subpoenas for the production of relevant documents were also served on two of ACS' contracting parties on January 2, 2017. It is not clear when the subpoenaed documents will be provided to the Cement Workers Funds. Once the documents are provided, the Cement Workers Funds intend to review them and then depose Donal O'Sullivan, William and Patrick

Murphy, Eoin Moriarty and a representative of Liberty concerning their roles in the proposed transaction.

10. The current schedule in which this would all have to be accomplished in time to present an objection to the Sale Motion by January 19, 2014 is not feasible. While ACS has cash needs, including an insurance payment needed to be made by early February, 2018, the Cement Workers Funds ( and other potential objectors to the sale) are entitled to conduct meaningful discovery on the Sale Motion.

11. Therefore, it is requested that the time frame for the Bidding Procedures be modified to set January 24, 2018 at 4:00 p.m.as the objection deadline to Sales Motion and January 29, 2018 for the hearing on Sales Motion.

### III    THE PROPOSED SALE ORDER FAILS TO REQUIRE ANY PURCHASER TO ASSUME THE LOCAL 282 COLLECTIVE BARGAINING AGREEMENT

12. Local 282 objects to the Debtor's Bidding Motion, *inter alia*, for approval of bidding procedures for a sale of the Debtor's assets pursuant to Bankruptcy Code §363, to the extent the motion fails to require, as part of the bidding and sale procedures, any purchaser to assume the collective bargaining agreement between Navillus Tile, Inc., d/b/a Navillus Contracting and Building Material Teamsters Local 282, IBT (the "Local 282 CBA").[3]

13. Advanced Contracting Solutions LLC, d/b/a ACS-NY LLC is an alter ego of Navillus Tile, Inc., d/b/a Navillus Contracting/Advanced Contracting Solutions LLC, d/b/a ACS-

---

[3] The Local 282 CBA, together with documentation establishing Navillus Tile, Inc., d/b/a Navillus Contracting/Advanced Contracting Solutions LLC, d/b/a ACS-NY LLC is a member of the multiemployer collective bargaining association Building Contractors Association, Inc. and therefore bound to the Local 282 CBA, is annexed as Exhibit A to the Objection of Creditors Trustees and Fiduciaries of the Local 282 Welfare Trust Fund, the Local 282 Pension Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund filed this same date.

7

NY LLC and therefore bound prospectively to the Local 282 CBA.[4]

14. The Local 282 CBA contains a successor clause at page 2 which states:

(3) This Agreement shall be binding upon the parties hereto, their successors, administrators, executors and assigns. In the event the entire operation or any part thereof is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, (said purchaser, lessee, transferee, assignee, administrator, executor, receiver, hereafter referred to as "successor"), the Employees of the Employer affected shall be employed by the successor and such operation or part thereof shall continue to be subject to the terms and conditions of this Agreement for the life thereof. If the successor does not have a collective bargaining agreement with Local 282 at the time of the transaction, the Employees
employed by the successor pursuant to the terms of this section shall be maintained by the successor as a separate collective bargaining unit, and shall not be integrated with any other Employees, whether or not he successor's Employees are represented by any other labor organization. The Employer shall give notice of the existence of this Agreement to any potential successor. Such notice shall be in writing, with a copy provided to the Union, prior to the time the Employer executes a contract or transaction as herein described with any successor. The Union shall also be advised of the exact nature of the transaction, not including financial details. No transaction described herein shall become effective unless and until the Union has been
notified in writing by the Employer and the successor that the successor has agreed to assume the obligations of this Agreement.

(4) It is the intent of this provision to extend coverage of this Agreement to the maximum extent permissible, and to prevent any escape or evasion of this Agreement by any means, however sophisticated, and whether or not motivated by legitimate business reasons.

15. Local 282 objects to this relief as violating the successor clause and 11 U.S.C. § 1113 to the extent Advanced Contracting Solutions LLC, d/b/a ACS-NY LLC moves to establish bidding and sale procedures that do not include, as part of the bidding and sale process, an obligation that the purchaser agree in advance of sale that if the purchaser successfully bids for Advanced Contracting Solutions LLC, d/b/a ACS-NY LLC it will assume and abide by the Local 282 CBA.

---

[4] *Moore v. Navillus Tile, Inc.*, No. 14 CIV. 8326, 2017 WL 6388962, at *27, 55 (S.D.N.Y. Sept. 20, 2017).

