| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br><br>In re:<br><br>ADVANCED CONTRACTING SOLUTIONS, LLC,<br><br>　　　　　　　　　Debtor. | Return date: January 24, 2018 at 2:00 p.m.<br><br>Chapter: 11<br><br>Case No.: 17-13147 (SHL) |

**Creditors Local 282 Welfare Trust Fund, The Local 282 Pension Trust Fund, The Local 282 Annuity Trust Fund, The Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund's Objection and Reservation of Rights to Debtor's Motion for Orders Pursuant to Sections 105(A), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006: (A)(I) Establishing Bidding Procedures and Bid Protections in Connection With The Sale Of Certain Of The Assets Of The Debtor, (Ii) Approving The Form And Manner Of Notices, (iii) Approving The Asset Purchase Agreement Subject To Higher And Better Offers and (Iv) Setting a Sale Hearing Date; and (B)(I) Approving the Sale of Certain Assets of the Debtor Free and Clear of Liens, Claims and Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; and (iii) Granting Related Relief ("Bidding Motion")**
**(Docket. No. 122)**

## INTRODUCTION

1.　　　Thomas Gesualdi, Louis Bisignano, Anthony D'Aquila (replaced by Trustee Darin Jeffers as of January 1, 2017), Michael O'Toole, Michael Bourgal, Frank H. Finkel, Joseph A. Ferrara, Sr., Marc Herbst, Denise Richardson, and Thomas Corbett (collectively the "Gesualdi Plaintiffs") as Trustees and Fiduciaries of the Local 282 Welfare Trust Fund, the Local 282 Pension Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund (collectively the "Funds") make this objection to the Debtor's Bidding Motion, *inter alia*, for approval of bidding procedures for a sale of the Debtor's assets pursuant to Bankruptcy Code § 363.

2.　　　As set forth below, the proposed bidding and sale procedures violate the collective bargaining agreement between Navillus/ACS and Local 282, to which the Funds are a third party beneficiaries, because the procedures fail to require that any purchaser assume the collective

Page 1 of 10.

bargaining agreement.[1] In addition, Advanced Contracting Solutions LLC, d/b/a ACS-NY LLC has been held to be an alter ego of Navillus Tile, Inc., d/b/a Navillus Contracting/ Advanced Contracting Solutions LLC, d/b/a ACS-NY LLC, and therefore is bound prospectively to the collective bargaining agreement.  In particular, the U.S. District Court for the Southern District of New York held that "ACS was set up as, and at all relevant times was, Navillus' alter ego."[2] (Decision, p. 55). *See generally, Lihli Fashions Corp., Inc. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996) (discussing the factors binding non-signatory companies to the collective bargaining agreements of related signatory companies).

3.      Based on the foregoing, and as more fully set forth herein, Advanced Contracting Solutions LLC, d/b/a ACS-NY LLC, is bound to the Collective Bargaining Agreement.

***The Successor Clause in the Collective Bargaining Agreement***

4.      The Collective Bargaining Agreement contains a successor clause which states:

> (3) This Agreement shall be binding upon the parties hereto, their successors, administrators, executors and assigns. In the event the entire operation or any part thereof is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, (said purchaser, lessee, transferee, assignee, administrator, executor, receiver, hereafter referred to as "successor"), the Employees of the Employer affected shall be employed by the successor and such operation or part thereof shall continue to be subject to the terms and conditions of this Agreement for the life thereof. If the successor does not have a collective bargaining agreement with Local 282 at the time of the transaction, the Employees employed by the successor pursuant to the terms of this section shall be maintained by the successor as a

---

[1] The relevant collective bargaining agreement (hereinafter "Collective Bargaining Agreement"), together with documentation establishing Navillus Tile, Inc., d/b/a Navillus Contracting/ Advanced Contracting Solutions LLC, d/b/a ACS-NY LLC is a member of the multiemployer collective bargaining association Building Contractors Association, Inc. and therefore bound to the attached Collective Bargaining Agreement, is annexed hereto at Exhibit A.

[2] *Moore v. Navillus Tile, Inc.*, No. 14 CIV. 8326, 2017 WL 6388962, at *27 (S.D.N.Y. Sept. 20, 2017).

separate collective bargaining unit, and shall not be integrated with any other Employees, whether or not he successor's Employees are represented by any other labor organization. The Employer shall give notice of the existence of this Agreement to any potential successor. Such notice shall be in writing, with a copy provided to the Union, prior to the time the Employer executes a contract or transaction as herein described with any successor. The Union shall also be advised of the exact nature of the transaction, not including financial details. No transaction described herein shall become effective unless and until the Union has been notified in writing by the Employer and the successor that the successor has agreed to assume the obligations of this Agreement.

(4) It is the intent of this provision to extend coverage of this Agreement to the maximum extent permissible, and to prevent any escape or evasion of this Agreement by any means, however sophisticated, and whether or not motivated by legitimate business reasons.

Collective Bargaining Agreement, p. 2.

5.    In short, the successor clause in the Collective Bargaining Agreement requires that any purchaser of Advanced Contracting Solutions LLC, d/b/a ACS-NY LLC to agree to assume the Collective Bargaining Agreement.  The proposed bidding and sale procedures do not require a proposed purchaser to agree to assume and be bound by the Collective Bargaining Agreement, and would therefore violate the Collective Bargaining Agreement.

## Objections

6.    The Local 282 Funds object to this relief as violating the collective bargaining agreement successor clause.  The Funds further submit that the requested relief would violate the express provisions of 11 U.S.C. § 1113, which contains the exclusive procedures that must be followed to reject a debtor's collective bargaining obligations.

7.    The breach of contract cause of action, that accrues if the Debtor is permitted to sell its assets without an assumption of the Collective Bargaining Agreement, will significantly damage the bankruptcy estate and will flout the requirements of 11 U.S.C. § 1113. It will also

Page 3 of 10.

result in irreparable harm to the ACS employees covered by the Collective Bargaining

Agreement, as the purchaser in the proposed Asset Purchase Agreement specifically reserves the

right choose which employees to hire and to unilaterally set the initial terms and conditions of

employment and otherwise disregard the Collective Bargaining Agreement's contribution

requirement to the 282 Funds and the successor language.

      8.     The proposed Asset Purchase Agreement (ECF Doc. 122-3) at Page 5, Section

2.1.9 specifically seeks to reject the Collective Bargaining Agreement and 282 Funds

obligations, both retroactive and prospective, as it reads (emphasis added):

2.1.9 Employees, Labor Matters. etc.

> (a) Purchaser shall have **no obligation to employ any of Seller's employees**, provided however, Purchaser may make applications for employment with Purchaser available to Seller's employees.

> (b) Except to the extent specifically provided in this Agreement and subject to the Bankruptcy Code and other applicable Laws, **Seller shall be responsible and liable for all amounts owed to any of its employees or former employees, including, without limitation, accrued wages, salaries, sick pay, vacation, compensation, bonuses or other benefits or payments on account of termination**, and any amounts determined to be due to the plaintiffs in that certain action commenced on October 17, 2014, by the trustees of four union funds in the United States District Court for the Southern District of New York which was thereafter consolidated with a later-filed case brought by a separate fund, or any other labor unions and related fringe benefit funds (collectively, the "Union Plaintiffs") (See Moore v. Navillus Tile, Inc., et al., Case No. 1:14- cv-08326-CM-JLC (S.D.N.Y. 2014)). **Purchaser shall not assume or accept any obligation or liability under any employee benefit plan or compensation arrangement of Seller.**

The proposed Asset Purchase Agreement, Section 2.1.10, reads:

> 2.1.10 Litigation. Except for the Bankruptcy Case and as set forth in Part 3 of Seller's Statement of Financial Affairs, dated

> November 20, 2017 as disclosed in Schedule 2.1.1 0, as filed in the
> Bankruptcy Case, there is no judicial or administrative action, suit,
> proceeding or investigation pending or, to the Knowledge of
> Seller, threatened which has or could have a Material Adverse
> Effect or result in any liability on the part of Seller, or which
> involves or could involve the validity of this Agreement or of any
> action taken or to be taken in connection herewith.

The foregoing section is completely misleading to any potential purchaser, as the liability

resulting from the breach of the Collective Bargaining Agreement successor clause will likely

result in liability both to the Seller and any purchaser and will involve the validity of any asset

purchase agreement that does not incorporate an assumption of the Collective Bargaining

Agreement. Federal courts have developed a body of law providing a successor/purchaser theory

of liability to Taft-Hartley Funds, labor unions, and their employees.[3]

9.      The 282 Funds object to the proposed Asset Purchase Agreement, p. 13 language

"Purchaser shall not be subject to any successor liability" as not complying with the Collective

Bargaining Agreement successor clause and as tantamount to a rejection of the Collective

Bargaining Agreement, which can only be rejected pursuant to 29 U.S.C. § 1113. As this

Southern District Bankruptcy Court opined on facts similar to the instant action:

> Bankruptcy Code § 1113 governs the rejection of a collective
> bargaining agreement. It establishes a negotiation process that the
> debtor must satisfy before a bankruptcy court will approve a
> rejection motion. Bankruptcy Code § 1113(e) allows for interim
> relief during the pendency of the rejection motion. Finally,
> Bankruptcy Code § 1113(f) states:
>
> > No provision of this title shall be construed to
> > permit a trustee [including a debtor-in-possession]
> > to unilaterally terminate or alter any provisions of a
> > collective bargaining agreement prior to compliance
> > with the provisions of this section.

---

[3] *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414 (1973); *Upholsters' Intern.
Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir. 1990);
*Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89 (3d Cir. 2011).

"Subsection 1113(f) evinces an intent that other provisions of the Bankruptcy Code are inoperable to the extent that they allow the debtor to bypass the requirements of § 1113." *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.),* 922 F.2d 984, 989 (2d Cir.1990), *cert. denied,* 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991); *accord Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines),* 125 F.3d 120, 137 (3d Cir.1997) (Section 1113 precludes the application of other provisions of the Bankruptcy Code to allow a debtor "to escape the terms of the collective bargaining agreement without complying with the requirements of section 1113"), *cert. denied,* 522 U.S. 1114, 118 S.Ct. 1049, 140 L.Ed.2d 113 (1998). Pending compliance with § 1113, the collective bargaining agreement remains in effect and the collective bargaining process continues after the filing of a bankruptcy petition. *Ionosphere,* 922 F.2d at 990.

The Debtors have not moved to reject their collective bargaining agreements with the Unions or sought any interim relief from the successor clauses. Accordingly, the question presented by the sale motion and the Unions' objection is whether the Court can approve the sale if the Debtors have not procured the Buyer's agreement to assume the Debtors' obligations under the pertinent collective bargaining agreements. The Unions have brought two decisions to the Court's attention that addressed this issue. In *In re Stein Henry Co.,* No. 91–15491S, 1992 WL 122902 (Bankr.E.D.Pa. June 1, 1992), the debtor proposed to sell its assets under a plan. The debtor's collective bargaining agreement with Teamsters Local 500 contained a successor clause stating that the agreement "shall be binding upon [the Debtor's] successors ... and assigns." The sale agreement did not include such a provision. The bankruptcy court concluded that the failure to preserve the union's rights against the purchaser violated Bankruptcy Code § 1113, and a collective bargaining agreement cannot be terminated or modified except through the medium of Bankruptcy Code § 1113(f). *Id.,* 1992 WL 122902, at *2. One year later, however, the same bankruptcy judge questioned *Stein Henry* 's broad reading of Bankruptcy Code § 1113(f). *After Six, Inc. v. Philadelphia Joint Board (In re After Six, Inc.),* Adv. Proc. No. 93–0339S, 1993 WL 160385, at *2 (Bankr.E.D.Pa. May 13, 1993).

*In re Agripac, Inc.,* No. 699–60001, slip. op., (Bankr.D.Or. Apr. 2, 1999) is more on point. There, the debtor sought to sell its canned foods division. The debtor's collective bargaining agreement with Teamster Local 670 included a successor clause similar to those at

issue in this case. It stated that if the business was sold the agreement would be binding on the parties and their successors and the purchaser would continue to be subject to the collective bargaining agreement, and in the event the debtor failed to require the purchaser to assume the obligations of the collective bargaining agreement, the debtor would be liable in damages to the union and the employees. The proposed agreement did not comply with the successor clause, and the union objected to the sale on that basis.

The bankruptcy court sustained the union's objection on two different grounds. First, the breach of the collective bargaining agreement could result in substantial administrative expense claims against the estate. *Id.* at 11. Second, the sale of the canned foods business without compliance with the collective bargaining agreement amounted to a rejection of the contract under Bankruptcy Code § 1113, and the sale could not go forward until the debtor complied with § 1113 or the union and the new buyer reached an agreement rendering compliance moot. *Id.* at 12; *see United Food & Commercial Workers Union v. Family Snacks, Inc. (In re Family Snacks, Inc.),* 257 B.R. 884, 896 n. 8 (8th Cir. BAP 2001) ("A debtor may not, however, fail to take steps to reject the Collective Bargaining Agreement under § 1113 and, at the same time, fail to comply with the terms of the Collective Bargaining Agreement."); see *generally* 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1113.02[1][c], at 1113–9 (16th ed. 2012).

The *Agripac* court's conclusion is consistent with the intent of Bankruptcy Code § 1113. The collective bargaining agreement continues to bind the debtor post-petition, and a debtor cannot reject a collective bargaining agreement except in accordance with Bankruptcy Code § 1113. Generally speaking, a rejection represents a decision not to perform a burdensome executory contract. A debtor cannot bypass § 1113 and obtain a *de facto* rejection of its collective bargaining agreement simply by refusing to perform it. Although the obligation to comply with the successor clause is only one duty among many under a collective bargaining agreement, a debtor's intentional breach of a material provision of the collective bargaining agreement is tantamount to a rejection, or alternatively, a unilateral alteration of its provisions in violation of Bankruptcy Code § 1113(f). Thus, as a general proposition, a sale under Bankruptcy Code § 363 cannot circumvent the condition imposed under a successor clause absent compliance with § 1113.

*In re Journal Register Co.*, 488 B.R. 835, 838–40 (Bankr. S.D.N.Y. 2013).

10.    The 282 Funds reserve the right to object to any final Sales Order, raise any issue in relation to the asset sale of the Debtor, and litigate any successor liability or breach of contract claim against the Debtor or the Purchaser. The proposed asset purchase agreement in its current form is unacceptable to the 282 Funds as it completely ignores the 282 Funds contractual rights and statutory rights under 11 U.S.C. § 1113.

11.    Assumption of the obligations to the Local 282 Pension Fund may reduce claims against the Debtors' estates, and provide benefits to a successful bidder. The Bidding Procedures fail to provide that the Debtors should appropriately value a bid that assumes the pension plan obligations. Attached at Exhibit B is a Pension Benefit Guaranty Corp. objection to sale in the *In re Journal Register Co.* action. The Local 282 Pension Fund adopts the objections in that PBGC objection and submits the Court should find the PBGC's arguments persuasive.

12.    The 282 Funds also object to the proposed timing of the sales process, which does not facilitate a competitive auction process, does not provide value to the Debtors' estate, is done exclusively for the benefit of the Debtor and the creditors Signature Bank and Liberty, and fails to protect the rights of the unsecured general creditors such as the 282 Funds and other employee benefit fund creditors. The marketing period was held over the December holidays and the sales hearing and proposed sales transaction is scheduled for January 2018. The selling period and the sales hearing should be extended for at least a month or two to afford time to locate a potential bidder other than the stalking horse bidder and to allow the parties discovery relating to the stalking horse bidder's relationship to any ACS insiders and the Debtor's claim the sale must occur in January 2018. Any bidding procedures should include cautionary language to the potential purchaser that the 282 Funds reserve their right to enforce the Collective Bargaining Agreement fund contribution clause and successor clause against the Debtor and any purchaser.