16. Under Section 1113(f), the terms and conditions of a CBA, including successorship provisions, remain in effect notwithstanding the filing of a bankruptcy petition. Absent compliance with the strict procedures and standards set forth in Section 1113 for obtaining modification of a CBA, "[n]o provision of [Title 11] shall be construed to permit a trustee to unilaterally terminate or alter any provision of a collective bargaining agreement." 11 U.S.C. §1113(f). *See also In re Journal Register Co.*, 488 B.R. 835, 838–40 (Bankr. S.D.N.Y. 2013) ("as a general proposition, a sale under Bankruptcy Code § 363 cannot circumvent the condition imposed under a successor clause absent compliance with § 1113); *American Flint Glass Workers v. Anchor Resolution Corp.*, 197 F.3d 76, 81-82 (3d Cir. 1999) (holding that debtor violated Section 1113(f) when it bound "itself contractually to obtain a change in the legal relationship created by a CBA as a condition precedent to closing a sale of substantially all of the debtor's assets"); *In re Stein Henry Co.*, 1992 WL 122902 *2 (Bankr. E.D.Pa. 1992); *In re Continental Airlines*, 125 F.3d 120, 137 (3d Cir. 1997).

17. Local 282, IBT reserves the right to object to any final Sales Order, raise any issue in relation to the asset sale of the Debtor, and litigate any successor liability or breach of contract claim against the Debtor or the Purchaser. The unions sponsoring the *Moore v Navillus Tile, Inc* Plaintiff Funds also reserve a similar right.

**IV    THE PROPOSED SALE ORDER FAILS TO CLEARLY STATE THAT A PURCHASER THAT IS SHOWN TO BE AN ALTER EGO UNDER THE NATIONAL LABOR RELATIONS ACT OR ERISA REMAINS LIABLE FOR POST-363 SALE HOURS WORKED THAT WERE COVERED BY THE NAVILLUS CBAs.**

18. Should this Court approve the sale of the Debtors' assets to a purchaser (especially if the purchaser is Trident, given the manifest involvement of Donal O'Sullivan in the business affairs of Trident's owner and his specific role in bringing

9

about the proposed sale), the Sale Order should be revised to note specifically that nothing in that Order precludes Unions that have a CBA with Navillus, or the multiemployer benefit funds that are third party beneficiaries of those CBAs, from contending that Trident, for purposes of federal labor law or ERISA, constitutes an alter ego of ACS and Navillus and, as such, is bound to the terms of the Navillus CBAs.

19. Under the alter ego doctrine, a successor employer "is subject to all the legal and contractual obligations of the predecessor" when the successor is a mere alter ego of the predecessor, or nothing more than "a disguised continuance of the old employer." *NLRB v. Omnitest Inspection Servs. Inc.*, 937 F.2d 112, 118 (3d Cir.1991).

20. The "key factors in an alter ego analysis are whether the two organizations have substantially identical 'management, business purpose, operation, equipment, customers and supervision, as well as ownership.'" *Trafford Distribution Center v. NLRB*, 478 F.3d 172, 179 (3d Cir. 2007) (quoting *Crawford Door Sales Co.*, 226 N.L.R.B. 1144, 1144 (1976)); *see generally Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987) (in determining whether a new employer is a successor employer, the question is whether the new company has "'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations'") (quoting *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 184 (1973)).

21. The determination of alter ego status for purposes of labor law is not a matter left to the Bankruptcy Court at the time of the approval of a sale or thereafter. *See NLRB v. Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 955 (5th Cir. 1989) ("The question of whether a new entity, be it an employer or labor organization, is a

10

successor, disguised continuance, or alter ego of another entity is a question of substantive labor law which could not have been decided, in this case, by the bankruptcy court."); *see also RCR Sportswear, Inc.*, 312 NLRB 513 (1993), *enf'd*, 37 F.3d 1488 (3d Cir. 1994); *Century Printing Co.*, 242 NLRB 659 (1979); *enf'd*, 661 F.2d 914 (3d Cir. 1981) (cases where the NLRB found a purchaser to be an alter ego where a bankruptcy court had authorized the purchaser's acquisition of another employer's business). Here, it appears that a substantial case will be able to be made that Trident is an alter ego of ACS and Navillus after, and as a result of, the proposed sale, particularly since it is apparent that Trident will continue the same operations as the Debtor in the same locations, with the same employees and with the same management and equipment.[5]

22.   The sale order should not preclude any potential claim by the Unions or the Plaintiff Funds in the *Moore* or *Gesualdi* cases that Trident constitutes an alter ego of ACS and Navillus which will be bound to the same CBAs to which ACS is bound under federal labor law.  Consequently, the sale order must be modified to add provisions that confirm and make clear that all federal labor law rights concerning the alter ego or successor employer status of the purchaser are reserved.

23.   Courts have confirmed that bankruptcy courts lack authority under 11

---

[5]  The principals of Trident may have liability as well for work performed after any 363 sale. Generally, "an individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager." *Sasso v. Cervoni,* 985 F.2d 49, 50 (2d Cir. 1993). However, the Second Circuit has "recognized that special circumstances . . . might warrant the imposition of personal liability for a corporation's ERISA obligations." *Id.* In order to determine whether such "special circumstances" exist, district courts are to "examine the officer's actual role in the company's affairs and relationship to the company's wrongdoing." *Cement and Concrete Workers District Council Welfare Fund, Pension Fund, Legal Services Fund and Annuity Fund v. Lollo,* 35 F.3d 29, 33 (2d Cir. 1994) (citing *Leddy v. Standard Drywall, Inc.,* 875 F.2d 383, 387 (2d Cir. 1989)). The Second Circuit has held that a corporate official who "deliberately flout[s] ERISA obligations [does] not deserve the protection of the corporate form." *Lollo,* 35 F.3d at 33 (citing *Leddy,* 875 F.2d at 388).