Because the proposed sale involves a stalking horse bidder with connection to insider(s) is subject to heightened scrutiny and neither the identity of the successful bidder, nor the terms of its bid, are now before the Court, the 282 Funds reserve their right to object to any sale motion at the appropriate time.  The 282 Funds adopt the arguments made by the PBGC in the attached memorandum to bidding procedures in a similar case to the instant case[4] and request any bidding procedures incorporate the following language:

> The Building Material Teamsters Local 282, IBT sponsors a multiemployer defined benefit pension plan, the Local 282 Pension Fund, as well as the Local 282 Welfare Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund. The Local 282 Pension Fund provides retirement benefits for employees and their beneficiaries. All Qualified Bids may be a combination of cash and certain assumed obligations, including obligations with respect to the Local 282 Pension Fund, the Local 282 Welfare Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund. In determining a successful bidder, the Debtors shall only consider bids that, *inter alia*, assume the Navillus/ACS liabilities to the Local 282 Welfare Trust Fund, the  Local 282 Pension Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund,  including any contributions due those funds, both prospectively and retroactively under the collective bargaining agreement between Navillus/ACS and Building Material Teamsters Local 282, IBT, and any potential withdrawal liability to the Local 282 Pension Fund owed by ACS or Navillus resulting from the sale of ACS assets or otherwise. Debtors shall provide to the Local 282 Pension Fund and Pension Benefit Guaranty Corp. copies of all Qualified Bids that propose to assume the Local 282 Pension Fund, the Local 282 Welfare Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund.

13.     For the foregoing reasons the creditors Local 282 Welfare Trust Fund, the Local

---

[4] *In re Journal Register Co.*, 488 B.R. 835 (Bankr. S.D.N.Y. 2013), S.D.N.Y. Docket 12-13774 Document No. 267.

282 Pension Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust

Fund, the Local 282 Vacation and Sick Leave Trust Fund object to Debtor's pending motion

Docket No. 122 and request the Court deny the Debtor's motion or condition any approval of the

bidding procedures and sale on any purchaser agreeing at time of bidding and sale to assume the

attached collective bargaining agreement between Building Material Teamsters Local 282, IBT

and Navillus/ACS and the obligations to the 282 Funds and to language in any sale agreement that

11 U.S.C. §1113 precludes the rejection of the collective bargaining agreement between Building

Material Teamsters Local 282, IBT and Navillus/ACS through this bid process and sale, together

with such other relief the Court deems proper.

Respectfully submitted,

TRIVELLA & FORTE, LLP


*/s/Christopher Smith*

Christopher Smith
*Attorneys for the Creditors Trustees and
Fiduciaries of the Local 282 Welfare Trust Fund,
the Local 282 Pension Trust Fund, the Local 282
Annuity Trust Fund, the Local 282 Job Training
Trust Fund, and the Local 282 Vacation and Sick
Leave Trust Fund*
1311 Mamaroneck Avenue, Suite 170
White Plains, New York 10605
914-949-9075

# Exhibit "A"

(BCA) Building Contractors
Association
INC

# LOCAL 282

### International Brotherhood of Teamsters

## HIGH-RISE CONTRACT

## 2008–2013

## BUILDING CONTRACTORS ASSOCIATION
## AND INDEPENDENTS



JUN 2 9 2009

Local 282, I.B.T.
2500 Marcus Avenue
Lake Success, New York 11042

(718) 343-3322          (516) 488-2822

Confidential          Local 282 Funds 000127

## TABLE OF CONTENTS

Page

SECTION 1. DURATION OF AGREEMENT ...............................................................1

SECTION 2. OBJECTS...............................................................................................1

SECTION 3. EMPLOYERS BOUND-ASSOCIATION AUTHORIZATION..............................1

SECTION 4. GEOGRAPHICAL JURISDICTION ........................................................2

SECTION 5. UNION RECOGNITION ........................................................................2

SECTION 6. HOURS OF WORK AND OVERTIME ....................................................3

SECTION 7. HOLIDAYS ..........................................................................................4

SECTION 8. WAGES ................................................................................................5

SECTION 9. WORK PRESERVATION ......................................................................5

SECTION 10. REGULAR PAY DAYS AND WAITING TIME PAY ...........................7

SECTION 11. UNION BUSINESS REPRESENTATIVES ...........................................8

SECTION 12. NON-DISCRIMINATION ....................................................................8

SECTION 13. POLYGRAPH TESTING .....................................................................8

SECTION 14. DISCHARGE.......................................................................................8

SECTION 15. TRADE BOARD .................................................................................9

SECTION 16. TRADE AND JURISDICTIONAL DISPUTES.....................................10

SECTION 17. WELFARE, PENSION, ANNUITY
            AND JOB TRAINING TRUST FUNDS..............................................11

SECTION 18. SURETY BOND.................................................................................12

SECTION 19. INDUSTRY ADVANCEMENT PROGRAM.........................................13

SECTION 20. CHECK-OFF .....................................................................................13

SECTION 21. D.R.I.V.E. ........................................................................................14

SECTION 22. SENIORITY.......................................................................................14

SECTION 23. BEREAVEMENT LEAVE...................................................................14

- i -

Confidential                                                    Local 282 Funds 000128

Page

SECTION 24. FEDERAL AND STATE LAWS ..............................................................14

SECTION 25. MATERNITY LEAVE ...........................................................................14

SECTION 26. ON-SITE STEWARD ("OSS") .............................................................15

SECTION 27. SHOP STEWARD ................................................................................19

SECTION 28. AUTHORITY OF UNIT EMPLOYEES, INCLUDING SHOP
STEWARDS AND ON-SITE SHOP STEWARDS ..............................19

SECTION 29. RESPONSIBILITY FOR VEHICLES.....................................................20

SECTION 30. PROTECTION OR RIGHTS...................................................................20

SECTION 31. DOUBLE BREASTED OPERATION ....................................................20

SECTION 32. SCOPE OF AGREEMENT ....................................................................20

SECTION 33. NAME ON VEHICLE ..........................................................................21

SECTION 34. MOST FAVORED NATIONS ...............................................................21

SECTION 35. LOCAL 282 LABOR-MANAGEMENT EMPLOYEE
ASSISTANCE PROGRAM....................................................................21

SECTION 36. JOINT ADVISORY COMMITTEE ......................................................22

SECTION 37. PROJECT LABOR AGREEMENTS/SITE SPECIFIC
AGREEMENTS......................................................................................22

SECTION 38. VALIDITY............................................................................................22

Confidential                                    Local 282 Funds 000129

# HIGH RISE CONTRACT

## BUILDING CONTRACTORS ASSOCIATION AND INDEPENDENTS

### 2008-2013

AGREEMENT made and entered into by and between the Employers described herein and LOCAL NO. 282, affiliated with the INTERNATIONAL BROTHERHOOD OF TEAMSTERS (hereinafter called the "Union").

## SECTION 1.  DURATION OF AGREEMENT

This Agreement shall take effect July 1, 2008 and shall remain in full force and effect until June 30, 2013.

## SECTION 2.  OBJECTS

To establish and maintain wages, hours and working conditions for the work covered by this Agreement in the territory to which it applies; to prevent strikes and lockouts; to insure the peaceful adjustment and settlement of any and all grievances, disputes or differences that may arise between the parties as such or between them as Employer and Employee, and to provide for the adjustment of disputes between trades and jurisdictional disputes.

## SECTION 3.  EMPLOYERS BOUND-ASSOCIATION AUTHORIZATION

A.    This Agreement covers all Employers in the High-Rise Industry consisting of general contractors and subcontractors who sign this Agreement or who are properly bound by an authorized Association.

B.    The Building Contractors' Association ("BCA") and any other association of Employers which may become party hereto (hereinafter referred to as the "Association") have entered into this Agreement on behalf of itself and all of its members.

C.    The Association will provide the Union with a list of its members who have designated the Association as their bargaining agent, and who have agreed to be bound by the terms and conditions of this collective bargaining agreement.  In addition, the Association will notify the Union of any changes in membership, either by the addition of new members of the dropping of members during the period of this Agreement.  It is further agreed that all Employer members of the Association are bound by this collective bargaining agreement in all respects until its termination date, whether or not they retain their membership in the Association for the full period of the Agreement.

D.    (1)    This Agreement shall apply to all present and future operations in the building construction and renovation industry in the area of the Union's jurisdiction (NYC, Nassau and Suffolk Counties) by the Employer, or by any other business entity substantially owned or controlled by the Employer or by any person or persons who substantially own or control the Employer, whether such ownership or control is direct or indirect.

(2)    Each Employer covered by this Agreement shall notify the Union in writing, no later than five (5) days after execution of this Agreement, of all companies, business or operations in the industry covered by this Agreement in which the Employer (or any owner, principal or manager of the Employer) has a substantial ownership or managerial interest as of July 1, 1987 and shall notify the Union in writing of any such interest obtained subsequent to July l, 1987 no later than five (5) days after so obtained.

(3)    This Agreement shall be binding upon the parties hereto, their successors, administrators, executors and assigns.  In the event the entire operation or any part thereof is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, (said purchaser, lessee, transferee, assignee, administrator, executor, receiver, hereafter referred to as "successor"), the Employees of the Employer affected shall be employed by the successor and such operation or part thereof shall continue to be subject to the terms and conditions of this Agreement for the life thereof.  If the successor does not have a collective bargaining agreement with Local 282 at the time of the transaction, the Employees employed by the successor pursuant to the terms of this section shall be maintained by the successor as a separate collective bargaining unit, and shall not be integrated with any other Employees, whether or not he successor's Employees are represented by any other labor organization.  The Employer shall give notice of the existence of this Agreement to any potential successor.  Such notice shall be in writing, with a copy provided to the Union, prior to the time the Employer executes a contract or transaction as herein described with any successor.  The Union shall also be advised of the exact nature of the transaction, not including financial details.  No transaction described herein shall become effective unless and until the Union has been notified in writing by the Employer and the successor that the successor has agreed to assume the obligations of this Agreement.

(4)    It is the intent of this provision to extend coverage of this Agreement to the maximum extent permissible, and to prevent any escape or evasion of this Agreement by any means, however sophisticated, and whether or not motivated by legitimate business reasons.

SECTION 4.   GEOGRAPHICAL JURISDICTION

This Agreement shall apply only to the following territory within the State of New York: the five counties within the City of New York and the adjacent counties of Nassau and Suffolk.

SECTION 5.   UNION RECOGNITION

The Employer recognizes the Union as the sole and exclusive bargaining agent for all chauffeurs, drivers and full-time warehousemen.  All Employees who are members of the Union at the time of the signing of this Agreement shall continue membership in the Union as a condition of continued employment.  All other Employees must become members of the Union after seven (7) days following the beginning of employment, or the effective or execution date of this Agreement, whichever is later, and must maintain their membership in the Union as a condition of continued employment.

- 2 -

It is understood and agreed that the following Employees are not covered by this Agreement:

   (1)   Maintenance personnel and equipment.
   (2)   supervisory personnel and equipment.
   (3)   Surveying personnel an equipment.
   (4)   Management personnel and equipment.
   (5)   Personnel of the Employer moving from one jobsite to another with hand tools.

## SECTION 6.  HOURS OF WORK AND OVERTIME

A.    It is agreed by and between the parties hereto that eight (8) hours all constitute a full day's work, exclusive of meal periods, and no Employee shall be employed for less than eight (8) hours in any day.  Overtime shall be paid at a rate of time and one-half (1-1/2). Employees who begin to work on a Sunday will be guaranteed eight hours (8) pay at double time.  Employees who begin to work on a Saturday will be guaranteed eight (8) hours pay at one and one-half times the regular rate of pay time is to be taken when arriving at commencement of work and computed when leaving at the end of the day.  Employees shall have one (1) hour for lunch or one-half (½) hour when the latter condition prevails at the jobsite.

B.    Starting time shall be 8:00 A.M.  Work prior to 8:00 A.M. and after eight (8) hours in any one day shall be paid for at the overtime rate, to be computed in one-half (½) hour intervals.  The Employer may schedule a start time other than 8:00 A.M. if it is directed to do so by the New York City Department of Buildings, or other New York State or New York City agency; in that event, the OSS shall be paid at the applicable rate for the first eight (8) hours of his/her workday.

The Employer shall notify an Employee before he leaves work if he is to shape earlier than 8:00 A.M. the next day, except in an emergency.  An Employee, notified to shape earlier than 8:00 A.M. and who does shape, shall be guaranteed overtime for the time between the shape and 8:00 A.M., plus the regular eight (8) hours for that day.

C.    <u>Special Condition Starting Time</u>.  The Employer may propose the establishment of a difference schedule of starting times and/or shift assignments if special job conditions are such that such different schedules are necessary and shall justify such proposal together with its effect upon maximization of job opportunities, reduction and protection of Labor Standards.  The Union's decision to accept or reject such proposal shall be final and not subject to arbitration.

<u>Special Shifts</u>.  Subject to the approval of the Union, and upon one week's notice of the Employees affected, the Employer may establish (for a minimum of two (2) weeks) a work schedule of one eight (8) hour and one or two seven (7) hour shifts, exclusive of mealtimes. The first eight-hour shift shall begin at 8:00 A.M.  Employees assigned to a second or third shift will be paid at the regular hourly rate for actual hours worked, plus one (1) additional hour's pay at the regular hourly rate.  Hours worked in excess of eight for the first shift and in excess of seven for the second and third shifts shall be paid at the applicable overtime rate.

- 3 -

D.    <u>Alteration Repair Work</u>.  When it is not possible to conduct alteration or repair work during regular working hours in an occupied building, said work shall proceed on a straight time basis at odd hours with a minimum of eight (8) consecutive hours.  However, when an Employee works over eight hours in any twenty-four (24) hour period, the time after eight hours shall be considered overtime.  Proper notice shall be given to the Union of the facts and circumstances prior to the performance of work outside of normal working hours.

E.    <u>Interior Renovation</u>.  Notwithstanding any provisions in this Agreement to the contrary, an Employee assigned to interior renovation work, as it is defined in Section 26, shall be paid time and one half (1-1/2) for work performed on Saturday, Sunday or on a holiday.

SECTION 7.  HOLIDAYS

The days which are to be observed as holidays under this Agreement shall be as follows:

| | |
|---|---|
| New Year's Day | Fourth of July |
| Martin Luther King's Birthday | Labor Day |
| President's Day | Thanksgiving Day |
| Memorial Day | Christmas Day |

Although holidays are hereby designated, it is understood that whatever holidays may be prescribed by governmental authority (State and Federal), shall be regarded as holidays.

All Employees who work at least two (2) days in the payroll week in which any of the above holidays occur shall be paid for such holiday.

Employees who work on holidays shall be paid at the rate of double time.

Paid holidays shall be included for purposes of vacation credit.

Employees employed on December 24 and December 31 who report for work on such days shall be paid afternoon holiday pay of four (a) hours each day.  In the event the Employer is contractually obligated with the person, partnership or corporation for whom the Employer is performing construction work to close down his job operations on religious holidays of any of three major faiths, Catholic, Protestant or Jewish, the Employer may shut down and his Employees shall receive no pay on the days in question, provided that at the time the Employer first requests or obtains Employees from the Union to man the said job or assigns Employees presently on his payroll to perform work on the job in questions, the Employer notifies the Union and the men of such job requirements.  The provisions of this paragraph shall not apply, however, to the paid holidays set forth in this Article.

- 4 -

SECTION 8.  WAGES

All employees are to be paid the following hourly wages:

| Effective | Per Hour | 8 Hour Day | 40 Hour Week |
|---|---|---|---|
| July 1, 2008[1] | $41.81 | $334.48 | $1,672.40 |
| July 1, 2009 | $42.81 | $342.48 | $1,712.40 |
| July 1, 2010 | $43.81 | $350.48 | $1,752.40 |
| July 1, 2011 | $44.81 | $358.48 | $1,792.40 |
| July 1, 2012[2] | | | |

SECTION 9.  WORK PRESERVATION

A.    It is the intent of this Agreement that, to the maximum extent legally permissible:

(1)    All present work in the bargaining unit shall be preserved;

(2)    All work previously in the bargaining unit which is no longer in the bargaining unit shall be recaptured;

(3)    All work which is fairly claim able for the bargaining unit shall be covered by this Agreement.

B.    In view of the different situations affecting individual Employers covered by this Agreement, it is understood that the specific application of the above intent to each Employer shall be in accordance with the following principles.

(1)    The driving of all trucks owned, operated or under the control of the Employer shall be performed by Employees of the Employer and covered by this Agreement. The Union will not claim jurisdiction over station wagons, pick-up trucks, or light panel trucks to the extent that such vehicles are driven by executives, administrative staff, field supervisors, foremen, field engineers, watchmen, timekeepers, checkers, or cost engineers, who use such vehicles for personal transportation and transportation of personal property and their hand tools only. The Union will not claim jurisdiction over those vehicles which, are driven by mechanics and skilled tradesmen incidental to the trade itself with their hand tools of their trade only. In no event will men, material or equipment be transported in such vehicles.