U.S.C. § 363(f) to absolve a purchaser from its own obligations to refrain from committing unfair labor practices <u>post-sale</u>, including if the purchaser refuses to act consistently with any successor liabilities under labor law as enforced by the NLRB. *Erica, Inc. v. NLRB*, 200 Fed. App'x 344 (5th Cir. Sept. 19, 2006) ("[i]f the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor," then the new employer must bargain with the union that represented the predecessor's employees, and a bankruptcy court order cannot shield the new employer from its bargaining obligations) (internal citations omitted). *See also NLRB v. Horizons Hotel Corp.*, 49 F.3d 795, 803 (1st Cir. 1995) (fact that purchaser bought hotel in a free and clear sale did not shield it from liability for its post-sale violations of the NLRA); *Massey Energy Co. and Its Subsidiary, Spartan Mining Co. d/b/a Mammoth Coal Co. and United Mine Workers of America*, 358 N.L.R.B. 1, 89, 2012 WL 4482797 at, *57 (NLRB Sept. 28, 2012) ("a bankruptcy sale order in no way insulates against the possibility that a buyer will take actions subsequent to the sale that give rise to a successorship bargaining obligation or require the buyer to maintain the existing terms and conditions of employment"); *In re Wrangell Seafoods, Inc.*, No. K09–00012–DMD, 2009 WL 8478297 at *2 (Bankr. D. Alaska Mar. 9, 2009) (requiring the following language be added to a 363(f) sale order: "Nothing in this Order is intended to, nor shall it be deemed to, preclude the National Labor Relations Board or any court from finding that [the purchaser], or any other purchaser of the Debtor's assets, is subject to a successor collective bargaining obligation under the National Labor Relations Act."); *In re Adamar of N.J., Inc.*, No. 09-20711, 2009 Bankr. LEXIS 5191 (Bankr. D. N.J. Nov. 4, 2009) at *29-30 (qualifying sale order with the following:

"nothing in this Amended Sale Order is intended to, nor shall it be deemed to, preclude: (i) the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America from arguing or requesting a finding from the National Labor Relations Board or any court, or (ii) the National Labor Relations Board or any court from finding, as to each that [the purchaser], is subject to a collective bargaining obligation under the National Labor Relations Act pursuant to *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 92 S. Ct. 1571, 32 L. Ed. 2d 61 (1972) and its progeny; and provided, further, that the [unions'] rights to object to such a finding or any request for relief therefor are expressly reserved and preserved").

24. Section 363(f) only permits a sale of assets "free and clear of any interest in such property of an entity other than the estate." 11 U.S.C. § 363(f). The Second Circuit has determined that "the term 'any interest in property' encompasses those claims that 'arise from the property being sold.'" *Ind. State Police Pension Trust v. Chrysler LLC* (*In re Chrysler LLC*), 576 F.3d 108, 126 (2d. Cir. 2009), *vacated on other grounds,* 556 U.S. 960 (2009).

25. It would strain the meaning of this phrase beyond the breaking point, however, to conclude that the obligation of a purchaser to recognize and bargain with its employees' unions under *Burns*, or its obligations as an alter ego to provide payments to employee benefit funds, arise from the property being sold which is the right to perform the projects now under contract to ACS. *See also In re Grumman Olson Indus., Inc.*, 445 B.R. 243, 250 (Bankr. S.D.N.Y. 2011) (Judge Bernstein) ("The Sale Order did not give Morgan a free pass on future conduct, and the suggestion that it could is doubtful"), *aff'd,* 467 B.R. 694 (S.D.N.Y. 2012).

26. The Cement Workers Funds and Local 282 expressly reserve the right to supplement or amend this objection upon the conclusion of discovery and prior to the hearing on the Motion.

WHEREFORE, the Cement Workers Funds and Local 282 respectfully request that the Court enter a Bidding Procedures Order and Sales Order modified as requested above, and granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
       January 3, 2017

    Respectfully submitted,
    COHEN, WEISS & SIMON, LLP
    Counsel for the Cement Workers Funds

By: */s/ Thomas M. Kennedy*
    Thomas M. Kennedy
    Susan M. Jennik
    900 Third Avenue
    New York, NY 10022
    Tel. (212) 563-4100
    Fax (212) 563-6527
    tkennedy@cwsny.com
    sjennik@cwsny.com