(2)    The performances of all on-site truck driving on any construction job site, in connection with work which the Employer is contracted to be responsible for, manage, or perform shall be done by Employees of the Employer and covered by this Agreement. If the Employer shall contract or subcontract the job site work covered by this Agreement, provision

---

[1] This increase includes a buy-out of all paid vacation and sick leave, as well as four holidays.

[2] The July 1, 2012 wage shall be based on an allocation by the membership after any required increase in the contribution to the Local 282 Welfare Trust Fund has been actuarially determined.

- 5 -

Confidential                                                    Local 282 Funds 000134



# Building Material Teamsters
## Local 282

THOMAS GESUALDI
President

LOUIS BISIGNANO
Secretary-Treasurer

June 12, 2009

### ****Revised Wage & Benefit Rates Effective July 1, 2009****

Dear Employer:

At a meeting held on June 7, 2009, the members of the **Highrise Industry (CAGNY, BCA & Independents)** voted to re-allocate the overall wage and benefit package on the remaining years of the agreement in effect.

### *Therefore, enclosed please find a copy of the "Revised Rate Schedule" effective for July 1, 2009 through June 30, 2013..*

Please disregard any rate schedules you previously received and consult the enclosed "Revised" schedule instead.  If you have any questions or concerns, kindly contact us.

Very truly yours,

*Louis Bisignano*

Louis Bisignano
Secretary Treasurer

LB/kmc
Enclosure
HR/BCA/CAGNY

Affiliated with the International Brotherhood of Teamsters

# Building Material Teamsters
## Local 282

THOMAS GESUALDI
President

LOUIS BISIGNANO
Secretary-Treasurer

## "REVISED"

### Local 282

### HIGHRISE INDUSTRY
### (BCA, CAGNY & INDEPENDENTS)
### RATE SCHEDULE FOR JULY 1, 2009 THROUGH JUNE 30, 2013

### Effective July 1, 2009

| | | |
|---|---|---|
| WAGES | INCREASE $0.40 PER HOUR TO | $42.21 PER HOUR |
| WELFARE | NO INCREASE | $9.95 PER HOUR |
| PENSION | INCREASE $1.50 PER HOUR TO | $8.50 PER HOUR |
| ANNUITY | INCREASE $0.60 PER HOUR TO | $10.6025 PER HOUR |
| JOB TRAINING | NO INCREASE | $0.15 PER HOUR |
| CHECK OFF | INCREASE $0.05 PER HOUR TO | $1.50 PER HOUR |
| BLDG. FUND | NO INCREASE | $0.20 PER HOUR |

### Effective July 1, 2010

| | | |
|---|---|---|
| WAGES | DECREASE $0.50 PER HOUR TO | $41.71 PER HOUR |
| WELFARE | INCREASE $1.10 PER HOUR TO | $11.05 PER HOUR |
| PENSION | INCREASE $1.50 PER HOUR TO | $10.00 PER HOUR |
| ANNUITY | INCREASE $0.40 PER HOUR TO | $11.0025 PER HOUR |
| JOB TRAINING | NO INCREASE | $0.15 PER HOUR |
| CHECK OFF | INCREASE $0.05 PER HOUR TO | $1.55 PER HOUR |
| BLDG. FUND | NO INCREASE | $0.20 PER HOUR |

### Effective July 1, 2011

| | | |
|---|---|---|
| WAGES | DECREASE $0.50 PER HOUR TO | $41.21 PER HOUR |
| WELFARE | INCREASE $1.25 PER HOUR TO | $12.30 PER HOUR |
| PENSION | INCREASE $1.50 PER HOUR TO | $11.50 PER HOUR |
| ANNUITY | INCREASE $0.25 PER HOUR TO | $11.2525 PER HOUR |
| JOB TRAINING | NO INCREASE | $0.15 PER HOUR |
| CHECK OFF | INCREASE $0.05 PER HOUR TO | $1.60 PER HOUR |
| BLDG. FUND | NO INCREASE | $0.20 PER HOUR |

### Effective July 1, 2012

To be determined

Marcus Avenue, Lake Success, New York 11042 • (516) 488-2822 • (718) 343-3322 • Fax (516) 488-4895

Confidential     Local 282 Funds 000136

shall be made in writing (with a copy thereof immediately provided to the Union) requiring observance and compliance by said contractor or subcontractor with the full terms of this Agreement: In addition, the Employer shall make certain that the provisions of this Agreement, regarding job site work to be performed by bargaining unit Employees, shall be a condition of any supply contract entered into by the Employer, contractor or subcontractor.

(3)     Any person, including but not limited to vendors, contractors, subcontractors, construction managers or agents thereof, who makes a delivery to or pick-up from a construction job site, of materials, supplies or equipment in connection with work which the Employer is contracted to be responsible for, manage or perform and who, in addition to such delivery or pick-up, performs any on-site work shall be bound to observe the terms of this Agreement, regardless of past practice or custom.  Whenever a designated location has been established, in accordance with Section 26 of this Agreement, Employees covered by this Agreement shall perform any loading or unloading or pick-ups or deliveries that take place at such designated locations, as well as all transportation of materials, supplies and equipment between the designated locations within the jobsite.

(4)     If any other labor organization claims jurisdiction over any work required by this Agreement to be performed by Employees covered by this Agreement, the Union will proceed diligently to process the dispute through the New York Plan; pending final resolution of the dispute, the Employer shall assign an Employee covered by this Agreement to perform the work in question, whether or not any contractor or subcontractor refuses to comply with its obligation.

(5)     All of the Employer's own trucking requirements (other than those covered in paragraph 2 relating to on-site trucking) must be performed by Employees of the Employer covered by this Agreement, provided that the Employer may hire trucks from, or contract or subcontract such work to, an Employer whose Employees enjoy not less than all the economic benefits and conditions of employment set forth in this Agreement, said economic benefits and conditions to be construed in the broadest manner legally permissible.

(6)     Notwithstanding paragraphs 2 and 3, the Employer may not hire outside manned trucks, or contract or subcontract any trucking, until the peak number of Employees on the Employer's seniority list between July 1, 1971 and July 1, 1972 have been afforded the opportunity to work.  If any of the Employees on the Employer's seniority list are laid off, they shall be recalled by written notice prior to any such hiring, contracting or subcontracting.  If any of the Employees on the seniority list of the Employer terminate their employment for any reason whatever, the number of Employees necessary to maintain the lasts of its 7/1/71-7/1/72 peak strength, must be hired and employed prior to any such hiring, contracting or subcontracting.

This clause shall not apply to the hiring of outside manned special vehicles, which are not available on an unmanned rental basis, provided that such vehicles may not be used to perform work which may be performed by the Employer's own vehicles or by hired, unmanned vehicles, and provided further that any such hired, manned special vehicles must be hired from Employers whose Employees receive economic terms and conditions of

Confidential

Local 282 Funds 000137

employment at least equal to those in this Local 282 High Rise Agreement unless none such are available after the Union has been contacted as to the need.

(7)    Every Employer who accepts a job, whether as General Contractor, Construction Manager (however described), prime contractor, or subcontractor, shall immediately notify the Union of the job. It is the responsibility of the contractor to substantiate the value of its contract.

The underlying principle shall be to provide maximum job opportunities for the Employees of the Employer covered by this Agreement, then to the .maximum extent permissible under law, to provide maximum job opportunities for all Employees in the multi-employer collective bargaining unit covered by this Agreement.

The Employer and the Union shall discuss the lawful implementation of this job protection provision, and shall reduce their Agreement to writing. If Agreement cannot be reached, the matter shall be submitted to arbitration under the terms of this Agreement.

The character and/or amount of work demanded by an employer shall not be unreasonable nor shall it be restricted by the Union, its representatives or members. The Employer shall designate a person or persons in his employ who are authorized to issue directions and assignments to the chauffeurs and drivers and these Employees shall not take directions from any other than a duly authorized representative of an Employer. Employees shall at all times observe and comply with all general conditions pertaining to the jobsite and with all safety policies adopted by the Building trades Employer's Association.

(8)    The Employer agrees that all containers utilized on the jobsite for the removal of excavated material, construction debris and materials shall be driven by persons covered by this Agreement when boxes or containers are delivered to the jobsite by persons not receiving wages or obtaining conditions that are equal to or higher than those contained herein, said boxes or containers shall be manned by an Employee of the Employer covered by this Agreement, so long as the boxes or containers are being used on the jobsite.

(9)    The Employer will not participate in any fashion, in any scheme, device or plan (either directly or indirectly through relatives, business associates or Employees) to defeat the terms and intent of this Section.

## SECTION 10.    REGULAR PAY DAYS AND WAITING TIME PAY

All wages payable under this Agreement shall become due on or before the end of the working day on Friday of each work week. Said wages are to be paid, at the Employer's option, either in cash in envelopes, upon the outside of which shall be plainly marked the Employer's name, the Employee's name and number, the Employee's. Social Security number, the hours worked and the amount of money enclosed, or by check provided the check is a Todd Insured ABC System Payroll check, or similar type of check, containing the same above information as is contained on the pay envelope, and that delivery of the decks to the Employees shall be made at least on the day preceding a banking day.

Confidential

If, for any reason, an Employer terminates the services of any Employee working under this Agreement, then the accrued wages of the Employee shall be paid to him at the time of his termination of employment; otherwise, waiting time shall be charged for accrued wages. If an Employee shall, of his own violation, leave the services of an Employer, then the Employer may retain his wages until the next pay day. Employees shall be entitled to waiting time if not paid on regular pay day within working hours, said waiting time not to exceed eight (8) hours.

·    This Agreement is based on the principle that an Employer is entitled to eight (8) hours actual work for eight hours pay. Any unreasonable failure to work these hours gives an Employer the right to pay only for the hours actually worked. Each Employee must be at the job site not later than the established starting time and must remain at the job site performing his assigned tasks until quitting time.

## SECTION 11.   UNION BUSINESS REPRESENTATIVES

The business representatives of the Union shall have access to the work site at all times. They shall comply with all general conditions on the jobsite and with all safety policies adopted by the Building Trades Employer's Association.

## SECTION 12.   NON-DISCRIMINATION

The Employer and the Union agree there will be no discrimination against any Employee, or applicant for employment, with respect to race, creed, color, national origin, sex, age, disability, marital status, sexual orientation or citizenship status in all employment decisions, including but not limited to recruitment, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, layoff and termination, and all other terms and conditions of employment except as provided by law.

## SECTION 13.   POLYGRAPH TESTING

No Employee shall be required to take any form of lie detector test as a condition of employment.

## SECTION 14.   DISCHARGE

A.    There shall be no discrimination on the part of either party against any employee because of Union activities.

B.    The Employer shall not discharge nor suspend any Employee without just cause. In all cases involving the discharge or suspension of any Employee, the Employer must notify the Union prior to the action being taken. In all cases involving the dismissal or suspension of a Shop Steward or On Site Steward, the disciplinary action will not be effected unless and until an Arbitrator's decision authorizing same is rendered.

C.    Arbitration of such a matter may be invoked pursuant to Section 15 by either party upon twenty-four (24) hours notice, and the first available Arbitrator on the panel of Arbitrators shall schedule an immediate hearing. If the Union fails to proceed to the hearing as

- 8 -

scheduled by the Arbitrator, the disciplinary action may be taken forthwith, subject to subsequent arbitration procedures.

D.    The Employer shall notify the Union of any job opening in a category covered by this Agreement and shall afford the Union an opportunity to refer applicants for the position.

The Employer shall retain the right to reject any job applicant referred by the Union. In the event of such rejection, the Employer shall notify the Union. The Union shall then have the opportunity to refer other applicants to the Employer until the required number of applicants are obtained.

E.    If a dispute arises under Section 26 concerning a contention by either party that the spirit of the Agreement would be violated by the refusal of an Employer to employ an OSS on a particular project or by the insistence of the Union that the Employer is required to hire an OSS on a particular project or continue his employment for a particular period of time, the Employer or the Union may request the assistance of Arbitrator X, acting in the capacity of a Facilitator/Mediator. Mr./Ms. X may schedule formal hearings or informal meetings to facilitate a resolution of the matter and may, in his/her discretion, issue a written report at the conclusion of the process, whether or not a joint determination has been reached. Such report may be introduced by either party in any subsequent arbitration or other proceeding between the Union and that Employer. The proceeding referred to in this section is mandatory, if invoked, but does not replace arbitration.

SECTION 15.  TRADE BOARD

A.    All complaints, disputes and differences arising under this Agreement, between the Union and any Employer or between any Employer and any Employee shall be referred first to the Joint Trade Board. Should the Trade Board fail to reach a decision, the matter shall then be referred to an impartial Umpire, as set forth in Paragraph C of this Section. The Joint trade Board and the impartial Umpire are hereby empowered to hear, adjust and decide the matter at issue and a decision by any one of these trade agencies shall be final and binding on all parties.

B.    Within three (3) weeks of the execution of this Agreement, the Building Contractors Association, Inc., together with the Union, shall form a Joint Trade Board to exercise the powers enumerated in Paragraph A above. This Board shall be known as the Local 282-Building Contractors Association Joint Trade Board.

The Joint Trade Board shall consist of not less than three (3) or more than five (5) members to represent the Employers and an equal number to represent the Union. Members shall be appointed or selected to serve not less than one (1) year the Board shall meet within forty-eight (48) hours after a written request has been made to one side by the other to meet for a specific purpose.

In voting, the Employers as such and the Union as such, shall each cast an equal number of votes and in the event of a tie vote or failure to reach a decision, the matter shall be submitted within ten (10) days to the impartial Umpire selected, as set forth in Paragraph C Any and all expenses shall be equally divided between the paid for by the parties to this agreement.

- 9 -

C.      If the Joint Trade Board fails to agree upon the selection of an impartial Umpire, he shall be selected in accordance with the Rules and Regulations of the American Arbitration Association.  Any and all expenses in connection with such reference shall be equally divided between and paid for by the parties to this Agreement.

D.      Any Employer member of the Trade Board, directly involved in any case brought before this Board, shall withdraw from the Board until the case is settled, and an alternate shall be selected by the remaining Employer members to fill the temporary vacancy.

Any Union member of the Trade Board, directly involved in any case brought before the Board, shall withdraw from the Board until the case is settled and an alternate shall be selected by the remaining Union members to fill the temporary vacancy.

E.      The Trade board shall have the power to assess costs against any party.

## SECTION 16.  TRADE AND JURISDICTIONAL DISPUTES

A.      The Union or its representatives shall not order a strike or stoppage of work nor shall the Employees strike against any Employer, or collectively leave the work of an Employer, nor shall any Employer lock out Employees prior to filing a complaint, or pending the adjustment of any existing disputes, as provided in Section 15.

B.      The Union shall not halt or interfere, in any manner, with the regular operation of an Employer's business, nor shall it suffer a cessation of work in an Employer's establishment because of any disputes or grievance, alleged or otherwise, which may exist.  All such matters shall be referred to a duly authorized representative of both parties hereto and, in the event that same cannot be amicably adjusted, the matter shall be arbitrated as herein provided.

C.      Disputes between trades and disputes relative to questions of jurisdiction of trade shall be adjusted in accordance with the methods set forth in the Joint Arbitration Plan of the New York Building Trades, as adopted on July 9, 1903 and amended on April 22, 1905, except to the extent that Section 3 of the said Joint Arbitration Plan requires the Employer to employ only members of the Union directly or indirectly through subcontractors or otherwise, and all decision thereunder shall be recognized by and be binding upon the parties hereto.

It is understood that prior to submission of the matter to arbitration in accordance with the New York Plan, where there is an Agreement in effect between the contending Unions or their International Union, the dispute shall be processed in accordance with said Agreement. If resolved between the Unions or the Internationals, said resolution shall be binding upon the Employer.  If not resolved, the matter shall proceed to arbitration in accordance with the procedure of the New York Plan.

If, for any reason, the New York Plan ceases to function, then the parties shall meet to establish an alternate means of trade and jurisdictional dispute resolution.

Confidential                                                                                    Local 282 Funds 000141

SECTION 17.   WELFARE, PENSION, ANNUITY AND JOB TRAINING TRUST FUNDS

A.      Welfare.  Effective July 1, 2008, the Employer shall contribute Nine Dollars and Ninety-Five Cents ($9.95) to the Local 282 Welfare Trust Fund ("Welfare Fund") for each hour worked under this Agreement during the regular work week (Monday-Friday), up to a maximum of forty (40) hours.  Effective July 1, 2009, the aforesaid contribution rate of $9.95 per hour shall be increased to Ten Dollars and Eighty-Five Cents ($10.85) per hour.  Effective July 1, 2010, the aforesaid contribution rate of $10.85 per hour shall be increased to Eleven Dollars and Ninety-Five Cents ($11.95)  per hour.  Effective July 1, 2011, the aforesaid contribution rate of $11.95 per hour shall be increased to Thirteen Dollars and Twenty Cents ($13.20) per hour.  Effective July 1, 2012, the aforesaid contribution rate of $13.20 per hour shall be modified to reflect an appropriate actuarial calculation.

B.      Pension.  During the life of this Agreement, the Employer shall contribute Seven Dollars ($7.00) to the Local 282 Pension Trust Fund ("Pension Fund") for each hour worked under this Agreement, during the regular work week (Monday-Friday), up to a maximum of forty (40) hours.

Contributions to the Pension and/or Welfare Fund for work performed on Saturday or Sunday will be a maximum eight (8) hours for each day.  Hours worked shall include paid holiday hours and paid vacation hours, up to maximum of eight (8) hours per day.

C.      Annuity.  Effective July 1, 2008, the Employer shall contribute Ten Dollars and One-Quarter Cents ($10.0025) to the Local 282 Annuity Trust Fund ("Annuity Fund") for each hour paid at the straight time rate.  Effective July 1, 2009, the aforesaid contribution rate of $10.0025 shall be increased to Ten Dollars and Sixty and One Quarter Cents ($10.6025) per hour.  Effective July 1, 2010, the aforesaid contribution rate of $10.6025 shall be increased to Eleven Dollars and One Quarter Cents ($11.0025) per hour.  Effective July 1, 2011, the aforesaid contribution rate of $11.0025 shall be increased to Eleven Dollars and Twenty-Five and One Quarter ($11.2525) per hour.  Effective July 1, 2012, the aforesaid contribution rate of $11.2525 shall be allocation by the membership after any required increase in the contribution to the Local 282 Welfare Trust Fund has been actuarially determined.

D.      For each hour paid at a premium rate, the Employer will make the contribution to the Annuity Fund at the applicable premium rate.

E.      Job Training Trust Fund.  During the life of this Agreement, the Employer shall contribute Fifteen Cents ($.15) per hour to the Local 282 Job Training Trust Fund ("Job Training Fund") for each hour paid, up to a maximum of forty (40) hours per Employee per week. Nothing herein contained is intended, nor shall be construed, to prohibit the Employer from continuing the practice of hiring from any source or from any training its own drivers at its own costs and expense.

F.      Payments to the Welfare, Pension, Annuity and Job Training Funds shall be made on the thirtieth (30th) day of each month covering all payroll periods which ended during the preceding calendar month.  Payment forms shall be furnished by the Funds prior to the fifth (5th) day of each month.

Confidential                                            Local 282 Funds 000142

An Employer who fails to make payment to the Welfare, Pension, Annuity and Job Training Funds, or Dues Check-Off when due, shall be subject to all the remedies set forth in Section 502 (g) (2) of ERISA, in an action brought in a court of competent jurisdiction.

G.      The Trust Agreement governing the Local 282 Welfare, Pension, Annuity and Job Training Trust Funds, as it shall be amended form time to time, is hereby made a part of this Agreement with the same force and effect as if fully incorporated herein, and the Employer and the Union hereby agree that, upon the execution of this Agreement, they shall be deemed parties to said Trust Agreements. Failure of the Employer to make payments of said contributions promptly when due shall authorize the Union to take immediate economic action against the Employer, without waiting for arbitration, notwithstanding any other provisions in this Agreement. Before any action is taken by the Union or its members, the Employer shall be entitled to notice in writing by certified or registered mail, return receipt requested, giving him an opportunity to make his payments within five (5) days and, if he fails to make the payments, then the foregoing procedure may be followed by the Union or the Employees.

SECTION 18.  SURETY BOND

A.      The Employer shall provide a Surety Bond to guarantee payment of contributions to the Welfare, Pension, Annuity and Job Training Funds and Dues to the Union, as provided for in this Agreement. Said Surety Bond shall be in the following amounts:

| | |
|---|---:|
| an Employer employing 1 to 5 Employees | $10,000 |
| an Employer employing 6 to 10 Employees | 15,000 |
| an Employer employing 11 to 15 Employees | 20,000 |
| an Employer employing 16 to 20 Employees | 25,000 |
| an Employer employing 21 to 25 Employees | 50,000 |
| an Employer employing 26 to 50 Employees | 100,000 |
| an Employer employing 51 and over Employees | 150,000 |

Employees referred to herein shall include all persons on the Employer's Seniority List.

B.      Employers of the Building Contractor's Association shall not have to provide a Surety Bond to guarantee the payment of contributions to the Welfare, Pension, Annuity, Job Training Trust Funds unless a member of the B.C.A.'s records are audited by the Funds auditors and the records show material discrepancies in which case such B.C.A. member shall be required to post a Surety Bond as set forth herein.

C.      In lieu of a bond to secure payment of contributions to the Welfare, Pension, Annuity and Job Training Funds, and Dues to the Union, the Employer may, it and to the extent that the Trustees of the Welfare, Pension, Annuity and Job Training Funds so authorize in writing:

(1)      deposit cash, in an amount determined pursuant to paragraph (A) of this Section, in escrow with a financial institution approved by the Trustees to be held pursuant to the terms of an escrow agreement authorized by the Trustees; or

- 12 -

      (2)    deliver to the Trustees the personal guarantee, with such terms and conditions as may be required by the Trustees in their sole discretion, of one or, more of the duly appointed officers of the Employer, pursuant to which each such officer will promise to pay and to hold himself personally liable to pay to the Trustees, upon demand, any contributions which the Employer does not timely pay to the Welfare, Pension, Annuity and Job Training Funds.

      D.    In the event that the Employer subcontracts work to a subcontractor which has an agreement with the Union requiring it to make contributions to the Welfare, Pension, Annuity and Job Training Funds ("Funds"), the Employer shall make a good faith effort to ensure that its subcontractor makes timely contributions to the Funds, pursuant to the subcontractor's agreement with the Union.  When an authorized representative of the Funds informs the Employer, in writing, that one or more of its subcontractors is delinquent in its required contributions to the Funds, the Employer may withhold from those contractors an amount of money equal to the amount of the delinquency until the delinquency is cured.  In no event shall the Employer be liable for any delinquent payments to the Funds by its subcontractors.

SECTION 19.  INDUSTRY ADVANCEMENT PROGRAM

      A.    The Employer shall pay Twenty-Five Cents ($.25) per hour for each hour of employment of Teamsters to the Building Contractors Association Industry Advancement Program.

      B.    Payments shall be made together with Welfare, Pension, Annuity and Job Training Fund payments, and will be forwarded by the Local 282 Fund office to the Building Contractors Association Industry Advancement Program upon payment of collection and administrative costs.

SECTION 20.  CHECK-OFF

      Effective July 1, 2008, the Employer agrees to deduct from the wage rate of each Employee covered by this Agreement and to pay to the Union, after proper execution by each Employee of an authorization form, which form shall be furnished by the union to the Employer, the sum of One Dollar and Forty-Five Cents ($1.45) for each hour paid. Effective July 1, 2009, the aforesaid deduction shall be increased to One Dollar and Fifty Cents ($1.50) for each hour paid. Effective July 1, 2010, the aforesaid deduction shall be increased to One Dollar and Fifty-Five Cents ($1.55) for each hour paid.  Effective July 1, 2011, the aforesaid deduction shall be increased to One Dollar and Sixty Cents ($1.60) for each hour paid.  Effective July 1, 2012, the aforesaid deduction shall be subject to determination by the membership.  In addition, the Employer agrees to deduct from the wage rate of each Employee covered by this Agreement and to pay the Local 282 Building Trust Fund, after proper execution by each Employee of an authorization form, which form shall be furnished by the Union to the Employer, the sum of Twenty Cents ($.20) for each hour paid.  Said sums shall constitute a part of said Employee's Local Union No. 282 Union dues.  Payment of dues checked off shall be forwarded to the Union no later than the thirtieth (30th) of each month covering all payroll periods ending during the preceding calendar month.  Local Union No. 282 agrees to indemnify and to hold harmless the Employer from any and all claims, actions and/or proceedings arising out of said dues Check-Off.

- 13 -

This shall be in addition to any regular monthly Union dues checked off pursuant to written authorization pursuant to law.

The Employer will also honor voluntary written Check-Off authorization for the purpose of group insurance premium payments.

SECTION 21.   D.R.I.V.E.

The Employer will recognize a lawful, voluntary authorization for the D.R.I.V.E. deduction from wages, to be transmitted by the Employer to National D.R.I.V.E.  The D.R.I.V.E. deduction shall be made from the Employee's wages only after a duly signed authorization card has been filled out for the amount of One Dollar ($1.00) per week, the Employer shall forward said contributions to D.R.I.V.E., International Brotherhood of Teamsters, 25 Louisiana Avenue, Washington, D.C. 20001.

SECTION 22.   SENIORITY

Seniority shall prevail within each Employer covered by this Agreement.

Seniority Employees shall have the right to break in on new equipment.  The Shop Steward and the Employer shall decide the qualifications of the driver on equipment; if they disagree the matter shall be subject to the grievance procedure, in accordance with Section 15.

SECTION 23.   BEREAVEMENT LEAVE

An Employee shall be entitled to one (1) day's pay for bereavement leave in the event of the death of the Employee's parent, sibling, spouse or child.

SECTION 24.   FEDERAL AND STATE LAWS

The Employer hereby agrees to comply fully with all laws pertaining to Social Security, Unemployment Insurance and Worker's Compensation.

SECTION 25.   MATERNITY LEAVE

A pregnant Employee shall be permitted to continue working so long as she is capable of performing satisfactorily and medically permitted to do so.  The Employer reserves the right to request the Employee provide written statements from her doctor as to her continued employability during the last trimester of her pregnancy.  An Employee may elect to begin maternity leave when medically required to do so or at the end of the seventh (7th month of pregnancy, whichever is earlier, and shall return form such leave as soon as her physical condition permits, but no later than sixty (60) days after the date of delivery.  If the Employee's medical condition prohibits a return to employment by such sixtieth day, and satisfactory proof of such fact has been provided to the employer, the continued absence of the Employee will be treated as any other type of extended illness would be treated, for leave purposes, by the Employer.

- 14 -

SECTION 26.   ON-SITE STEWARD ("OSS")

A.    (1)    <u>New Construction</u>.  Effective July 1, 2008, an On-Site Steward ("OSS") shall be employed where an Employer is contracted to be responsible for, manage, or perform work on a construction site and the total gross square footage of the structure to be constructed, whether or not performed by the Employer or covered by its contract, is Two Hundred Thousand (200,000) square feet or greater; effective July 1, 2010, Two Hundred Twelve Thousand Five Hundred (212,500) square feet or greater; effective June 30, 2011, Two Hundred Twenty Five Thousand (225,000) square feet or greater; and effective July 1, 2012, Two Hundred Thirty Seven Thousand Five Hundred (237,500) square feet or greater.

(2)    <u>Facade</u>.  An OSS shall be employed where the total gross square footage of the structure to be constructed requires an OSS under subparagraph (3) below.

(3)    <u>Renovation</u>.  An OSS shall be employed where an Employer is contracted to be responsible for, manage or perform work involving the substantial renovation, rehabilitation, restoration or alteration of a previously occupied building that is not associated with new construction; one OSS shall be employed on each such project according to the following schedule:

| Project Size | Duration of Employment |
|---|---|
| • 0 to 274,999 square feet | No OSS |
| • 275,000 to 400,000 square feet | 2 weeks for every 25,000 square feet (calculated from 0 square feet) |
| • 400,001 to Infinity square feet | 2 weeks for every 25,000 square feet (calculated from 0 square feet) |

<u>Effective July 1, 2009</u>

| Project Size | Duration of Employment |
|---|---|
| • 0 to 287,499 square feet | No OSS |
| • 287,500 to 412,500 square feet | 2 weeks for every 25,000 square feet (calculated from 0 square feet) |
| • 412,501 to Infinity square feet | 2 weeks for every 25,000 square feet (calculated from 0 square feet) |

<u>Effective July 1, 2010</u>

| Project Size | Duration of Employment |
|---|---|
| • 0 to 299,999 square feet | No OSS |
| • 300,000 to 425,000 square feet | 2 weeks for every 25,000 square feet (calculated from 0 square feet) |

- 15 -

- 425,001 to Infinity square feet     2 weeks for every 25,000 square feet (calculated from 0 square feet)

Effective July 1, 2011

| Project Size | Duration of Employment |
|---|---|
| 0 to 312,499 square feet | No OSS |
| 312,500 to 437,500 square feet | 2 weeks for every 25,000 square feet (calculated from 0 square feet) |
| 437,501 to Infinity square feet | 2 weeks for every 25,000 square feet (calculated from 0 square feet) |

Effective July 1, 2012

| Project Size | Duration of Employment |
|---|---|
| 0 to 324,499 square feet | No OSS |
| 325,000 to 450,000 square feet | 2 weeks for every 25,000 square feet (calculated from 0 square feet) |
| 450,001 to Infinity square feet | 2 weeks for every 25,000 square feet (calculated from 0 square feet) |

Provided, however, that an OSS may be laid off when the particular project to which he or she is assigned is actually completed regardless of the period of employment otherwise mandated by the schedules set out above.

On projects ranging from 275,000 to 400,000 square feet in 2008 (and for similar projects from 2009 to 2012 with appropriate adjustments in square footage thresholds), the OSS shall be paid for forty straight time hours and shall receive no overtime payments, any other provision in this Agreement to the contrary notwithstanding, except for a maximum payment of eight hours on Saturday or Sunday, at the applicable rates, when there is transportation of construction or building materials to, from or on the job site. An OSS assigned to a renovation project over 400,000 square feet in 2008 (and for similar projects from 2009 to 2012 with appropriate adjustments in square footage thresholds), shall be entitled to payment for overtime and weekend work as provided in Section 26(C)(5). The provisions of this paragraph shall apply to all projects beginning after July 1, 1999.

Where one Employer is performing renovation work for different tenants/owners at a single site, the square footage of each separate tenant's/owner's project shall not be aggregated for purposes of determining whether an OSS shall be employed under this section.

(4) An Employer is required to employ an OSS under this provision whether it is responsible for the work as owner, general contractor, prime contractor, subcontractor or construction manager, however its role is described.

Confidential     Local 282 Funds 000147

(5)    HYBRID/ALT1:  When a project involves New Construction as defined in Section 26(A)(1) and Renovation as defined in Section 26(A)(3), the OSS shall be assigned based on the nature of the permit issued by the Department of Buildings.  In the event the permit is a New Construction permit, the OSS shall be assigned under subsection (A)(1); if the permit is an Alteration permit the OSS shall be assigned under subsection (A)(3); in either event, the total square footage of the space to be renovated and the space to be constructed shall be combined to determine whether the appropriate threshold under subsection (A)(1) or subsection (A)(3) has been reached.

B.    On multiple building projects, the applicable dollar square footage threshold will be deemed met on the day on which a contract is awarded for work covering a square footage that, when combined with the square footage on all other contracts awarded on the project, first meets or exceeds the applicable square footage threshold.

C.    (1)    It is the intent of the parties that an Employer and any of its subcontractors shall be considered to be a single Employer for the purpose of determining any obligation to hire OSS's.

(2)    Effective July 1, 2008, on projects requiring the employment of an OSS where the total gross square footage of the structure to be constructed is Two Hundred Thousand (200,000) square feet to Three Hundred Twenty Four Thousand Nine Hundred Ninety Nine (324,999) square feet (with similar adjustments in square footage from 2009 through 2012), the OSS shall be employed from the start of construction until three months before the end of construction as determined by the Employer's construction project schedule, as amended from time to time.  Where the total gross square footage of the structure to be constructed is Four Hundred Thousand (400,000) square feet to Seven Hundred Ninety-Nine Thousand Nine Hundred Ninety Nine (799,999) square feet, the OSS shall be employed from the start of construction until four months before the end of construction as determined by the Employer's construction project schedule, as amended from time to time.  Where the total gross square footage of the structure to be constructed is Eight Hundred Thousand (800,000) square feet or greater, the OSS shall be employed from the start of construction until five months before the end of construction as determined by the Employer's construction project schedule, as amended from time to time; provided, however, where a particular project exceeds Eight Hundred Thousand (800,000) Square Feet and involves substantial site work or paving at the conclusion of the project, the Employer and the Union shall meet in a pre-job conference to determine whether the OSS should remain at the job for an additional period not to exceed two months.

(3)    The OSS shall be appointed by the Union.  When practicable he will be appointed from the seniority list of the Employer.

The OSS shall function as the Steward on the job site.  He shall handle all grievances involving the application of this Agreement on the job site.  He shall be allowed a reasonable amount of time to conduct Union business consistent with the concept that he is a working Teamster.

Confidential    Local 282 Funds 000148

(4)    The Employer shall provide the OSS with a desk and telephone on or contiguous to the job site, as well as a "beeper" unit. Said desk and telephone should, to the extent practicable, be located on the first floor or at street level.

(5)    The OSS's regular work day shall begin at 8:00 A.M. and end at 4:30 P.M.; for the purposes of overtime assignments, however, the OSS's work day shall begin when the first truck starts unloading or loading and shall finish when the last truck starts unloading or loading. The OSS shall be employed on Monday-Friday during his regular work hours while there is any construction activity on the job site. On Saturday and Sunday, the OSS shall be employed when there is any transportation of construction or building material to, from or on the job site.

The OSS shall not be entitled to overtime or premium pay for any utility work performed by any person outside of the curb line. The OSS shall be entitled to overtime or premium pay for any utility work performed by any person inside the curb line subject to the applicable trucking requirement in this subsection.

An OSS assigned to interior renovation work who works overtime on Saturdays, Sundays or Holidays shall be paid at the rate of time and one-half (1½).

In the event there is a delivery of garbage or debris containers or a pick-up of garbage or debris from the job site on Monday through Friday at a time when the OSS is not otherwise being paid in accordance with the terms of this Agreement, then the OSS shall receive one (1) hour's pay, at the appropriate overtime rate, for each pick-up or delivery.

(6)    On job sites where an OSS is employed, and it is practical and job conditions warrant it, deliveries shall be routed to a designated location selected by the Employer. The designated location may be changed as job conditions warrant.

(7)    The OSS shall be subject to the direction and control of the Employer at all times. The OSS's duties shall include, but are not limited to, the dispatch and coordination of traffic, including operations at the loading dock or other designated areas, the receiving and processing of building and construction material at the job site, and the distribution of all materials received on the job site.

(8)    The OSS shall not deprive Employees on the Seniority List of the Employer, or any other Employer, of their normal work opportunities. He shall not be used for the transportation of materials between job sites of the Employer, without the permission of the Union.

(9)    The Employer responsible for the "core and shell" of the building shall employ the OSS until the termination of such Employer's obligation in accordance with the terms of this Agreement.

D.    No OSS employed as of July 1, 2005 shall be laid off as a result of any change to any provision of this Section, as it existed on June 30, 2008.

- 18 -

E.      Where an Employer acting as construction manager enters into a contract with an owner or developer to manage, facilitate or coordinate construction activities in connection with a building project that is governed by either state or municipal prevailing wage laws ("prevailing wage project" such as those performed for entities like those listed in Appendix A, excluding Federal projects), the Employer shall not be required to employ an OSS where their contract with the owner or developer does not require them to sign contracts with prime contractors or subcontractors also working on the project or does not assign them responsibility for "general conditions."

Where an Employer holds and is responsible for contracts with other prime contractors or subcontractors working at a prevailing wage project, the Employer shall be obligated to employ an OSS in accordance with the terms of the collective bargaining agreement.

On those prevailing wage projects where the Employer does not sign contracts with the prime contractors also working on the project but is responsible for the "general conditions" and the value of the Employer's individual contract for the responsibilities it has assumed for "general conditions" (which excludes any monies received for pre-construction services, payroll costs associated with management supervision and management staffing, post-construction services, professional services, and management fees) is Fifteen Million Dollars ($15,000,000) or more, that Employer shall be responsible to employ an OSS. Effective July 1, 2003 and July 1, 2004, respectively, the obligation to employ an OSS shall not arise unless the Employer's individual contract (per the above) is in excess of $6,750,000 and $6,975,000. Nothing in this paragraph shall reduce the threshold set forth in the Parties' respective collective bargaining agreements for Employers who are awarded prime contracts as the general contractor.

The Parties further agree that on prevailing wage projects only one OSS shall be employed at each such site, regardless of the number of prime contractors working on the site.

F.      The Employer shall provide to the Union a list of the five (5) major subcontractors it intends to use on any project on which it is performing work as a construction manager or general contractor, and on which it is not required to employ an OSS, no later than thirty (30) days after it commences work on such projects, or as the contracts are awarded.

SECTION 27.   SHOP STEWARD

A Shop Steward shall be appointed by the Union for each Employer who employs Teamsters and is covered by this Agreement.

SECTION 28.   AUTHORITY OF UNIT EMPLOYEES, INCLUDING SHOP STEWARDS AND ON-SITE SHOP STEWARDS

Persons, including Shop Stewards and On-Site Stewards, are absolutely forbidden and are without any actual or apparent authority to, in any manner, interfere or threaten to interfere with the operations of any person, including. Employer signatories - or Employers that are non-signatories - to any collective bargaining agreement with the Union, without, prior thereto, receiving express approval for such conduct from the Chief Operating Officer of the Union.

Confidential                                        Local 282 Funds 000150

SECTION 29.  RESPONSIBILITY FOR VEHICLES

A.  The Employer shall assume full responsibility for the condition of all vehicles operated by Employees, and shall be obliged to pay any money fines which are assessed against any Employee because of negligence on the part of the Employer, in failing or refusing to correct any unsafe condition of a vehicle or any part thereof not properly cared for in accordance with the laws governing the same.  However, the Employer shall assume no responsibility in the event that the chauffeur or, driver of such vehicles neglects or fails to promptly notify the Employer of such conditions, when discovered, to the Employee.  The Employer shall not discharge or discipline an Employee or refuse to hire an Employee on the basis of violations or tickets received by the Employee due to Employer acts.

B.  Employees will help load and unload in the shop or at the jobsite.

Where necessary to set or guide slung loads, or to perform other difficult tasks, another person (who need not be a Teamster) shall assist.

C.  Teamster yardmen shall continue to perform their customary job.

D.  Employers may not lay-up trucks, layoff drivers and hire similar trucks.

SECTION 30.  PROTECTION OR RIGHTS

A.  Picket Lines.  It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action, nor shall such Employee be permanently replaced, in the event an Employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's place of business..

B.  Struck Goods.  It shall not be a violation of this Agreement and it shall not be cause of discharge or disciplinary action, nor shall such Employee be permanently replaced, in the event an Employee refuses to perform any service which his .Employer undertakes to perform as an ally of an Employer or person whose Employees are on strike, and which service, but for such strikes, would be performed by the Employees of the Employer or person on strike.

SECTION 31.  DOUBLE BREASTED OPERATION

The Employer hereby agrees that in order to protect and preserve the work opportunities of the Employees covered under this Agreement, it shall not establish or have an ownership interest in a DOUBLE BREASTED operation within the geographical jurisdiction of Local 282, namely the City of New York, Nassau and Suffolk Counties, or outside Said area if the work is to be performed within said area.

SECTION 32.  SCOPE OF AGREEMENT

No provision of this Agreement is intended to create any obligation on the part of the Union which is enforceable against the Union by individual Employees.

Confidential                                                                                          Local 282 Funds 000151

SECTION 33.   NAME ON VEHICLE

Any truck or vehicles performing bargaining unit work or owned or operated by or on behalf of the Employer must have the name of the owner of the truck prominently displayed thereon.

SECTION 34.   MOST FAVORED NATIONS

In the event the Union grants to or permits any Employer engaged in the same or similar business as the Employer any more favorable rates, terms or work rules (hereinafter collectively referred to as "conditions") than are generally applicable to Employers covered under this Agreement, then such more favorable conditions shall thereafter be deemed to be part of this Agreement and all Employers covered by this Agreement shall be entitled to the benefit of such more favorable conditions.  In the event that the Building Contractors Association negotiates a collective bargaining agreement with any other Union which provides more favorable increases in wages and/or benefits, such more favorable rate of increase shall automatically be applicable to this Agreement and be substituted for the lesser increases provided herein.

SECTION 35.   LOCAL 282 LABOR-MANAGEMENT
               EMPLOYEE ASSISTANCE PROGRAM

A.    Where an Employer has reasonable cause to believe that an Employee is a drug abuser, substance abuser or alcohol abuser, the Employer can suspend the suspected abuser and require that the Employee meet with the Local 282 Welfare Fund Employee Assistance Program Director.

B.    The Employee Assistance Program Director will arrange for the immediate testing of the suspected abuser to determine whether the Employee has a drug, substance or alcohol abuse problem.

C.    If the test reveals that the Employee is not a drug, substance or alcohol abuser, he shall be immediately returned to work and the Employer shall pay the Employee for the days he would have worked during his suspension, up to a maximum of three (3) days.

D.    If the test reveals that the Employee is a drug; substance or alcohol abuser, he will be suspended with no pay and the Employee will be given the opportunity to participate in a rehabilitation program to suit his individual need under the guidance of the Employee Assistance Program Director.  If the Employee tests positive after successful completion of two rehabilitation programs, he shall be subject to discharge without recourse to the grievance procedure.

E.    If the Employee completes the rehabilitation program and subsequently tests clean of drug, substance or alcohol abuse, the Employee shall be returned to his previous position .with no loss of seniority.

F.    Should the Employee fail to meet with the Employee Assistance Prog3zamDirector or refuses to submit to testing for drug, substance or alcohol abuse or refuses

- 21 -

to participate in the Local 282 Labor Management Employee Assistance Program or the Detoxification program after testing positive for drug, substance or alcohol abuse, the Employee shall be terminated without recourse to the grievance procedure contained in the collective bargaining agreement between the parties.

G.    The cost of testing, detoxification or other services will be paid by the Local 282 Welfare Fund.

H.    It is agreed that the procedure set .forth above shall be the exclusive procedure for resolving the disputes concerning drug, substance or alcohol abuse and testing.

SECTION 36.   JOINT ADVISORY COMMITTEE

The BCA, CAGNY, and Union shall establish a Joint Advisory Committee (the "Committee") composed of an equal number of CAGNY, BCA and Union members to address issues of mutual concern that arise during the term of this Agreement, including but not limited to workplace safety, industry concerns, proposed project labor agreements and the employment of an OSS on construction projects subject to the "Wicks Law" or bid out by public agencies or quasi-public agencies like "Wicks Law" projects.

The Committee shall discuss issues raised by CAGNY, BCA or Union representatives and, where appropriate, shall draft and execute agreements supplemental to this Agreement which shall become binding upon the parties as if part of this Agreement. The Committee shall establish appropriate procedures for its deliberations.

SECTION 37.   PROJECT LABOR AGREEMENTS/SITE SPECIFIC AGREEMENTS

The Union and the Employer may, in their respective sole discretion, enter into Project Labor Agreements ("PLAs") or Site Specific Agreement ("SSAs") under circumstances and with terms consistent with their respective approach to such matters. As between the Employer and the Union, the terms of any such PLA or SSA shall not be binding unless both are signatories to such PLA or SSA.

SECTION 38.   VALIDITY

If any Section of this Agreement is held by a Court, or other tribunal of competent jurisdiction to be invalid, or if compliance or enforcement of any Section should be enjoined o r restrained, the remainder of this Agreement shall continue in full force and effect, and the parties shall meet immediately to negotiate a substitute for the Section involved. If the parties fail to agree, the matter shall be subject to grievance or arbitration and the Union shall not have the right to strike. The Trade Board, or, if deadlocked, the Arbitrator shall have the power to develop a new provision to carry out the general intent of the parties.

- 22 -

**IN WITNESS WHEREOF,** the parties hereto have set their hands and affixed
their seals this _1st_ day of _July_ , 200_8_.

BUILDING MATERIAL TEAMSTERS
LOCAL UNION NO. 282

EMPLOYER

Affiliated with the International Brotherhood
of Teamsters

_Building Contractors Assoc, Inc._
Company Name

By: _Louis Big_
Signature

_457 Park Avenue South_
Street Address

_Secretary Treasurer_
Title

_New York, N.Y. 10016_
City        State        Zip

By: _[signature]_
Signature

_Paul J. O'Brian_
Print Name

_Managing Director_
Title

_1 July 2008_
Effective Date

_718-683-8080_
Phone Number

- 23 -



# Building Material Teamsters
# Local 282

**THOMAS GESUALDI**
President

**LOUIS BISIGNANO**
Secretary-Treasurer

## "REVISED"

### Local 282

### HIGHRISE INDUSTRY
### (BCA, CAGNY & INDEPENDENTS)
### RATE SCHEDULE FOR JULY 1, 2009 THROUGH JUNE 30, 2013

*Affiliated with the International Brotherhood of Teamsters*

### Effective July 1, 2009

| | | |
|---|---|---|
| WAGES | INCREASE $0.40 PER HOUR TO | $42.21 PER HOUR |
| WELFARE | NO INCREASE | $9.95 PER HOUR |
| PENSION | INCREASE $1.50 PER HOUR TO | $8.50  PER HOUR |
| ANNUITY | INCREASE $0.60 PER HOUR TO | $10.6025 PER HOUR |
| JOB TRAINING | NO INCREASE | $0.15 PER HOUR |
| CHECK OFF | INCREASE $0.05 PER HOUR TO | $1.50  PER HOUR |
| BLDG. FUND | NO INCREASE | $0.20  PER HOUR |

### Effective July 1, 2010

| | | |
|---|---|---|
| WAGES | DECREASE $0.50 PER HOUR TO | $41.71 PER HOUR |
| WELFARE | INCREASE $1.10 PER HOUR TO | $11.05 PER HOUR |
| PENSION | INCREASE $1.50 PER HOUR TO | $10.00 PER HOUR |
| ANNUITY | INCREASE $0.40 PER HOUR TO | $11.0025 PER HOUR |
| JOB TRAINING | NO INCREASE | $0.15  PER HOUR |
| CHECK OFF | INCREASE $0.05 PER HOUR TO | $1.55  PER HOUR |
| BLDG. FUND | NO INCREASE | $0.20  PER HOUR |

### Effective July 1, 2011

| | | |
|---|---|---|
| WAGES | DECREASE $0.50 PER HOUR TO | $41.21 PER HOUR |
| WELFARE | INCREASE $1.25 PER HOUR TO | $12.30 PER HOUR |
| PENSION | INCREASE $1.50 PER HOUR TO | $11.50 PER HOUR |
| ANNUITY | INCREASE $0.25 PER HOUR TO | $11.2525 PER HOUR |
| JOB TRAINING | NO INCREASE | $0.15  PER HOUR |
| CHECK OFF | INCREASE $0.05 PER HOUR TO | $1.60  PER HOUR |
| BLDG. FUND | NO INCREASE | $0.20  PER HOUR |

### Effective July 1, 2012

To be determined

2500 Marcus Avenue, Lake Success, New York 11042 ● (516) 488-2822 ● (718) 343-3322 ● Fax (516) 488-4895
Confidential                                                                                    Local 282 Funds 000155





451 Park Avenue South
4th Floor
New York, NY 10016

Tel: 212-683-8080
Fax: 212-683-0404

www.ny-bca.com

July 25, 2014

To Whom It May Concern:

This letter is to confirm that the following contractor is a member in good standing with the Building Contractors Association, Inc.:

**Navillus Tile, Inc., (D.B.A. Navillus Contracting & D.B.A. Navillus General Contractors)**
**575 Fifth Avenue-29th Floor**
**New York, NY 10017**
**Donal O'Sullivan-President**

As a member of the B.C.A., **Navillus Tile, Inc., (D.B.A. Navillus Contracting & D.B.A. Navillus General Contractors)** is signatory to the various Collective Bargaining Agreements we negotiate on our members' behalf. They are as follows:

**NYC District Council of Carpenters – Exp. 2011-2015**
**General Building Laborers – Local #66- Exp. 6/30/17**
**Teamsters – Local #282 – Exp. 6/30/16**
**Mason Tenders' District Council – Exp. 6/30/14**
**Operating Engineers – Locals#14-14B, #15-15D #138 –138A – Exp. 6/30/15**
**Northeast Regional Council of Carpenters – Exp. 6/30/16**

As a signatory party to these Collective Bargaining Agreements, **Navillus Tile, Inc., (D.B.A. Navillus Contracting & D.B.A. Navillus General Contractors)**, is bound to the provisions of said agreements and is entitled to all rights and privileges stated therein. This includes being bound to the Apprenticeship provisions contain within each agreement.

Furthermore, the B.C.A. is a member of the Building Trades Employers Association of NY and, on behalf of our members, agrees to abide by the provisions of the New York Plan for Jurisdictional Disputes.

If you have any questions or you require further information on this matter, please do not hesitate to contact me.

Sincerely,

John F. O'Hare
Assistant Managing Director – B.C.A.

(membershipconfirmation)



BCA000025



451 Park Avenue South
4th Floor
New York, NY 10016

Tel: 212-683-8080
Fax: 212-683-0404

www.ny-bca.com

March 4, 2013

To Whom It May Concern:

This letter is to confirm that the following contractor is a member in good standing with the Building Contractors Association, Inc.:

**Navillus Tile, Inc., (d.b.a. Navillus Contracting & d.b.a. Navillus General Contractors)**
**460 Park Avenue – 8th Floor**
**New York, NY 10022**
**Doanl O'Sullivan - President**

As a member of the B.C.A., **Navillus Tile, Inc., (d.b.a. Navillus Contracting & d.b.a. Navillus General Contractors),** is signatory to the various Collective Bargaining Agreements we negotiate on our members' behalf. They are as follows:

**NYC District Council of Carpenters – Exp. 6/30/11 - (Contract is on Extension)**
**General Building Laborers – Local #66- Exp. 6/30/13**
**Teamsters – Local #282 – Exp. 6/30/13**
**Mason Tenders' District Council – Exp. 6/30/14**
**Metal Lathers – Local #46 – Exp. 6/30/14**
**Operating Engineers – Locals 14-14B, 15-15A & 15D, 138 –138A – Exp. 6/30/14**
**Northeast Regional Council of Carpenters – Exp. 6/30/14**

As a signatory party to these Collective Bargaining Agreements **Navillus Tile, Inc., (d.b.a. Navillus Contracting & d.b.a. Navillus General Contractors),** is bound to the provisions of said agreements and is entitled to all rights and privileges stated therein. This includes being bound to the Apprenticeship provisions contain within each agreement.

Furthermore, the B.C.A. is a member of the Building Trades Employers Association of NY and, on behalf of our members, agrees to abide by the provisions of the New York Plan for Jurisdictional Disputes.

If you have any questions or you require further information on this matter, please do not hesitate to contact me.

Sincerely,

John F. O'Hare
Assistant Managing Director – B.C.A.

(membershipconfirmation)



Blumberg No. 5113    PLAINTIFF'S EXHIBIT

BCA000026



*(BCA) (Regular) (Contractors*

*Ratified 6/2/16*

# Building Material Teamsters
# Local 282

*Association*

**THOMAS GESUALDI**
President

**LOUIS BISIGNANO**
Secretary-Treasurer

Affiliated with the International Brotherhood of Teamsters

### Local 282
### HIGHRISE INDUSTRY (BCA & INDEPENDENTS)
### JULY 1, 2016 THROUGH JUNE 30, 2019

### Effective July 1, 2016

| | | | |
|---|---|---|---|
| WAGES | INCREASE $1.00 PER HOUR TO | $49.36 | PER HOUR |
| ANNUITY | INCREASE $1.37 PER HOUR TO | $14.8725 | PER HOUR |
| WELFARE | INCREASE $ .30 PER HOUR TO | $15.95 | PER HOUR |
| PENSION | NO INCREASE | $11.50 | PER HOUR |
| JOB TRAINING | NO INCREASE | $0.15 | PER HOUR |
| CHECK OFF | NO INCREASE | $1.95 | PER HOUR |
| BLDG. FUND | NO INCREASE | $0.20 | PER HOUR |

### Effective July 1, 2017

| | | | |
|---|---|---|---|
| WAGES | INCREASE $1.00 PER HOUR TO | $50.36 | PER HOUR |
| ANNUITY | INCREASE $1.27 PER HOUR TO | $16.1425 | PER HOUR |
| WELFARE | INCREASE $ .40 PER HOUR TO | $16.35 | PER HOUR |
| PENSION | NO INCREASE | $11.50 | PER HOUR |
| JOB TRAINING | NO INCREASE | $0.15 | PER HOUR |
| CHECK OFF | NO INCREASE | $1.95 | PER HOUR |
| BLDG. FUND | NO INCREASE | $0.20 | PER HOUR |

### Effective July 1, 2018

| | | | |
|---|---|---|---|
| WAGES | INCREASE $1.00 PER HOUR TO | $51.36 | PER HOUR |
| ANNUITY | INCREASE $1.17 PER HOUR TO | $17.3125 | PER HOUR |
| WELFARE | INCREASE $ .50 PER HOUR TO | $16.85 | PER HOUR |
| PENSION | NO INCREASE | $11.50 | PER HOUR |
| JOB TRAINING | NO INCREASE | $0.15 | PER HOUR |
| CHECK OFF | NO INCREASE | $1.95 | PER HOUR |
| BLDG. FUND | NO INCREASE | $0.20 | PER HOUR |

2500 Marcus Avenue, Lake Success, New York 11042 ● (516) 488-2822 ● (718) 343-3322 ● Fax (516) 488-4895



## MEMORANDUM OF AGREEMENT
### between the
### BUILDING CONTRACTORS' ASSOCIATION, INC.
### and the
### INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 282

The Building Contractors' Association, Inc. ("BCA" or "Employer") and the International Brotherhood of Teamsters Local Union No.282 ("Local 282") hereby enter into a Collective Bargaining Agreement ("Agreement") which will take effect on July 1, 2016. BCA and Local 282 agree as follows:

1.      <u>Agreement</u>:  BCA and Local 282 shall execute a three year collective bargaining agreement which shall be effective as of July 1, 2016, and shall expire at midnight on June 30, 2019.

2.      <u>Terms</u>:  The agreement will continue all terms and conditions of the 2013-16 High Rise Agreements ("Expired CBA") between Local 282 and the Building Contractors Association and between Local 282 and the Contractors' Association of Greater New York, except with those modifications reflected below.

3.      <u>On-Site Stewards</u>:
Position will be eliminated and Section 26 will be modified to reflect the terms stated in Paragraph 4 of this MOA.  No On-Site Stewards employed as of June 30, 2016 shall be laid off as a result of the modifications to Expired CBA Section 26.  On-Site Stewards employed as of June 30, 2016 will continue their employment as On-Site Steward under the terms and conditions of the Expired Collective Bargaining Agreement for the duration as specified in Section 26 of the Expired CBA.  Economic increases in accordance with Paragraph 7 of this MOA shall apply to such On-Site Stewards.

4.      <u>New Section 26 - Site Coordinator</u>

     a.      A single Site Coordinator shall be employed where an employer is contracted to be responsible for construction work on a construction site as an owner, general contractor, prime contractor, subcontractor, or construction manager in accordance with the following employment thresholds.  The role of the Site Coordinator shall include, but are not limited to, the dispatch and coordination of traffic, including operations at the load docks or other designated areas, the receiving and processing of building and construction material at the project site, distribution of all materials received on the project site in addition to other roles assigned by the Employer subject to approval by the Union.

     b.      Site Coordinator shall be appointed by the Union.  The Site Coordinator in addition to the work assigned by the Employer shall function as the Steward on the project site.  The Site Coordinator shall handle all grievances involving the application of this Agreement on the project site.  The Site Coordinator shall be allowed a reasonable amount of time to conduct Union Business.

c.      Threshold for employment of a Site Coordinator shall be as follows:

1.      Commercial projects: Site Coordinator shall be employed on projects greater than 495,000 square feet from start of foundation until (8) eight months before end of construction as determined by the Employer's construction project schedule as amended from time to time, or when the project is completed.

2.      Residential/Hospitality projects subject to a Project Labor Agreement: Site Coordinator shall be employed on projects greater than 375,000 square feet as follows:

    a.    New Construction: From start of foundation until (8) eight months before end of construction as determined by the Employer's construction project schedule as amended from time to time, or when the project is completed.

    b.    Renovations: From start of project until (8) eight months before the end of construction as determined by the Employer's construction project schedule, as amended from time to time or when the project is completed. Where one Employer is performing Residential/Hospitality Renovation work for different tenants/owners at a single site, the square footage of each separate tenant's owner's project shall not be aggregated for the purpose of determining whether the Site Coordinator shall be employed under this section.

3.      Residential/Hospitality projects not subject to a Project Labor Agreement: No Site Coordinator shall be required.

4.      Façade only projects: No Site Coordinator shall be required.

5.      Core and Shell Commercial Renovation projects: Site Coordinator shall be employed on projects greater than 495,000 square feet from start of project until (8) eight months before the end of construction as determined by the Employer's construction project schedule, as amended from time to time or when the project is completed. Where one Employer is performing Core and Shell Commercial Renovation work for different tenants/owners at a single site, the square footage of each separate tenant's owner's project shall not be aggregated for the purpose of determining whether the Site Coordinator shall be employed under this section.

6.      Residential/Hospitality Renovation projects not subject to a Project Labor Agreement: No Site Coordinator shall be required.

7. Tenant work projects subject to a Project Labor Agreement: Site Coordinator shall be employed on projects greater than 375,000 square feet from start of project until (8) eight months before the end of construction as determined by the Employer's construction project schedule, as amended from time to time or when the project is completed. Where one Employer is performing Tenant work for different tenants/owners at a single site, the square footage of each separate tenant's owner's project shall not be aggregated for the purpose of determining whether the Site Coordinator shall be employed under this section.

8. Tenant work projects not subject to a Project Labor Agreement: No Site Coordinator shall be required.

9. Projects that are governed by either State or municipal prevailing wage laws (excluding Federal projects) that are not subject to a Project Labor Agreement: No Site Coordinator shall be required. The employer may self perform or hold general conditions contracts without the requirement to employ the Site Coordinator.

10. Projects that are governed by either State or municipal prevailing wage laws (excluding Federal projects) that are subject to a Project Labor Agreement: Site Coordinator shall be required on projects greater than 375,000 square feet from start of foundation until (8) eight months before end of construction as determined by the Employer's construction project schedule as amended from time to time, or when the project is completed.

11. Mixed Use Projects: Mixed Use projects shall be assigned to the commercial project threshold category c.1 when the percentage of commercial use floor area, as determine by the issued NYC DOB building permit, equals or exceed 40%.

12. Site Work: On site work only projects that are not part of a building project, the requirement to employ a Site Coordinator will be determined by Section 10, Paragraph B.1 of the GCA Heavy Construction and Excavating Contract Collective Bargaining Agreement. Duration of employment shall be mutually agreed upon by the Employer and Union at the beginning of the project.

d. NYC DOB issued permits shall be used to determine project areas in Section 26, Paragraph c.

e. Employer may utilize Paymaster with respect to Site Coordinator wages and benefits

f.    On jobs where no Site Coordinator is required, Employer <u>may</u> hire a Site Coordinator, selected by the employer, on a daily basis to perform tasks related to safety and transportation issues that Site Coordinator normally performs (*e.g.*, coordinate trucks and deliveries at the site, *etc.*).

g.    <u>Work Hours</u>

1.    Work hours shall be in accordance with CBA Section 7.

2.    For purposes of overtime assignments, Site Coordinator's work day shall begin when the first truck starts unloading or loading and shall finish when the last truck starts loading or unloading.

3.    Site Coordinator shall be employed on Monday-Friday during his regular work hours while there is any construction activity on the project site. On Saturday and Sunday, the Site Coordinator shall be employed when there is any transportation of construction or building material to, from or on the project site.

4.    Site Coordinator will only be paid for the verifiable hours worked on the project site. Disputes for failure to employ a Site Coordination shall be resolved using CBA Section 15 Trade Board procedures as administered by the Building Contractors Association.

5.    The Employer may use time clock or other electronic means to verify work hours of its employees. This includes Site Coordinator and other Teamsters employed by the employer under this agreement.

6.    The Site Coordinator shall <u>not</u> be entitled to overtime or premium pay for the following activities:

a.    Work performed by a utility outside the curb line.

b.    Work performed by a utility inside the curb line when there is no trucking.

c.    Pick-up or delivery of garbage or debris containers when the job is closed except for work performed under the GCA Agreement.

d.    Pick-up of concrete cylinders.

e    No trucking activities are scheduled whether or not the project is open and working.

f    Snow removal or other weather related activities provided the project is not working.

7.   It shall be a violation of this Agreement for the Employer not to inform the Site Coordinator of scheduled trucking activity taking place after hours or on weekends when the job is open and working, and not to promptly notify the Site Coordinator of trucking activity taking place after hours or on weekends when the job is open and working.  If the Union alleges that an Employer has so violated this Agreement, and the parties fail to informally resolve the alleged violation, the matter shall be resolved pursuant to Section 15(C).

h.   The Site Coordinator shall be subject to the direction and control of the Employer at all times.

i.   The Site Coordinator shall not deprive Employees on the Seniority List of the Employer, or any other Employer, of their normal work opportunities.  The Site Coordinator shall not be used for the transportation of materials between project sites of the Employer, without permission of the Union.

j.   The Employer responsible for the "core and shell" of the building shall employ the Site Coordinator until the termination of such Employer's obligation in accordance with the terms of this Agreement.

k.   With respect to Commercial Construction on which employment of a Site Coordinator is required (including Mixed Use Projects governed by the Commercial Construction threshold), if reasonably necessary for the Employer to bid effectively against competitors who are not required to provide the same or better terms and conditions of employment as are required under the terms of this Agreement, the Employer may, during the term of this Agreement, request that the Union agree to modify the required duration of employment of the Site Coordinator for the specific project. Any agreement(s) reached pursuant to this paragraph shall not be precedential, and shall not establish any modification to this Agreement for any other project. The Union agrees to respond to any such request in good faith and in a timely manner.

5.   <u>Local Deliveries/Work and Area Standards Preservation</u>:

a.   Employers to ensure the use of signatories to the applicable Local 282 industry CBA (or use of those who provide their drivers with wages, benefits and working conditions no less favorable than those in the applicable Local 282 industry CBA) for all ready-mixed concrete deliveries and dump truck hauling.

b.   It shall not be a violation of this agreement for deliveries or pick-up made by members of other International Brotherhood of Teamster Locals.

6.    <u>Economic Increase</u>: **3.0% per year**

    a.    Straight time increases of $2.675 per hour each July 1 of the contract's term, to be allocated among wages and benefits

    b.    Increase includes actuarially required increases for Welfare Fund

7.    <u>Duration</u>:  3 Years (through June 30, 2019)

8.    <u>Most Favorite Nation Clause</u>:  CBA Section 34 shall be fully applicable to this agreement.

9.    <u>Grievance procedures</u>:  CBA Section 15 grievance procedures as administered by the Building Contractors Association shall be fully applicable to this agreement.

10.    <u>Industry Advancement Program</u>:  Modify the first sentence of Section 19 (Industry Advancement Program) to provide "The Employer (including both BCA members and independents) shall pay Fifty Cents ($.50) per hour for each hour of employment of Teamsters to the Building Contractors Association Industry Advancement program."

11.    **BCA**:  Execution of this Agreement by the BCA binds its members whose names appear on the attached list to its terms.

12.    <u>Ratification</u>:  This Agreement is subject to ratification by the members of the Union.

13.    <u>Agreement offered to others</u>:  The Union at its sole discretion may offer this agreement to other trade associations and contractors.

14.    <u>Facsimile</u>:  For purposes of execution of this Memorandum of Agreement, facsimile signatures shall be treated as originals.

Dated this ___ of June, 2016                 Dated this ___ of June, 2016

**FOR BUILDING CONTRACTORS'**          **FOR INTERNATIONAL BROTHERHOOD**
**ASSOCIATION, INC.**                  **OF TEAMSTERS LOCAL 282**

_____             _____
Paul J. O'Brien                         Thomas Gesualdi
Managing Director, BCA            President, IBT Local 282

Rc7 5-19-2018

TEAMSTERS LOCAL 282 -IN'S-

AMBASSADOR CONSTRUCTION
ANDREW JAMES INTERIORS, INC.
ARI PRODUCTS, INC.
BARR & BARR, INC.
BLUEHILL CONSTRUCTION, INC.
BROAD CONSTRUCTION (REINFORCED)
C & L CONTRACTING CORP.
CALVIN MAINTENANCE
CIROCCO & OZZIMO, INC.
CITNALTA CONSTRUCTION CORP.
CLK CONSTRUCTION CO., INC.
COMMERCIAL PAYROLL, INC.
COMMODORE CONSTRUCTION CORP.
COMPLETE CONSTR. CONTRACTING CORP.
CONSTRUCTOMICS
CREATIVE CONSTRUCTION SERVICES CORP
CROSS, NY
D'APRILE
DAVE OSBORNE CONSTRUCTION CONTRACTING, INC.
DFL CARPENTRY, INC.
DOLMEN DESIGN GROUP
DRILL CONSTRUCTION CO., INC.
EARTH CONSTRUCTION CORP.
ECO SPECIALTIES, LLC
ELITE INTERIOR SYSTEMS, INC.
EMPIRE OFFICE, INC.
EUROTECH CONSTRUCTION CORP.
EXECUTIVE TRIM, LLC
EXTERIOR WALL + BUILDING CONSULTANTS, INC.
SCIAME CONSTRUCTION
FCR CONSTRUCTION SERVICES, LLC
FINALY GENERAL CONTRACTING CORP.
FRATCO CONSTRUCTION CORP.
GANTER INTERIORS, INC.
GEM ATLAS CARPENTRY CORP.
GLENWOOD MANAGEMENT SERVICES, INC.
GSR CONCRETE TOV, LLC
H.R.A.D. CONSTR. CO., INC.
HI TECH DATA FLOORS, INC.
IANELLI CONSTRUCTION CO., INC.
JAK CONSTRUCTION SERVICE, LLC
JOYCE INTERIORS, INC.
KAFKA CONSTRUCTION, INC.
KEL-TECH CONSTRUCTION CORP.
KEYSTONE CONSTRUCTION &DEVELOPMENT, INC.

KMF CONSTRUCTION, INC.
LEED INSTALLATIONS, INC.
LINEAR CONTRACTING, INC.
THE MANHATTAN COMPANY OF NEW YORK
MBI GROUP, INC.
M.D.F. CONTRACTING CORP.
METRO FURNITURE DELIVERY (D/B/A FITCO)
MILLENNIUM CONTRACTING
NATIONAL ENVIRONMENTAL SAFETY CO., INC.
NAVILLUS CONTRACTING, INC.
NEW YORK CITY ACOUSTICS, INC.
NIKHI CONTRACTING CORP.
PHOENIX INTERIOR CONTRACTING CO INC
PM CONTRACTING COMPANY, INC.
PRISTINE SERVICES, INC.
RAISED COMPUTER FLOORS, INC.
R.C. BAAS CONSTRUCTION CORP.
RC DOLNER
REGIONAL FURNITURE SYSTEMS
REVAL SOLUTIONS, INC.
ROBERT HINDMAN, INC.
SKYLINE INDUSTRIES, LLC
SMEG CORPORATION
SWEENEY & HARKIN CARPENTRY & DRYWALL
TANGENT CONSTRUCTION
TDX CONSTRUCTION CORPORATION
TECHNO ACOUSTIC HOLDINGS, LLC
THE URBAN GROUP, LTD.
TOPROCK INTERIORS, INC.
TRIDENT INSTALLATIONS, INC.
VRH CONSTRUCTION CORP.
WDF, INC.
WETZEL CONSTRUCTION
WILLCO
WOODSTOCK FINISHES, INC.
YORKE CONSTRUCTION CORPORATION
ZARKIN, INC.

# MEMORANDUM OF AGREEMENT
### between the
## BUILDING CONTRACTORS' ASSOCIATION, INC.
### and the
## INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 282

The Building Contractors' Association, Inc. ("BCA") and the International Brotherhood of Teamsters Local Union No.282 ("Local 282") hereby enter into a Collective Bargaining Agreement ("Agreement") which will take effect on July 1, 2013. BCA and Local 282 agree as follows:

1.   Agreement: The BCA and Local 282 shall execute a three year collective bargaining agreement which shall be effective as of July 1, 2013, and shall expire at midnight on June 30, 2016.

2.   Terms: The terms of the Agreement shall be the same as the terms of the agreement between the parties that expired on June 30, 2013 ("Expired Agreement"), except for necessary modifications in dates and except as specified below.

3.   Wages/Benefits: Modify appropriate sections to increase wages and benefits (to be allocated by the Union) as follows:

| Effective | Per Hour |
|-----------|----------|
| July 1, 2013 | $5.25* |
| July 1, 2014 | $2.50 |
| July 1, 2015 | $2.50 |

*This increase includes a buy-out of the start time which shall be determined at a pre-job conference.*

4.   Start Time: Modify SECTION 6(B), "HOURS OF WORK AND OVERTIME," to read:

> "Starting time shall be between 7:00 a.m. or 8:00 a.m.; the precise start time for a particular project shall be established at a pre-job conference between the Union and the Employer. Each Employee must be at the job site no later than the established starting time and must remain at the job site performing his assigned tasks until quitting time. Work in excess of eight (8) hours in any one day shall be paid for at the overtime rate, to be computer in one-half (1/2) intervals."

5.   Special Shifts: Modify SECTION 6, "HOURS OF WORK AND OVERTIME," by deleting subsection (C), SPECIAL SHIFTS," in its entirely and replacing it with the following:

> "(C) SHIFT WORK. The Union and the Employer shall agree on start times for work requiring more than one shift. On projects with two shifts, each assigned OSS shall work eight hours with an unpaid 1/2 hour lunch break. On projects with three shifts, the

Confidential                                                    Local 282 Funds 000120

OSS assigned to the first shift shall work eight hours with an unpaid 1/2 hour lunch break (e.g., 7:00 a.m. to 3:30 p.m.); the OSS assigned to the second shift shall work seven and one-half hours and shall be afforded a paid 1/2 hour lunch break (e.g., 3:30 p.m. to 11:30 p.m.); the OSS assigned to the third shift shall work seven hours and shall be afforded a paid one-half hour lunch break (e.g., 11:30 p.m. to 7:00 a.m.); in addition the seventh hour of the third shift shall be paid at time and one-half the regular hourly rate of the OSS."

Subsection C.  "SPECIAL CONDITIONS STARTING TIME" shall be renumbered as subsection (C)(1) and the new paragraph, "SHIFT WORK" shall be numbered as subsection (C)(2).

6.   Debris Containers/Concrete Cylinders:  Modify SECTION 26, ON SITE STEWARDS, by deleting the last paragraph of subsection (C)(5) in its entirety, and replacing it as follows:

It shall be a violation of this Agreement for the Employer not to inform the OSS of scheduled trucking activity taking place after hours or on weekends when the job is open and working, and not to promptly notify the OSS of trucking activity taking place after hours or on weekends when the job is open and working. If the Union alleges that an Employer has so violated this Agreement, and the parties fail to informally resolve the alleged violation, the matter shall be resolved pursuant to SECTION 15, ARBITRATION, subsection(C).

7.   Residential/Hospitality Projects:  Add an additional subparagraph to SECTION 26, "RESIDENTIAL/HOSPITALITY" as follows:

"(1) On projects requiring the employment of an OSS that involve the construction of primarily residential units (i.e., more than 50 % of the total square feet of the project) and which are built in the Bronx, Queens, Kings or Richmond Counties, the OSS shall be employed from the start of construction until the end of construction pursuant to the present schedule in the Expired Agreement, with that total number of months reduced by 20%.

For example, where the total gross square footage of the structure to be constructed is 800,000 square feet and the duration of the project is 42 months, the OSS would be employed under the Expired Agreement from the start of construction until five months before the end of construction, or for 37 months (42-5=37). To reflect a 20% reduction in the length of time the OSS spends on such a project, the OSS would be employed from the start of construction until 12.4 months before the end of construction (42 -5 months=37 months less 20% = 29.6 months or 12.4 months prior to the end of constructions (42-29.6=12.4)).

Page 2 of 6

Confidential                                                                                    Local 282 Funds 000121

(2) On projects requiring the employment of an OSS that involve the construction of primarily residential units (i.e., more than 50% of the total square feet of the project) which are built in New York County and where the total square feet of the project is 750,000 square feet or less, the OSS shall be employed from the start of construction until the end of construction pursuant to the present schedule of the Expired Agreement, with that total number of months reduced by 20%.

For example, where the total gross square footage of the structure to be constructed is 700,000 square feet and the duration of the project is 42 months, the OSS would be employed under the Expired Agreement from the start of construction until five months before the end of construction, or for 37 months (42-5=37). To reflect a 20% reduction in the length of time the OSS spends on such a project, the OSS would be employed from the start of construction until 12.4 months before the end of construction (42 months -5 months = 37 months less 20% = 29.6 months or 12.4 months prior to the end of construction (42-29.6=12.4)

(3) On projects requiring the employment of an OSS that involve the construction of primarily hospitality units (i.e., more than 50% of the total square feet of the project), the OSS shall be employed from the start of construction until the end of construction pursuant to the present schedule in the Expired Agreement, with that total number of months reduced by 20%.

For example, where the total gross square footage of the structure to be constructed is 800,000 square feet and the duration of the project is 42 months, the OSS would be employed under the Expired Agreement from the start of construction until five months before the end of construction, or for 37 months (42-5=37). To reflect a 20% reduction in the length of time the OSS spends on such a project, the OSS would be employed from the start of construction until 12.4 months before the end of construction (42months -5 months = 37 months less 20% = 29.6 months or 12.4 months prior to the end of construction (42-29.6=12.4)).

8.   Scan In/Scan Out: Add new section SCAN IN/SCAN OUT (and renumber subsequent selections) as follows:

"The Employer may require each OSS to indicate the time that he/she reports for work and leaves work at the end of the work day by scanning an Employer-issued electronic identification card/badge or by some equivalent method."

Page 3 of 6

9.   New York Plan for the Settlement of Jurisdictional Disputes: Modify Section 16, "JURISDICTIONAL DISPUTE RESOLUTION PROCEDURE" to delete all references to the New York Plan for the Settlement of Jurisdictional Disputes. The subsections shall read as follows:

>    (C) In the event a dispute arises between the Union and another construction union over their respective rights to perform work under the direction and control of the Employer, the Union shall attempt to resolve the dispute through informal discussions.

>    (D) In the event the dispute cannot be resolved informally, the Union may elect to initiate or participate in a formal dispute resolution procedure. Both unions must inform the Employer in writing that they are referring the dispute for formal resolution and that each agrees to abide by the result without further appeals. If the Union thus informs the Employer, the Employer shall take whatever action is necessary to implement a formal resolution of the jurisdictional dispute."

10.   Drug and Alcohol Testing: Add new section DRUG AND ALCOHOL TESTING (and renumber subsequent sections), as follows:

>    "Effective July 1, 2013, the parties agree to administer a mutually agreeable drug and alcohol testing procedure. The Parties to this Agreement have agreed to participate in a Department of Transportation-approved drug testing program that is administered by a certified independent service and is funded by the Local 282 Welfare Fund. The program shall remain in full compliance with all Department of Transportation regulations. The Employers covered by this Agreement may require that their employees covered under this Agreement submit to drug testing in accordance with the regulations of the Department of Transportation.

>    The Parties further agree that as part of this program, a traveling collection facility will be available to be utilized by Employers whose Employees are required to be tested by this Agreement.

11.   Paid Sick Leave Waiver: Add a new section PAID SICK LEAVE WAIVER (and renumber subsequent sections), as follows:

>    "Local 282, on behalf of all Local 282-represented OSS's employed under this Agreement, waives any right or entitlement they may have for paid sick leave pursuant to any city, state, or federal law or regulation."

12.   OSS Desk and Telephone: Modify SECTION 26(C)(4) by deleting all references to telephones and beepers.

Confidential                                                                                    Local 282 Funds 000123

13.    <u>OSS Regular Work Day</u>:  Modify the first paragraph of SECTION 26(C)
(5) to reflect the start times listed in Item #4 above.

14.    <u>Check-Off</u>: Modify SECTION 20, "CHECK-OFF," to read as follows:

>   "Effective July 1, 2013 the Employer agrees to deduct from the wage
>   rate of each Employee covered by this Agreement and to pay to the
>   Union after proper execution by each Employee of an
>   authorization form which form shall be furnished by the Union to
>   the Employer, the sum of One Dollar and Sixty Five Cents ($1.65)
>   *for each hour worked at the straight time rate, excluding holiday pay and paid
>   bereavement leave. ... .*" (Emphasis added).

15.    <u>Fringe Benefit Fund Contributions</u>:  Modify SECTION 17, "WELFARE, PENSION,
ANNUITY AND JOB TRAINING TRUST FUNDS," by adding a new subsection as
follows:

>   "For the purposes of this SECTION 17, "hours worked" shall
>   include hours worked at the straight time rate and shall NOT
>   include holiday pay and paid bereavement leave. 'Hours paid' shall
>   include holiday pay and paid bereavement leave."

16.    <u>Industry Advancement Program</u>: Modify SECTION 19, "INDUSTRY ADVANCEMENT
PROGRAM," by adding the following sentence to the end of the paragraph:  "For the
purposes of this Section 19, 'the total amount paid per hour in wages and fringe benefits'
shall include holiday pay and paid bereavement leave."

17.    <u>Renovations</u>:  Modify SECTION 26 (3), "RENOVATIONS," by deleting the last sentence
of paragraph 3 of subsection (A)(3) which currently reads "The provisions of this
paragraph shall apply to all projects beginning after July 1, 1999."

Modify subsection (D), which currently reads: "No OSS employed as of July 1, 2005 shall
be laid off as a result of any change to any provision of this Sections, as it existed on June
30, 2008" by deleting it in its entirety.

18.    <u>Heavy Construction Work</u>:  Add a new to provide for work covered under the GCA
Agreement as follows:

>   If the Employer performs work as a heavy construction or
>   excavating contractor, then the Employer, when performing such
>   work shall comply with the provisions contained in the Local 282
>   New York City Heavy Construction & Excavating Contract,
>   except that if the Employer is performing such work in either
>   Nassau or Suffolk County, then the Employer shall comply with
>   the provisions of the Nassau/Suffolk Heavy Construction and
>   Excavating Contract.  The New York City Heavy Construction
>   and Excavating Contract and the Nassau/Suffolk Heavy
>   Construction & Excavating Contract are incorporated herein by
>   reference.

Page 5 of 6

Confidential                                                                                    Local 282 Funds 000124

19.   Paymaster: Add a new subsection D to SECTION 18, SURETY BOND, as follows:

In the event that the Employer is required to utilize a Paymaster, then it shall only use a Paymaster: (1) that is bound or agrees to be bound to the surety bond provisions of this Agreement, and (2) thereafter remains in compliance with those provisions.   In the event the Paymaster is delinquent in payment of contributions to the Fringe Benefit Funds, the Employer, upon written notice from the Union or Funds, shall withhold such delinquent sums from payments owed to the Paymaster with respect to the affected job, and upon request of the Union or Funds provide written notice confirming such withholding. Such notice from the Funds or the Union shall indicate the sums owed by the Paymaster for work performed at the specified site of the Employer, and the Employer shall be required only to withhold sums owed by the Paymaster for work performed at that specific site.   The Paymaster, by this Agreement, authorizes the withholding of these sums and further authorizes the Employer to pay such delinquent amounts directly to the fringe Benefit Funds.

20.   Ratification: This Agreement is subject to ratification by the members of the Union.

21.   BCA: Execution of this Agreement by the BCA binds its members whose names appear on the attached list to its terms.

22.   Facsimile: For purposes of execution of this Memorandum of Agreement, facsimile signatures shall be treated as originals.

Dated this 21st of May, 2013

FOR BUILDING CONTRACTORS' ASSOCIATION, INC.

Paul J. O'Brien
Managing Director, BCA

Dated this ___ of May, 2013

FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 282

Thomas Gesualdi
President, IBT Local 282



Page 6 of 6

Confidential                                                                              Local 282 Funds 000125



## LOCAL 282

*Welfare, Pension, Annuity, Job Training, Vacation & Sick Leave Trust Funds*

*2500 Marcus Avenue ▪ Lake Success, New York 11042-1018 ▪ (516) 488 2822 ▪ (718) 343 3322 ▪ (516) 488 4490 Fax*

Union Trustees

Thomas Gesualdi
Louis Bisignano
Anthony D'Aquila
Michael O'Toole
Benny Umbra

Employer Trustees

Frank H. Finkel
Joseph A. Ferrara Sr.
Marc Herbst
Denise Richardson
Thomas Corbett

### HIGH RISE - B.C.A., C.A.G.N.Y.
### AND INDEPENDENTS

Reporting Instructions for July 1, 2013 to June 30, 2016

❖ WELFARE - Each hour worked, Monday to Friday up to a maximum of forty (40) hours plus a maximum of eight (8) hours for each day for work performed on Saturday and Sunday. Hours worked shall include hours worked at the straight time rate and shall <u>NOT</u> include holiday pay and paid bereavement leave.

❖ PENSION - Each hour worked, Monday to Friday up to a maximum of forty (40) hours plus a maximum of eight (8) hours for each day for work performed on Saturday and Sunday. Hours worked shall include hours worked at the straight time rate and shall <u>NOT</u> include holiday pay and paid bereavement leave.

❖ ANNUITY - All hours paid, which includes all straight time and/or premium time hours. For each hour paid at the premium rate, the Employer will make the contributions at the applicable premium rate.

❖ JOB TRAINING - Each hour paid for, up to a maximum of forty (40) hours per employee per week.

hr – 301/03
6/10/13



4/29/13

### B.C.A. MEMBERS THAT HAVE DESIGNATED THE ASSOCIATION AS THEIR BARGAINING AGENT WITH TEAMSTERS LOCAL 282



RECEIVED
APR 2 9 2013

1

Confidential

APR 29 2013





2

Confidential

Local 282 Funds 000269

APR 29 2013



3

Confidential

APR 2 9 2013

Local 282 Funds 000270



APR 2 9 2013

APR 2 9 2013

Confidential

4

Local 282 Funds 000271



RECEIVED

APR 2 9 2013

5

APR 29 2013



ₑₙT

6

RECEIVED
APR 2 9 2013

Confidential

APR 29 2013



NAVILLUS TILE, INC.
(D.B.A. NAVILLUS CONTRACTING & D.B.A.
NAVILLUS GENERAL CONTRACTORS)
575 FIFTH AVENUE – 29TH FLOOR
NEW YORK, NY 10017
DONAL O'SULLIVAN – PRESIDENT
(212) 750-1808 FAX (212) 750-4015

RECEIVED
APR 2 9 2013

7

APR 29 2013



RECEIVED
APR 2 9 2013

8

Confidential

Local 282 Funds 000275

APR 29 2013



T

R.

RECEIVED
APR 2 9 2013

9

APR 29 2013





10

Confidential

# Exhibit "B"

ISRAEL GOLDOWITZ
Chief Counsel
CHARLES L. FINKE
Deputy Chief Counsel
MICHAEL C. MILLER
Assistant Chief Counsel
LORI A. BUTLER
DAMARR M. BUTLER
Attorneys
Pension Benefit Guaranty Corporation
Office of the Chief Counsel
1200 K Street, N.W., Suite 340
Washington, D.C.  20005-4026
Ph:  202-326-4020, ext. 3723
Fax: 202-326-4112
E-mails:  butler.lori@pbgc.gov *and* efile@pbgc.gov


# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JOURNAL REGISTER COMPANY et al.,[1] | ) | Case No. 12-13774 (SMB) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Hearing Date:  December 20, 2012  10:00 am** |
| | ) | **Response Deadline: December 14, 2012  4:00 pm** |
| | ) | |
| | ) | |
| | ) | |
| | ) | **Ref. Docket No. 199** |

---

[1]       The Debtors in these Chapter 11 cases, along with the last four digits of each of the Debtors' tax identification numbers, are: Journal Register Company (8615), Register Company, Inc. (6548), Chanry Communications Ltd. (3704), Pennysaver Home Distributions Corp. (9476), All Home Distribution Inc. (0624), JR East Holdings, LLC (N/A), Journal Register East, Inc. (8039), Journal Company, Inc. (8220), JRC Media, Inc. (4264), Orange Coast Publishing Co. (7866), St. Louis Sun Publishing Co. (1989), Middletown Acquisition Corp. (3035), JiUS, Inc. (3535), Journal Register Supply, Inc. (6546), Northeast Publishing Company, Inc. (6544), Hometown Newspapers, Inc. (8550), The Goodson Holding Company (2437), Acme Newspapers, Inc. (6478), 21st Century Newspapers, Inc. (6233), Morning Star Publishing Company (2543), Heritage Network Incorporated (6777), Independent Newspapers, Inc. (2264), Voice Communications Corp. (0455), Digital First Media Inc. (0431), Great Lakes Media, Inc. (5920), Up North Publications, Inc. (2784), Greater Detroit Newspaper Network, Inc. (4228), Great Northern Publishing, Inc. (0800), and Saginaw Area Newspapers, Inc. (8444).  The mailing address for each of the Debtors is Lower Makefield Corporate Center, 790 Township Road, 3rd Floor, Yardley, PA 19067.

**PENSION BENEFIT GUARANTY CORPORATION'S LIMITED OBJECTION AND
RESERVATION OF RIGHTS TO DEBTORS' MOTION FOR ORDERS
(A) ESTABLISHING BIDDING PROCEDURES IN CONNECTION WITH
SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, (B) APPROVING
THE FORM AND MANNER OF NOTICES, (C) SETTING A SALE HEARING,
(D) AUTHORIZING THE SALE OF THE ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS, (E) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (F) GRANTING RELATED RELIEF
("BIDDING MOTION")**

The Pension Benefit Guaranty Corporation ("PBGC"), an agency of the United States Government and a creditor in the above-captioned case, hereby objects to Debtors' Bidding Motion and reserves its right to object to any final Sales Order.   The procedures set forth in the Bidding Motion fail to take into account that a prospective bidder may wish to assume the defined benefit pension plan sponsored by Debtors.  Assumption of the pension plan may reduce claims against the Debtors' estates, and provide benefits to a successful bidder.  However, the Bidding Procedures fail to provide that the Debtors should appropriately value a bid that assumes the pension plan. In addition, the proposed timing of the sales process does not facilitate a competitive auction process that maximizes value to the Debtors' estate.  The marketing period is held over the December holidays and the sales hearing is scheduled for January 25, 2013.  The selling period and the sales hearing should be extended for at least a month or two.  Finally, because the proposed sale  involves insiders subject to heightened scrutiny and neither the identity of the successful bidder, nor the terms of its bid, are now before the Court, PBGC reserves its rights to object to any sale motion at the appropriate time.

**PRELIMINARY STATEMENT**

1.       Journal Register East, one of the Debtors, is the sponsor of the Journal Register Company Retirement Pension Plan ("Pension Plan" or "Plan").  There are approximately 4,242 participants of the Pension Plan, and PBGC estimates that it is underfunded by approximately

$79 million.  PBGC is the statutory guarantor of retirement benefits promised to participants of the Pension Plan.

2.      The Pension Plan is facing termination if the Pension Plan is not assumed by an asset buyer.  Alden Global Capital (together, with its non-Debtor affiliates, "Alden"), and the Debtors, through its affiliates acting in various roles, have structured this proceeding, seeking to ensure that the pension plan is abandoned, and that  PBGC – the agency that will protect pension plan participants abandoned by Alden – is left without  any meaningful recovery on its loss.

3.    Alden holds the equity and the pre-petition debt of Journal Register, and its affiliate is now acting as the stalking horse bidder.  In exchange for its credit bid and little cash, Alden seeks to buy all of the Debtors' productive assets, by means of a credit bid, ensuring that while certain creditors beneficial or useful to Alden are paid in full, other creditors such as PBGC are left with an estate that has minimal assets. Alden's stalking horse bidder will likely continue Journal Register's operations by using the same facilities, equipment, intellectual property, and Journal Register names and other intellectual property, and produce the same newspapers.

## STATUTORY BACKGROUND AND PBGC

4       The Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code with this Court on September 5, 2012.

5.      PBGC is a wholly owned United States government corporation established by section 4002 of the Employee Retirement Income Security Act, *as amended* ("ERISA"), 29 U.S.C. § 1302, to administer the pension plan termination insurance program established by Title IV of ERISA.  PBGC guarantees nonforfeitable pension benefits under defined benefit pension plans covered by Title IV of ERISA up to certain statutory limits.  29 U.S.C. § 1322.

6.      Debtor Journal Register East, Inc. sponsors the Pension Plan, which is a single-employer defined benefit pension plan covered by Title IV of ERISA.  The Pension Plans

provide retirement benefits for approximately 4,242 of Debtors' current and former employees and their beneficiaries.

7.      The Debtors and each member of their controlled group are jointly and severally responsible for liabilities that may be owed to PBGC or the Pension Plan.  29 U.S.C. §§ 1082(c)(11), 1301(a)(14), 1307(e)(2), and 1362(a).[2]

8.       The Debtors have not made the required contributions under ERISA § 302, 29 U.S.C. § 1082, and Internal Revenue Code ("I.R.C.") § 430, 26 U.S.C. § 430, for the Pension Plan due April 15, 2012, July 15, 2012, September 15, 2012, and October 15, 2012.

9.      The exclusive means of terminating a pension plan are through a (1) a standard termination, 29 U.S.C. § 1341; (2) a distress termination, 29 U.S.C. § 1341(c); or (3) a PBGC initiated termination, 29 U.S.C. § 1342.[3]  Debtors have made no effort to initiate termination of the pension plan under the voluntary termination procedures under ERISA, 29 U.S.C. § 1341(a), (c), and apparently intend to leave the pension plan with the non-operating debtor.  The termination of the pension plan would then become a forgone conclusion.

10.     PBGC estimates the underfunding of the Pension Plans to be about $79.8 million. If the Pension Plan terminates, PBGC's claims against Debtors' may exceed this amount.  PBGC is the Debtors' largest unsecured creditor.

---

[2]      A group of trades or business under common control, referred to as a "controlled group," includes, for example, a parent and its 80% owned subsidiaries.  Another example includes brother-sister groups of trades or business under common control.  *See* 29 U.S.C. § 1301(14)(A), (B); 26 U.S.C. § 414(b), (c); 26 C.F.R. §§ 1.414(b)-1, 1.414(c)-1, 1.414(c)-2.

[3]      *See Hughes Aircraft Co. v. Jacobsen*, 532 U.S. 432, 446-48 (1999).

**OBJECTIONS**

A.   **The Bidding Procedures Should Be Modified To Encourage Assumption Of The Pension Plan.**

11.   The APA and the proposed Sale Order makes it clear that the pension plan will not be assumed.  However, continuing the Pension Plan can benefit the Debtors' estates and their creditors, because plan continuation would avoid PBGC's large claims for the Pension Plan's liabilities.  Additionally, assumption of the Pension Plan often can improve employee morale and efficiency.  Accordingly, the Debtors should encourage bidders to assume the Pension Plan, or at the very least disclose sufficient information regarding the Pension Plan to allow prospective bidders to submit informed and competitive bids.  To do so, the Debtors should make two modifications to the Bidding Procedures.

12.   The procedures should require all bidders to explicitly state in their bids whether they intend to assume the Pension Plan.  Second, the bidding procedures should provide that in determining the successful bid to be submitted to the Court for approval, the Debtors will give credit for the value of the liabilities associated with the Pension Plan that the bidder agrees to assume.  Accordingly, the bidding procedures should not establish a minimum cash amount, but provide that the successful bid for the Debtors' assets should be the one that provides the greatest total amount of consideration to the Debtors, including any pension liabilities transferred to the purchaser.  *See* Attachment A.

13.   Additionally, PBGC requests that the Debtors provide to PBGC copies of all Qualified Bids.  PBGC requests that any successful bidder who proposes to assume the Pension Plan provide sufficient information for the agency to assure itself of the bidder's financial ability to maintain the Pension Plan.

### B. The Proposed Timing Of The Sales Process Does Not Facilitate A Competitive Auction Process That Maximizes Value To The Debtors' Estate

14.     PBGC objects to the rushed schedule for bidding and approval of the sale.  "The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997); *In re Reading Broad., Inc.*, 386 B.R. 562, 575 (Bank. E.D. Pa. 2008).  Indeed, the Debtors have a fiduciary duty to establish bidding procedures and a sale process which will "maximize value to the estate." *In re Metaldyn Corp.*, 409 B.R. 661, 668 (Bankr. S.D.N.Y. 2009).

15.     If the Bidding Procedures are approved at the December 20 hearing, potential bidders have less than 30 days -- until January 18, 2012, the Bid Deadline -- to submit a bid. Bidding Procedures ¶ 3.  Potential bidders may not have enough time to adequately develop a competitive bid during that time period, since this marketing period is over the holidays.  This truncated schedule may have a chilling effect on the auction process.  Unless the Court extends the times provided in the bidding procedures, the sale process may not be competitive enough to maximize value to the estate for the benefit of the Debtors' creditors.

### C. PBGC Reserves Its Right To Object To Any Final Sales Order

16.     The Debtors have attached to the APA a form of a Sales Order, and have requested approval of both the APA and the attachments.  However, Debtors admit that ". . . members of the board of directors of the Debtors are affiliated with Alden and, as a result, are also affiliated with the proposed Purchaser." Bidding Motion ¶ 5.  As an insider, the proposed Purchaser may have the ability to influence the sale process improperly, to the detriment of the

creditors. As such, the transaction is subject to heightened scrutiny.[4]

17.    Further, the Debtors contend that the proposed Purchaser, an insider, will not

purchase the assets without a successor liability finding. Bidding Motion, p.13; proposed Sale

Order, at Exh. B, ¶¶ S, 7, 21-24. According to Debtors, the insider, with a credit bid of

$117,500,00, will not purchase the Debtors' assets, which include cash, accounts receivable, IRS

tax refunds, real property and intellectual property, unless PBGC, with ERISA pension plan

claims of over $79,000,000, is enjoined from any attempt to assert liability regarding the Pension

Plan against the insider. Successor liability, and similar claims against non-debtor third party

buyers are based on the particular facts and circumstances surrounding the sale and the asset

purchaser.[5] Neither the identity of the successful bidder, nor the terms of its bid, are now before

the Court, and thus, a ruling on successor liability is premature and not ripe for judicial decision.

18.    Accordingly, PBGC reserves its rights to object to any Sales order at the

appropriate time, i.e., the Sales hearing.

---

[4]    *See Crown Vill. Farm, LLC v. Arl. LLC (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93
(Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the
Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v.
Comm. Of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823
(W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to
rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good
faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation
and those with interests therein.") *See also Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)
(insider dealings with corporation require "rigorous scrutiny," "inherent fairness from the
viewpoint of the corporation and those interested therein," and "under all the circumstances the
transaction carries the earmarks of an arm's length bargain.")

[5] *See R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 635-36 (S.D.N.Y.
1995)(describing the extremely fact-intensive nature of successor liability claims); *see also
Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v.
Tasemkin*, 59 F.3d 48, 49-51 (7th Cir. 1995); *Anderson v. J.A. Interior Applications, Inc.*, 1998
WL 708851, *5 (N.D. Ill. 1998).

## CONCLUSION

For the foregoing reasons, PBGC requests that the procedures set forth in the Bidding

Motion be modified as stated above.  In addition to the reservation of rights stated above, and if

the Pension Plan terminates, PBGC also reserves its rights to request from Debtors, the proposed

Purchaser or Prevailing Bidder copies of all pension and personnel records for participants in the

Pension Plan.


DATED:  December 14, 2012                    Respectfully submitted,
         Washington, D.C.

                                             /s/ Lori A. Butler
                                             ISRAEL GOLDOWITZ
                                             Chief Counsel
                                             CHARLES L. FINKE
                                             Deputy Chief Counsel
                                             MICHAEL C. MILLER
                                             Assistant Chief Counsel
                                             LORI A. BUTLER
                                             DAMARR M. BUTLER
                                             Attorneys
                                             Pension Benefit Guaranty Corporation
                                             Office of the Chief Counsel
                                             1200 K Street, N.W., Suite 340
                                             Washington, D.C.  20005-4026
                                             Ph:  202-326-4020, ext. 3723
                                             Fax: 202-326-4112
                                             E-mails:  butler.lori@pbgc.gov *and*
                                             efile@pbgc.gov

# ATTACHMENT A

ATTACHMENT A

PBGC proposes the following language to be added to the Bidding Procedures:

Debtor Journal Register East, Inc., sponsors a single-employer defined benefit pension plan, the Journal Register Company Retirement Plan (the "Pension Plan"). The Pension Plan provides retirement benefits for approximately 4,242 of Debtors' employees and their beneficiaries. All Qualified Bids may be a combination of cash and certain assumed obligations, including obligations with respect to the Pension Plan. In determining a successful bidder, the Debtors shall consider any bid that assumes the liabilities of the Pension Plan and give credit for the value of the liabilities under the Pension Plan that the bidder agrees to assume. Last, Debtors shall provide to PBGC copies of all Qualified Bids that propose to assume the Pension Plan and such bidders shall provide sufficient information for the Pension Benefit Guaranty Corporation to assure itself of the bidder's financial ability to maintain the Pension Plan.